**FILED**
**ASHEVILLE, N.C.**

**JUN 1 2 2017**

**U.S. DISTRICT COURT**
**W. DIST. OF N.C.**

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

GREGORY G. ARMENTO,
              Plaintiff, Pro Se,

vs.

ASHEVILLE BUNCOMBE COMMUNITY
CHRISTIAN MINISTRY, INC., et al.
              Defendant.

Civil Action No. 1:17-Cv-150

JURY TRIAL DEMANDED

## COMPLAINT

1.    The allegations set forth in this Complaint are based on information and belief that the Plaintiff, Gregory G. Armento believes to be true.

### PARTIES

2.    Now comes the Plaintiff, Gregory G. Armento (herein also referred to as "Plaintiff", or "Armento"), on his own behalf complains against the Defendant.

3.    The Plaintiff is a citizen of the United States, an honorably discharged U.S. Army Veteran, and at all times material hereto, the Plaintiff did and continues to be temporarily housed in a homeless shelter for Veteran's in Buncombe County, North Carolina. The Plaintiff's last residence of record was in Orlando, Florida.

4.    Asheville Buncombe Community Christian Ministry, Inc. ("Defendant", or "ABCCM") is a Charitable and Religious non-profit corporation, incorporated under the laws of the State of North Carolina, and is owned and operated by Christian congregations of Buncombe County (including their pastor affiliates) who are members of same organization, and under

1

the direction ABCCM Board of Directors at all times relevant and are collectively referred to as "Defendant".

5.      The Defendant is headquartered at 20 Twentieth Street, Asheville, NC 28806 (formerly, 30 Cumberland Avenue, Asheville North Carolina 28801), and at all times material hereto engaged in business in North Carolina.

6.      Additionally, Defendant's business interests are multi-faceted, whereas several businesses have been registered with the North Carolina Secretary of State, and share the entity name "Asheville Buncombe Community Christian Ministry" or "ABCCM", and/or, the same officer or Registered Agent or name "Scott B. Rogers", and/or, identify a business address that is known to be operating in the business interest of the Defendant at the time of the actions complained of, such as, but not limited to:

    a)  ABCCM Doctors' Medical Clinic, Inc., (Non-Profit);

    b)  Asheville-Buncombe Community Pharmacy, LLC., (Business: Retail Pharmacy);

    c)  Buncombe County Recycling Unlimited, Inc., (Non-Profit);

    d)  Buncombe Emergency Assistance Co-ordinating Network, Inc., (Non-Profit);

    e)  Interdenominational Ministerial Alliance Ministries, Inc., (Non-Profit);

    f)  Eye of The Storm, LLC., (Business: Time-Share Rental);

    g)  Hidden Treasures of the Carolinas, LLC., (Business: Retail);

    h)  Biltmore 15K Classic, Inc., (Non-Profit);

    i)  Advance Trucking Institute, LLC., (Business: Truck Driving School);

    j)  ABCCM Real Estate, LLC., (formed 4/17/2015 – destructed 4/15/2016).

Plaintiff is without the benefit of pre-trial Discovery and it is unknown as to what extent same businesses have benefited from the actions complained of herein.

## NATURE OF ACTION

7. This action seeks full and complete relief for:

    a) Wage Theft, Failure to Pay Minimum Wage and Overtime under Fair Labor Standards Acts ("FLSA") U.S.C. 29 § 206 Minimum wage, U.S.C. 29 § 207 Maximum hours; and under North Carolina Wage and Hour Act ("NCWHA") N.C.G.S. § 95-25.3 Minimum wage, and N.C.G.S. § 95-25.4 Overtime; and, interest at the legal rate set forth in N.C.G.S. § 24-1; and,

    b) Failure to Maintain Records under U.S.C. 29 § 211(c), Records; and N.C.G.S. § 95-25.13 Notification, posting, and records; and,

    c) Misclassification of Employee, under 29 CFR Part 541 and 29 CFR 541.2; and,

    d) Retaliation and Wrongful Termination 29 U.S. Code § 218c - Protections for employees, 29 U.S. Code § 215 - Prohibited acts, and N.C.G.S. § 95-241 Discrimination prohibited; and,

    e) Violations of North Carolina Common Law, Tort Law, Public Policy, for Duress, Undue Influence, Illegal Contracts; and Intentional Infliction of Emotional Distress; and,

    f) Violations of the Plaintiff's Constitutional Rights under U.S.C. 42 § 1981 - Equal rights under the law; U.S.C. 42 § 1983 - Civil action for deprivation of rights; 42 U.S. Code § 1988 - Proceedings in vindication of civil rights; and 42 U.S. Code § 1985 - Conspiracy to interfere with civil rights.

## JURISDICTION

8. The Court has jurisdiction in the matters complained of herein pursuant to 28 U.S.C. §1331

and 1343, and 29 U.S.C. § 216(b).

9.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

**VENUE**

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff did reside in this District at times material hereto, the Defendant is headquartered doing business in this District, the unlawful employment practices and the other violations of applicable laws were committed in this District.

**STATEMENT OF FACTS**

11.    Defendant promotes its brand of homeless services across state lines and through interstate television broadcasts, a website, events, U.S. Mail, telephone and fax communications, and other means:

    a) soliciting the public, homeless veterans, their families for business purposes; and

    b) soliciting businesses, Community Support Agencies, Law Enforcement Agencies, Governmental Agencies for business purposes; and

    c) soliciting cash donations from the general public, businesses, schools, ministries and other entities; and

    d) soliciting donations of goods and services from the general public, private businesses, schools, ministries and other entities for business purposes; and

    e) soliciting volunteers from the general public, businesses, schools, ministries and other entities for purposes of performing repairs, construction, facility upgrades and other purposes.

12.    The Defendant owns and operates the Veteran's Restoration Quarters ("VRQ"), a homeless

4

shelter formerly known as "A Vets Place", and is located at 1329 Tunnel Road, Asheville, NC 28805 and same address is a business address.

13. The Plaintiff and other sheltered residents are temporarily housed at the VRQ.

14. The Defendant is an authorized provider of U.S. Department of Veterans Affairs (VA) Homeless Providers Grant and Per Diem (GPD) Program (38 CFR Part 61, et. seq.), and a recipient of federal funding from the U.S. Department of Veterans Affairs, and other governmental agencies.

15. In the Defendant's VA GPD program application, the Defendant was asked to put forth a proposal of the Defendant's own design to address the needs of homeless veterans.

16. The Defendant is aware of the VA GPD program stated goal to "*help homeless Veterans achieve residential stability, increase their skill levels and/or income, and obtain greater self-determination*".

17. The Plaintiff is a sheltered resident of ABCCM's Veterans Restoration Quarters and a participant in the VA GPD program as provided by the Defendant.

18. The Defendant is paid a Per Diem rate as a provider of the VA GPD program for each night the Plaintiff is housed at the Defendant's VRQ shelter.

19. The Defendant has a fiduciary responsibility and bears the duties of a benefactor that extend from the VA GPD program to provide Veterans' benefits to the Plaintiff.

20. The Defendant has authority and control over Plaintiff, and same is demonstrated by Defendant requiring compliance to VRQ rules, policies, and restrictions that are not typical to a residential agreement or employer relationship, such as but not limited to: a monthly review of personal savings account balance, room assignment and room changes, roommate assignments and re-assignments, available in-room amenities, overnight passes,

5

off-campus curfew times, and disciplining.

21. The Defendant's authority and control over the Plaintiff includes admission to and expulsion from the VRQ, and termination of the Plaintiff's current Per Diem episode.

22. The Plaintiff is dependent on the Defendant for shelter, food, safety and other necessities.

23. The Defendant has designed and implemented a "Service Hours" program which requires sheltered residents to perform work activities necessary to the daily operation of the Defendant as per **Exhibit 01 – Service Hour Requirements.**

24. The Defendant's evaluation criteria for a sheltered resident's promotion and privileges includes consideration of the resident's Service Hour work performance.

25. Defendant does not offer or provide the Plaintiff a receipt on completion of Service Hours.

26. Defendant does not offer or provide the Plaintiff a monthly statement of completed Service Hours.

27. The Defendant does not offer or provide the Plaintiff a means of independently auditing his accrued Service Hours.

28. The Defendant has not stated a cash value to the Plaintiff for his Service Hours.

29. Defendant has implemented a Reward Points program as per **Exhibit 02 - Reward Points Program.**

30. The Plaintiff accrues Reward Points as a result of performing Service Hours.

31. Defendant does not offer or provide a receipt of accrued Reward Points on completion of Service Hours to the Plaintiff.

32. Defendant does not offer or provide the Plaintiff a monthly statement of accrued Reward Points.

33. Defendant does not offer or provide the Plaintiff a means of independently auditing his

accrued Reward Points.

34. Reward Points have no stated cash value.

35. The Defendant hires a limited number of sheltered residents as "formal employees", where "formal employee" is defined by: wages being paid to and taxes being withheld from said formal employee's paycheck.

36. Service Hours work activities performed by sheltered residents can be identical to work activities performed by paid formal employees, and can be performed at the same time.

## COUNT I
### Wage Theft by Service Hours,
### Failure to Pay Minimum Wage and Overtime,
### Failure to Maintain Records, Misclassification of an Employee as a Volunteer

37. Plaintiff re-alleges and reiterates the foregoing paragraphs as if contained herein.

38. The Plaintiff arrived at the VRQ shelter on September 2, 2015.

39. On the same day of arrival, the Plaintiff was interviewed during an meeting, and required to sign and date a form typified by **Exhibit 03 – Service Hours Intake Form,** and Plaintiff was required to make a choice of a Service Hours area in which he would prefer to perform work activities known as Service Hours; said Service Hours area choices included: Housekeeping, Maintenance, Kitchen, Computer Lab, or Front Desk. The Plaintiff selected the Computer Lab as per **Exhibit 02 - Reward Points Program.**

40. During said meeting the Plaintiff was not provided a detailed job description of each Service Hours work activity.

41. Defendant requires the Plaintiff to perform work activities identified as Service Hours.

42. The Plaintiff began work activities in the performance of Service Hours on or about September 4, 2015.

43. On said date, Plaintiff and other sheltered residents of the VRQ performed Service Hours

7

as laborers removing refuse from a building at 217 Coxe Avenue, Asheville, NC.

44. Defendant owned and sold same real property to a third party for $1.4 million.

45. Plaintiff's work activities for same day of refuse removal continues to be unpaid.

46. The Plaintiff was already employed as a VRQ Front Desk Manager and attending a Front Desk Manager's Meeting on Monday morning in November 2015; at that time the VRQ Front Desk Supervisor (VRQ FDS), Randy Gamble required a copy of any Front Desk Manager who had a driver's license.

47. After same meeting, the Plaintiff provided a copy of his Florida Driver's License to the VRQ FDS and began performing Duty Driver work activities in November 2015.

48. Plaintiff's Duty Driver work activities are necessary to the daily operation of Defendant.

49. The Defendant requires the Plaintiff to attend Duty Driver Meeting and same meetings are unpaid.

50. The Plaintiff's Duty Driver work activities are in fulfillment of required Service Hours.

51. The Defendant knowingly permits the Plaintiff to perform Duty Driver work activities known as Service Hours.

52. Defendant retained control, oversight, direction over the Plaintiff's Service Hour work activities, and provided the method, manner, and means to the Plaintiff to perform his Service Hours.

53. The Defendant's work related control over the Plaintiff's Service Hours includes but is not limited to: assigning tasks, scheduling, timekeeping, providing a vehicle, and disciplining.

54. When Plaintiff performs Service Hours work activities, he is a de facto employee of the Defendant.

55. Defendant requires the Plaintiff to perform Duty Driver Service Hours:

8

a) while "on duty" as per a schedule typified by **Exhibit 04 – VRQ Driver Schedule;**

b) while "waiting" on campus, but while waiting the Plaintiff is free to leave the VRQ campus and at any time, but he must return before to his assigned overnight curfew;

c) while "on-call" requiring him to remain on the VRQ campus during such times as Plaintiff's overnight curfew;

d) Plaintiff is required to keep a written record of each passenger van trip on forms unique to each passenger van as typified by **Exhibit 05 - Passenger Van Logs.**

56. If the Plaintiff fails to show up to perform scheduled Duty Driver Service Hours he is subject to disciplining.

57. Defendant has not offered or provide a contract or agreement to the Plaintiff stating his Service Hours work activities are in the capacity of a Volunteer.

58. Defendant has not offered or provide any contract or agreement to the Plaintiff stating his Service Hours work activities are in the capacity of an Independent Contractor.

59. Defendant has not offered or provide any Federal or State tax forms or ABCCM employment forms, handbook, or agreement to Plaintiff for Service Hours work activities.

60. Service Hours work activities performed by the Plaintiff are without cash or cash equivalent paid by the Defendant to the Plaintiff.

61. Defendant has failed to pay the Plaintiff a minimum wage or an applicable hourly rate for Duty Driver Service Hour work activities preformed up to 40 hours per work week, and failed to pay overtime wages for same work activities performed in excess of 40 hours per work week.

62. Defendant has failed to make, keep, and preserve accurate recordkeeping with regards to the Plaintiff's Service Hours, where same records would include:

a) record a wage rate or an cash equivalent;

b) total hours worked each workweek;

c) total daily or weekly or pay period regular-time earnings;

d) total overtime earnings for the workweek;

e) credits or deductions from the employee wages;

f) total wages or cash equivalent paid each pay period;

g) date of payment and the pay period covered by the payment.

63. Defendant willfully and routinely engaged in a pattern of practice resulting in a scheme designed to re-allocate the Plaintiff's unpaid wages and overtime pay in performance of Service Hours for the furtherance of the Defendant's benefit and gain.

64. The Defendant classifies the Plaintiff's work activities in his capacity of a Duty Driver as a volunteer.

65. Through events, publications, a website, and broadcasts the Defendant represents Service Hours work activities as "volunteer hours", and in doing so, the public has been deceived by the Defendant.

66. The Defendant required Service Hours work performance in liquidation of a debt or obligation wrongfully applied to the Plaintiff as a sheltered resident of the VRQ; and, has conspired to deprive the Plaintiff of his lawful compensation and rights.

67. Plaintiff has suffered damages in his capacity as a sheltered resident employed by the Defendant to perform Services Hours and thereby was deprived of wages and overtime compensation in accordance with the FLSA and NCWHA, or as provided for by applicable law, in amounts to be determined at trial. Plaintiff is entitled to recovery of such amounts, liquidated and statutory damages, nominal damages, declaratory relief,

injunctive relief, pre-judgment and post-judgment interest.

<u>**COUNT II**</u>
<u>**Wage Theft of a Formal Employee,**</u>
<u>**Failure to Pay Minimum Wage and Overtime,**</u>
<u>**Failure to Maintain Records, Misclassification of a Formal Employee as a Manager**</u>

68.     Plaintiff re-alleges and reiterates the foregoing paragraphs as if contained herein.

69.     The Plaintiff began training and accepting the duties and responsibilities of a VRQ Front Desk Manager on September 8, 2015 and stopped same duties and responsibilities on June 1, 2016, and said times are relevant to and frame the allegations in Count II.

70.     Defendant did hire the Plaintiff as a formal employee, where "formal employee" is defined by wages being paid and Federal and State taxes being withheld from paychecks paid to the Plaintiff by the Defendant as per **Exhibit 06 – Armento Paycheck 12-31-2015.**

71.     Plaintiff was hired and paid $9 per hour as a non-exempt formal employee of Defendant.

72.     The Defendant permitted the Plaintiff to work, and provided the method, manner, and means for the Plaintiff to perform work activities necessary to the daily operation of Defendant as a Front Desk Manager.

73.     Defendant retained control, oversight, and direction over the Plaintiff in his capacity as a Front Desk Manager where same control over the Plaintiff includes but not limited to: assigning tasks, scheduling, timekeeping, payroll, and disciplining.

74.     Defendant provided written instructions that included but were not limited to the VRQ Front Desk Manager Policy **Exhibit 07 – ABCCM VRQ Front Desk Manager Policy.**

75.     The Defendant provided verbal instructions to the Plaintiff regarding his Front Desk Manager work activities where same verbal instructions were communicated by the Front Desk Supervisor.

76.     Defendant did not offer or provided an Employee Handbook to the Plaintiff that explains

11

Defendant's employment policies and practices regarding Performance Reviews, Payroll, Overtime, Sick leave, Vacations, Holidays, Severance pay.

77. Defendant provided the Plaintiff a timesheet to keep track of his Front Desk Manager work hours as typified by **Exhibit 08 - ABCCM Timesheet**.

78. Instructions for filling out said time sheet were verbally communicated to the Plaintiff by the Front Desk Supervisor with words to the effect of:

   a) Do not record any hours for working 1st shift between 8am-4pm, Monday through Friday, you will not be paid for those hours, those are Service Hours.

   b) You will only get paid for eight hours a work day.

   c) All work hours over eight hours in a work day must be approved.

   d) You may record your 1st shift between 8am-4pm hours when working on Saturday and Sunday, those are the only two days that the 1st shift is paid.

   e) You may record all of your hours for working 2nd shift between 4pm-12am.

   f) You may record all of your hours for working 3rd shift between 12am-8am.

   g) You may record all of your hours for working Code Purple between 10pm-6am.

   h) You must sign your Time Sheet to get paid.

   i) Timesheets are kept in a drawer at the Front Desk.

79. The Defendant did not provide any written or printed timesheet instructions to the Plaintiff.

80. The Defendant routinely withheld payment of the Plaintiff's scheduled Front Desk Manager work activities relevant to the times of Monday thru Friday, 8:00am to 4:00pm.

81. Plaintiff's Front Desk Manager work activities relevant to the times of Monday thru Friday, 8:00am to 4:00pm are not accounted for on the Plaintiff's Direct Deposit Paychecks.

82. The Defendant creates a Front Desk Weekly Schedule stating the start time and end time

for each Front Desk Manager's shift as per **Exhibit 10 - Front Desk Work Schedule**.

83. The Defendant barred the Plaintiff from recording accurate start and end work times in his capacity as a Front Desk Manager.

84. The Defendant regularly and routinely required the Plaintiff to work off the clock while working in his capacity as a Front Desk Manager.

85. The Defendant required the Plaintiff to arrive earlier than his Front Desk Work Schedule start time to perform pre-shift work activities **(Exhibit 07 - ABCCM VRQ Front Desk Manager Policy, page 01, paragraph 2),** and said pre-shift work activities are unpaid.

86. The Plaintiff in his capacity as a Front Desk Manager's pre-shift work activities include but not limited to counting and reconciling facility keys, meal tickets, a cash drawer; postal packages, prescription medication parcels, government checks, and writing by hand an inventory of the postal packages, prescription medication parcels, and government checks.

87. If the counting and reconciling of the cash drawer produces a shortage then the previous shift of Front Desk Manager were required to pay the cash drawer shortages.

88. If the counting and reconciling of facility keys, postal packages, prescription medication parcels, government checks, are missing or not accounted for, then the previous shift which may include the Plaintiff in his capacity as a Front Desk Manager must remain, sometimes past the end of the shift to help reconcile the missing item(s), and said post-shift work activities are unpaid.

89. The Defendant required Plaintiff to attend a weekly Front Desk Managers' meeting, and same weekly meeting is unpaid.

90. Defendant provides "smokers" with a ten minute smoking break every hour pursuant to VRQ Desk Managers Policy, but non-smokers are <u>not</u> provided similar work breaks **(Id.**

**page 02, paragraph 4).**

91. Defendant required the Plaintiff to work unpaid Service Hours before earning regular wages or overtime.

92. The Defendant requires Front Desk Managers to perform work related activities while off the work schedule, such as, reporting security issues and shelter resident violations of the Residents' Handbook.

93. Defendant has failed to maintain accurate records regarding the Plaintiff's Front Desk Manager:

    a) daily start and end times;

    b) total hours worked each week;

    c) overtime earnings;

    d) credits and deductions from Plaintiff's pay.

94. The Defendant misclassified the formally employed Plaintiff as a "manager" for the purposes of not paying overtime.

95. Defendant was aware at all times relevant that the Plaintiff was not being compensated for all hourly work activities performed in his capacity as a Front Desk Manager.

96. Defendant failed to pay wages at the proper hourly rate for work hours up to 40 hours per work week, and failed to pay overtime wages in excess of 40 hours per work week to the Plaintiff in his capacity as a Front Desk Manager.

97. Defendant willfully and routinely engaged in a scheme designed to re-allocate the Plaintiff's regular wages and overtime pay in his capacity as a Front Desk Manager for the Defendant's benefit and gain.

98. Through events, publications, and broadcasts the Defendant publicizes it business brand as

a successful provider of homeless services to U.S. Veterans wherein the Plaintiff's Service Hour work activities as a Front Desk Manager are represented as "volunteer hours"; and in doing so the public have been deceived by the Defendant.

99. The Defendant has conspired to deprive the Plaintiff as a Front Desk Manager employee of his lawful compensation.

100. Plaintiff has suffered damages in his capacity as a Front Desk Manager by being deprived of wages and overtime compensation in accordance with the FLSA and NCWHA, or as provided for by applicable law, in amounts to be determined at trial. Plaintiff is entitled to recovery of such amounts, liquidated and statutory damages, nominal damages, declaratory relief, injunctive relief, pre-judgment and post-judgment interest.

## COUNT III
### Retaliation and Wrongful Termination

101. Plaintiff re-alleges and reiterates the foregoing paragraphs as if contained herein.

102. Plaintiff attempted to reconcile unpaid wages with Defendant prior to this complaint.

103. By November 11, 2015, Veterans Day, the Plaintiff had attempted to discuss unpaid wages with VRQ staff on four different occasions.

104. On November 12, 2015, the Plaintiff went to the U.S. Department of Labor office in Asheville, NC; and then visited ABCCM's main offices on Cumberland Avenue, on both occasions the Plaintiff discuss unpaid wages and Service Hours.

105. On the same day, upon returning to the VRQ, the Plaintiff met with ABCCM's Director of Homeless Services (ABCCM DHS), Ms. Mary Sczudlo; VRQ Operations Manager (VRQ OM), Marc Monacelli; and VRQ Front Desk Supervisor (VRQ FDS), Randy Gamble to discuss Plaintiff's unpaid wages and Service Hours.

106. ABCCM's Director of Homeless Services (ABCCM DHS), Ms. Mary Sczudlo agreed to

review Plaintiff's unpaid wages and Service Hours.

107.    On or about December 3, 2015 Plaintiff's Case Manager showed a spreadsheet to the Plaintiff that represented the Plaintiff's paid work hours and Service Hours.

108.    Same Case Manager said that spreadsheet accounted for only 20 unpaid hours.

109.    The Plaintiff asked for a copy of same spreadsheet and was denied a copy.

110.    The Plaintiff expressed his disagreement with the assessment to his case manager and related his intent to seek unpaid wages.

111.    Plaintiff participated in an activity protected by law by sending an email to the Office of U.S. Senator Thom Tillis (NC) on February 01, 2016 **(Exhibit 09 - Emails Chris Bullard, on behalf of U.S. Senator Tillis)**. Plaintiff's email to U.S. Senator Tillis contained details of his ABCCM employment, unpaid wages, Service Hours, and the Reward Points programs, attached to the email was **Exhibit 11 - ABCCM Wage Hour and Service Hour Representations**. Senator Thom Tillis's office submitted letters inquiry to the U.S. Department of Labor, and, the U.S. Department of Veterans Affairs who in turn contacted the Asheville VA Medical Center. On April 8th, 2016 the Plaintiff received a call from Ms. Whitney Lott of the Asheville VA Medical Center regarding unpaid wages and ABCCM employment.

112.    The Homeless Program Coordinator of the Asheville VA Medical Center, contacted the VRQ OM, Marc Monacelli regarding Plaintiff's unpaid wages.

113.    On two separate occasions in April 2016, the Defendant sought to retaliate against the Plaintiff by attempting to terminate his employment.

114.    On April 18th, 2016 the VRQ FDS, Randy Gamble communicated to the Plaintiff that he was enrolled in a 1000 Hour Work Program and that he had 50 work hours left on payroll.

115. The Plaintiff offered a printed bank deposit statement to VRQ OM, Marc Monacelli, showing Plaintiff's payroll direct deposits and work hour totals for each deposit, which was near 727 total paid work hours, the Plaintiff was allowed to continue his employment.

116. Again, on April 28, 2016, the VRQ OM, Marc Monacelli and VRQ FDS, Randy Gamble told the Plaintiff that he was enrolled in a 1000 hour work program and his 1000 hours were completed; the Plaintiff was removed from the Front Desk Work Schedule.

117. On Monday morning, May 2, 2016, the Plaintiff offered a printed bank deposit statement to VRQ OM, Marc Monacelli, showing Plaintiff's payroll direct deposits and work hour totals for each deposit was near 799 paid hours, and again, the Plaintiff was allowed to continue his employment.

118. On June 1, 2016 the Defendant did terminate the Plaintiff's employment.

119. Defendant expressed to the Plaintiff that he had completed 1000 hour work program and that he would no longer be employed as a Front Desk Manager.

120. On or about June 22, 2016, the Defendant provided the Plaintiff with a pre-filled form as in **Exhibit 12 - ABCCM Employee Enrollment and Change Notice Form** requesting Plaintiff's signature.

121. Plaintiff did not sign said ABCCM Employee Enrollment and Change Notice Form.

122. The Plaintiff has not signed any 1000 hour employment agreement before, during, or after his formal employment as a Front Desk Manager.

123. The Defendant has acted in a retaliatory manner toward the Plaintiff for his participation in an activity protected by law and was a substantial or motivating factor in the Defendant's conduct.

124. The Defendant did not taken any precautions to dissuade persons in Defendant's

employment, control, or persons working in concert, from engaging in adverse employment actions against the Plaintiff for participation in conduct protected by law.

125. Defendant was aware or should have been aware that its retaliatory tactics were unlawful.

126. Defendant's retaliatory tactics were willful and did effect a discriminatory discharge of the Plaintiff for his participation in conduct protected by law and was a substantial factor in the Defendant's decision to terminate the Plaintiff.

127. Plaintiff was subjected to wrongful termination of his employment as a Front Desk Manager, and the loss of pay for participation in an activity protected by law under 29 U.S. Code § 218c - Protections for employees, 29 U.S. Code § 215 - Prohibited acts, and N.C.G.S. § 95-241 Discrimination prohibited.

## COUNT IV
### Duress, Undue Influence, and Illegal Contracts

128. Plaintiff re-alleges and reiterates the foregoing paragraphs as if contained herein.

129. The Defendant has designed and deployed a public branding and marketing effort that solicited the enrollment of the Plaintiff into Defendant's homeless services for Veterans.

130. Prior to the Plaintiff's arrival at the VRQ, the Defendant verbally held itself out in a phone conversation with the Plaintiff as a provider of homeless services authorized by the U.S. Department of Veterans Affairs pursuant to the Grant and Per Diem program.

131. Prior to the Plaintiff's arrival at the VRQ, the Plaintiff was not provided any means to evaluate or compare ABCCM's administration of the VA GPD program.

132. Prior to the Plaintiff's arrival at the VRQ, the Defendant did not make any disclosure of required Service Hours and Reward Points program on its website or available literature.

133. On the day of the Plaintiff's arrival at the VRQ, the Defendant was made aware of the Plaintiff's weakened economic condition, whereas the Plaintiff was homeless, without

18

income, without a vehicle, without employment, and Plaintiff was psychologically fragile, and without the basic necessities and means to support himself.

134. After the Plaintiffs' arrival at the VRQ the Defendant assessed the ongoing needs of the Plaintiff and submitted him for enrollment as a participant in the VA GPD program.

135. As an authorized provider of the federally funded VA GPD program, the Defendant has a fiduciary responsibility and bears benefactor duties to provide the Plaintiff with Veteran benefits.

136. The Defendant maintains records of a privileged and confidential nature about the Plaintiff, such as but not limited to: personally identifiable and sensitive information, medical records, mental health evaluations, prescription drug use, recreational drug usage, personal financial statements, criminal history and homeless history.

137. Defendant's has a position of authority and control over the Plaintiff as demonstrated by Defendant requiring immediate compliance in instances of: room changes, Breathalyzer Alcohol Content (BAC) testing, drug urinalysis testing, room searches, search of possessions and room locker.

138. The Defendant position of authority and control of over the Plaintiff is further demonstrated by Defendant's capacity to demote or promote the Plaintiff affecting his daily living conditions, decreased or increased privileges such as room amenities, number of roommates, off-campus curfew times, overnight off-campus passes.

139. The Defendant has a benefactor's duty and obligation to exercise caution and care when contracting with the beneficiary Plaintiff due to his weakened economic condition.

140. The Defendant led the Plaintiff to believe that Service Hours are lawful.

141. The Defendant did not, at any time, fully disclose the limitations, restrictions, or benefits

of a Service Hours contract or agreement to the Plaintiff.

142. Defendant maintains a position of influence over the Plaintiff by holding a threat of disciplining, loss of privileges, expulsion into abject homelessness, and loss of Plaintiff's current VA Per Diem benefit to obtain compliance with Service Hour labor practices.

143. The Defendant did not, at any time, fully disclose the limitations, restrictions, or benefits of a Reward Points contract or agreement to the Plaintiff.

144. Prior to the Plaintiff's formal ABCCM employment, the Defendant did not offer or provide any contract or agreement to the Plaintiff stating terms for enrollment in a 1000 hour work program.

145. The Defendant did not, at any time, fully disclose the limitations, restrictions, or benefits of a 1000 hour employment contract or agreement to the Plaintiff.

146. Defendant willfully and routinely engages in a scheme constructed to take advantage of its superior position of authority and control over the homeless and weakened economic position of the Plaintiff.

147. The Defendant coerced the Plaintiff into agreeing with unconscionable labor demands and contracts which Plaintiff would not have otherwise agreed, and did so by means of economic pressure.

148. Defendant unilaterally creates, modifies, terminates express and implied contracts verbally or in writing to which the Plaintiff has no reasonable alternative except to acquiesce.

149. Plaintiff has no reasonable living alternatives due to his weakened economic position.

150. The Defendant's unlawful actions substantially contributed to the Plaintiff's failure to increase his skill levels and/or income, and obtain greater self-determination while in the Grant Per Diem program.

151. Defendant's Service Hours and Reward Points contracts with the Plaintiff are incongruous with the goals of the VA GPD program, and are immoral, outrageous and substantially injurious.

152. The Defendant profits by not paying wages and payroll taxes on Service Hours, and does so in the furtherance of its business interests, benefit, gain, and thereby obtains a commercial advantage affecting the State of North Carolina and interstate commerce.

153. Plaintiff was subjected to the Defendant's failure to administer and provide the VA GPD program pursuant to the laws and regulations of the United States, the State of North Carolina, Tort law, and public policy.

### COUNT V
### Intentional Infliction of Emotional Distress

154. Plaintiff re-alleges and reiterates the foregoing paragraphs as if contained herein.

155. The Defendant performed a psychological interview and evaluation of the Plaintiff and is aware of the Plaintiff's mental states, homeless history, economic history, and other conditions affecting the Plaintiff.

156. With full knowledge of the Plaintiff's psychological fragility, the Defendant disregarded the possibility that its actions would aggravate said sensitivities causing further emotional distress and anxieties in the Plaintiff.

157. The Defendant has relied on the Plaintiff to perform required Service Hours far in excess of what is expected or reasonable regardless of the effect on the Plaintiff.

158. The Defendant was negligent in the performance of its administrative duties to maintain safety standards, oversight, and scheduling of the VRQ Duty Drivers, and said negligence placed the burden of the Defendant's administrative responsibilities on the Plaintiff.

159. The Defendant increased the Plaintiff's required Duty Driver Service Hours for the

Defendant's own gain and to the detriment of the Plaintiff.

160. The Defendant has not taken precautions to dissuade persons in Defendant's employment, control, or persons working in concert from harassing the Plaintiff.

161. The Defendant and subordinates have instigated and carried out harassing tactics and reprisal against the Plaintiff for his opposition to actions of the Defendant.

162. The Defendant was aware of the Plaintiff's psychological fragility and weakened economic condition, the Defendant recklessly and callously tried to provoke a rebellious response from the Plaintiff to construct grounds to expel the Plaintiff from the VRQ.

163. The Defendant's retaliatory and harassment tactics toward the Plaintiff are intentional and in disregard to any likelihood that said tactics would inflict emotional distress.

164. The Defendant's retaliatory and harassing tactics directed at the Plaintiff are stigmatizing; the Defendant has significantly foreclose Plaintiff's possibility of future employment.

165. The conduct of the Defendant is extreme and outrageous with malice intent, and callous indifference to the protected rights and well-being of the Plaintiff.

166. As a result the forgoing allegations in this Complaint the Plaintiff has been deprived of his livelihood, subjected to great humiliation, and emotional stress, mental anguish, and subjected to other damages.

## COUNT VI
### Violations of U.S.C. 42 § 1983 and 42 U.S. Code § 1985, and the First Amendment and Fourteenth Amendment to the Constitution of the United States

167. Plaintiff re-alleges and reiterates the foregoing paragraphs as if contained herein.

168. Acting under color of U.S. Department of Veterans Affairs and U.S. Department of Labor contracts the Defendant used said authority to engage in colorable actions to violate the Plaintiff's Constitutional Rights.

169. Defendant coerced the service the Plaintiff into a condition of unpaid labor.

170. Defendant coerced Plaintiff to perform labor in liquidation of a debt or obligation wrongfully applied to the Plaintiff as a sheltered resident of the VRQ.

171. The Defendant conspired to deprive the Plaintiff of his lawful compensation, employment, benefits, and rights.

172. The Defendant's unlawful actions substantially contributed to the Plaintiff's failure to increase his skill levels and/or income, and obtain greater self-determination while in the Grant Per Diem program.

173. Defendant wrongfully conspired, retaliated, and terminated the Plaintiff's employment for pursuing his protected right to speak to a government official and his liberty interests in his employment in violation of the First Amendment and the Fourteenth Amendment.

174. Defendant's willful actions violate 42 U.S.C. § 1983, and 42 U.S. Code § 1985 whereby the Defendant's acts constitutes a deprivation of rights, privileges, immunities and liberty interests secured by the Constitution of the United States.

**WHEREFORE,** the Plaintiff demands a trial by jury, andm that following such trial, judgment be entered on Plaintiff's behalf against Defendant granting the following relief:

1. Find the Service Hours program in Count I, Count II, and Count IV and any related contract in violation of the public interest, without consideration, unfair and deceptive, and unconscionably extreme; and,

2. Find the Rewards Points program in Count I, Count II, and Count IV and any related contract in violation of the public interest, without consideration, unfair and deceptive, and unconscionably extreme; and,

3. Find Plaintiff's Service Hours work activities in Count I to be consistent with that of an

employee of the Defendant and subject to Federal and State employment laws;

4.      Order the Defendant to pay full and complete relief in the amount of $15,095.85 for unpaid regular wages to the Plaintiff for work performance in his capacity as a Duty Driver under Count I, with pre-judgment and post-judgment interest, and Order same doubled as liquidated damages; and,

5.      Order the Defendant to pay full and complete relief in the amount of $2,641.50 for unpaid regular hourly wages to the Plaintiff for work performed in his capacity as a Formal Employee under Count II, with pre-judgment and post-judgment interest, and Order same doubled as liquidated damages; and,

6.      Order the Defendant to pay full and complete relief in the amount of $1,309.50 as unpaid overtime in Plaintiff for work performed in his capacity as a Formal Employee under Count II, with pre-judgment and post-judgment interest, and Order same doubled as liquidated damages; and,

7.      Order the Defendant to pay full back pay and such benefits as the Plaintiff would he have enjoyed had he never been separated on June 1, 2016 from employment, with pre-judgment and post-judgment interest under Count III; and,

8.      Order the Defendant to pay front pay to the Plaintiff under, in his capacity as a formal employee, until he reaches age sixty-five (65); and,

9.      Order the Defendant to pay full and fair monetary damages in an amount to be proven at trial to compensate Plaintiff for intentional infliction of emotional distress and such other damages resulted from the improper conduct of the Defendant under Count V; and,

10.      Order the Defendant to pay punitive damages as determined by the enlightened conscience of an impartial jury as acceptable to deter the Defendant from future conduct of the type

proven at trial; and,

11. Order Plaintiff's costs of this action including expert witness fees; and reasonable attorneys' fees in the event the Plaintiff secures representation; and,

12. Declare pursuant to 29 U.S.C. §§2201 and 2202 the findings of the Court in the present matter as binding precedent in this jurisdiction, whereby past and present sheltered residents with claims proven to arise out of the same facts are entitled to an applicable hourly wage and overtime wage, liquidated damages, and reasonable attorneys' fees pursuant to the FLSA, whereas the Defendant failed to pay a minimum or applicable wages and overtime wages, and the Defendant failed to keep accurate time records; and Defendant failed to prove a good faith defense; and the Defendant has a legal duty to pay pursuant to the provisions of the FLSA; and,

13. Such further and additional relief as the Court may deem is appropriate, just and proper.

## JURY DEMAND

Plaintiff hereby request that upon trial of this action, all issues be submitted to and determined by a jury except those issues expressly reserved by law for determination by this Court. The foregoing Complaint consisting of 74 paragraphs, and 25 pages, and 12 Exhibits.

Respectfully submitted this day of JUN 12, 2017

Gregory G. Armento (Pro Se)
1329 Tunnel Road
Asheville, NC 28805
Telephone - (808 364-6463
Email – ggarmento@yahoo.com