```
 1                  UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                       (Asheville Division)

 3

 4   ---------------------------x
     GREGORY G. ARMENTO,         :
 5                  Plaintiff,:
                                 :
 6                               :
     vs                          :Civil Action 1:17-CV-150
 7                               :
                                 :
 8   ASHEVILLE BUNCOMBE COUNTY   :
     CHRISTIAN MINISTRY, INC.,   :
 9                  Defendant.:
     ---------------------------x
10

11                               Wednesday, November 13, 2019
                                 Asheville, North Carolina
12

13        The above-entitled action came on for a Bench
     Trial  before the Honorable Martin K. Reidinger, United
14   States District Judge, in Courtroom 1, commencing at 9:00
     a.m.
15
          APPEARANCES:
16        On behalf of the Plaintiff:
          CLERMONT F. RIPLEY, Esquire
17        CAROL LEE BROOKE, Esquire
          The North Carolina Justice Center
18        Post Office Box 28068
          Raleigh, North Carolina  27611
19

20        On behalf of the Defendant:
          DALE A. CURRIDEN, Esquire
21        JONATHAN H. DUNLAP, Esquire
          The Van Winkle Law Firm
22        11 North Market Street
          Asheville, North Carolina  28801
23

24
     Tracy Rae Dunlap, RMR, CRR          828.771.7217
25   Official Court Reporter
```

1                          **I N D E X**

2                  <u>DIRECT</u>   <u>CROSS</u>  <u>REDIRECT</u> <u>RECROSS</u>

3   Robert Plaskowitz..6......33......43......45
    Scott Rogers......47......76...107,113...112
4   Gregory Armento..114.....165
    Mary Sczudlo.....208.....224....237
5   Jeremy Darnell...241.....248....255
    Timothy McElyea..256.....289....303

6

7

8                        **E X H I B I T S**

9                                                   <u>Page</u>

    Plaintiff's Exhibit 1A.........................52
10  Plaintiff's Exhibit 1B.........................54
    Plaintiff's Exhibit 1C.........................54
11  Plaintiff's Exhibit 1D.........................54
    Plaintiff's Exhibit 8..........................60
12  Plaintiff's Exhibit 9..........................62
    Plaintiff's Exhibit 6..........................65
13  Plaintiff's Exhibit 3.........................119
    Plaintiff's Exhibit 21........................121
14  Plaintiff's Exhibit 2.........................122
    Plaintiff's Exhibit 13........................127
15  Plaintiff's Exhibit 16........................131
    Plaintiff's Exhibit 14........................148
16  Plaintiff's Exhibit 22........................155
    Plaintiff's Exhibit 20........................159
17  Plaintiff's Exhibit 7.........................163
    Plaintiff's Exhibit 17........................165
18  Defendant's Exhibit 10........................214
    Defendant's Exhibit 11........................221
19  Defendant's Exhibit 1.........................241
    Defendant's Exhibit 3.........................241
20  Defendant's Exhibit 7.........................263
    Defendant's Exhibit 8.........................265

21

22

23

24

25  Reporter's Certificate.......................315

# P R O C E E D I N G S

THE COURT:  Good morning, everyone.  We have one civil case that remains on the calendar for this term, and that is Armento versus ABCCM.

Ms. Brooke, Ms. Ripley, is the plaintiff prepared to proceed?

MS.  BROOKE:  We are, Your Honor.

THE COURT:  Mr. Curriden, I was expecting to see you in a different seat, is the defendant prepared to proceed?

MR.  CURRIDEN:  Yes, we are, Your Honor.  I would just represent the other representative of the defendant, Tim McElyea, should be here shortly.  He's dealing with an injury that occurred over the weekend, and we expect him here any minute, but we can proceed without him.

THE COURT:  Are there any issues that we need to address before we start with the presentation of the evidence in this case?  Anything for the plaintiff?

MS.  BROOKE:  Your Honor, we did want to note we filed last night a correction to our index to our trial exhibits.  We noticed some errors, and I've passed a copy to Ms. Miller, so, hopefully you have that corrected index.

And, also, I don't know if it's going to be an issue, but if defendants are planning witnesses beyond Mr

1    McElyea but, if so, we would ask that witnesses be

2    excluded while the testimony of other witnesses is being

3    given.

4          THE COURT:  So you're requesting the sequestration

5    of witnesses?

6          MS.  BROOKE:  Yes.

7          THE COURT:  Okay.  And I didn't understand what

8    you were saying with regard to the two representatives of

9    the defendant.

10          MS.  BROOKE:  I don't know if defendants are

11    planning to have additional witnesses.  If their only

12    witnesses are the two representatives of the defendant

13    then obviously we would not object to them being present

14    during testimony.  But if there are additional witnesses

15    then we would ask that they not be present during the

16    testimony of other witnesses.

17          THE COURT:  You're not objecting to the two

18    representatives of the defendant being in the courtroom

19    through the whole matter.

20          MS.  BROOKE:  Correct.

21          THE COURT:  Okay.  Well, under 615, where one

22    party invokes sequestration of the witnesses, then the

23    Court is required to impose the sequestration.  So anyone

24    other than the plaintiff himself as a party and then the

25    representatives of the defendant, also as parties, can

1    remain in the courtroom.  But all other people who are

2    here for the purpose of providing testimony need to be

3    waiting in the witness rooms unless and until called to

4    testify.

5         MS.  BROOKE:  Thank you, Your Honor.

6         THE COURT:  Anything else that we need to address

7    before we proceed with the presentation of the evidence?

8         MS.  BROOKE:  Just to clarify.  Your Honor, our

9    first witness is here and I just wanted to let him know

10   he does not need to leave because we expect to call him.

11        THE COURT:  Okay.  With regard to the first

12   witness, obviously, it's easier to have him here in the

13   room.  But all others you will need to make the

14   arrangements to make sure that they are readily available

15   but not in the room.

16        MS.  BROOKE:  Thank you.

17        MR.  CURRIDEN:  If I could just ask where the

18   "witness room" is so that we can direct our witnesses

19   there instead of just being in the hall, or is it okay if

20   they're in the hall?

21        THE COURT:  The hall is fine, also, so long as

22   they're not carrying on conversations that we can hear in

23   here.  But the witness rooms -- if you go out of the door

24   to the courtroom and turn right down the hall, at the end

25   of the hall, just passed the door to the clerk's office

### DIRECT - PLASKOWITZ

1  it has a big sign over it that says "witness rooms," and

2  there are two witness rooms back there.

3       MR. CURRIDEN:  Thank you.

4       THE COURT:  Maybe it says "attorney conference

5  rooms" rather than "witness room," but something like

6  that on the sign.

7       Are we ready to proceed then?

8       MS. BROOKE:  I think we are, Your Honor.

9       MR. CURRIDEN:  Yes, sir.

10       THE COURT:  Okay.  The plaintiffs may call their

11  first witness.  Who's the first witness?

12       MS. BROOKE:  Yes.  We'd call Bob Plaskowitz.

13       (Witness duly sworn at 9:08 a.m.)

14       THE COURT:  You may proceed.

15       MS. BROOKE:  Thank you, Your Honor.

16                 **DIRECT EXAMINATION**

17       BY MS. BROOKE:

18  Q.   Mr. Plaskowitz, could you please state your full

19  name?

20  A.   Robert Joseph Plaskowitz.

21  Q.   What is your date of birth?

22  A.   June 17th 1949.

23  Q.   Where do you live, Mr. Plaskowitz?

24  A.   I live at the Veteran's Restoration Quarters.

25  Q.   Is that part of Asheville Buncombe Community

### DIRECT - PLASKOWITZ

1 Christian Ministry?

2 A.     Correct.

3 Q.     And when did you first start living at the VRQ?

4 A.     I've done two per diems there.  The first one was

5 in 2008, when they first opened up, and then I was gone

6 for five years after that per diem was over.  And I came

7 back about three or so years ago.

8 Q.     And when you refer to "per diem," what do you

9 mean?

10 A.     There's a -- there's more than one program that

11 can allow you to be a resident.  And "per diem" means

12 that you're in a two-year program with a case manager,

13 your room and board are all taken care of, three meals a

14 day for a period of two uears, also, counseling with case

15 managers, and various educational opportunities during

16 that time.

17 Q.     When you were part of the grant program during

18 both of those stays, were you part of the VRQ?

19 A.     I understand that everyone has to do 20 hours of

20 service hours, they're disabled in some way or have an

21 exemption for some reason then I suppose it would vary

22 from case to case.  But any able-bodied person is

23 supposed to do 20 hours a week.

24 Q.     And were you required to do 20 hours a week?

25 A.     Yes.

## DIRECT - PLASKOWITZ

1  Q.     Did you ever work more than 20 hours a week?

2  A.     Sometimes, yes.  It happened rarely sometimes and

3  often others.  So it could happen a few times a week, and

4  it might not happen every week.

5  Q.     And when you were asked to do additional hours how

6  many hours would you be asked to do?

7  A.     It could be anywhere from a few to 20-plus or

8  more.

9  Q.     What are the different types of work that you did

10  as service hours?

11  A.     For service hours I worked in the computer room

12  just as a computer monitor.  I've been a team leader, I

13  have worked at the front desk, and I've been a driver.

14  Q.     Let's start with the computer room.  When you

15  worked in the computer room was that during your first or

16  your second stint?

17  A.     My first per diem.

18  Q.     All right.  And how long did you do that work?

19  A.     Probably a year or more.

20  Q.     Did anyone supervise your work?

21  A.     There was a supervisor; Byron Storm was his name.

22  Q.     And did you have a work schedule?

23  A.     Yes.

24  Q.     Who created that work schedule?

25  A.     Byron did.

## DIRECT - PLASKOWITZ

1  Q.     Were you paid for that work?

2  A.     No.  That was service hours.

3  Q.     Why did you do that work if you weren't paid for

4  it?

5  A.     Because I was told it was a requirement.

6  Q.     Who told you it was a requirement?

7  A.     It was -- well it was first introduced in intake

8  meetings.  When you first come in you go to weekly intake

9  meetings where you learn about what to do, what the

10 opportunities are, what not to do, and given a handbook.

11 It's in the handbook, and it's emphasized.

12 Q.     Who conduct conducted those intake meetings?

13 A.     The first time around I don't remember.  The

14 second per diem -- sometimes I think it was whoever was

15 the operations manager and, if not, probably one of the

16 desk people.

17 Q.     And what were you told would happen if you didn't

18 perform service hours?

19        MR.  CURRIDEN:  Objection.

20        THE COURT:  Basis.

21        MR.  CURRIDEN:  Hearsay.

22        THE COURT:  Overruled.  Answer it if you can.

23        THE WITNESS:  Answer it?

24        THE COURT:  Yes.

25        THE WITNESS:  If you didn't do it you would get a

### DIRECT - PLASKOWITZ

1  strike.

2       BY MS.  BROOKE:

3  Q.    What is a "strike?"

4  A.    There's a three strike policy at the quarters

5  where if you do something inappropriate like go off the

6  property without signing out, or drink on the property,

7  or get rowdy and loud and noisy, or push somebody around,

8  you would get a strike.  Any improper behavior -- smoking

9  in the wrong place, trying to light a cigarette inside a

10 building, those kind of things, and not doing service

11 hours.

12 Q.    What are the consequences of getting a strike?

13 A.    The first one you'll get a talk with your case

14 manager and probably the second one, too.  And the third

15 one, the policy was three strikes and you're out.  That

16 wasn't necessarily the case.  Some people were given

17 leniency and allowed to stay beyond three strikes, but at

18 any point anybody can be asked to leave.  You don't even

19 need a strike, necessarily.  If you were to do something

20 totally inappropriate like, I don't know, just stand in

21 the middle of the lobby cursing loudly when there were

22 guests there, you'd probably be asked to leave the

23 property or be taken away by the police.

24 Q.    After you finished your time working in the

25 computer lab what service hours did you perform?

## DIRECT - PLASKOWITZ

1  A.     After that I went to work at the front desk.

2  Q.     And did you have a supervisor at the front desk?

3  A.     Yes.  I believe it was Randy Gamble, but I'm not

4  sure if Randy was doing it when I first came on.  He was

5  doing it in my second per diem for sure, and I think it

6  was him in the first but I'm not positive.

7  Q.     Did you have a work schedule?

8  A.     Yes.

9  Q.     Who created that schedule?

10  A.     Randy or whoever was running the desk.  Sometimes

11  the operations manager had something to do with it.

12  Q.     How long did you work at the front desk?

13  A.     When I first came in I worked -- well after my

14  time in the computer room, and then until I left.

15  Q.     I believe you testified that you worked in the

16  computer room for a year; is that correct?

17  A.     Yes.

18  Q.     So would that have been another year working at

19  the front desk?

20  A.     Yes.  A little more than that because I stayed two

21  months over my per diem because I hadn't found a place to

22  live.

23  Q.     After you left your first per diem and returned

24  for your second per diem, did you perform service hours

25  during that second per diem?

## DIRECT - PLASKOWITZ

1  A.      Yes.

2  Q.      And what was the first service hours job that you

3  did?

4  A.      Front desk.

5  Q.      Was -- did you have a supervisor then?

6  A.      Yes.  Randy Gamble for sure.

7  Q.      Did he create your work schedule?

8  A.      Yes, in consultation with the desk managers.  I

9  mean he didn't do it himself.  He kind of checked with

10  people to see what worked.

11  Q.      Were you a desk manager?

12  A.      Yes.

13  Q.      How long did you work at the front desk that time?

14  A.      I worked, probably, at least a year, and then I

15  found some outside work and lasted for a few months, and

16  then I went back to working on the desk.

17  Q.      And were you ever paid for that front desk work?

18  A.      Initially, no.  Initially, everyone goes through

19  what's called a training period.  And even though I had

20  worked the desk for a year in my first per diem I still

21  had to be trained for my second per diem, and that lasted

22  about six months.  And, along the way, I was often told

23  that I'd start getting paid, too, soon, but it never

24  happened until about six months later.

25  Q.      And when you did get paid how did that come about?

## DIRECT - PLASKOWITZ

1  A.     I was given a Land of Sky grant -- I think it's

2  called a Chapter 5 -- that allows people to be paid $7

3  and change an hour for 20 hours per week for two to four

4  years I think it is.

5  Q.     How did you get that Land of Skies grant?

6  A.     Well, as a desk manager, I had to ask for it,

7  apply for it.  I didn't necessarily do the initial

8  paperwork.  But if you were approved to do that -- in

9  other words, if you had done a good job while you were

10 working they would put your name in for it when something

11 came open.

12 Q.     And who paid you?  Who paid you the $7 and change?

13 A.     The money comes from Land of Sky -- I think it's a

14 government grant.  I think it's called a Title V grant.

15 So it's -- it's nothing to do with ABCCM or the VRQ.

16 It's an outside government grant.

17 Q.     And how many hours a week does that pay for?

18 A.     It pays for 20 hours a week.

19 Q.     Did you continue to work unpaid hours at the front

20 desk once you started working through Land of Sky?

21 A.     Well if I had to do more than 20 hours a week

22 those were unpaid.  You couldn't get paid for more than

23 20 hours a week.

24 Q.     Did you work more than 20 hours a week?

25 A.     Sometimes.

**DIRECT - PLASKOWITZ**

1  Q.      Did you fill out any kind of time sheet?

2  A.      I did a time sheet for Land of Sky every two

3  weeks.  But there was no record, that I can recall, for

4  any extra hours where you might be taking somebody else's

5  shift or, you know, swapping with somebody so that

6  somebody could have a day off because of an emergency or

7  because the staff was shorthanded.  Anything over 20 was

8  all that was recorded.

9  Q.      When you worked at the front desk during your

10  first per diem, and you were not paid, did you fill out a

11  time sheet?

12  A.      No.

13  Q.      What about when you worked in the computer room?

14  A.      No.

15  Q.      After the Land of Sky grant -- well is the Land of

16  Sky grant something that you are still working under?

17  A.      Yes.

18  Q.      And are you working anywhere else?

19  A.      No.

20  Q.      When you were performing service hours, and as you

21  are performing them now, do those service hours benefit

22  you in some way?

23  A.      Well, officially, I'm not performing service hours

24  because I'm getting paid.  So they don't call getting

25  paid service hours.  That's more like a job.  I suppose

## DIRECT - PLASKOWITZ

1  it's -- I don't know how it would be categorized.  I mean

2  I suppose you could say it's 20 hours of service hours

3  that I get paid for, but they don't refer to it as

4  service hours.  I've never heard paid hours being

5  referred to as service hours, although it could be I

6  suppose.

7  Q.    Well, to clarify, are you currently working any

8  unpaid hours?

9  A.    Rarely.

10 Q.    When you do work those unpaid hours do you -- do

11 those unpaid hours benefit you in some way?

12 A.    Well there's no financial compensation.  You know,

13 sometimes I'd rather not be doing it but the unspoken

14 policy is it's, you know, pitching in your part to help

15 and compensation for what you're getting, you know, a

16 roof over your head and three meals a day, et cetera, et

17 cetera.  So most people don't say anything about it.  I

18 never said anything about it.

19 Q.    During your first per diem were you ever paid?

20 A.    Toward the end, as a front desk manager, yeah.

21 Q.    As a front desk manager you were paid during your

22 first per diem?

23 A.    Yeah.

24 Q.    Was that through Land of Sky?

25 A.    Yes.

### DIRECT - PLASKOWITZ

1  Q.     All right.  When you were performing the unpaid

2  hours during your first per diem did those unpaid hours

3  benefit you?

4  A.     Well only that I didn't get strikes.  I mean you

5  have to do it -- you had to do it, and I wasn't going to

6  buck the system.  That's not a good thing to do.

7  Q.     Did you consider yourself to be a volunteer when

8  you were performing those unpaid hours?

9  A.     I considered that I was required by unspoken --

10 well unspoken law.  We were told it was a requirement and

11 you had to do it to live there.

12 Q.     Did your service hours, or your unpaid hours,

13 benefit the VRQ or ABCCM in any way?

14 A.     Sure.  It would have to.  Service hours could be

15 anything from mowing the lawn and raking leaves or

16 trimming bushes or mopping the floors, doing the laundry,

17 washing the dishes, a lot of things that would have to be

18 paid for if they were weren't done by service hours.

19 Q.     What would happen if no one was doing unpaid hours

20 at the front desk?

21 A.     I imagine that would be problematic for ABCCM.  I

22 mean I can't see that happening, necessarily, because it

23 would increase payroll considerably.  I don't know how

24 many positions -- how many service hour positions there

25 are, but I'm going to guess 50 to a hundred.

## DIRECT - PLASKOWITZ

1  Q.     You are currently working at the front desk?

2  A.     Yes.

3  Q.     Does that job involve also driving the van?

4  A.     Yes, I'm also a driver.

5  Q.     Tell me about the van driving work.

6  A.     Well we have three or four Honda vans that provide

7  transportation for the men in the quarters to get back

8  and forth to the hospital, go to doctor and dental

9  appointments, for emergency runs to the hospital.

10  There's a schedule of five runs a day.  But if something

11  happens where somebody falls and is bleeding needs to get

12  to the hospital we ride them up there in the van any time

13  of day or night.  Some people complain of being sick, and

14  we take them to the emergency room.  Doctor appointments,

15  dental appointments, whatever, we take them and drop them

16  off and pick them up.

17  Q.     Do you have a supervisor for the van driving work?

18  A.     That would be Joe Landry at this time.

19  Q.     What is Joe Landry's job?

20  A.     Joe Landry's title, I believe, is Operations

21  Manager.  He's kind of -- kind of runs the place.  I

22  believe he's directly under Mr.  McElyea.

23  Q.     Does he create a work schedule for the van

24  drivers?

25  A.     Well we kind of create it ourself with his

## DIRECT - PLASKOWITZ

1  approval.  There's weekly meetings, and people kind of

2  get together and agree on what shifts would work best for

3  them and they're filled into those slots and usually stay

4  with them unless a problem comes up or there's a change

5  in personnel, which used to happen quite often actually.

6  Q.    Are those weekly meetings required for the van

7  drivers?

8  A.    Yes.

9  Q.    Are there other people besides you who are paid to

10  drive the van?

11  A.    Currently, I believe everyone is, but back in the

12  day, when Greg was there, not everyone was.  And even at

13  this point I don't believe everybody's paid initially.

14  They have to go through kind of a trial period to prove

15  that they're a good applicant.  Not everybody is.  And

16  there's a fairly high number of people who don't succeed

17  or don't want to do it.  So there's a time lag between

18  when people start and when they get paid.

19  Q.    When you --

20  A.    If they get paid.

21  Q.    I'm sorry?

22  A.    If they get paid.

23  Q.    When you refer to "Greg," are you referring to the

24  plaintiff, Mr.  Armento?

25  A.    Correct.

### DIRECT - PLASKOWITZ

1  Q.     The trial period that you mentioned.  How long
2  does that last?
3  A.     That could vary.  I've seen it be as little as a
4  week or two, and I've seen it be months and months.  In
5  my case, it was about six months on my second per diem
6  from the time I was told I would get paid until the time
7  I actually did get paid.
8  Q.     And when those van drivers are in their trial
9  period are they driving the van?
10 A.     Once you've been approved on ABCCM insurance and
11 your driver's license has been checked for accidents or
12 whatever.  I mean they look at your record to make sure
13 you're a good driver, and then they put you on ABCCM
14 insurance, and then you're allowed to drive the vans.
15 But they kind of -- generally speaking, new people don't
16 go right into driving vans because they like to know
17 who's going to be taking a vehicle out, and I would too.
18 Q.     What do they do instead of driving the vans?
19 A.     They'll do other things like mow the lawn, rake
20 grass, do dishes, clean up the dining hall after meals,
21 do the laundry, any one of a large number of jobs around
22 the campus.
23 Q.     Once the new person has their driving record
24 checked, and they're on the ABCCM insurance, do they
25 begin to drive the van?

## DIRECT - PLASKOWITZ

1  A.    Yes.

2  Q.    And is that true even if they're considered to be

3  in a trial period?

4  A.    Yeah.  The trial period is not well defined but I

5  suppose it's until you get paid, or that's the way I

6  always saw it.

7  Q.    Okay.  Are there people -- you may have answered

8  this.  Are there people now who perform service hours

9  driving the van?

10  A.    I don't think so at this point in time.

11  Q.    Were there when Mr.  Armento was at ABCCM?

12  A.    Well, yes.  Like myself, I mean there could be

13  somebody -- right now everybody that's driving has been

14  driving.  So they're all, you know, cleared.  But I

15  suppose somebody -- if somebody wanted to go start off

16  today to be a driver they would probably not get paid for

17  an undetermined amount of time.

18  Q.    When did you first start driving the van?

19  A.    I believe I started kind of toward the end of my

20  first per diem because it was obvious that the front --

21  all the driving information is kept at the front desk,

22  what the assignments are, and the keys are kept at the

23  front desk.  People have to come in, sign a key out, get

24  a clipboard, record time in, time out and mileage, and

25  return that to the front desk.

## DIRECT - PLASKOWITZ

1   Being on the front desk I noticed that often we

2   were scrambling for drivers and having to call every

3   available driver and not always getting one immediately.

4   So we -- Mr. Armento and I actually suggested a number

5   of times that we get more drivers so that there wouldn't

6   be staff shortages. And we ourselves tried to recruit

7   drivers as best we could until we -- right now the way

8   the driving team stands it's pretty together, and it's

9   very rarely shorthanded.

10  Q.   When you described coming to the front desk to get

11  the keys and so on. Is that the same procedure that you

12  followed when you were an unpaid van driver?

13  A.   Exactly.

14  Q.   Is there any difference in what you did as an

15  unpaid van driver and a paid van driver?

16  A.   None.

17  Q.   Who was your supervisor when you first started

18  driving the van?

19  A.   That would have been Randy Gamble. Again, I think

20  -- I don't know if somebody has records that somebody

21  else was in charge. I don't remember.

22  Q.   Would it have been -- was it the front desk

23  supervisor?

24  A.   Well the front desk supervisor was Randy Gamble.

25  So he was kind of the guy that handled it, but the

## DIRECT - PLASKOWITZ

1   operations manager was over him and sometimes

2   participated or didn't participate in -- if it was taken

3   care of and he didn't have to participate then he wasn't

4   necessarily about it because he had other duties.

5   Q.    Do you record the time that you start driving the

6   van?

7   A.    Yes.

8   Q.    Where do you record that?

9   A.    There's a clipboard with a key attached to it for

10  each van that hangs at the front desk.  You have to come

11  up to a desk agent, ask for the key to the van, which

12  gives you a key and the clipboard.  And you either fill

13  it out at the desk or fill it out in the van and finish

14  filling it out at the end of your run and hand it in

15  immediately to the desk.

16  Q.    And is that the same procedure that you have

17  followed the whole time you've driven a van for ABCCM?

18  A.    That's always been the way that it is, right.

19  Q.    Who owns the vans?

20  A.    I believe they're owned or leased by ABCCM but I

21  don't know that.  I think either Mr. McElyea or

22  Mr. Rogers would know.

23  Q.    And who provides the gas for the vans?

24  A.    ABCCM has a credit card for the vans.  And some of

25  the drivers that have been around for a long time, like

## DIRECT - PLASKOWITZ

1  myself, have access to the credit card which is kept at a
2  Mobil station just down the road from us.  And the
3  cashiers there know who we are and know we're driving an
4  ABCCM vans.  We fill up the tank, and he hands us the
5  card and a receipt.  We run it through and give it back
6  to him, and it's stored there which makes it easier for
7  everybody.
8  Q.     Have you ever known of a community volunteer to
9  drive the vans?
10 A.     I don't believe so.  I know the case managers are
11 allowed to drive the van but I've never known
12 specifically a community volunteer.  Reverend Ritt used
13 to drive the vans but I don't know if he was a staff
14 member, a paid staff member, or a volunteer.
15 Q.     Is it --
16 A.     So it would be rare that somebody outside of ABCCM
17 would drive because they wouldn't have gotten on the
18 insurance and wouldn't have had their record checked.
19 Q.     What about working at the front desk?  Have you
20 ever known community volunteers to work at the front
21 desk?
22 A.     Yes.  That happens more frequently lately.
23 Initially, in the first year there were, I don't remember
24 volunteers at the front desk.  But in the beginning of my
25 second per diem there were occasionally second --

DIRECT - PLASKOWITZ

1  volunteers who would help to fill in.  Initially, at the

2  front desk, there was one or two people that took care of

3  everything which made it pretty rigorous sometimes, or

4  complicated, if there were too many people asking

5  questions.  Now, I believe, there's usually two or three

6  people at the desk, and sometimes one of them is a

7  volunteer who usually does the signing in and out of

8  residents.

9  Q.    And what do the non-community volunteers do at the

10  front desk?

11  A.    They -- in the beginning, they oversee the signing

12  in and out which involves people coming up to the desk,

13  signing the logbook with their name, room, number and

14  time, handing in their room key so they're not taking

15  their room key off campus and so they can't sneak back

16  into their room.  And then when they come back they ask

17  for their key and sign out the time that they came back.

18  It's also a record for keeping track of who's on -- who's

19  there and who's not, in case of emergency.

20  Q.    The people who are working at the front desk who

21  are not doing that signing in and out function, what work

22  are they doing?

23  A.    The --

24  Q.    The VRQ residents who work at the front desk.

25  A.    The VRQ people?  We keep the daily log.  We patrol

## DIRECT - PLASKOWITZ

1  the grounds every 30 minutes or so.  There's a required

2  route for, kind of, checking the property to make sure

3  there's no problem, there's nobody injured, there is

4  nobody that doesn't belong.  Sometimes people will, even

5  though they're not supposed to, invite somebody on, and

6  sometimes those people are semi-unsavory characters.  So

7  we ask them to leave as soon as we realize they're there,

8  make sure our residents aren't smoking in their cars.

9  Q.    Do you ever drive the van in the middle of the

10 night?

11 A.    I used to.  I have some vision problems now, but

12 in my first per diem I did.

13 Q.    How often would that happen?

14 A.    It was, maybe, once every few weeks or once a

15 month.  The desk would try not to call on the same person

16 all the time but you could go a few times.  There was a

17 fellow who didn't mind driving in the middle of the

18 night, and he would drive two or more times a night if

19 needed.

20 Q.    Why would it be needed?

21 A.    If there's an emergency of any kind, an injury of

22 some kind, an emotional breakdown; someone coming to the

23 desk saying I've got to go to the ER right away because

24 I've got stomach pain or whatever.  We weren't able to

25 assess that so we would take them to the emergency room.

## DIRECT - PLASKOWITZ

1  Q.      What is "Code Purple?"

2  A.      Code Purple is a program to help homeless

3  individuals in Asheville and the surrounding area have a

4  place to sleep indoors, and dinner or supper at 6

5  o'clock, and breakfast in the morning before they're

6  asked to leave the property at approximately 8:00 a.m.

7  when it's 32 degrees or below, or if the weather is

8  really, really ferocious.  Like if there's a hurricane or

9  something there might be a Code Purple.  Generally, it's

10  for the cold temperatures so nobody freezes to death.

11  Q.      Is there a code for the van drivers in the Code

12  Purple program?

13  A.      They go out roughly 7 o'clock-ish -- and that can

14  vary an hour or so in either direction I suppose -- and

15  drive around the places where homeless individuals are

16  likely to hang out or where people know at this stage

17  that the van's going to stop, like the Salvation Army.

18  If people go to the Salvation Army and they don't have

19  enough room -- and at this point they don't take them in

20  at all.  But it's still, I believe, like, a bus stop for

21  homeless individuals who want to get here who want to do

22  Code Purple and who don't have a bus -- don't have a

23  vehicle and don't have the money to take a bus.

24        And they also will find individuals on the street

25  and invite them to come in.  And if they seem to be

## DIRECT - PLASKOWITZ

1  poorly clothed for winter or need gloves or hats or a

2  jacket or blanket those things are handed out to

3  individuals wherever they might be found if they're not

4  going to come back to ABCCM.

5  Q.    When you were performing unpaid hours as a van

6  driver, did you work Code Purple?

7  A.    I did for a time.

8  Q.    Are you currently in the Permanent Supportive

9  Housing Program?

10  A.    That's correct.

11  Q.    What is that program?

12  A.    After you've graduated from per diem, or sometimes

13  along the way if you choose to, you can ask to get in to

14  permanent supportive housing which gives you an

15  individual room.  You pay $425 a month for which includes

16  -- it's pretty much all expenses paid like, you know,

17  utilities, heat, three meals a day, and still some case

18  manager supervision for people who are transitioning or

19  don't want to be out on their own.

20  Q.    And for that $425 a month, is that -- do you have

21  a room to yourself?

22  A.    A room to yourself, correct.  It's the only way

23  you'll get a private room, typically.

24  Q.    When you were in the grant per diem program did

25  you try to find a paying job outside of the VRQ?

## DIRECT - PLASKOWITZ

1  A.     I had a paying job once for maybe two months.

2  Q.     Did you ever try to find another paying job?

3  A.     Once I applied at Pizza Hut and worked for one

4  day.

5  Q.     Why do you think that you were not able to find a

6  paying job?

7  A.     Well I wasn't really looking that hard.  I was

8  satisfied with where I was and what I was doing.

9  Q.     When you were enrolled in the per diem program did

10  you ever have to go to the VA to get medical attention?

11  A.     I had regular appointments all the time.  They not

12  only do emergency stuff but they do routine and

13  maintenance check-ups, physicals, and monitor things like

14  -- for example, I've had two heart attacks one of which

15  was treated by the VA and one of which was treated by

16  referral from the VA to Mission.  All the followup care

17  that's needed, and all the assorted heart tests and

18  cardiology things, and medication, are taken care of by

19  the VA.  So, typically, I probably have one appointment a

20  month or more for something or other.

21  Q.     What were the requirements of the per diem

22  program?

23  A.     For the per diem program?

24  Q.     Yes.

25        MR.  CURRIDEN:  Objection.

## DIRECT - PLASKOWITZ

1      THE COURT:  Basis.

2      MR.  CURRIDEN:  Are we talking legal requirements?

3  I guess I'm unclear about the form of the question.  Is

4  she asking what his requirements were or -- what were the

5  requirements of ABCCM, or what were the legal

6  requirements?

7      MS.  BROOKE:  I'm happy to rephrase.

8      THE COURT:  If you would do that.  That was a very

9  ambiguous question.

10     BY MS.  BROOKE:

11 Q.    Mr.  Plaskowitz, what was your understanding of

12 any requirements that you had to comply with as part of

13 the per diem program?

14 A.    Well, typically, you were homeless or about to be

15 homeless.  If someone knew about the program and knew

16 they were going to lose their place at the end of the

17 month they might come along two weeks early and try to

18 get it set up so the day they moved out they could move

19 in.  For me, I was homeless.  There's no age requirement.

20 You have to be a service member except for a very small

21 number of civilians.  There is a small civilian program

22 and, I think, right now it's six or eight people who are

23 -- who share rooms for a one year period if they're, you

24 know, granted that privilege and if there's room or

25 openings.

## DIRECT - PLASKOWITZ

1  Q.    When you were in the per diem program was there a

2  requirement that you meet with your case manager?

3  A.    Yes, weekly meetings.

4  Q.    Was there any sort of requirement related to your

5  health?

6  A.    You had to enroll at the VA immediately upon

7  arrival.  By that I mean within a few days or a week or

8  so of your arrival and go and get a physical to make sure

9  that you were, you know, fit and functional.

10  Q.    Was there any ongoing requirement to go to the VA?

11  A.    Well whatever appointments your doctor set up for

12  you.

13  Q.    And were there any educational requirements?

14  A.    There are classes at the VA.  At the time I was

15  going -- not at the VA.  Classes at the VRQ.  It could be

16  assorted things like money management, anger management,

17  bible study.  There's probably 20 or more classes you

18  could choose from, and you're supposed to go to two

19  classes a week.  I believe that was if you weren't

20  working full-time or going to school full-time, then you

21  might get an exemption or get it reduced to one.

22  Q.    Would it be a problem if the VRQ stopped providing

23  van drivers for its residents?

24  A.    Oh, it'd be a major problem because most people

25  don't have licenses or cars.  I would estimate that the

### DIRECT - PLASKOWITZ

1  vans move 20 to 40 people a day back and forth between
2  the VA and the VRQ.  And we also run the van to Steadfast
3  House for the women there if they need to go to the
4  hospital.
5  Q.     Would it be a problem if the VRQ didn't have
6  anyone staffing the front desk?
7  A.     Again, it would be a major problem.  The front
8  desk is like the hub of who's who and what's what.  I
9  mean if you come through the front door and the desk is
10 there you're supposed to stop, check in, and state your
11 business.  We don't just let people, you know, walk on
12 the property and roam around because that could be
13 dangerous for all kinds of reasons.  So everybody's
14 required to come to the front desk and sign in, even if
15 they're not in the program, and state what their business
16 is.  I'm here to visit John Smith, or I'm here dropping
17 off donations, or I just wanted to take a tour of the
18 place to see what you're about.  That's all handled
19 through the desk, in addition to the keeping of the daily
20 log, which is computerized, time-sheeted, every major
21 event that happens during the day, and in making sure
22 that people are signing in and signing out.  If the desk
23 wasn't there people would probably stroll out on their
24 own probably.
25 Q.     Did you ever hear anyone complain about having to

## DIRECT - PLASKOWITZ

1 perform service hours?

2       MR. CURRIDEN: Objection.

3       THE COURT: Basis.

4       MR. CURRIDEN: Hearsay.

5       THE COURT: It's overruled. Answer it if you can.

6       THE WITNESS: There are a lot of people who didn't

7 like service hours, yes.

8       BY MS. BROOKE:

9 Q.    Do you know Greg Armento?

10 A.    Yes.

11 Q.    How do you know him?

12 A.    I know him from the VRQ. I was there when he came

13 in.

14 Q.    Did you ever have the opportunity to observe his

15 work at the front desk?

16 A.    Not directly but I heard of it.

17 Q.    Did you have the opportunity to observe Greg's

18 work driving the van?

19 A.    Well I wasn't in the vans with him. He and I used

20 to make up the schedule, at one point, when we were

21 almost the only functional drivers, and we kind of kept

22 things going because we were short staffed.

23 Q.    Did Mr. Armento show up for work on time?

24 A.    Absolutely.

25 Q.    Did he do what was asked of him by his supervisor

CROSS - PLASKOWITZ

1  that you observed?

2  A.     As far as I know, yes.

3  Q.     Were you aware of any efforts he undertook to find

4  outside employment?

5  A.     Once I told you I took an outside job, which was

6  holding signs for a company that did advertising for

7  people going out of business, and I took him on two runs

8  with me.  They didn't work out so, basically, we took a

9  ride somewhere, turned around and came back, and that was

10 the end of that.

11 Q.     What didn't work out?

12 A.     The job holding the signs.

13 Q.     It wasn't available?

14 A.     Yeah.  We were told it was available, but when we

15 got there it wasn't.

16 Q.     How would you characterize Mr. Armento's work

17 ethic?

18 A.     I think he has a good work ethic.  I mean he's

19 very conscientious to the point of fastidiousness.  He's

20 very, careful, and he's very detailed and does a good

21 job.

22 Q.     That's all the questions I have, Your Honor.

23        THE COURT:  Cross-examination.

24        MR. CURRIDEN:  Yes.  Thank you, Your Honor.

25                    **CROSS-EXAMINATION**

## CROSS - PLASKOWITZ

1   BY MR. CURRIDEN:

2   Q.    Good morning, Mr. Plaskowitz.

3   A.    Good morning.

4   Q.    I understand there are a few different categories

5   of residents at the VRQ; is that correct?

6   A.    That is correct.

7   Q.    And then there are a few different categories of

8   people performing jobs at the VRQ; is that correct?

9   A.    Correct.

10  Q.    And, as far as the residents go, there are grant

11  per diem residents or participants --

12  A.    Yes.

13  Q.    -- and they are there for up to 24 months at a

14  time.

15  A.    Correct.

16  Q.    And then there are people in the Permanent

17  Supportive Housing Program that one has to qualify for

18  and pay for.

19  A.    Correct.

20  Q.    All right. And then in terms of the categories of

21  people doing jobs. There are people doing service hours;

22  correct?

23  A.    Correct.

24  Q.    And then there are people who are getting paid

25  from some outside entity such as Land of the Sky?

CROSS - PLASKOWITZ

1  A.     Or somebody just has an outside job.  I mean there

2  are people who come into the program who might be

3  homeless and already have a job, so they continue working

4  their job.  Or they come there and they find a job.  It

5  could be anything.  It doesn't have to be grant-related.

6  It just could be a regular job, and they do it and they

7  save their money so they can go on at some point.

8  Q.     Right.  And I'm sorry.  My question wasn't very

9  clear.  I was referring to just people doing jobs on the

10 VRQ campus or in the VRQ facility.

11 A.     I think you lost me there for a minute.  There are

12 always people doing some kind of -- some kind of work,

13 and they usually come from the per diem group.  I don't

14 think that intake people have been around long enough to

15 be scheduled for assignments.  If my memory serves me,

16 PSH people weren't required to do service hours during my

17 first per diem.  Then after you were out of the program

18 you were exempted from PSH paying for your room.  These

19 days that may be a gray area which I'm not fully up to

20 date and informed on.

21 Q.     Okay.  But in terms of the categories of people

22 doing jobs in and around the VRQ.  There are grant per

23 diem participants doing service hours.  That's one

24 category; correct?

25 A.     Right.

CROSS - PLASKOWITZ

1  Q.     And then there are people who are working there,

2  such as yourself, now who are getting paid by some

3  outside entity such as Land of the Sky.

4  A.     Correct.  Or ABCCM could hire someone as staff.

5  Q.     And that was the next category I was getting to.

6  Someone could be hired by ABCCM in the Transitional

7  Employment Program?

8  A.     Correct.

9  Q.     Right.  And that's a program where people are

10 employed for up to 1,000 hours; correct?

11 A.     Correct.

12 Q.     And you started out a few years ago, your first

13 time, in this -- as a grant per diem resident; correct?

14 A.     Correct.

15 Q.     And then again most recently around -- I think you

16 said 2013 is when you started a second grant per diem

17 stay?

18 A.     Yeah.  Approximately, yeah.

19 Q.     And then after some period of time -- I think you

20 told me 22 months -- you graduated in to the Permanent

21 Supportive Housing Program.

22 A.     Correct.

23 Q.     And in the Permanent Supportive Housing Program

24 you mentioned that you pay a fee per month for the room

25 and board, for the meals, and for the other services you

**CROSS - PLASKOWITZ**

1  receive through the facility.

2  A.      Right.

3  Q.      And you don't have all the same requirements as

4  the grant per diem participants; correct?

5  A.      That is correct.

6  Q.      For example, you don't have a service hours

7  requirement in the Permanent Supportive Housing Program.

8  A.      As far as I know.  I had heard rumors there --

9  there were rumors that that was going to change or might

10  have changed.  I haven't read the latest copy of the

11  handbook.  And that, of course, depends on somebody's

12  health and ability to function.

13  Q.      But as far as you know --

14  A.      As far as I know, it's not a requirement for PSH,

15  although it may be and I could be mistaken.

16  Q.      Okay.

17  A.      I'm sure someone will correct me if I'm wrong.

18  Q.      All right.  And in order to transition from the

19  grant per diem program in to the Permanent Supportive

20  Housing Program you had to qualify for that; correct?

21  A.      Correct.  You had to ask to be in it.  I don't

22  know the process exactly, but I imagine you were reviewed

23  at a staff meeting in terms of, you know, do you think

24  this person would be a good fit for PSH.  In other words,

25  not just anybody's going to get into PSH.  If somebody's

CROSS - PLASKOWITZ

1  known to go out drinking every payday they're not a good

2  PSH candidate probably.

3  Q.     Right.  In other words, you had to demonstrate

4  that you could save and manage your money at least well

5  enough to pay the $425 per month program fee.

6  A.     Absolutely.  Absolutely.  And not be a

7  troublemaker.

8  Q.     Do you know whether Greg Armento ever tried to

9  qualify for the PSH program?

10  A.     I do not.  I don't think he did.

11  Q.     And going back to your -- the beginning of your

12  second grant per diem stay around 2013.  As part of that,

13  I think you said that you did service hours at the front

14  desk; correct?

15  A.     Correct.

16  Q.     And you understood that the service hours were not

17  for pay; correct?

18  A.     Correct.

19  Q.     That was explained to you at the time of your

20  intake into the program.

21  A.     Correct.  That service hours were required, yes,

22  and that there was no pay.

23  Q.     And that was part of the program as long as you

24  were not working at an outside job or going to school;

25  correct?

**CROSS - PLASKOWITZ**

1    A.    Correct.

2    Q.    And you understood there were other requirements

3    of the grant per diem program as well; right?

4    A.    Sure.  There's a whole long list of things you do

5    or don't.

6    Q.    As a few examples of those.  Number one, you were

7    expected to stay sober; correct?

8    A.    Correct.

9    Q.    You were expected to comply with the facility

10   curfew.

11   A.    Correct.

12   Q.    You were expected to meet with your caseworker --

13   A.    Correct.

14   Q.    -- and work on goals, or developing what's called

15   a "contract for success;" correct?

16   A.    Yes.

17   Q.    And these were all part of the program of

18   stabilization and rehabilitation for vets who had

19   previously been homeless and unemployed; correct?

20   A.    As far as I know, yes.

21   Q.    And you testified that you did service hours at

22   the front desk and then later as a van driver both during

23   your second per diem stay; correct?

24   A.    Yes.

25   Q.    And you did that for some period of time until it

CROSS - PLASKOWITZ

1  became a paid position.  You were authorized to receive
2  payment through the Land of the Sky grant.
3  A.    Yes.
4  Q.    And that arrangement -- well let me back up a
5  little bit.
6        I understand that you were on a service-related
7  disability; is that correct?
8  A.    Correct.
9  Q.    And the arrangement with Land of the Sky allows
10 you to work and be compensated in a way that doesn't
11 affect your disability; is that right?
12 A.    That's what I was told, but I've been informed
13 lately that I can't find anybody who will verify that at
14 this point in time.  That's what we were told in regular
15 meetings at Land of Sky by the people who administered
16 the program.
17 Q.    As soon as you began working in that paid position
18 you were no longer required to do service hours; correct?
19 A.    Correct.
20 Q.    But until you graduated from the grant per diem
21 program and in to the Permanent Supportive Housing
22 Program you still had to meet the other requirements of
23 the grant per diem program; correct?
24 A.    Correct.
25 Q.    Such as, as we mentioned, staying sober, complying

CROSS - PLASKOWITZ

1  with curfew, meeting with your caseworker?

2  A.     Yeah.    Absolutely.

3  Q.     In other words, those requirements didn't go away

4  when you graduated in to a paid position?

5  A.     No, they didn't go away.   Whether we were paid or

6  not had nothing to do with whether you followed the rules

7  or not.

8  Q.     Okay.   And you testified about being asked to work

9  more than what you were getting paid or more than the

10  minimum requirements.   Did I understand that correctly?

11  A.     Yes, that is correct.

12  Q.     And you said most people, including you, didn't

13  complain about that or you let it slide.   Is that

14  correct?

15  A.     Generally, people might have talked about it but

16  not made noise about it to the administration because

17  they'd be afraid to be bucking the system I suppose.   I

18  was.

19  Q.     And that was an assumption on your part; correct?

20  A.     Yeah, you could say that.   I had no proof of that.

21  Q.     In other words, nobody in a position of authority

22  ever told you you are required to work more than what

23  you're getting paid or more than what the minimum service

24  hour requirements would be.

25  A.     Well that's not true.   Actually, if I was working

CROSS - PLASKOWITZ

1  on the desk and there was a need for a desk manager and

2  someone got sick and someone had to fill in and I was the

3  only available person I was told you're working the desk.

4  And if I said I'm not working the desk I probably

5  wouldn't have a paid job much longer.  You might get away

6  with that once or twice, but if you refused to help out

7  you'd probably find yourself looking for something else

8  to do.

9  Q.    But no one in a position of authority ever stated

10 that to you explicitly, did they?

11 A.    I believe Randy Gamble did.  And it was -- it was

12 kind of understood.  It's kind of understood, like, if

13 you get pulled over by a policeman you'd be wise not to

14 start cursing at him in a loud voice.  Nobody ever kind

15 of tells you that but you just know that you're not

16 supposed to do that or it could result in harm.

17 Q.    You're not aware, are you, of anyone having been

18 kicked out of the facility for refusing to do service

19 hours beyond the minimum requirements.

20 A.    I believe it's probably happened but I don't have

21 any specific example for you.  People get removed for a

22 lot of things.  Refusing service hours would be one of

23 many possibilities that might have combined to make

24 somebody be asked to leave.

25 Q.    And I think you mentioned earlier that there was a

## REDIRECT - PLASKOWITZ

1  fair amount of latitude, and even on a third strike there

2  may be some flexibility.

3  A.    Right.  If someone demonstrated remorse and a

4  commitment to try to do better very often they were given

5  the opportunity to prove themselves, and sometimes they

6  did and sometimes they didn't.

7  Q.    And you would agree with me, wouldn't you, that

8  the mission of the VRQ is to provide shelter for people

9  who were previously homeless; correct?

10  A.    That is correct.

11  Q.    And to provide a source of stabilization and

12  rehabilitation?

13  A.    That is correct.

14  Q.    And that's what it was for you.

15  A.    You're right.

16  Q.    All right.  Thank you, sir.  Those are my

17  questions.

18        THE COURT:  Any redirect?

19        MS.  BROOKE:  Just a few, Your Honor.

20                    **REDIRECT EXAMINATION**

21        BY MS.  BROOKE:

22  Q.    Are there employees at the VRQ who are paid by

23  ABCCM?

24  A.    There are some, yes.

25  Q.    And are there some who are not part of the

## REDIRECT - PLASKOWITZ

1  Transitional Employment Program?

2  A.    By "Transitional Employment Program" you mean like

3  what I'm in?

4  Q.    I am referring specifically to the thousand hours

5  program.

6  A.    Could you repeat the question?

7  Q.    Sure.  Are there employees at the VRQ who are paid

8  by ABCCM who are not part of the thousand hours

9  Transitional Employment Program?

10  A.    Paid by ABCCM who are not part of -- I imagine

11  there are.  I'm not sure.  That's above my pay grade,

12  really.

13  Q.    Okay.  Are you aware of employees at the front

14  desk who are paid directly by ABCCM?

15  A.    I believe there are a few, yes, or there have

16  been.  I don't know if there are right now.

17  Q.    Are you aware of employees of ABCCM who drive vans

18  and who are paid by ABCCM?

19  A.    Yes.  I'm rather certain that has happened and may

20  still be happening.

21  Q.    Do you perform unpaid hours now?

22  A.    Not that often because we've got a full schedule

23  of people.  When Mr. Armento started this whole thing

24  there was kind of a shift in terms of hours and pay, and

25  I think there was a kind of a reformation that happened

**REDIRECT - PLASKOWITZ**

1  because of whatever Greg was doing at that time.

2      MR. CURRIDEN: Objection, and motion to strike.

3  Speculation.

4      THE COURT: Sustained.

5      BY MS. BROOKE:

6  Q.    When you were first in the Permanent Supportive

7  Housing Program did you perform unpaid hours?

8  A.    When I was first there, yes.

9  Q.    In the Permanent Supportive Housing Program?

10  A.    Oh, no, not in Permanent Supportive Housing.  In

11  per diem but not Permanent Supportive House.

12  Q.    Do you now at times perform unpaid hours?

13  A.    Well, no, not really.  No.

14  Q.    I believe you mentioned previously that you would

15  be scheduled for more than your 20 hours per week.

16  A.    That could happen but it wasn't common.  Because

17  now we have -- we have a full schedule of people who are

18  supposed to work and who are mostly reliable, and we have

19  a couple of standby drivers in the event that somebody

20  needs to be filled in so the people who are doing 20

21  hours don't have to be asked to do more.

22  Q.    When you were first paid through Land of Sky for

23  20 hours a week were you scheduled for more than 20 hours

24  a week at times?

25  A.    I don't remember the schedule.  I'm not sure that

## RECROSS - PLASKOWITZ

1  we were scheduled for more than 20 but we would sometimes

2  do more than 20.

3  Q.    When someone is asked to leave the VRQ does the

4  administration tell the other residents why that person

5  had to leave?

6  A.    No, not necessarily.  Sometimes it becomes common

7  knowledge or because of an incident is involved, it's

8  observed and talked about.  But, no, it's not common to

9  share that information with residents.

10 Q.    That's all I have, Your Honor.

11        THE COURT:  Any recross?

12        MR.  CURRIDEN:  Just a couple of followup.

13                    **RECROSS EXAMINATION**

14        BY MR.  CURRIDEN:

15 Q.    Mr.  Plaskowitz, your current schedule.  I think

16 when you and I spoke on the phone yesterday you said that

17 you -- it's variable.  It may be as little as an hour a

18 week; it may be as much as ten to 15 hours a week.

19 A.    That's as a backup driver, as what's called an

20 "on-call driver."

21 Q.    And is that your job at this point?

22 A.    That is my job at this point, yes.

23 Q.    All right.  So you're not working any more than

24 that as a van driver.

25 A.    No, not right now.  Not for the past few weeks.

### DIRECT - ROGERS

1  Q.    Okay.  And for that one to ten to 15 hours you're

2  still being paid through the Land of the Sky grant.

3  A.    That is correct.

4  Q.    Thank you, sir.

5        THE COURT:  Anything else, Ms. Brooke?

6        MS. BROOKE:  No, Your Honor.

7        THE COURT:  May Mr. Plaskowitz be released?

8        MS. BROOKE:  He may.

9        THE COURT:  Any objection?

10       MR. CURRIDEN:  No objection.

11       THE COURT:  Thank you, Mr. Plaskowitz.  You may

12  step down.  You are free to go.

13       THE WITNESS:  Thank you.

14              (Witness excused at 10:10 a.m.)

15       THE COURT:  Call your next witness.

16       MS. BROOKE:  We call Scott Rogers, Your Honor.

17       THE COURT:  Come forward to be sworn.

18       THE CLERK:  Put your left hand on the Bible,

19  please, and raise your right hand.

20              (Witness duly sworn at 10:10 a.m.)

21       THE COURT:  You may proceed.

22                    **DIRECT EXAMINATION**

23       BY MS. BROOKE:

24  Q.    Reverend Rogers, could you state your full name

25  and address for the record please?

DIRECT - ROGERS

1    A.      Yes.  It's Scott Bailey Rogers.

2    Q.      And what is your address, sir?

3    A.      My address is 69 Evelyn Acres Drive in Asheville,

4    North Carolina, 28806.

5    Q.      What is your occupation?

6    A.      I'm the Executive Director of the Asheville

7    Buncombe Community Christian Ministry, fondly known as

8    "ABCCM."

9    Q.      How long have you worked there?

10   A.      Since October 1st of 1981.  So a little over 38

11   years now.

12   Q.      Is part of your job to oversee the Veterans'

13   Restoration Quarters?

14   A.      Yes.

15   Q.      Do you supervise staff members there?

16   A.      Yes.

17   Q.      How many staff members do you supervise?

18   A.      I don't have the exact number, but it's about 22

19   not counting the part-time or temporary employees.

20   Q.      When you refer to "temporary employees" are you

21   referring to employees in the temporary employment

22   program?

23   A.      Yes.

24   Q.      How many people live at the VRQ?

25   A.      So that varies.  We have three components:  The

## DIRECT - ROGERS

1  Emergency Shelter component, the Transitional Housing

2  component, and the Permanent Supportive Housing units.

3  Q.    How many are in the transitional housing

4  component?

5  A.    In transitional housing we have roughly 160 or so.

6  So there's about 145 or so who are veterans in the grant

7  per diem program, and roughly 15 non-veterans.

8  Q.    Do you have staff members who live at the VRQ?

9  A.    We have some staff who may be in permanent

10 supportive housing.

11 Q.    Any others?

12 A.    No.

13 Q.    Okay.

14 A.    Not that I'm aware of.

15 Q.    And are any of those staff members in permanent

16 supportive housing paid directly by ABCCM?

17 A.    Yeah, they may be.  We do hire former residents as

18 permanent -- as regular employees.

19 Q.    Do you know how many people fit that category now?

20 A.    Not off the top of my head I don't.

21 Q.    Would it be a handful?

22 A.    It would probably be -- yes.  It would be less

23 than five.

24 Q.    Was the plaintiff, Greg Armento, part of the grant

25 per diem program?

## DIRECT - ROGERS

1  A.    Yes.

2  Q.    Does ABCCM employ a volunteer coordinator?

3  A.    Yes.

4  Q.    Is that a full-time position?

5  A.    Yes.

6  Q.    And how long have you had someone in that

7  position?

8  A.    From almost the -- let's see.  That started around

9  the mid '90s.

10  Q.    How many volunteers does that person manage?

11  A.    Upwards of about 2,500-plus.

12  Q.    Are those volunteers from the community?

13  A.    Yes.  Most of them are there our -- we have two

14  types of volunteers.  We have our regular volunteers,

15  mostly from our member churches and area businesses, and

16  then we have our -- what we call our mission, or project

17  volunteers, who are annually once a year.

18  Q.    Are those people who volunteer full-time for you

19  the mission volunteers?

20  A.    Yeah.  The once-a-year project volunteers are just

21  coming in for projects or mission groups.  The other

22  group of volunteers, yes, they volunteer either once a

23  week, once a month, or once a quarter.

24  Q.    Okay.  And do they fill out some kind of paperwork

25  when they start volunteering?

## DIRECT - ROGERS

1  A.      Yes, ma'am.

2  Q.      What does that include?

3  A.      So we utilize a -- both a paper record and an

4  electronic record in what we call the volunteer hub so

5  that we provide people both with a sign-in, an

6  orientation, some training that's in conjunction,

7  usually, with other volunteers that have been regulars

8  for a while or are lead volunteers.

9  Q.      What does the orientation involve?

10 A.      So the orientation covers a whole host of things

11 from just a tour of the facility and orienting them to

12 how their role fits with others to, also,

13 confidentiality, safety, how to report an incident or

14 concerns, how to understand both the role and function

15 and duties they're being asked to perform.

16 Q.      How long does that orientation take?

17 A.      It varies with the various jobs, but the

18 orientation is anywhere from an hour to three or four

19 hours over multiple times.

20 Q.      Does ABCCM employ someone to supervise the front

21 desk managers?

22 A.      Yes.

23 Q.      Who is that person?

24 A.      Again, that varies.  Right now I'm not sure who

25 that person is.  Our operations manager is Joe Landry

DIRECT - ROGERS

1  and, of course, he's supervised by the director, Tim

2  McElyea.

3  Q.    Between 2015 and 2017 do you know who was

4  supervising the front desk managers?

5  A.    I believe Randy Gamble was doing that most of the

6  time.

7  Q.    And was Mr. Gamble employed directly by ABCCM?

8  A.    Yes, I believe he was.

9  Q.    Was he part of the permanent supportive housing

10 program?

11 A.    Yes.

12 Q.    Was he a former per diem grant recipient as well?

13 A.    Yes.

14 Q.    I am going to show you what's been marked as

15 Exhibit 1A.  Do you have that in front of you?

16 A.    I do.  The Veterans Restoration Quarter resident

17 handbook.

18 Q.    Your Honor, the defendants have stipulated that

19 this exhibit is authentic and admissible, and we'd move

20 it into evidence.

21        THE COURT:  Any objection?

22        MR. CURRIDEN:  No objection.

23        THE COURT:  Let it be admitted.

24           (Plaintiff's Exhibit 1A is admitted.)

25        BY MS. BROOKE:

**DIRECT - ROGERS**

1  Q.      Can you tell me what this is?

2  A.      Yes.  This is the ABCCM Veterans' Restoration

3  Quarters resident handbook.

4  Q.      Is this handbook provided to all residents of the

5  VRQ?

6  A.      Yes.

7  Q.      If you turn to page 2.  I'm going to turn to page

8  2.

9  A.      Thank you.

10  Q.      Can you tell me what the date is on this handbook

11  please?

12  A.      6/22/14.

13  Q.      And what does this handbook communicate to

14  residents?

15  A.      Well it is generally the overall program,

16  overview, our purpose, the services of the transitional

17  housing program.  It reflects how we help folks move on

18  an incentive basis and through a developmental process of

19  rehabilitation through the various stages and, of course,

20  the overall rules, the accountability, and our staffing.

21  Q.      I'm going to turn to that staffing page now.  At

22  the time that this handbook was written which staff

23  position was in charge of supervising the van drivers?

24  A.      I don't see the -- I mean Tim McElyea overrsees

25  the, you know, general operations of the program at this

## DIRECT - ROGERS

1  time, and he would have overseen whoever was putting all

2  of that together at the time.

3  Q.    So between Tim McElyea and the drivers there, the

4  van drivers, there was another person.

5  A.    I don't know that there was at that time.

6  Q.    All right.

7  A.    He would have to clarify that for you.

8  Q.    What rate did ABCCM pay its van drivers?

9  A.    So for our temporary employees the rate, I

10 believe, at that time was $9 an hour.

11 Q.    And when you refer to temporary employees are you

12 referring to people who were part of the Transitional

13 Employment Program?

14 A.    Yes.  That is specifically correct.  So you need

15 to understand that as part of our rehabilitation program

16 we have a structure that encourages them and reinforces

17 them through that to participate in the health and safety

18 and the support of the community.

19 Q.    The question was, when you're referring to

20 temporary employees are you referring to the members of

21 the Transitional Employment Program?

22 A.    Yes.

23 Q.    Your Honor, we have two additional handbooks that

24 have also been stipulated as admissible and authentic.

25 Would you like me to have Mr.  Rogers identify them or

## DIRECT - ROGERS

1   can we move them into evidence?

2          THE COURT:  If you're offering them and there's no

3   objection we can get them in the record.

4          MS.  BROOKE:  This would be Exhibits 1B, 1C, and

5   1D.

6          MR.  CURRIDEN:  No objection.

7          MS.  BROOKE:  Thank you.

8          THE COURT:  Let them be admitted.

9              (Plaintiff's Exhibits 1B, 1C, and

10              1D are admitted.)

11         BY MS.  BROOKE:

12  Q.    Reverend Rogers, how many times a day does ABCCM

13  provide van runs to the VA medical center?

14  A.    There was a schedule, and the schedule was in the

15  handbook.

16  Q.    All right.  Let me have you turn to that.  Is this

17  the schedule that you're referring to in the middle of

18  page 10?

19  A.    Yes.

20  Q.    The van driver position.  Would you characterize

21  the van driver position as essential to the operations of

22  the VRQ?

23  A.    So I would not characterize it as "essential"

24  because we offer other forms of transportation.  All that

25  we're asked to provide through the VA grant per diem is

DIRECT - ROGERS

1  to be on a public transportation line and provide that.

2  The shuttle transportation that we provide is over and

3  above what is expected by the grant per diem program.  It

4  is something that we provide as a way to both facilitate

5  and support the men and both their health and safety, as

6  well as in their work readiness through training either

7  at AB-Tech, or other work programs like NC Workforce

8  Solutions or Goodwill.  So we do this over and above as

9  part of what we try to support holistically for the men

10 in transitional housing.

11 Q.    Could the people who are in the grant per diem

12 program fulfill their requirement to take care of their

13 health if ABCCM did not provide van driving?

14 A.    Yes.

15 Q.    How would they do that?

16 A.    They would do that by utilizing the public

17 transportation system or, as many still do today, by

18 walking, through car pooling with others, and we also

19 have the option to also utilize volunteers who are not

20 part of the transitional housing, or residents or former

21 residents.  We can also utilize volunteers from our large

22 volunteer pool.

23 Q.    Are volunteers on ABCCM's insurance?

24 A.    Yes.

25 Q.    They're on vehicle insurance?

## DIRECT - ROGERS

1  A.    Yes.

2  Q.    How many volunteers are on their vehicle

3  insurance?

4  A.    I don't know the specific number.

5  Q.    Are volunteers available to drive grant per diem

6  residents in the middle of the night?

7  A.    I don't know the answer.  I mean they would have

8  to make themselves available.

9  Q.    Do they make themselves available?

10  A.    I'm not aware of any at this time.

11  Q.    In emergencies, would the VA expect ABCCM to

12  transport grant per diem residents to the hospital?

13  A.    No.  We can call 911.  We can utilize the EMS

14  system.

15  Q.    I'm going to turn your attention to another

16  exhibit.

17        Your Honor, we have a -- we do not have

18  Mr. Rogers' full affidavit on our exhibit list.  This is

19  not in the exhibit notebook that we provided to the

20  Court.  Given Mr. Rogers' answer to a previous question

21  I would like to ask him a question about one of these

22  paragraphs, and I'd like to show it --

23        THE COURT:  Are you saying that there's a prior

24  inconsistent statement?

25        MS. BROOKE:  Yes.

## DIRECT - ROGERS

1      THE COURT:  You may examine him as to a prior

2  inconsistent statement with something that is not an

3  exhibit, but you are limited to that since it is not an

4  exhibit.

5      MS.  BROOKE:  Yes, Your Honor.

6              **FURTHER DIRECT EXAMINATION**

7  BY MS.  BROOKE:

8  Q.    Mr.  Rogers, do you recognize this?

9  A.    Yes.

10 Q.    Can you tell me what it is?

11 A.    It's the affidavit of Scott Rogers.

12 Q.    And did you sign this affidavit?

13 A.    Yes.

14 Q.    On what date?

15 A.    The second of July, 2018.

16 Q.    All right.  And you were under oath when you

17 signed it?

18 A.    Yes.

19 Q.    Can you please read to me paragraph 8 from your

20 affidavit?

21 A.    The service hours requirement is in furtherance of

22 the eleemonysary purpose of ABCCM.  Residents perform

23 work that is essential to keeping the VRQ operating.  The

24 examples given: cleaning the kitchen, cleaning common

25 areas, staffing the front desk, driving a shuttle, et

DIRECT - ROGERS

1  cetera.  And the purpose of having residents perform this

2  work is to help develop time management skills, job

3  skills, and to develop a sense of purpose.

4  Q.     Under the terms of ABCCM's agreement with the

5  Veterans' Administration, is ABCCM allowed to charge rent

6  to people who are part of the grant per diem program?

7  A.     My understanding is that we can, yes.

8  Q.     I'm sorry?

9  A.     My understanding is, yes, that we could do that.

10  Q.     Do you do that?

11  A.     As a part of the transitional housing grant per

12  diem?  No, we do not.

13  Q.     And your understanding is that ABCCM is allowed to

14  charge rent to people.  Is it also your understanding

15  that if you did that that the amount that ABCCM received

16  from the grant per diem program would be decreased by

17  that amount?

18  A.     No.  I was not aware of that because we don't

19  utilize that, so I do not know the details of that.

20  Q.     I'm going to turn to another exhibit.  This is

21  Exhibit 8.  Do you recognize this?

22  A.     Yes.

23  Q.     Can you tell me what it is?

24  A.     This was the official notice of our per diem rate

25  request form and approval.

### DIRECT - ROGERS

1    Q.      And who is it from?

2    A.      It's from the VA national grant per diem office.

3    Q.      And who is it to?

4    A.      To me as executive director of ABCCM.

5    Q.      Did you receive this letter?

6    A.      Yes.

7    Q.      And if you look down at the fourth paragraph of

8    that letter --

9    A.      Okay.

10   Q.      -- does that refresh your recollection as to

11   whether the VA would reduce your per diem payment if you

12   charged rent to payment participant -- to grant per diem

13   participants?

14   A.      So, as I'm reading it here, according to our

15   records the veterans have received transitional housing

16   under this award and are not charged any rent or fees.

17   If this is not accurate please notify our office

18   immediately.  It is likely the requested and approved per

19   diem rate is overstated.

20   Q.      Did you notify the Veterans' Administration that

21   you were -- at any point that you were charging grant per

22   diem recipients rent?

23   A.      No.  We do not charge rent so we did not notify

24   them.

25   Q.      So you never asked them to receive less than the

### DIRECT - ROGERS

1  full per diem amount for room and board; is that correct?

2  A.    That's correct.  It was -- according to our

3  records, the veterans that receive transitional housing

4  under this award are not charged any rent and/or fees.

5  If this is not accurate please notify our office

6  immediately, as it is likely the requested/approved per

7  diem rate is overstated.

8  Q.    Your Honor, I'd like to move this exhibit into

9  evidence.

10       THE COURT:  Any objection?

11       MR.  CURRIDEN:  No objection, Your Honor.

12       THE COURT:  Let it be admitted.

13            (Plaintiff's Exhibit 8 is admitted.)

14       BY MS.  BROOKE:

15  Q.    I'm going to turn to another exhibit.  This is

16  Exhibit 9.  Can you tell me what this is?

17  A.    This is a per diem payment voucher.

18  Q.    Are the entries on these vouchers made at the time

19  the vouchers are sent to the Veterans' Administration?

20  A.    I'm sorry?

21  Q.    Are the entries on these vouchers made at the time

22  these vouchers are sent to the Veterans' Administration?

23  A.    Yes.

24  Q.    Were those entries made based on information from

25  someone who has knowledge of the ABCCM per diem program?

### DIRECT - ROGERS

1  A.      Yes.

2  Q.      Were they created in the course of ABCCM's regular

3  course of business?

4  A.      Yes.

5  Q.      And part of your regular business practice?

6  A.      Yes.

7  Q.      Your Honor, I'd like to move this exhibit into

8  evidence.

9       THE COURT:  Any objection?

10       MR.  CURRIDEN:  I would object on relevance

11  grounds, Your Honor.

12       THE COURT:  As to relevance -- the amounts that

13  are at issue in this case I understand you all have

14  stipulated to.  So why are we supplementing the record

15  beyond the stipulation on that point?  Or is there

16  something in this document that is of evidentiary value

17  beyond what you've already stipulated to?

18       MS.  BROOKE:  Yes, Your Honor.  On the second page

19  of the document there is a certification.  There is --

20  I'm sorry.  There's language on the first page of the

21  document in the supportive housing section that explains

22  the basis for the calculation of the payment.  We have

23  stipulated to the amount but we have not stipulated to

24  what that amount covers.

25       THE COURT:  So you're offering this as a statement

### DIRECT - ROGERS

1  by Reverend Rogers as to what the payment is to cover?

2  Is that the relevancy that you are wanting the Court to

3  glean from this document?

4      MS.  BROOKE:  Yes.  And that the amount as

5  certified to by Reverend Rogers does not exceed 100

6  percent of the daily cost of care per veteran per day.

7  We have stipulated to the amount that they received from

8  the Veterans' Administration, but we have not stipulated

9  that -- whether that amount covered their entire cost.

10      THE COURT:  Mr.  Curriden, do you want to be heard

11  further on your objection?

12      MR.  CURRIDEN:  No, sir, Your Honor.

13      THE COURT:  The objection is overruled.  Let it be

14  admitted.

15        (Plaintiff's Exhibit 9 is admitted.)

16      BY MS.  BROOKE:

17  Q.  Mr.  Rogers, do you see that you certified at the

18  bottom that the statements made in this voucher were

19  correct?

20  A.  Yes.

21  Q.  And that the information provided was based on

22  actual costs and when divided does not exceed 100 percent

23  of the daily cost of care per veteran per day?

24  A.  What are you referring to on this form?

25  Q.  I'm referring to the section just under "payment

## DIRECT - ROGERS

1  validation" and above your name.

2  A.    Okay.  So what this statement says is that, to the

3  best of my knowledge, the funds are requested for the

4  services and/or housing that have been provided to

5  eligible veterans.  It does not, in my opinion, state

6  that this covers a hundred percent.  It just says that we

7  have provided the services and housing to the eligible

8  veterans that are requested to help cover the costs that

9  we submitted for.

10 Q.    Do you see where it says, directly above your

11 printed name, "I certify the billing requested is

12 accurate based on actual costs and when divided does not

13 exceed 100 percent of the daily cost of care per veteran

14 per day?"

15 A.    I do see that now.

16 Q.    Okay.  That's all.

17        You mentioned earlier that ABCCM provides housing

18 to some staff members through the permanent supportive

19 housing program; correct?

20 A.    I did.

21 Q.    Do those staff members pay rent?

22 A.    I don't know specifically.  Generally, yes.  Some

23 have had their rent waived at times.

24 Q.    Why would their rent be waived?

25 A.    So our permanent supportive housing is primarily

DIRECT - ROGERS

1  for those veterans who struggle to have -- to be able to

2  afford housing in the community without either the

3  supportive environment or subsidy.  And prior to -- well

4  let me just say that the VA and HUD have gone together to

5  create what are called HUD Veteran Assistant Supportive

6  Housing vouchers or VASH vouchers.  There's a limited

7  supply of them that does not meet the need of many of all

8  of the disabled veterans who are seeking housing and who

9  may graduate from our program.

10 Q.     What is the general requirement for rent payment

11 for members of the Permanent Supportive Housing Program?

12 A.     So it's about $425 a month I believe.

13 Q.     Does that cover the full cost of their rent?

14 A.     Heavens no.

15 Q.     Does ABCCM take a wage credit toward those staff

16 members' wages for the subsidized room and board?

17 A.     I don't know that we take any credit.  I'm not

18 aware of that, no.

19 Q.     You're not aware of it or you don't take the

20 credit?

21 A.     I am not aware of it.

22 Q.     Do persons in the grant per diem program

23 participate in the rewards program?

24 A.     In the?

25 Q.     Rewards program.

DIRECT - ROGERS

1   A.      Transitional housing folks do, yes.

2   Q.      Was that a yes?

3   A.      Yes.

4   Q.      I'm going to turn to Exhibit 6.  This exhibit has

5   been stipulated as authentic and admissible.  Your Honor,

6   we'd like to move it into evidence.

7           THE COURT:  Any objection?

8           MR.  CURRIDEN:  No objection.

9           THE COURT:  Let it be admitted.

10                  (Plaintiff's Exhibit 6 is admitted.)

11          BY MS.  BROOKE:

12  Q.      I'm going to direct your attention to the top of

13  the second page where it says "eligibility," and I will

14  read it to you.

15          "All residents in good standing (performing

16  service

17  hour, no strikes) with an income of $800 or less, (after

18  deductions) are eligible to participate in the points

19  program."  Did I read that correctly?

20  A.      Yes.

21  Q.      When did ABCCM start its service hours program?

22  A.      We started the service hours program from

23  virtually the beginning of when we had our old facility

24  in 1987.

25  Q.      What was the purpose of the service hours program?

### DIRECT - ROGERS

1  A.    The purpose of the service hours program is part

2  of our rehabilitation, part of our developmental

3  structure, to support both the health and safety of the

4  veterans, and to also help them develop healthy routines

5  in their own personal lives as well as supporting the

6  community's health and safety and welfare overall.

7  Q.    When did ABCCM start the Transitional Employment

8  Program?

9  A.    I don't remember the exact date of when we started

10 that.  It was in the early 2000s.

11 Q.    What is the purpose of the Transitional Employment

12 Program?

13 A.    The purpose of that is part of our work readiness

14 training.  We found that it wasn't enough to just provide

15 work readiness around resume writing and certain skill

16 building and that we really needed -- many employers

17 would not hire anyone who had not had a short-term record

18 at least of showing up on time, being able to perform

19 repetitive tasks, being able to stay on task, being able

20 to follow directions, take supervision, and so on.  So

21 this provided us with a way to give residents a temporary

22 employment along with a brief work history that we could

23 responsibly and with integrity say to employers that they

24 have been able to perform these duties and those duties,

25 and it gave them confidence that they can have them on

### DIRECT - ROGERS

1  their job site.

2  Q.     Who funds the Transitional Employment Program?

3  A.     ABCCM funds it.

4  Q.     Why couldn't VRQ residents learn the skills that

5  you discussed related to service hours in a paid

6  position?

7  A.     So help me understand the distinction you're

8  trying to make.

9  Q.     You mentioned that service hours provide a

10  rehabilitative purpose.

11  A.     Yes.

12  Q.     That they support the health and safety of

13  veterans and help them establish healthy routines.  Is

14  that correct?

15  A.     That's correct.

16  Q.     Why couldn't veterans learn healthy routines

17  between a paid position at ABCCM?

18  A.     Well, first of all, there isn't enough money to

19  pay for all that.  Second, these healthy routines are --

20  you have to understand that these are there for their

21  primary benefit.  When folks come to us who have been

22  homeless and isolated and come from very unstructured,

23  very unhealthy, even self-destructive behaviors, helping

24  to reinstate those healthy routines and structures for

25  one's self is just the first step towards stability in

## DIRECT - ROGERS

1  their lives.

2  Q.    If a veteran comes to ABCCM with a work history

3  and does not have self-destructive behavior why do they

4  have to perform service hours?

5  A.    Well they don't have to.  We ask them to because

6  it's also a part of participating with the community in

7  the daily living chores.  You know, everybody needs to

8  take care of their room, their space, be a part of

9  helping to feed and support each other and caring for

10  their own places.  Many veterans call it as their home.

11  This also prepares them for when they will be in their

12  own home independently, and all of us have those

13  responsibilities in our own homes.  The goal of the grant

14  per diem program is to empower them and equip them with

15  the skills to sustain them and be in their own permanent

16  home.

17  Q.    I'm going to turn back to the VRQ handbook.  I'm

18  sorry.  I'm just looking for the page here.

19         THE COURT:  Anything else, Ms. Brooke?

20         MS.  BROOKE:  Yes.  I'm sorry, Your Honor.

21         Can you please read to me what it says at the top

22  of that page that is on your screen?

23         THE COURT:  Which exhibit is this.

24         MS.  BROOKE:  I'm sorry.  This is Exhibit 1A, Your

25  Honor, the VRQ residents handbook.

## DIRECT - ROGERS

1      THE COURT:  When you say "this page" what page are

2  we talking about?

3      MS.  BROOKE:  This is page 10.

4              **FURTHER DIRECT EXAMINATION**

5      BY MS.  BROOKE:

6  Q.    Mr.  Rogers, can you please read where it begins,

7  "with service hours" and read those three bullet points?

8  A.    Sure.  All unemployed residents must perform

9  service hours to remain motivated and engaged with campus

10 life.  Service hours are performed in housekeeping,

11 maintenance, the kitchen, computer lab, or at the front

12 desk.  Any missed days or hours must be made up.  Please

13 consult department head to make up missed hours.

14 Q.    Thank you.

15      I'm going to turn to the next exhibit, which is

16 Plaintiff's Exhibit 11.

17      THE COURT:  If somebody would please clear the

18 annotations that are on the screen.

19      MS.  BROOKE:  I believe that Mr.  Rogers may have

20 done that, and I don't know how to clear it.

21      THE WITNESS:  I did.  I touched the screen in

22 three places.

23      MS.  BROOKE:  There we go.  Thank you.

24      THE WITNESS:  Thank you.

25      BY MS.  BROOKE:

## DIRECT - ROGERS

1  Q.      Reverend Rogers, can you please tell me what this
2  is?
3  A.      It's a capital grant and per diem application.
4  Q.      As Part of ABCCM's regular course of business does
5  ABCCM fill out grant applications?
6  A.      Yes.
7  Q.      Are these applications filled out at or near the
8  time the applications are sent?
9  A.      Yes.
10 Q.      And are they made based on information from
11 someone with knowledge of ABCCM's programs?
12 A.      Yes.
13 Q.      And they're created as part of ABCCM's regular
14 business practices?
15 A.      Yes.
16 Q.      Your Honor, I'd like to move this exhibit into
17 evidence.
18      THE COURT:  Any objection?
19      MR.  CURRIDEN:  We would object based on
20 relevance, Your Honor.
21      THE COURT:  How are you tying this to the issues
22 that are in this lawsuit?
23      MS.  BROOKE:  Yes, Your Honor.  On the second page
24 of this document there is a section which deals with work
25 performed by VRQ residents, and it's representations made

### DIRECT - ROGERS

1   to the Veterans' Administration about that work performed

2   and whether it will be compensated or uncompensated.

3        THE COURT:  Mr.  Curriden, do you want to be heard

4   further on your objection?

5        MR.  CURRIDEN:  I guess I would maintain the

6   objection, Your Honor, in that there's no dispute that

7   the intent at the time Mr.  Armento was at the VRQ that

8   residents would not be charged for their room and board

9   and that they would -- I guess I continue to fail to see

10   the relevance here.

11        MS.  BROOKE:  Your Honor, this is not related to

12   the room and board.  This is related to compensation for

13   work performed.

14        THE COURT:  I'll allow you to examine this witness

15   with regard to Plaintiff's 11.  I'll reserve ruling on

16   whether or not I'm going to allow it into evidence,

17   because at this point I do not see how it relates to what

18   this lawsuit is about.  You may go ahead and ask this

19   witness regarding this document.

20        MS.  BROOKE:  Thank you, Your Honor.

21            **FURTHER DIRECT EXAMINATION**

22        BY MS.  BROOKE:

23   Q.   I'm going to have you look at page 2, Reverend

24   Rogers, and Section D.  Can you please follow along, and

25   I will read that paragraph to you?

## DIRECT - ROGERS

1    ABCCM will maintain the responsibility for the

2  overall safety, supervision, operation, and maintenance

3  of the housing.  We will utilize community donations and

4  volunteers to maintain the facility equipment and

5  supplies in an excellent manner that reflects our high

6  standards for dignity and hospitality.  Our policy

7  currently calls for ABCCM to compensate veterans that

8  might otherwise be done by contractors in the community

9  so that our resident veterans have an opportunity to earn

10  while they learn.  Our board of advisors wants to insure

11  that none of our residents are exploited in any way in

12  the daily operation or maintenance of the housing so that

13  they can stay focused on their goals that lead to the

14  successful outcome of independent living.

15    Was that an accurate reading of Section D?

16 A.    Yes.

17 Q.    What policy is this passage referring to?

18 A.    This is primarily referring to two things at the

19 time.  This was prior to our acquisition of the Veterans

20 Restoration Quarters, and first it's referring to our

21 desire to hire veterans as part of the regular staff

22 which is to compensate veterans.  Second is it's also

23 referring to the fact that we were looking at having

24 major renovations done to the motel facility that we were

25 proposing to purchase as a part of this.  And we wanted

1    to be sure that when contractors performed work on and

2    around the facility that if there was an opportunity for

3    them to hire our residents as laborers, or as workers,

4    that that would be a priority.  We would try to build in

5    to any subcontracting that we did outside -- or outside

6    work on the facility.

7    Q.    So ABCCM thought it was important for veterans to

8    be paid for work that they performed.

9    A.    We thought it was important for employers to have

10   a priority to hire our veterans -- to hire veterans, and

11   particularly to hire our residents.  That was the purpose

12   of this.

13   Q.    And why would it be important for your veterans to

14   be hired and paid for their work?

15   A.    Because it's a part of the earlier goals that are

16   mentioned earlier in the paragraph above where our goal

17   is to provide them with -- equip them with skills, and

18   skills that led to work or stable income that led to

19   permanent housing.

20   Q.    Does ABCCM still have a policy against

21   exploitation of its residents?

22   A.    We don't have a specific exploitation policy, you

23   know, other than what are fair labor standards or fair

24   housing standards are.

25   Q.    ABCCM is part of the veterans services of the

DIRECT - ROGERS

1  Carolinas; is that right?

2  A.    Yes.  They are a division under ABCCM's umbrella.

3  That's correct.

4  Q.    And does that program have a focus on helping

5  veterans to get living wage jobs?

6  A.    Yes.

7  Q.    Why is it important for veterans to get living

8  wage jobs?

9  A.    So that they can sustain permanent housing.

10 Q.    Does ABCCM have different levels that its

11 residents progress through?

12 A.    Yes.

13 Q.    What are those levels?

14 A.    So we have four levels.  Our intake and

15 stabilization level, our foundation, our cornerstone, and

16 our color levels as described in the handbook.

17 Q.    I'm going to direct your attention back to Exhibit

18 1A, the VRQ handbook, and turn to page 4 of that

19 handbook.  I'm going to read to you from Section D.

20       This program is divided into three stages of

21 residential progression:  1.  Foundation; 2.

22 Cornerstone; and 3.  Pillar.  Progress is the key to

23 moving from one stage to the next.  Your progress is

24 measured by both the director and your case manager, and

25 is by your attitude, behavior, cooperation, service,

### DIRECT - ROGERS

1  accomplishment of your goals as they relate to your

2  sobriety, mental stability, employment, or pursuit of a

3  claim/pension, and financial savings.

4       Did I read that accurately?

5  A.    Yes, you did.

6  Q.    What level did Mr. Armento achieve when he was at

7  the VRQ?

8  A.    I would not know that.

9  Q.    Can a resident be demoted to a lower level if they

10 struggle with any of those things that I just read to

11 you?

12 A.    Yes.

13 Q.    Was Mr. Armento ever demoted?

14 A.    I would not know that.

15 Q.    Who would know that?

16 A.    Tim McElyea, the director, and his case manager.

17 Q.    That's all I have right now, Your Honor.

18       THE COURT:  Okay.  Before we go on to

19 cross-examination let's go ahead and take the morning

20 break at this time.  So we're going to take 15 minutes.

21       Marshal, please give us 15 minutes.

22                 (Off the record at 10:58 a.m.)

23                 (On the record at 11:14 a.m.)

24       THE COURT:  Reverend Rogers, if you would return

25 to the witness stand please.

**CROSS - ROGERS**

1    THE WITNESS:  Thank you.

2         (Witness resumes the stand.)

3    THE COURT:  Cross-examination.

4    MR. CURRIDEN:  Thank you, Your Honor.

5              **CROSS-EXAMINATION**

6    BY MR. CURRIDEN:

7    Q.    Good morning, Reverend Rogers.

8    A.    Good morning.

9    Q.    I'm going to start by asking you a few questions

10   about some of the questions you were asked by

11   Mr. Armento's counsel, and then we'll go back and have

12   you explain a little bit more generally about ABCCM and

13   the VRQ.

14        First of all, you were asked recently about the

15   exploitation of vets.  I think you said that you don't

16   have a specific anti-exploitation policy; s that right?

17   A.    Right.

18   Q.    Do you feel that ABCCM and the VRQ exploits

19   homeless vets?

20   A.    Absolutely not.

21   Q.    Would that be consistent with the goals and the

22   objectives and e mission of ABCCM and the VRQ?

23   A.    It would not.  Our handbook opens up with our

24   number one value and statement, and preserving and

25   protecting the dignity and respect of every veteran, man

**CROSS - ROGERS**

1  and woman, child.  And I want you to know that our

2  director, Tim McElyea, who is an Army veteran, would not

3  stand for it, and neither would I or any of our team at

4  any point for any veteran to be exploited.

5  Q.    All right.  And you were asked some questions

6  about Plaintiff's Exhibit 11.

7       THE COURT:  Now, on Plaintiff's 11, Mr. Curriden,

8  you objected based on relevance, and I withheld my ruling

9  on that.  Now you're saying you want to examine this

10  witness.  Are you withdrawing your objection to the

11  introduction of Plaintiff's 11?

12       MR. CURRIDEN:  No, Your Honor.  But he was asked

13  specific questions about it and so I'd like him to

14  clarify, further, his answers about that exhibit.

15       THE COURT:  Okay.  You may proceed.

16       BY MR. CURRIDEN:

17  Q.    Mr. Rogers, you were asked about a grant per diem

18  application.

19  A.    Yes.

20  Q.    And do you know the timeframe that that

21  application applied to?

22  A.    To the best of my recollection that application

23  applied to 2004.

24  Q.    And there were some renovations going on at the

25  facility at the time?

## CROSS - ROGERS

1  A.      Yes.  We were currently located then at 207 Coxe

2  Avenue, and the veterans themselves had asked us to

3  renovate that facility, as well, in order to accommodate

4  changes that we were making in our transitional housing

5  program.

6  Q.      And were there veterans used by contractors in

7  that renovation project?

8  A.      Yes.

9  Q.      And who hired them?

10 A.      So it was contractors that we engaged.  So folks

11 like electricians and plumbers and carpentry and framing.

12 And the same later, at 207, the contract when we acquired

13 the motel.  We had extensive renovations of several

14 hundreds of thousands of dollars.

15 Q.      All right.  And I'd like to turn your attention

16 now to Exhibit 9 that you were asked about.

17 A.      By the way, nothing is coming up on the screen, if

18 you're pulling those up.

19 Q.      Okay.  I think I need to hit the button.

20 A.      There.  Yes.

21 Q.      And you were asked about the -- I think it's the

22 next page of that exhibit.  There we go.  In the center

23 there where it says "payment validation," and the last

24 sentence where it says, "I certify the billing requested

25 is accurate based on actual costs and when divided does

CROSS - ROGERS

1  not exceed 100 percent of the daily cost of care per

2  veteran per day."  The daily cost that's referring to, is

3  that the $43.32 just above that section?

4  A.     Yes.

5  Q.     And does that $43.32 exceed 100 percent of the

6  costs of care per day per veteran?

7  A.     No.

8  Q.     And let me -- it's a little confusing I know.

9  A.     Yeah.

10 Q.     Let me flip it around.  Does the daily cost of

11 care and services provided to the veterans exceed $43.32?

12 A.     Yes, it does.

13 Q.     By how much?

14 A.     It's hard to put a number on that because we have

15 so many different things that go into the additional

16 cost.  We have contributions from the community.  We have

17 -- of dollars that we apply.  We have huge contributions

18 of food, of clothes, of hygiene, of personal supplies,

19 boots, work clothes, nursing and medical supplies that

20 are provided.  So just on the basis of food alone,

21 because so much of the food is donated, we estimate that

22 that saves us upwards of $300,000 a year that otherwise

23 would have to be spent just on food.

24 Q.     And do you have a sense of what the per day per

25 person cost is for a resident of the VRQ?

CROSS - ROGERS

1  A.      So the per day costs, in our estimation, is only

2  about half of what ABCCM provides and receives in the way

3  of support from the volunteers, the churches, the

4  businesses, from other grants, as well as a huge amount

5  of incoming support from those groups in the community.

6  So we estimate that we provide that much more again to

7  provide the true level of services that the veterans are

8  receiving.

9  Q.      When you say "that much more again" do you mean

10 $43.32 times two?

11 A.      Times two, yes, sir.

12 Q.      In other words, that's closer to the actual cost

13 of all of the different services that are provided to the

14 VRQ residents?

15 A.      That's correct.

16 Q.      You were asked some questions about vans and

17 whether or not those are essential to the operations of

18 the VRQ.  Do you consider the transportation to be an

19 important service provided by the VRQ?

20 A.      It is.  Transportation is frequently referred to

21 on surveys of the homeless as one of the biggest barriers

22 to their success or to achieving their goals.

23 Q.      But is it required by the grant per diem program

24 that you provide?

25 A.      No, it's not required.  It's part of our holistic

CROSS - ROGERS

1  approach to helping to reduce and overcome the barriers

2  faced by the homeless.

3  Q.     You mentioned that sometimes vets will walk to the

4  VA.  How far is it from the VRQ to the VA?

5  A.     According to our measurements it's right at one

6  mile.

7  Q.     All right.  Let me take a step back and ask you

8  some more general questions.  What is your -- just about

9  your background a little bit.  What is your educational

10 background?

11 A.     So I have both training and degree in church

12 missions and world missions and work, as well a masters

13 degree in human development, counseling.

14 Q.     And can you describe for us what ABCCM is?

15 A.     Yes.  ABCCM, in a nutshell, is church owned and

16 operated by about 300 member churches.  We're driven and

17 led through over 7,000 volunteers in 2018.  We are about

18 creating opportunities for those volunteers to help folks

19 across a broad spectrum of poverty.  So those coming out

20 of the criminal justice system through those who are

21 homeless on our streets, to those families who are low

22 income and struggling to make ends meet, as well as to

23 the uninsured through our medical care.  We also provide

24 a number of different skills to folks to help them

25 succeed or improve their ability to earn money as well as

**CROSS - ROGERS**

1  to improve their ability with housing or permanent

2  housing.

3  Q.    Who founded ABCCM?

4  A.    ABCCM was founded by a group of eight churches

5  back in 1969.  It was in October that they incorporated

6  so we just celebrated our 50th anniversary.

7  Q.    Congratulations.  What are the primary missions or

8  ministries of ABCCM at this point?

9  A.    So ABCCM has six areas of ministry.  So we have

10  our crisis ministries, which is our emergency assistance

11  with food and clothes and financial help, and we have

12  four different ones around Buncombe County.  We have a

13  jail ministry that helps to go in and provide both bible

14  studies as well as informational resources about how to

15  transition with purpose and meaning in to a more

16  responsible living through our jail ministry.  And then

17  we have our homeless services, which is both the

18  Veterans' Restoration Quarters and Steadfast House, that

19  operate identically providing both emergency shelter and

20  transitional housing that leads to permanent or permanent

21  supportive housing and stable incomes.

22        Then we also operate a medical ministry that

23  provides medical, dental, and two pharmacies in the

24  community that distributed between $4.5 and $5 million of

25  medical care, again, at no charge.  And then we have

## CROSS - ROGERS

1  Veterans Services of the Carolinas that provides homeless
2  prevention and rapid rehousing through a housing first
3  model, veterans employment and training services.  We
4  operate a veterans call center throughout western North
5  Carolina, and we also have a Pathways program for
6  chronically homeless veterans.
7  Q.    And what are your primary duties as executive
8  director of ABCCM?
9  A.    So my primary duties are to oversee all those
10 various programs of the ministry as well as provide the
11 administrative support with both fundraising personnel,
12 marketing, property management, and community
13 collaboration.
14 Q.    Turning your attention, more specifically, to the
15 VRQ.  First of all, why is ill it called "Veterans'
16 Restoration Quarters?"
17 A.    Veterans' Restoration Quarters was named by the
18 veterans.  Back in 2001 we separated the women from the
19 men at our Coxe Avenue facility, and in '02 we asked the
20 men what they needed.  To our surprise there were about
21 50 out of 80 men who were veterans, and at that point
22 they said we really want to have -- not dormitory type
23 housing but to make it a vet's place.  And they began
24 working with our staff and our transitional housing
25 program then to specifically develop a veteran's

**CROSS - ROGERS**

1   restoration process.  So when we had the opportunity to
2   partner with the VA on acquiring this facility it was men
3   in the residents' council who coined the term "Veterans'
4   Restoration Quarters."
5   Q.     We've heard about some of the services that the
6   VRQ provides, including room and board.  What are other
7   services that are provided to homeless vets at the VRQ?
8   A.      So between both our volunteer advisory committee,
9   the residents council, as well as the board of ABCCM, we
10  work intensively with collaborative partners, both with
11  the School of Cocial Work with Chapel Hill, with NC
12  Workforce Solutions, of course with the Charles George VA
13  Medical Center, and our volunteers and residents, to
14  shape this transitional housing so that it was more
15  holistic and got beyond just providing the basic
16  necessities of, you know, a room, three meals a day,
17  showers, some laundry facilities, which is basically what
18  a lot of transitional housing programs were providing.
19          And because of the huge volunteer resources from
20  the community we're already offering a number of life
21  skill classes, work readiness training, the rudiments of
22  job placement.  As we looked at transportation that was a
23  huge need, and so we decided to supplement these funds
24  and encourage the purchase of vans; we applied for
25  separate grants in order to acquire those.

**CROSS - ROGERS**

1    We also work with healthcare a lot.  We hired a
2 nurse, and we're required to do that so that they would
3 have not only a way to help manage their treatment but to
4 understand their chronic health issues.  Fifty percent of
5 our men, roughly, are diabetics, 25 percent, roughly, are
6 hypertensives; and 12 percent struggle with COPD.  So
7 having a nurse on board was a big part of that.  And then
8 making sure that we were integrating volunteers with the
9 types of classes that both the staff and residents
10 council saw a need for.

11    We've offered as many as 60 different life skills
12 classes by volunteers that are on both a short-term and
13 long-term basis.  Those life skills cover the waterfront
14 of both interpersonal communications, managing with
15 various coping skills, PTSD skills and coping, and as
16 well as spiritual formation, bible studies, and as well
17 as other programs such as arts and crafts and hobbies.
18 Q.    And you mentioned that ABCCM as a whole has some
19 7,000 volunteers.  Is there a volunteer roster that's
20 specific to the VRQ?
21 A.    Yes.  There is a specific roster and it's managed
22 through our volunteer database.
23 Q.    Do you know about how many volunteers there are
24 designating themselves to be VRQ?
25 A.    Yes.  Kind of the two categories -- we've had

**CROSS - ROGERS**

1   about 2,500 regular volunteers and then over 1,000 kind

2   of one-time project-oriented volunteers.

3   Q.     And what sorts of work do the volunteers do at the

4   VRQ?

5   A.     So the volunteers do everything.  We've had

6   volunteers, of course, as cook teams, as I said, with the

7   life skills classes.  They've also helped at the front

8   desk; we've had volunteers there.  We've, of course, had

9   volunteers help with just about every aspect from

10  maintenance to housekeeping to landscaping at different

11  times.  Some of those are more project-oriented, and some

12  are more regular.  The bulk of our volunteers are with

13  our cook teams and our life skill classes, and our

14  mentoring and peer support.

15  Q.     And you mentioned when you were asked about what

16  limits ABCCM from just paying residents to do all the

17  work, and you said it was funding.

18  A.     Yes.

19  Q.     If you have insufficient funding to pay for all

20  that needs to be done at the VRQ, what do you do?

21  A.     So what we do is two things.  First, we really

22  look towards how do we involve the community and our

23  churches and our volunteers?  Because they are the

24  primary owners, if you will, of the ministry.  We get

25  them engaged.  In fact, it was the men prior to moving in

**CROSS - ROGERS**

1    to the VRQ -- and, actually, it was probably around 2009

2    or '10 that we changed from calling them "chore services"

3    to "service hours."  This, again, was at the request of

4    the residents who wanted to really be a part of working

5    side-by-side as they do with volunteers in the community

6    to say that they were a part of contributing to the

7    community and that they took seriously their ownership

8    and commitment to having a place that both they were

9    proud of, a place that was clean and beautiful, a place

10   that was healthy and encouraged each other to be

11   healthier, to have good nutrition and sanitation, and

12   personal hygiene skills.

13   Q.    What does it take for one to become a resident of

14   the VRQ in the grant per diem program?

15   A.    So there's a specific eligibility process

16   proscribed by the VA.  So a person has to be homeless,

17   they have to be a veteran, and they have to make less

18   than 50 percent of the average median income which is

19   about $19,600 a year.

20   Q.    $19,600?

21   A.    Yes, sir.

22   Q.    So when a homeless vet checks into the VRQ what

23   would you say is the VRQ's mission at that point?  What's

24   its role related to that new resident?

25   A.    So our primary role, and our commitment to the VA

CROSS - ROGERS

1    and to the community, has been to not have any

2    unsheltered veteran on our streets.  Many of our veterans

3    come here specifically for healthcare but they also may

4    be veterans who have lost their income, who have been in

5    a life of addictions or drug abuse or substance abuse

6    with alcohol.  It may have been a situation of domestic

7    violence where they've been abused.  It's also a

8    situation where men struggle with specific mental health

9    conditions like chronic depression, bipolar, or

10   schizophrenia.

11   Q.     And how does the VRQ accomplish that mission?

12   A.     So the way we accomplish it is working closely in

13   collaboration, of course, with the VA hospital.  Some men

14   have lost their paperwork and they don't even know what

15   benefits they have available.  So working with them and

16   the VA hospital we go through a benefits certification

17   process.  The VA can help them restore or find their

18   DD-214 that certifies they were in the service.  Each

19   combat era has different criteria and qualifications.  So

20   World War II veterans or Korean veterans have a different

21   set of qualifications than Vietnam, Kosovo, Bosnia or

22   Gulf I.  And Gulf I versus Iraqi Enduring Freedom or

23   Operation Iraq -- OIF/OEF have different criteria.  So

24   our staff and the VA do a great job of helping the

25   veterans know what their benefits are, what criteria they

CROSS - ROGERS

1  meet, and that helps us then take them out of that
2  condition of homelessness and start offering the
3  stability that they need.
4  Q.     All right.  I want to ask you some questions about
5  the grant per diem gram.  Can you just summarize in a
6  nutshell what the grant per diem program is?
7  A.     Yeah.  The grant per diem program is our contract
8  with the VA to provide services and outcomes that they
9  are not able to provide as cheaply or as effectively on
10 their own.  So we provide transitional housing that takes
11 men through these four -- what we call -- there are three
12 stages in the handbook.  The first stage is the
13 stabilization phase.  Then we take them through life
14 skills, which is the foundation stage, helping them with
15 communications and interpersonal relationships, setting a
16 larger sense of purpose and goals, and then moving
17 towards stabilizing their income.  We have two tracks,
18 both a disability track for those who have various
19 disabilities, whether that's service-related or through
20 Social Security disability, and then those who are
21 able-bodied and able- minded, able to go to work and
22 obtain job skills as well as professional licensures or
23 certifications so that they get on career track.
24        All of this is designed to equip them with both
25 greater self-determination.  Each man has a case manager

CROSS - ROGERS

1  who takes them through those three stages that we talked

2  about earlier that are incentive based so that we're

3  building on the best practices that the military and

4  other developmental programs have outlined.  And we

5  recognize it as the best practice in the community

6  because eight out of ten leave us with stable income and

7  permanent housing.

8  Q.     How long has ABCCM been involved in the grant per

9  diem program?

10  A.     So it started after -- in 2002 when we realized

11  most of the veterans were veterans.  And we went to the

12  VA, and the VA began this conversation.  And we applied

13  for our first grant per diem transitional housing in 2003

14  with 24 beds, and another 24 beds in 2004, and then 100

15  beds in 2007, and ten more beds, specifically for women,

16  in 2008.

17  Q.     And what year did the VRQ open?

18  A.     It opened in May of 2008.

19  Q.     And with regard to the service hours program that

20  we've heard some about already.  What is the purpose of

21  the service hours program at the VRQ?

22  A.     So the purpose is pretty well outlined in the

23  handbook.  The larger purpose is to be a part of this

24  healthy living structure.  Most of our homeless folks

25  come from a deep place of isolation, of no structure, no

CROSS - ROGERS

1  boundaries, lots of unhealthy boundaries in their life

2  besides other self-destructive behaviors that have led to

3  their homeless condition.  So service hours are part of

4  this overall structure to set some minimum standards for

5  folks to begin to participate.

6          Since most of our men come from some deep

7  isolation they haven't been a part of a congregate living

8  or community setting.  So being a part of that, helping

9  them to have both meaningful and productive hours, being

10 a part of working in teams, learning to communicate

11 together, being a part of the greater community, and

12 helping each other reach their greater potential is the

13 reason we have these structured chores.  They're not just

14 about caring for the facility.  It's about the

15 opportunity to teach them both healthy ways to relate

16 with each other, teach them how to be responsible, and

17 how to have healthy living standards in their own lives.

18 Q.     You were asked earlier by Mr. Armento's counsel,

19 can't you achieve all those objectives by starting out

20 paying for those service hours?  Do you recall that

21 question?

22 A.     I do.

23 Q.     When new residents check into the VRQ are they all

24 reasonable candidates to be employees to do --

25 A.     Oh, heavens no.  They're nowhere near ready to be

**CROSS - ROGERS**

1  an employee.

2  Q.     What does it take from the time they check in to

3  the time one may be entered into the Transitional

4  Employment Program where they start getting paid for work

5  they do?

6  A.     So each man progresses at different rates.  What

7  we see are folks that are very broken and wounded.  As I

8  said, we see folks that are very isolated.  Many times

9  our homeless men won't even look somebody in the eye.

10  They don't know how to communicate.  They don't know very

11  well how to respond to what most of us would consider

12  simple instructions.  Those instructions can be

13  misinterpreted in all kinds of ways from anxiety to

14  threats or attacks, or to being overwhelming and causing

15  them to shut down.  So we go through these very slow but

16  intentional and deliberate processes to engage them with

17  their roommates, with others, with volunteers, and with

18  very simple tasks to be able to start helping them

19  develop.

20       We also give them time with their health and

21  nutrition.  So a lot of -- so we do have a requirement

22  that every resident have a primary care health visit as

23  soon as possible.  If they have mental health issues we

24  also require a mental health visit and evaluation with

25  the VA.  We want them to begin taking as many healthy

## CROSS - ROGERS

1  steps to become stable physically, to become stable

2  emotionally, to become stable in their own selves, and

3  begin to develop their sense of both belonging,

4  acceptance, respect, and dignity.

5  Q.     How long have service hours been a part of the

6  ABCCM's program for home less vets?

7  A.     So it's been a part of us since the very beginning

8  in 1987.  In 1987 we were given the building at 7 Coxe

9  Avenue, and it was run entirely with volunteers and only

10 one staff person when we had 40 residents, and only five

11 staff people when we had 80 residents, because it was all

12 volunteer driven and a part of our core values of

13 everybody sharing in the responsibilities of that place.

14 Q.     And back in 2015, when Mr. Armento became a

15 resident at the VRQ, when were residents first introduced

16 to the service hours program?

17 A.     So residents are introduced to it usually at

18 intake or certainly through their enrollment and

19 orientation process.  They're all given the resident

20 handbook first thing, and that's reviewed numerous times

21 by their intake and enrollment caseworker and then by

22 their case manager and, of course, other staff go over it

23 at other times as well.

24 Q.     Back in September of 2015, when he became a

25 resident, what were the specific requirements of the

CROSS - ROGERS

1  service hours program?  In other words, how many hours

2  were required?

3  A.     So, as we reviewed earlier, our expectation has

4  always been to set service hours mainly for those who are

5  first coming into the program.  So 20 hours is the

6  average, depending on work or disability.

7  Q.     And how does it change with regard to work or

8  disability?

9  A.     So, when people go to work, then if they're

10  working part-time, those hours are cut to ten.  If they

11  were working full-time, they're cut to zero.  If they're

12  going to school part-time, they're cut to ten.  If

13  they're going to school full-time, they're cut to zero.

14  It's all voluntary.  And while we insist that they do it,

15  particularly in those early stages, it's still voluntary.

16  Many of the men come back to us and still volunteer even

17  though they're going to school part-time or working part-

18  time.  And, of course, if they're working part-time and

19  going to school part-time, it's zero.

20  Q.     And are residents allowed to do more than the

21  minimum requirements?

22  A.     They are.  They are allowed to do more.  In fact,

23  sometimes their supervisor is seeing them struggling with

24  certain things, or if times are short on folks who have

25  not shown up during their scheduled time because of

**CROSS - ROGERS**

1   either personal challenges or health issues, or

2   otherwise, folks are asked to contribute more, volunteer

3   more, as part of the greater good of the community and

4   the whole.

5   Q.    Are there repercussions if one were to refuse to

6   do more?  If they're asked and they've already met their

7   minimum requirement, are they allowed to refuse?

8   A.    Yes, they are allowed to refuse.

9   Q.    Are there repercussions to that?  A negative

10  consequence?

11  A.    Not to my knowledge, no.

12  Q.    How long -- you mentioned the requirements of 20

13  hours if they're not employed or not in school, and it

14  cuts to ten if you're doing part-time, or zero if you're

15  doing something full-time.  How long has that been for

16  the breakdown or the service hours requirements?

17  A.    Well, to my knowledge -- that's been an evolution

18  from '87.  But I would say, clearly, by the mid-'90s that

19  was already in place.  Again, that decision was made

20  jointly with both volunteers and the residents, and the

21  residents' council.

22  Q.    Did those requirements change at all during the

23  period of time when Mr.  Armento was there from September

24  of 2015 to December of 2017?

25  A.    I think, if anything, during that time we might

CROSS - ROGERS

1  have been getting more clear about those.  We were going

2  through a time of expansion there from '08 to around 2012

3  and '14, going from 80 to a hundred and 125 and 150, and

4  then eventually up to roughly 250 now or then.

5  Q.     Who would you say benefits most from the service

6  hours program?

7  A.     Well we believe that the residents benefit the

8  most.  It's for them.  And it's about them and helping

9  them to begin to put the -- again, the right kind of

10  boundaries, communication, team work, personal pride and

11  responsibility and dignity in what they're about and what

12  they're doing and how they're living.

13  Q.     If the only objective were to get the work done,

14  setting aside any rehabilitive purposes at this point -=

15  A.     Yes.

16  Q.     If the only objective were to get the work done,

17  the food served, the maintenance done, the front desk

18  staffeded, would ABCCM need the service hours program?

19  A.     No, we would not need the service hours program.

20  We would do it the way we had done it for 20 years prior

21  to that, which was entirely with volunteers.  We started

22  out that way.  Volunteers are more than willing to jump

23  in and fill any gaps from the community, and when we

24  identify those needs they are right there.

25         A big part of what we try to do is have the

## CROSS - ROGERS

1   residents and the volunteers working together.  The

2   kitchen area is a perfect example where that happens

3   three times a day every day.  Virtually, it's a perfect

4   example of landscaping and building maintenance.  We have

5   just hundreds of volunteers and staff doing those things

6   together.

7   Q.      And you've mentioned that service hours -- one can

8   become exempt from service hours by working full-time or

9   going to school full-time, or some combination.

10  A.      Yes.

11  Q.      Do you, as the representative of ABCCM or the VRQ,

12  do you have a preference between a resident doing service

13  hours and a resident being exempt from service hours?

14  A.      Oh, yes, we do.  We have a very strong preference.

15  We want every resident to both be fulfilling not only his

16  or her goals but, also, reaching their greater potential.

17  So to the degree that they are able to improve through

18  education, through training, through work and work

19  experience.  And, by the way, the volunteer service hours

20  don't apply just to the VRQ.  Our volunteer service hours

21  can also be counted by them volunteering at any other

22  organization within the community like Manna food bank,

23  Habitat, ARC, I man, United Way.  And there's a long list

24  of other places.  We have residents that volunteer in

25  ABCCM's crisis ministries or at the warehouse.

CROSS - ROGERS

1  Q.      Just to make sure I'm understanding that

2  correctly.  Someone can fulfill their service hours by

3  working for a charitable organization that has no

4  affiliation with ABCCM?

5  A.      That's correct.  Yes, sir.

6  Q.      So back to that.  And I apologize for

7  interrupting.  But in terms of the preference.  Would you

8  prefer to have a resident doing service hours or being

9  exempt from service hours?

10 A.      I'd prefer them being exempt.

11 Q.      When a resident is exempt from service hours does

12 that change or affect any of the other services they get

13 at the VRQ?

14 A.      No, it does not.

15 Q.      Prior to Mr. Armento, had anyone ever, to your

16 knowledge, claimed that the service hours program was in

17 violation of the North Carolina Wage and Hour Act?

18 A.      No, sir.

19 Q.      Have you ever had any other indication that the

20 service hours program was in violation of any laws?

21 A.      No, sir.  And that includes not only men at the

22 VRQ and residents there, but neither at Steadfast House

23 where we have female veterans in the grant per diem

24 program.

25 Q.      Are you familiar with other grant per diem program

CROSS - ROGERS

1  providers around the region or country?

2  A.     Yes, sir.

3  Q.     How are you familiar with them?

4  A.     I'm familiar with them in a couple of ways.

5  First, there's a national meeting with the National

6  Coalition of Homeless Veterans where we all get together

7  annually.  Also, the North Carolina -- the grant per

8  diems have gotten together annually for the past several

9  years, and there's 16 other programs in North Carolina.

10 Q.     Are you aware of whether they have programs

11 similar to VRQ's service hours program?

12 A.     They do.  In fact, many of them have visited us

13 and also modeled their programs after us.

14 Q.     And does the service hours program generate any

15 income for ABCCM?

16 A.     No, sir.

17 Q.     All right.  I'd like to shift your attention now

18 from the service hours program to the Transitional

19 Employment Program, and I think it's also been referred

20 to as the "1,000 hours" program.  Are those the same

21 program?

22 A.     Those are the same thing, yes.

23 Q.     What would you say is the most correct name for

24 that program?

25 A.     Well it's been called all kinds of things, from

**CROSS - ROGERS**

1  work readiness -- the thousand hours refers to the cap

2  that is imposed on how many hours residents can be there;

3  transitional employment is how we determined it several

4  years ago.  To really be specific about that, we're

5  giving each resident the opportunity to build a work

6  history as well as work skills that we can testify to and

7  specifically refer to in their future employment.

8  Q.     Does every resident need the thousand hour or the

9  temporary Transitional Employment Program?

10  A.     No, sir, they do not.  Many -- I would say over

11  half of them don't ever take advantage of that because

12  they're able to move straight from their education and

13  work readiness training into employment and a career.

14  Q.     Is every resident qualified to do the transitional

15  employment program?

16  A.     They are not.  In fact, there is a process by

17  which the employment specialist and the case manager and

18  staff work to assess and determine if they're both ready

19  physically, mentally, and are able to work with healthy

20  attitudes and boundaries.

21  Q.     Is the program intended to be permanent

22  employment?

23  A.     The program is designed to work itself out of

24  business which doesn't make any sense in the for profit

25  world.  The for profit world would train and have an

**CROSS - ROGERS**

1  employee and then keep them and just keep making them

2  better or promote them there.  Our job is to encourage

3  not only the work skills and the preparation, but we

4  encourage men and women to be actively looking for other

5  employment, use us as a reference, and then take that

6  employment as soon as possible so that they exit the TEP

7  program as soon as possible.

8  Q.      And is that process or that objective a part of

9  the work that the residents do with their case managers?

10  A.      Yes, it is.  That's an integral part of their

11  steps to success program.

12  Q.      In 2015 and 2016, was there a certain division or

13  organization within ABCCM that administered the

14  Transitional Employment Program?

15  A.      So in 2015 and '16 we -- it was primarily the

16  grant per diem program, our staff, but we also began

17  slowly integrating our homeless veterans' reintegration

18  program with job specialists to help them both with their

19  training, their resume, and job placement services.  So

20  we began integrating both HVRP services with the GPD

21  program during that time.

22  Q.      And what is the organization that now administers

23  the Transitional Employment Program?

24  A.      It's still a joint effort between both GPD and the

25  HVRP program.

**CROSS - ROGERS**

1  Q.     What is the HVRP?  What does that stand for?

2  A.     So that's a Department of Labor grant for Homeless

3  Veterans' Reintegration Program, and its specific purpose

4  is to help veterans with both with that process of work

5  readiness, resume writing, job search, and job placement,

6  and then followup in their jobs.

7  Q.     And there was some reference earlier to an

8  organization called Veterans Services of the Carolinas.

9  A.     Yes.

10 Q.     What is that?

11 A.     Veterans Services of the Carolinas is the umbrella

12 name for both the Homeless Veterans' Reintegration

13 Program as well as our Housing Homeless Prevention

14 Program, our veterans call center, and our Pathways

15 program.

16 Q.     All right.  And in 2015 and 2016, what was the

17 status of development in terms of the formalities and the

18 paperwork related to the Transitional Employment Program?

19 A.     So all of that formality and paperwork was handled

20 with the case manager of the GPD program, the

21 transitional housing.  So all the records at that point

22 were consolidated and integrated.  All those activities

23 with TEP were tracked through the case notes and as part

24 of the steps to success.

25 Q.     You mentioned that it's affiliated with the --

**CROSS - ROGERS**

1   there's a Department of Labor grant?

2   A.    So as the men needed additional help during the

3   transitional employment they could receive that help on

4   referral to a job specialist to help with identifying job

5   placement opportunities in the community.

6   Q.    And when a resident becomes a part of the

7   Transitional Employment Program, at that point does the

8   VRQ -- well the VRQ -- ABCCM becomes their employer --

9   A.    That's right.

10  Q.    -- temporarily, anyway.

11  A.    Yep.  They're signed up through our regular hiring

12  process.

13  Q.    At that point, does the VRQ give up its other role

14  as a source of shelter, stabilization, rehabilitation?

15  A.    By no means.  We're still continuing that process

16  for both housing and rehabilitation and success.   In

17  fact, there's a special layer to what we call the pillar

18  stage which is where we're also providing them with a

19  variety of skills for reintegration such as credit repair

20  and how to buy a car, how to lease an apartment, how to

21  manage their savings, how to have more stability, how to

22  be connected with other groups in the community, civic

23  groups as well as faith groups.

24  Q.    So the VRQ, when somebody comes in to the

25  Transitional Employment Program, continues to provide

## CROSS - ROGERS

1  those services.  Does it continue to require things of

2  the resident?

3  A.      Require them for what?

4  Q.      When the resident comes in to the Transitional

5  Employment Program and ABCCM becomes a temporary employer

6  you said it doesn't abandon its role to provide all these

7  other services.  Does it abandon other requirements of

8  the residents, such as being sober, the curfew, meeting

9  with caseworkers?

10 A.      It does not.  In fact, it becomes even more

11 important then that they not return to self-destructive

12 behaviors or old attitudes or old patterns.  The whole

13 process is designed to instill these healthy behaviors,

14 healthy attitudes, healthy communication, healthy

15 boundaries.  So, no, we continue those services as a part

16 of that last stage of reintegration back into the

17 community to help them achieve not only their greater

18 potential but greater self-determination.

19 Q.      And are there residents in the Transitional

20 Employment Program who are still required to do service

21 hours?

22 A.      By the time they're in for service and

23 transitional employment I don't know of any that are

24 required to do service hours.

25 Q.      What if their transitional employment is 20 hours

## CROSS - ROGERS

1  or if it's part-time?

2  A.    If it's part-time they may have some requirement,

3  yes.

4  Q.    And with regard to Mr. Armento. Were you

5  involved in the day-to-day management of his

6  participation in the grant per diem program?

7  A.    No, sir, I was not.

8  Q.    Do you know when he was told -- do you know how

9  long he was required to do service hours?

10  A.    No, I do not.

11  Q.    There have been some questions raised about

12  whether ABCCM profits from the grant per diem funding.

13  Does ABCCM make any kind of profit from the grant per

14  diem funding?

15  A.    No, sir, we do not. If we did we'd have to return

16  it to the VA.

17  Q.    ABCCM has taken the position in this case that in

18  the event the Court determines Mr. Armento must be paid

19  for his service hours, ABCCM is entitled to the cost of

20  credit for room and board provided to Mr. Armento.

21        When he first became a resident at the VRQ was

22  there any intent to charge him for room and board?

23  A.    No, sir, there was not.

24  Q.    Then why would ABCCM take the position now that

25  there should be a credit allowed?

**CROSS - ROGERS**

1  A.     Well we would take that position that our services
2  are extremely valuable and even go beyond the scope of
3  the grant per diem program or requirements itself.  So if
4  he takes the position that everything he did was somehow
5  to be compensated, then we need to turn around and charge
6  him for all the other services he was being provided.
7  Q.     In general -- I think I'm about finished with my
8  questions at this point -- how do you feel about the
9  VRQ's treatment of the homeless veterans that it serves?
10  A.     Well we're very passionate about several things
11  and how we feel.  We feel very strongly to make sure
12  there's no veteran left on our streets, which is why the
13  city at this point in time has less than ten unsheltered
14  veterans since we opened in 2008.  We are very protective
15  of each one's dignity which is why we have an
16  individualized case plan for every veteran.  Each known
17  veteran is treated as a number or as a group.  They're
18  invited to participate and belong to the community and be
19  a part of it as a whole, both to reinforce their dignity
20  and worth but, also, for them to reinforce the dignity
21  and worth of their fellow residents.
22         So we jealously guard those healthy boundaries,
23  those healthy practices.  We jealously guard giving each
24  veteran his or her own choices.  We believe strongly that
25  the most powerful gift we can give each veteran is the

1  right to choose.  So I'm really proud of our staff, as

2  led by Tim McElyea, that they uphold those principles and

3  values, which is why I have never heard before or even

4  during -- while Mr.  Armento was trying to recruit a lot

5  of other folks to complain about this system and join him

6  in his cause.  Nor, since, have I heard anyone remotely

7  take any of his positions before, during, or since.

8  Q.     All right.  Thank you, sir.  Those are my

9  questions.

10         THE COURT:  Any redirect?

11         MS.  BROOKE:  Yes, Your Honor.

12                 **REDIRECT EXAMINATION**

13         BY MS.  BROOKE:

14  Q.     Did ABCCM keep track of the number of service

15  hours residents performed?

16  A.     Yes.

17  Q.     How did they -- how did you keep track of that?

18  A.     So as you've seen in the record we've had logs and

19  time sheets and schedules.

20  Q.     Did Mr.  Armento fill out any paperwork to as a

21  volunteer for ABCCM?

22  A.     I don't get in to that level of detail so I don't

23  know.

24  Q.     Do all 16 other North Carolina grant per diem

25  programs have service hour requirements?

**REDIRECT - ROGERS**

1   A.      To my knowledge, yes.

2   Q.      Are they all unpaid service hours?

3   A.      To my knowledge, yes.

4   Q.      How do you know that?

5   A.      I know that from having visited them and having

6   been with them.

7   Q.      All 16?

8   A.      I've been in the room with all 16 of them -- with

9   them on several occasions, yes.

10  Q.      Are you aware of other grant per diem programs

11  across the country that pay veterans for all hours

12  worked?

13  A.      I'm not.

14  Q.      Are you familiar with the Salvation Army program

15  in Johnson City, Tennessee?

16  A.      I am not.

17  Q.      ABCCM has been sued by another veteran over unpaid

18  service hours, has it not?

19          MR. CURRIDEN:  Objection.

20          THE COURT:  Basis.

21          MR. CURRIDEN:  Relevance.

22          THE COURT:  What is the relevance of some other

23  accusation that's been made?

24          MS. BROOKE:  Mr. Rogers testified no one else

25  has raised such complaints.

## REDIRECT - ROGERS

1      THE COURT:  Overruled.  Go ahead and answer.

2      THE WITNESS:  I am not aware of what you're

3  referring to.

4      BY MS.  BROOKE:

5  Q.    Has ABCCM been sued by a resident within the last

6  year?

7  A.    Been sued in the last year.

8      THE COURT:  Are you talking about sued based on

9  this?

10     MS.  BROOKE:  Based on unpaid wages.

11     MR.  CURRIDEN:  Objection to the relevance.

12     THE COURT:  Overruled with that limitation.

13  Answer it if you can.

14     THE WITNESS:  By someone other than Greg Armento?

15     BY MS.  BROOKE:

16  Q.    Yes.

17  A.    Not that I'm aware of, no.

18  Q.    What kind of assessment is performed in order to

19  determine whether a new resident at the VRQ is ready for

20  employment?

21  A.    What kind of assessment?

22  Q.    Yes.

23  A.    So we perform an assessment as to the categories

24  that I referred to.  Are they physically able, mentally

25  able, attitude, naturally, able, communication -- the

## REDIRECT - ROGERS

1  same typical kinds of things that any employer would be

2  looking for in someone who's job ready.

3  Q.    If someone is determined to be job ready as soon

4  as they enter, are they required to do unpaid service

5  hours?

6  A.    They are.

7  Q.    I believe you mentioned that the Transitional

8  Employment Program is administered by the grant per diem

9  program.  Did I get that right?

10 A.    You did.

11 Q.    And does that mean that it's administered by the

12 VA?

13 A.    No.

14 Q.    Or by ABCCM?

15 A.    By ABCCM.

16 Q.    By ABCCM.  So are you referring to ABCCM staff

17 grant per diem grant staff members?

18 A.    ABCCM grant per diem staff members, yes.

19 Q.    Is there any relatti0nship between the U. S. Labor

20 Standards grant you mentioned and the service hours

21 requirement?

22 A.    So the only relationship has to do with the

23 ability to refer them from the transitional housing into

24 that program.

25 Q.    Into the service hours program?

### REDIRECT - ROGERS

1  A.      No.   No.   Into the Homeless Veterans Reintegration

2  Program.

3  Q.      My question was if there is any relationship

4  between the Department of Labor grant and service hours.

5  A.      No, there is not.

6  Q.      Are persons who are part of the Transitional

7  Employment Program ever employed full-time by ABCCM?

8  A.      Some do move on to full-time service, yes.

9  Q.      Does that mean they don't start full-time?

10  A.      No.   Right.   Temporary employment may be any

11  number of hours.   It can be from a few hours to 40 hours,

12  but when they hit 1,000 hours it ends.

13  Q.      Who decides how many hours per week someone is

14  paid through the Transitional Employment Program?

15  A.      So each department decides what their schedule is

16  and, also, in consultation with the case manager and the

17  veteran, the resident, what they can or cannot do.

18  Q.      Are veterans ever paid for 40 hours a week of work

19  through the Transitional Employment Program?

20  A.      Yes.

21  Q.      Have you ever consulted with the U. S. Department

22  of Labor regarding the service hours program?

23  A.      No.

24  Q.      Have you ever consulted with the North Carolina

25  Department of Labor?

1   A.      No.

2   Q.      Have you ever attended any kind of training on

3   employer responsibilities?

4   A.      Yes.

5   Q.      Regarding wage payment?

6   A.      Yes.

7   Q.      And where did you attend that training?

8   A.      I can't remember exactly.  It's been several years

9   ago.  But there's a number of those kinds of webinars

10  offered by both attorneys' offices, the United Way, and

11  the North Carolina Center for Nonprofits.

12  Q.      And did that training address issues related to

13  unpaid hours?

14  A.      What I remember was that the training specifically

15  talked about what constituted an employment relationship.

16  Q.      Which department is the van driving program in?

17  A.      What permanent?

18  Q.      What department?

19  A.      What department?  So it's its own department.

20  Q.      I don't have anything further, Your Honor.

21          THE COURT:  Any recross?

22          MR.  CURRIDEN:  Just one followup here.

23                  **RECROSS EXAMINATION**

24          BY MR.  CURRIDEN:

25  Q.      Reverend Rogers, you said you've attended some

**REDIRECT - ROGERS**

1  training through the North Carolina Center for Nonprofit

2  Services?

3  A.    Yes.

4        MS.  BROOKE:  Objection.  Your Honor, that is not

5  what he testified.  He mentioned several different

6  potential places where he may have attended training, and

7  he also mentioned a webinar.

8        THE COURT:  He also mentioned specifically the

9  North Carolina Center for Nonprofits, so, overruled.  Go

10  ahead and ask your question.

11       BY MR.  CURRIDEN:

12  Q.    Was there training from the North Carolina Center

13  for Nonprofit Services, and did that include training

14  about what constitutes an employment relationship?

15  A.    Yes.

16  Q.    Was there anything in that training that caused

17  you concern about the service hours program?

18  A.    No.

19  Q.    Thank you, sir.  No further questions.

20       THE COURT:  Any redirect?

21       MS.  BROOKE:  Just one question, Your Honor.

22              **FURTHER REDIRECT EXAMINATION**

23       BY MS.  BROOKE:

24  Q.    When was that training with the North Carolina

25  Center for Nonprofits?

1  A.    To the best of my recollection it was in early

2  2000.

3  Q.    Thank you.

4      THE COURT:  Anything else?

5      MS.  BROOKE:  Not for this witness, Your Honor.

6      THE COURT:  Okay.  Thank you, Reverend Rogers.

7  You may return to your table.

8              (Witness excused at 12:17 p.m.)

9      THE COURT:  Call your next witness.

10      MS.  RIPLEY:  Plaintiff would like to call

11  Mr.  Armento.

12      THE COURT:  Come forward to be sworn.

13              (Witness duly sworn at 12:18 p.m.)

14      THE COURT:  You may proceed.

15              **DIRECT EXAMINATION**

16      BY MS.  RIPLEY:

17  Q.    Mr.  Armento, please state your name for the

18  record.

19  A.    My name is Gregory George Armento.

20  Q.    And where do you live?

21  A.    I live at 48 Depot Street, Apartment 32,

22  Asheville, North Carolina, 28801.

23  Q.    How long have you lived at that address?

24  A.    Since October of 2017.

25  Q.    And prior to moving in there where did you live?

### DIRECT - ARMENTO

1  A.     I was a resident of the Veteran's Quarters on

2  Tunnel Road.

3  Q.     When did you first move into the Veteran's

4  Quarters?  And is it okay with you if I call it the VRQ?

5  A.     The VRQ.  It's the same.  I moved in on September

6  2nd 2015.

7  Q.     Prior to that date -- prior to moving in on

8  September 2nd, had you spoken to anyone at the VRQ about

9  moving in?

10  A.     Yes, I did.  I had made a phone call -- I did a

11  web search, first of all, for homeless services, and I

12  found ABCCM's website and I saw that they helped

13  veterans.  So I called the Veteran's Quarters and I

14  talked with a Marty Creasey.

15  Q.     And did Marty Creasey explain to you the program

16  offered at the VRQ?

17  A.     Yeah, briefly.  He made me feel better about my

18  position in life at that time.  It was quite a relief.

19  He gave me some requirements and those were, of course, I

20  had to have a valid ID to be able to identify myself.

21  Having a veteran's health card was also preferred and,

22  also, my DD form 214 which is a Department of Defense

23  form that you get on your discharge.  Oh.  And on that

24  form you had to be honorably discharged, or as the way

25  it's expressed is by means other than dishonorable.

## DIRECT - ARMENTO

1  Q.      Okay.  And you were a veteran, right?  Or you are

2  a veteran, excuse me.

3  A.      I still am, yes.

4  Q.      When you spoke to Marty Creasey did he say

5  anything to you about the cost of your room and board?

6  A.      No.  It was more or less -- it was general in our

7  discussion, just the requirements, and that I was welcome

8  based on the information that I had given him, and

9  everything would be taken care of.  And, you know, just

10  from that conversation it was a great relief to me at the

11  time.

12  Q.      You said he mentioned the requirements.  Did he

13  mention the service hours requirements?

14  A.      No, he did not.

15  Q.      Okay.  So a couple of days later you arrived at

16  the VRQ.  Can you tell us what happened when you first

17  got to the VRQ?  What was that process?

18  A.      Yeah.  You come in through the front door --

19  actually, part of the conversation with Marty was I would

20  be going into a room with six other guys, and there would

21  be limited space.  I asked if there was enough room for

22  my laptop, and he says there's a locker and you can get a

23  lock and a key.  So I brought enough clothes to last me

24  and, then, also my laptop because that's -- I can make a

25  living off of the laptop.

DIRECT - ARMENTO

1  Q.    So when you got there you were shown to the locker
2  and put your stuff in it; is that correct?
3  A.    No.  Actually, just to answer your question more
4  specifically, I came in the front door with just a few
5  possessions, clothes, and my laptop.  A front desk
6  manager came around and searched my possessions to make
7  sure there wasn't any contraband or weapons or anything
8  like that, and I was asked to wait in the lobby.
9  Q.    Okay.  And then did you have an intake interview?
10 A.    I did.  There was an intake interview in my
11 future.  That's who I met, who I believe at the time was
12 a college intern, his name was John Rogers.  We went to
13 the first room outside of the lobby at the VRQ, and there
14 was a round table and some chairs.
15 Q.    And that intern, John Rogers, is that the same
16 John Rogers who later returned to work at the VRQ?
17 A.    That's correct.  John Rogers eventually -- he left
18 his internship -- I think he did something else with
19 college and then came back and was hired by ABCCM and
20 promoted to eventually become the operations manager.
21 Q.    Okay.  And during that intake interview were you
22 given the VRQ handbook to review?
23 A.    Yes, I was.  There was -- John Rogers had left the
24 room because he didn't have one with him at the time.
25 And in the packet -- I think they copied one off.  I

**DIRECT - ARMENTO**

1  wasn't there when they did that, but he brought one back

2  and it was still warm.

3  Q.    All right.  I'd like to show you an exhibit that

4  we've got to wake up our display.  Is that document

5  showing on your form -- excuse me, on your screen?  This

6  is Plaintiff's Exhibit 1A which, I believe, has already

7  been moved into evidence.  Is this the handbook that you

8  were given?

9  A.    Yes, it is.

10 Q.    If you look at the second page do you see that

11 date on there?

12 A.    Yes, I see that.  June 22nd 2014.

13 Q.    Okay.  And did you have a chance to actually

14 review this handbook during your intake?

15 A.    Like I said, it was given to me at the end of the

16 -- I may not have said at the end.  But at the the end of

17 the interview he left the room to go get a copy of it,

18 came back, and it was given to me then.  I reviewed it,

19 and then I think I acknowledged that I was in possession

20 of one at some point.

21 Q.    Okay.  There there's a requirement in there that

22 all residents remain sober.  Was that a problem for you?

23 A.    No, it was not.  Drinking was not an issue for me.

24 Q.    What about drugs?  Is that a problem?

25 A.    No.  Drugs are not an issue for me.

### DIRECT - ARMENTO

1  Q.     Let's go to page 10 of that exhibit.  And I note
2  we've already asked about these service hours, but do you
3  remember reviewing the -- at the top of page 10 there's
4  the service hours part.  Do you remember reviewing this
5  during your intake?

6  A.     Not specifically.  It's a 15-page document and,
7  like I said, it was given to me at the end of it.  But,
8  yeah, I flipped through it, looked for anything that
9  would stand out at me.  But, you know, this specific page
10 10 section of page 10 was not drawn to my -- called to my
11 attention.  After the interview there was a tour of the
12 VRQ, and then I was taken to Room 105 which is an intake
13 room.  At that point in time I put clothes and the
14 computer -- laptop in a locker and, I think, maybe that
15 evening I started reviewing it.

16 Q.     Okay.  Do you remember filling out a different
17 form during your intake interview about service hours
18 though?

19 A.     There was another form regarding service hours,
20 and it was just a choice, a "where would you rather do
21 your service hours?"  At that time I asked what service
22 hours were, and John Rogers explained it was just
23 something everybody does on campus.

24 Q.     I'm sorry?

25 A.     Go ahead.

## DIRECT - ARMENTO

1  Q.     I didn't mean to interrupt you but I put up

2  another exhibit so I wanted to acknowledge that.  This is

3  Plaintiff's Exhibit 3 which has been stipulated to

4  already as authentic and admissible, and we would like to

5  move it into evidence.

6  A.     Okay.  Yes, I do recognize this form.

7         THE COURT:  Wait a second.  Any objection?

8         MR.  CURRIDEN:  No objection, Your Honor.

9         THE COURT:  Let it be admitted.

10             (Plaintiff's Exhibit 3 is admitted.)

11        BY MS.  RIPLEY:

12  Q.     Is this the form you were just referring to,

13  Mr.  Armento?

14  A.     Yes, it is.

15  Q.     Okay.  And you said -- you were talking about a

16  selection.  Do you remember choosing from the service

17  hours on this form?

18  A.     Sure.  I remember selecting the computer

19  department -- that's not my handwriting.  That's John

20  Rogers' handwriting.  But, yeah, it's accurate.  That's

21  what I chose.

22  Q.     Why did you choose computer lab?

23  A.     Well I have computer skills.  I've made a living

24  in advertising and marketing and also technical computer.

25  I can build computers and troubleshoot them.

DIRECT - ARMENTO

1  Communication skills.  And he said there was also a

2  library attached to that.  I enjoy libraries.

3  Q.    And then I believe there's one other document from

4  that intake interview we'd like to look at.  Showing you

5  Plaintiff's Exhibit 21 which has also been -- it's all

6  right.  We don't need to actually show you this exhibit.

7  I can just ask you about it.

8        Do you remember signing that ABCCM consent form --

9  this is Plaintiff's Exhibit 21 which has already been

10 authenticated as admissible.

11       THE COURT:  Are you offering it?

12       MS.  RIPLEY:  Yes.

13       THE COURT:  Any objection?

14       MR.  CURRIDEN:  No objection.

15       THE COURT:  Let it be admitted.

16            (Plaintiff's Exhibit 21 is admitted.)

17       BY MS.  RIPLEY:

18 Q.    Do you remember this form?

19 A.    Yes, I do.

20 Q.    If we look at the second page of it is that your

21 signature?

22 A.    I printed and signed my name and dated it.  Yes.

23 Q.    And it says "September 2nd" which is the day we

24 were just talking about; right?

25 A.    The day of my intake, the first time I set foot on

## DIRECT - ARMENTO

1  the grounds of the veteran's Restoration Quarters.

2  Q.    Okay.  Let's go back to the first page and the

3  services section at the top.  Will you just read the

4  sentence that is in quotation marks?

5  A.    I understand there is no cost for my residency in

6  the VRQ transitional housing program.  I will be

7  receiving free room and board.

8  Q.    Okay.  And was that your understanding?

9  A.    Yes, it was.

10  Q.    Okay.  A minute ago I think you told us that after

11  your interview you were moved into an intake room and

12  that it was Room 105.  Can you tell us what an intake

13  room is?

14  A.    An intake room is sort of a transitional room.

15  There are three bunk beds, six people to the room -- in

16  the room two beds each per bunk bed, and that's kind of a

17  holding area while you get processed by the potential for

18  the grant per diem program.  Your potential for it is

19  assessed not only by the VRQ but also by the VA.

20  Q.    Okay.  Do you remember about how long you stayed

21  in an intake room?

22  A.    Yeah.  I'm thinking about eight, maybe ten days.

23  Yeah, Eight.  Probably right around -- in between eight

24  and ten.

25  Q.    And then where did you move after the intake room?

DIRECT - ARMENTO

1  A.      I think it was Room 124.

2  Q.      Was that a six-man room as well?

3  A.      No, it was not.  That was actually a foundation

4  room, the first stage of the three-tiered process at the

5  Veteran's Restoration Quarters.  It was a three-man room.

6  Q.      Okay.  Showing you another document about service

7  hours.  This is Plaintiff's Exhibit 2 which has also been

8  stipulated as admissible and authentic, and we would like

9  to move it into evidence.

10        MR.  CURRIDEN:  No objection.

11        THE COURT:  Let it be admitted.

12             (Plaintiff's Exhibit 2 is admitted.)

13        BY MS.  RIPLEY:

14  Q.      Mr.  Armento, do you recognize this form?

15  A.      I do.

16  Q.      Do you remember receiving it?

17  A.      I do.  It wasn't personally given to me.  It was

18  taped to my room door.

19  Q.      Which room?

20  A.      Room 124.

21  Q.      Okay.  So it was after you moved into your pillar.

22  Is that the first stage?

23  A.      No foundation.

24  Q.      Excuse me.  After you moved into your foundation

25  room.  Where does it say that you are assigned?

## DIRECT - ARMENTO

1  A.      It says at the bottom in old bold letters:  You

2  are assigned to the computer lab.  See computer lab

3  supervisor B. Storms, Byron Storms.

4  Q.      Did you ever work in the computer lab?

5  A.      I did not.

6  Q.      Why not?

7  A.      I was already employed, or working, excepting the

8  duties of the front desk manager.

9  Q.      What does this form say at the top about service

10  hours for someone who is already employed?

11  A.      Well it basically lays out the requirements for

12  service hours.  And it says if you're unemployed you have

13  to do 20 hours a week.  If you're a part-time employee

14  and doing less than 20 hours per week you do 10 service

15  hours.  And then, also, for a part-time student less than

16  12 credit hours you do 10 hours per week.  Residents

17  working and attending school are exempt.

18  Q.      Okay.  At this point, were you employed?

19  A.      I was working at the front desk.  So, like I said,

20  this was -- this document does not have a date on it, but

21  I knew that it was not the first day that I arrived that

22  I received this but I had already started at the front

23  desk -- been accepted as a front desk manager, the duties

24  and responsibilities.

25  Q.      Let's talk about the front desk job.  The parties

## DIRECT - ARMENTO

1  have stipulated your first day at the front desk was

2  September 8th.  Do you remember how you ended up working

3  at the front desk?

4  A.    Yeah.  So while I was in the intake room there was

5  a front desk manager who was also there, and his name was

6  Shawn Hildebrandt, and he and I became good friends.  He

7  was like the first friend that I had there.  He kind of

8  explained that -- we got to know each other, and he

9  thought I would make a good front desk manager.  So he

10  had submitted my name to the front desk supervisor, a guy

11  named Randy Gamble.

12  Q.    So then did Randy Gamble approach you?

13  A.    No.  No, he did not.  I was asked to come to the

14  front desk and meet him.

15  Q.    Okay.  Did you apply for this position at the

16  front desk?

17  A.    No, not really.  It was just more or less a meet

18  and greet.  Randy just asked me, you know, I guess a few

19  basic questions.  I don't really recall what they were.

20  It was just more or less -- I think he just wanted to get

21  a read of who I was, what I looked like, whether or not I

22  had any disabilities, whether I could form sentences and

23  that sort of thing.

24  Q.    So, other than that conversation with Mr. Gamble,

25  did you interview for the position?

### DIRECT - ARMENTO

1  A.      No.  I did not submit a resume.  I did not sit

2  down and go through any sort of interview process.  No.

3  Q.      What was your job title at the front desk?

4  A.      I was a front desk manager.

5  Q.      Okay.  And were there other front desk managers?

6  A.      There were.

7  Q.      Was that an existing position already?

8  A.      Yes, it was.  Front desk managers -- at any given

9  time there can be two of them on the front desk, and they

10 would be at opposite ends of a very long, probably,

11 15-foot front desk.  The responsibility -- as you come in

12 the front door and look at the front desk, the

13 responsibility of the front desk manager on the right was

14 to accept room keys from residents who were either coming

15 in and signing in, or accept residents -- accept their

16 keys if they were leaving and signing out.  I'd then give

17 them back their keys if they are coming in and signing

18 in.

19 Q.      I'll ask you a little bit about what the front

20 desk manager did in just a minute.

21 A.      I understand.

22 Q.      How many shifts were front desk managers scheduled

23 for?

24 A.      Front desk managers were scheduled for three

25 shifts in a 24-hour day.

1    Q.    Do you remember what those three shifts were?  The
2    timing of them.
3    A.    Yeah.  They were eight-hour shifts.  You can break
4    24 hours into eight hours.  There was a midnight to 8:00
5    a.m., and I believe that was third shift.  And then the
6    first shift started at 8:00 a.m. and went to 4:00 p.m.
7    And then from 4:00 p.m. to midnight, that was the second
8    shift.
9    Q.    And, at a minimum, how many front desk managers
10   were scheduled per shift?
11   A.    Two.
12   Q.    Were front desk managers also scheduled for Code
13   Purple?
14   A.    You had to have front desk manager skills to
15   perform Code Purple duties, yes.
16   Q.    Okay.  We'll come back to that.
17         What was your training to work at the front desk?
18   A.    Well it was on the job.  There was nothing really
19   special about it other than policies and procedures.  It
20   wasn't like I was -- there was any serious heavy
21   equipment or, you know, safety issues.  I wasn't handling
22   acetylene torches or anything like that.
23   Q.    Were you given the front desk manual to review?
24   A.    Yes, I was.
25   Q.    I'd like to show you Plaintiff's Exhibit 13.  I

## DIRECT - ARMENTO

1  believe this is also -- yes, it's also been stipulated as

2  admissible and authentic, and we would like to move it

3  into objection.

4         THE COURT:  Any objection?

5         MR.  CURRIDEN:  No objection.

6         THE COURT:  Let it be admitted.

7              (Plaintiff's Exhibit 13 is admitted.)

8         BY MS.  RIPLEY:

9  Q.    Mr.  Armento, if you would just take a moment, I

10  believe you have the ability up there to scroll through

11  exhibit.

12        THE COURT:  I think you only have control over

13  whether or not he scrolls through it.

14        BY MS.  RIPLEY:

15  Q.    Never mind.  Well then let me scroll to -- there's

16  several duties listed in there that I want to ask you

17  about.  Well while we're looking at the first page --

18  okay.  On page one it says something about arriving.

19  Item two:  Please make it a point to arrive 15 minutes

20  early.  Did you do that?

21  A.    Yes.  On my first day of -- actually, when I was

22  told that, all right, I should come show up the next

23  morning, Marty Creasey was my trainer and he was kind of

24  like an assistant front desk supervisor.  Randy Gamble

25  was the official supervisor.  Marty told me it says in

## DIRECT - ARMENTO

1  the manual you should show up 15 minutes beforehand but

2  there's really more that you can do in that 15 minutes so

3  you should really show up a half hour before your shift

4  -- before your shift begins.

5  Q.    Okay.  So on a routine basis what time would you

6  arrive?

7  A.    Well if I was doing first shift, which is 8:00

8  a.m. to 4:00 p.m. I would show up at 7:30.

9  Q.    Okay.  Still looking at page one of Exhibit 13.

10 The third item down there talks about security.  Is that

11 something you did as a front desk manager?

12 A.    Yes.  It says security rounds are a vital part of

13 what we do.  And the presumption is there, of course, on

14 the front desk.

15 Q.    I want -- don't read these out loud.  Just look at

16 what's on page 2 for a moment.

17 A.    Okay.

18 Q.    Are there any front desk responsibilities on there

19 that you did not have to perform?

20 A.    Some of these refer to other shifts, but I have

21 worked all three shifts during my time at the VRQ.  And,

22 yes, I performed all of these tasks.

23 Q.    Okay.  There's just one more page, page 3, and

24 there's a couple more things on there.  So if you would

25 do the same thing and just look at them on your own.

### DIRECT - ARMENTO

1    Were you asked to do all of those things as a

2  front desk manager as well?

3  A.    Yes.  The last item -- I have never actually

4  called the Asheville Police Department, but it would have

5  been -- had there been an incident, I would have more

6  than likely had to clear it with Randy Gamble and then

7  follow his instructions.

8  Q.    Okay.  Going back to your first day at the front

9  desk, and I believe you said Marty Creasey was training

10  you.  Did you fill out a time sheet that day?

11  A.    No, I did not.

12  Q.    Did you keep a record of your own of the time you

13  worked?

14  A.    I did.

15  Q.    Why?

16  A.    Well there was no time clock, no time sheet given

17  to me, and this was more or less on the job training and

18  I was in a federal program.  And, also, I was -- I have

19  bills to pay.  I figured at some time I would be

20  compensated for my time so I kept track of my hours.

21  Q.    Did you ever start filling out an ABCCM time

22  sheet?

23  A.    Yes, I did.

24  Q.    When did you start doing that?

25  A.    I believe that was the 14th of September, 2015.  I

DIRECT - ARMENTO

1  was told that I was going to be hired or go on payroll.

2  Q.     Who told you that?

3  A.     That was -- well Randy Gamble confirmed it, but I

4  believe it was Shawn Hildebrandt who told me that I was

5  going to be hired on the front desk.

6  Q.     Did Mr. Gamble tell you what you would be paid?

7  A.     Yes.

8  Q.     Do you remember what that amount was?

9  A.     Yes.  It was $9 an hour.

10  Q.     Did Mr. Gamble give you an offer of employment in

11  the temporary -- Transitional Employment Program?

12  A.     No, he did not.

13  Q.     Okay.  Showing you Plaintiff's Exhibit 16 which I

14  believe you-all have stipulated admissible and authentic.

15  Yes, already stipulated.

16         We would like to move this into evidence.

17         THE COURT:  Any objection?

18         MR. CURRIDEN:  No objection.

19         THE COURT:  Let it be admitted.

20             (Plaintiff's Exhibit 16 is admitted.)

21         BY MS. RIPLEY:

22  Q.     What is this form?

23  A.     It says ABCCM Employment Enrollment and Change

24  Notice Form.

25  Q.     Who is the employee it identifies?

## DIRECT - ARMENTO

1  A.      It is me.  It says Greg Armento at the top.

2  Q.      What's the status selection?

3  A.      Full-time.

4  Q.      The effective date?

5  A.      September 30th 2015.  9/30/15.

6  Q.      And it shows $9 an hour; right?

7  A.      It does.

8  Q.      Who is it signed by at the bottom?

9  A.      The program director was Mary Sczudlo at the time.

10 Q.      Did you actually meet with Mary Sczudlo at the

11 time?

12 A.      I did not.

13 Q.      Does this form say anything about the Transitional

14 Employment Program?

15 A.      It does not.

16 Q.      Are there any other wage rates disclosed on this

17 form other than $9?

18 A.      No.  None that I can see.

19 Q.      So when did you first learn you were not going to

20 be paid for all of your work time as a front desk

21 manager?

22 A.      Well I began to suspect I was not going to be paid

23 for those first days that they called training, and I

24 believe that was something like ten or 12 days.  When the

25 -- I was explained how to fill out a time sheet.  When

## DIRECT - ARMENTO

1  that was explained to me Randy Gamble says, okay, well

2  you're going to come in and you're going to fill out a

3  time sheet now that you're going to be paid for your work

4  on the front desk.  And I was told that the hours between

5  8:00 a.m. and 4:00 p.m. Monday through Friday those hours

6  do not get written down on the time sheet.  You will not

7  be paid for those.  Do not write down any times over

8  eight hours a day.  If you do work more than eight hours

9  a day that has to be approved if it's going to be paid.

10  So you need prior approval to get paid for those eight

11  hours, for more than eight hours in a day.  Let's see.

12  Also, I would get paid for anything on midnight to 8:00

13  p.m. which I believe is --

14  Q.    You mean midnight to 8:00 a.m.?

15  A.    Midnight to 8:00 a.m., correct.  And I believe

16  that is called third shift.  And then also from 4:00 p.m.

17  to midnight, and that is called second shift.  And those

18  were payable.  Now there's two days left and that would

19  be Saturday and Sunday.  If you did work Saturday and

20  Sunday between the hours of 8:00 a.m. in the morning to

21  4:00 p.m. in the afternoon you could get paid for those

22  two days.

23  Q.    Were any of these instructions in writing?

24  A.    No, they were not.

25  Q.    Okay.

## DIRECT - ARMENTO

1  A.     They were verbally expressed to me.

2  Q.     So when you learned that you were not going to be

3  paid for all of your time, were you confused?

4  A.     A little bit.  I was happy to get a job.  Part of

5  -- I had very few modest bills.  I had everything that I

6  had ever owned and created in storage down in Orlando,

7  Florida.  I think the bill at the time was something like

8  $150, something like that, a month.  And then I had a

9  cell phone bill which to me it, you know, is a necessity,

10  especially in this age.  Finally, I also had a credit

11  card bill, not a great big, huge hit on my credit, but I

12  had one, and maintaining my credit was important to me.

13  So being paid was my first priority.  The concern about

14  unpaid hours at that time had to take a backseat to

15  getting a check and meeting my financial obligations.

16  Q.     Okay.  I just wanted to make sure this was clear

17  from a minute ago when you were talking about the

18  instructions about filling out the time sheet.  Who gave

19  you all of those instructions?

20  A.     That was my front desk supervisor, Randy Gamble.

21  Q.     Okay.  You also just mentioned Orlando.  When you

22  were in Orlando did you have a job?

23  A.     Yes.  I had a very successful career in

24  advertising and marketing.  I worked with Disney, I

25  worked with Lockheed Martin on various defense

**DIRECT - ARMENTO**

1  contractors and, also, contracted out on my own.  It was

2  a very marketable skill that I still have.  I can build

3  websites that adapt themselves not just to computer

4  screens but to cell phones.  It's called a responsive web

5  design.  I'm also a writer, a photographer, and I do some

6  video editing.

7  Q.    Did you ever have a job in Orlando where you

8  actually worked under a supervisor?

9  A.    Yes.  Yes, several times, especially at Lockheed

10 Martin and on Disney property.

11 Q.    And did you have actual schedules?  Work

12 schedules?

13 A.    Yes.

14 Q.    Did you ever have trouble arriving on time?

15 A.    No, not really.

16 Q.    Okay.  I want to go back to -- we were just

17 talking about your unpaid work.  Did you complain to

18 anyone about not getting paid for all your work?

19 A.    Yes, I did.  I was -- I'm trying to think.  Some

20 time in November, like the first of November, that first

21 week there, I decided that, you know, I had concerns

22 about it.  So I talked -- the first person I talked to

23 was my case manager, Slim Jones.  I figured he's the one

24 that -- he's my representative to ABCCM, so I expressed

25 to him that I had concerns I'm not getting paid for all

### DIRECT - ARMENTO

1  the hours that I'm working on the front desk.  And Slim

2  told me that, well, that's kind of a front desk thing;

3  you need to deal with Randy Gamble at that time.  I was

4  really kind of taken aback by that.

5       I was looking for an advocate and, so, I went and

6  talked to Randy Gamble about that as well.  And then also

7  I believe I talked to the operations manager at the time,

8  which was Marc Monacelli.  I know I had at least three

9  conversations with Randy Gamble and Slim Jones, my case

10 manager, who are the ones I had conversations with.

11 Q.     Did you go to the U. S. DOL to complain?

12 A.     Yeah.  After -- I wasn't satisfied with any of the

13 answers I was getting from anybody at the ABCCM, so I

14 went to the U. S. Department of Labor in the federal

15 building downtown Asheville.  And I was -- I had

16 questions about whether or not there were special

17 exemptions for nonprofits and that sort of thing.  After

18 they explained to me what the law was I felt satisfied

19 there was no special exemption that they could highlight

20 to me.

21      So then I went over to ABCCM's office at the -- I

22 believe that is Chestnut Street, or it was just across

23 240, And I asked to speak to someone.  The receptionist

24 then explained there is someone in accounting or payroll

25 that can tell me why I'm not getting paid for all my

## DIRECT - ARMENTO

1  hours.

2  Q.    What happened after that?

3  A.    There was no substantive answer coming from the

4  offices at ABCCM.  That process that I just explained is

5  what we would call in the military the "chain of

6  command." You know I'd take it up with, you know, my

7  immediate superviser or my case manager in this.  So I

8  felt like I had done all that I could on that day.  I

9  went back to the VRQ, and then I think my room phone

10 rang, or maybe the house manager came up and knocked on

11 my door.  But I was notified my presence was requested at

12 the -- in the director's office.

13 Q.    Who was the director at that time?

14 A.    Mary Sczudlo was the director.

15 Q.    Did you meet with Mary Sczudlo?

16 A.    Yes, I did.  There were also two other people in

17 the office besides me.  There was Randy gamble, my front

18 desk supervisor, and the director of operations was Marc

19 Monacelli.

20 Q.    So, after you met with them, did anything change?

21 A.    Well I think during that conversation there was

22 some disagreement about how many service hours I had so

23 they agreed to do a review -- not how many service hours

24 I had accumulated but how many service hours that I

25 needed to perform.  And the result of that meeting was

1  that they would review.  That was the result of the

2  meeting.

3  Q.    Ultimately, they did change your service hours;

4  right?

5  A.    Yes, along with all the other front desk managers

6  now had to perform service hours as well.  I was -- the

7  part about this that had me mostly confused was that the

8  requirements, as I just read on the requirement sheet for

9  service hours, were either ten or 20.  The threshold

10 between part-time and full-time was 20 service hours.  So

11 if I did 21 service hours -- excuse me, 21 working hours,

12 then I was considered full-time.  The service hour

13 requirement sheet that is in the record doesn't say

14 anything about full-time.  It just says if you're doing

15 20 or less then you're considered part-time.  I was doing

16 40 hours on the front desk.  But the confusing -- that

17 was partly confusing.

18       But the biggest conundrum was that I was working

19 in increments of eight hours on the front desk, but they

20 were taking full days of my front desk Monday through

21 Friday between 8:00 a.m. and 4:00 p.m. and subtracting

22 eight, 16, 24, 32 hours, and none of those numbers are on

23 those service hours requirement sheet.  So I was going,

24 what's happening to the rest of those hours?  So, as a

25 result of that meeting, there was a review and a

1  spreadsheet was generated, and my case manager called me

2  in to his office to review a spreadsheet and the results

3  for review of my service hours.

4  Q.    Were you given a copy of that spreadsheet?

5  A.    No.  The spreadsheet that was shown to me was on

6  -- was printed, and it was an Excel sheet.  I've seen

7  enough Excel sheets.  Some of the brackets were numbered,

8  brackets were colored.  The numbers were kind of small.

9  I had one cataract at the time so that's why I asked for

10  a copy of the spreadsheet.  And I was told by my case

11  manager they would be credited on the payroll ten hours,

12  and then on the next payroll -- paycheck I would be

13  credited another ten hours.  And based on what I just

14  told you, that there were ten hours, was -- the

15  mathematics still did not line up because I was still

16  being subtracted eight hours, 16 hours, 24, 32 hours, and

17  such.

18  Q.    So did you go complain to someone outside of

19  ABCCM?

20  A.    I told the -- the result of that meeting was that,

21  well, I'm still not satisfied at that point, and then I

22  started to look at what my options were from this point

23  on.  I had not gotten any -- still don't have a labor

24  advocate in my life from the U. S. Department of Labor

25  from -- or ABCCM staff.  So I started to catalog and

### DIRECT - ARMENTO

1  write and email because I thought, well, my next recourse

2  is to write my representatives, you know, federal and

3  state and, also, maybe the North Carolina Department of

4  Labor, maybe some attorneys.  You know, where does this

5  go from here?  You know I think I've followed the chain

6  of command as best I could.

7  Q.    Did you write to Senator Tillis' office?

8  A.    I did.  I wrote a document.  It's a fairly

9  complicated process because of the -- the service hours

10  requirement sheet doesn't say it's from Sunday to

11  Saturday.  That's what -- it doesn't define what a week

12  was, but I was being paid from Thursday to Wednesday.  So

13  I wound up writing something like an 11-page document but

14  I supported it with PDFs and, you know, documentation of

15  how I -- I explained what the conditions were.

16  Q.    And did Senator Tillis's office look into your

17  complaint?

18  A.    Well I did send the letter to Senator Tillis'

19  office, my federal representative, and I sent it to the

20  North Carolina Department of Labor and various attorneys

21  -- employment attorneys.  Senator Tillis' office

22  responded.  I heard back from his -- a gentleman from his

23  constituent advocacy office.

24  Q.    And what did you hear?

25  A.    Well he says they took my concern to heart and

1  that they had a -- I had to sign and return a constituent

2  advocacy -- it's so hard to say -- advocacy release so

3  that they could look into the issue on my behalf, which I

4  did.  And during the conversation, the followup

5  conversation, he had said that they were sending letters

6  of inquiry to the VA and the U. S. Department of Labor.

7  Q.    And did they ever tell you what the result of

8  their investigation was?

9  A.    Well I had worked -- the results -- the first that

10  I knew about it was that I had worked a midnight shift

11  and I was off during the day the next day.  I stayed up,

12  and my phone rang when I was off campus and it was

13  Whitney Lott, I believe, from the VA.  That's her name,

14  and she was asking about being a front desk manager and

15  unpaid hours.  So I connected the two and said that,

16  yeah, there's an issue.  I'm working 40-plus hours, and

17  I'm in a federal benefit that -- and I was not getting

18  paid, you know, the service hour departments.  I

19  explained the ten hours or 20 hours were required but

20  they were subtracting eight hours, 16, 24, 32.  There's

21  no deductions on my check; I've got nothing to show for

22  it.

23  Q.    All right.  I'd like to show you --

24        THE COURT:  Before you move on to something else,

25  Ms.  Riply, is this a logical time for us to go ahead and

### DIRECT - ARMENTO

1  take the lunch break?

2        MS. RIPLEY:  It would be.  Your Honor, I think in

3  about five minutes it would feel more logical --

4        THE COURT:  Okay.

5        MS. RIPLEY:  -- but I defer to you.

6        THE COURT:  I'll let you go five more minutes.

7  But get to a stopping point because it's time for us to

8  take a break.

9        BY MS. RIPLEY:

10 Q.    I'm showing you Plaintiff's Exhibit 19.

11 A.    I see it.

12 Q.    Do you recognize this letter?

13 A.    I do.

14 Q.    Did you see a copy of this letter?

15 A.    I did.

16 Q.    Who is this from?

17 A.    This is from Senator Thom Tillis' office.

18 Q.    Who is it to?

19 A.    It is to me.  It was mailed to me along with -- I

20 believe this is the cover letter, or maybe there was --

21 Q.    I don't believe it was to you.  (Indicating.)

22 A.    Oh, I see.  I understand.  There you go.  There

23 was a cover letter.  This was the enclosure to the cover

24 letter.

25 Q.    So who is this letter addressed to?

**DIRECT - ARMENTO**

1  A.     This is addressed to Senator Thom Tillis.

2  Q.     Who is it from?

3  A.     The director of the VA medical center in

4  Asheville, Cynthia Bryfold.

5  Q.     Did you receive a copy of this?

6  A.     This is a copy that I did receive.

7  Q.     Okay.  Why were you provided a copy of this?

8  A.     I'm sorry?

9  Q.     Why were you provided a copy of this?

10  A.     This was the Senator Tillis response to the

11  constituent advocacy complaint that I filed with his

12  office.

13  Q.     Were you happy with this response?

14  A.     No.  No, I was not.  It basically parroted back --

15         MR.  CURRIDEN:  Objection to the relevance and

16  hearsay.

17         THE COURT:  The relevance?

18         MR.  CURRIDEN:  The letter is hearsay.  It's also

19  irrelevant.

20         MS.  RIPLEY:  I haven't asked --

21         THE COURT:  Right.  The question is whether he is

22  happy with what the letter says.  There isn't a pending

23  question about the contents of the letter.

24         MR.  CURRIDEN:  Okay.

25         THE COURT:  So your objection is overruled at

## DIRECT - ARMENTO

1   least on the grounds that you gave.

2        MR.  CURRIDEN:  I believe the witness was about

3   the start reading from the letter is the reason for the

4   objection, Your Honor.

5        THE COURT:  Mr.  Armento, listen to the question

6   and answer what you were asked.  It was a yes or no

7   question of whether you were happy with the contents of

8   the letter.

9               **FURTHER DIRECT EXAMINATION**

10       BY MS.  RIPLEY:

11  Q.     Were you happy with the result?

12  A.     I was not.

13  Q.     Why were you not happy?  Without reading from the

14  letter.

15  A.     Because it basically parroted back the complaint

16  that I had filed with his office originally in the email

17  with supporting documents.  It basically affirmed what I

18  had told them but there was no result.  And the VA seemed

19  to be okay with writing back the same thing that I had

20  complained of.  It just seemed sort of a catch-22 to me.

21       MS.  RIPLEY:  Your Honor, we would like to move

22  this into evidence to show he was on notice of the result

23  of the investigation.

24       THE COURT:  Is there an objection?

25       MR.  CURRIDEN:  I'll withdraw the objection, Your

### DIRECT - ARMENTO

1  Honor.

2      THE COURT:  Okay.  It is offered for the limited

3  purpose of showing notice to the plaintiff.  It is

4  allowed for the limited purpose of showing notice to the

5  plaintiff of the contents.

6      MS. RIPLEY:  Your Honor, I think now would be an

7  okay time to stop.

8      THE COURT:  All right.  We're going to go ahead

9  and take the lunch break.  We're stopping a few minutes

10  late so let's come back at, say, 2:05.

11      Ms. Brooke, Ms. Ripley, what's the program for

12  this afternoon?  How much longer do you expect to take on

13  direct with Mr. Armento?

14      MS. RIPLEY:  It's a little bit hard to predict,

15  but I think 30 minutes to an hour on direct.  He is the

16  last witness we plan to call.

17      THE COURT:  Okay.  Mr. Curriden, how long do you

18  expect to take on cross-examination with the plaintiff?

19      MR. CURRIDEN:  I expect it to be about an hour.

20      THE COURT:  Okay.  So it sounds like the plaintiff

21  is going to get to the end of plaintiff's evidence before

22  the afternoon break.  If you're planning to present any

23  evidence you need to be ready with your witnesses before

24  the afternoon break.

25      Roughly speaking, how long do you anticipate your

## DIRECT - ARMENTO

1  evidentiary presentation is going to be?

2       MR.  CURRIDEN:  We plan to call Mr.  McElyea, and

3  then I expect his testimony to take an hour to an hour

4  and a half, and then we have two roommates whose

5  testimony will be probably 30 minutes each.  So that

6  takes us to two and a half hours, approximately, and then

7  Mary Sczudlo who will be an hour or less.

8       THE COURT:  So you may or may not finish today.

9  It will be a close case one way or the other.

10      MR.  CURRIDEN:  Correct, Your Honor.

11      THE COURT:  That certainly helps me with planning

12 our schedule.  Let's be back here at 2:05.

13      Marshal, please recess us to 2:05.

14           (Off the record at 1:05 p.m.)

15           (On the record at 2:05 p.m.)

16      THE COURT:  Is there anything we need to address

17 before we resume the presentation of the evidence?

18 Anything for the the plaintiff?

19      MS.  RIPLEY:  No, Your Honor.

20      THE COURT:  Anything for the defendant?

21      MR.  CURRIDEN:  No, Your Honor.

22      THE COURT:  Okay.  Mr.  Armento, if you would

23 please return to the witness stand.  You were previously

24 sworn, and you remain under oath until the trial is over.

25      THE WITNESS:  I understand.

**DIRECT - ARMENTO**

1          (Witness resumes the stand at 2:05 p.m.)

2          THE COURT:  You may cross-examine this witness,

3          MS.  RIPLEY:  Your Honor, I had a few more

4    questions.

5          THE COURT:  Oh, excuse me.  I thought we were at a

6    different place.  Go ahead.  You may continue.

7                **FURTHER DIRECT EXAMINATION**

8          BY MS.  RIPLEY:

9    Q.    Mr.  Armento, I'm going to ask you a couple more

10   questions about your work at the front desk.  Were you

11   required to attend a meeting of front desk managers?

12   A.    Yes.  There was a front desk manager's meeting

13   every Monday morning at 9:00 a.m.

14   Q.    Who conducted those meetings?

15   A.    The front desk supervisor, Randy Gamble.

16   Q.    Were you required to attend?

17   A.    Yes, I was required to attend.

18   Q.    Who else was required to attend?

19   A.    Well at all front desk manager meetings all front

20   desk managers were required.

21   Q.    While you were a front desk manager did any

22   outside volunteers ever attend that meeting?

23   A.    No, they did not.

24   Q.    Did you ever work with an outside volunteer at the

25   front desk?

## DIRECT - ARMENTO

1  A.      No, I did not.

2  Q.      Did you ever know of any outside volunteers

3  working at the front desk while they were there?

4  A.      No.  None that I was aware of.

5  Q.      Did your job as a front desk manager cause you to

6  come in contact with a truck driving school?

7  A.      Yes, it did.

8  Q.      Tell me about that.  What happened?

9  A.      Well as part of my front desk manager duties we

10 had performed security rounds.  It didn't matter -- all

11 three shifts had to perform them just the interval was

12 different for each.  Included on the grounds is a

13 building called -- what's called the "Acts" building,

14 A-C-T-S, and I guess that's short for "activities

15 building."  And there were -- there was a truck driving

16 school, a truck driving institute, on campus there for

17 veterans to take advantage of.  There were several

18 tractors and trailers parked on there, as well as you had

19 to check their doors to make sure they were looked after.

20 You had to walk around the "Acts" building, and if it was

21 open you'd have to perform security -- a little security

22 sweep on the inside.  Why was the door open?  You just

23 checked it and that sort of thing.

24 Q.      As a front desk manager did you come in contact

25 with any other businesses of ABCCM?

## DIRECT - ARMENTO

1  A.    Well, as part of that security, we also had to
2  perform a security sweep in the kitchen when it was not
3  in use.  If it was daytime, not necessarily, there was
4  meals and activities and authorized personnel working in
5  the kitchen.  At nighttime, in the evenings, especially
6  after it -- in the midnight shift which I think was --
7  this always gets me confused.  I guess that's third
8  shift, midnight to 8:00 a.m., had to perform security
9  sweeps, check all the doors to the kitchen and also had
10 to get a key to the door to the kitchen and bring out a
11 lunch bag for all the guys --
12 Q.    They used the kitchen to provide meals to you all,
13 right, the residents?
14 A.    Yeah.  But there was another business run out of
15 there and it was called Culinary Commandos.  It was
16 basically a catering business for the veterans.  There
17 was a culinary school there, a very successful culinary
18 school, on campus.
19 Q.    Okay.  I'd like to show you Plaintiff's Exhibit 14
20 which has been stipulated admissible and authentic, and
21 we would like to move it into evidence.
22        THE COURT:  Any objection?
23        MR.  CURRIDEN:  No objection.
24        THE COURT:  Let it be admitted.
25            (Plaintiff's Exhibit 14 is admitted.)

# DIRECT - ARMENTO

BY MS. RIPLEY:

Q.    So this is four pages, Mr. Armento.  If you could just tell me what that first page is you're looking at. What are the dates?

A.    This looks like it begins on September 13th, and I see my name second from the bottom.  It says I'm off. Then it says "train."  Then it says it has me starting on the 14th.  So I imagine this is September -- begins September 13th 2015.

Q.    Okay.  And your name appears under which heading?

A.    Service hours.

Q.    Okay.  And on page 2 of this exhibit do you see your name?

A.    I do.  Same position.  I'm second from the bottom.

Q.    What is the date?

A.    It begins September 20th, and under the heading service hours still.

Q.    On page 3, can you just tell us the first date at the top?

A.    It says October 18th.

Q.    Where does your name appear on this one?

A.    Oh.  It's up near the top.  I'm fifth from the top, and I'm under a heading called ABCCM.

Q.    Okay.  On October 18th it has you working "CP." What is "CP?"

## DIRECT - ARMENTO

1  A.      Code Purple.

2  Q.      Okay.  And then over on the 23rd it says "mid to

3  eight."  Is that midnight?

4  A.      That's correct.  That would be third shift.

5  Q.      Okay.  I'd like to ask you a couple of questions

6  about your work as a van driver.

7  A.      Okay.

8  Q.      The parties have already stipulated you did that

9  work from November 9th 2015 through July 3rd 2017 and

10  that that was considered service hours.  Can you tell us

11  how you became a van driver?

12  A.      I believe it was some time -- I'm not sure right

13  now.  I know it was early 2015, and I was -- it was

14  during a front desk managers' meeting.  Randy Gamble had

15  requested or, actually, required the driver's license of

16  every front desk manager, or a copy of that driver's

17  license.  After the meeting, I went up to the office and

18  made a copy of my driver's license and gave it to the

19  front desk supervisor.  And the purpose, as it was

20  explained to me, was that they needed duty drivers at the

21  VRQ, and now one of the duties of front desk managers was

22  being a duty driver.

23  Q.      So was that part of Randy Gamble's job as front

24  desk supervisor to also schedule the drivers?

25  A.      Yes, it was.

**DIRECT - ARMENTO**

1  Q.      Did he schedule the drivers?

2  A.      Yes, he did.

3  Q.      Did he schedule you to drive?

4  A.      Yes, he did.

5  Q.      At that time in 2015 was he the only person who

6  was scheduling drivers?

7  A.      Well there was a new operations manager, a guy

8  named Marc Monacelli, and they would coordinate -- I

9  think it was more Randy Gamble showing Marc some of the

10 procedures.  Marc was more or less just kind of getting

11 his operations manager's legs by the time I got at the

12 VRQ.

13 Q.      Okay.  I think we've already heard about the van

14 logs today.  Did you fill out a van log when you drove

15 the van?

16 A.      Yes, I did.

17 Q.      Other than those van logs were you instructed to

18 fill out a time sheet or any record?

19 A.      No, I was not.

20 Q.      Did you get any instructions on how to track your

21 service hours as a van driver?

22 A.      No.  I was never given any instructions.

23 Q.      Did you fill out the van logs regularly?

24 A.      Yes.

25 Q.      Where were those kept?

### DIRECT - ARMENTO

1  A.     They're behind the front desk.  There were several

2  clipboards, like four or five.  And those clipboards, of

3  course, had several sheets of van log records.  The top

4  one was the one that you would record your -- the date

5  that you got -- you requested the van, or you received

6  the keys for the van and the clipboard.  You would put

7  your name, also the time that you received the clipboard,

8  and the mileage in the van from when you got in the van,

9  and then also your destinations.  And then you were also

10  required to put how many passengers you took.

11  Q.     And I think you said those were kept near the

12  keys.  So did you have to pick up the keys from the front

13  desk?

14  A.     That's correct.  If you were scheduled -- say you

15  had Monday and Wednesday, Fridays, well your day would

16  start at 7:00 a.m. in the morning because the 7:15 van

17  run to the VA --

18  Q.     Sorry.  My question was just, did you go to the

19  front desk to get your keys?

20  A.     Yes, I did.

21  Q.     Okay.  And then could you get the keys any time

22  you wanted?

23  A.     No, I could not.

24  Q.     How did the people at the front desk know whether

25  they should give you the keys?

**DIRECT - ARMENTO**

1    A.    Well there was a schedule at the front desk.  And

2    then also the -- it was a duty driver's schedule, and

3    then after a while it became routine.  They knew I would

4    go up there and announce, hey, I'm Greg.  I'm here for a

5    van.  I'm doing the 7:15 van run.

6    Q.    Did you drive unscheduled runs as well?

7    A.    Yes, I did.

8    Q.    Why were there unscheduled runs?

9    A.    Well what would happen is sometimes someone would

10   come up and say, hey, I need to get to court, you know,

11   downtown, and that might be last minute or it might be a

12   -- the case manager coming up saying he needs to get to

13   the bus station or whatever.  So that would be one

14   instance.  Also, there could be emergency calls in the

15   middle of the night.  You could get a call in your room:

16   Hey, Greg, we've got an emergency.  We need to get

17   someone to the VA emergency room or maybe even Memorial,

18   Mission.

19   Q.    Did you ever get calls like that in the middle of

20   the night?

21   A.    Yes, I did.

22   Q.    Who called you in the middle of the night?

23   A.    It was the front desk, who one of the front desk

24   managers happened to be.

25   Q.    All right.  But if a resident wanted to get a ride

## DIRECT - ARMENTO

1  downtown to the courthouse, I think is the example you

2  gave, does the resident come to you and say, Mr.  Armento

3  please take me downtown?

4  A.    No.  They would talk to their case manager whoever

5  if it was, and eventually they started to create kind of

6  like a logbook for people who had appointments they

7  needed to get to.  That worked for a little while, but

8  for the most part nobody could go up there and say I

9  needed a ride.  As a matter of fact, those runs that we

10 took to the VA, and then over to the Steadfast House

11 those were strictly van runs.  If a guy wanted to go

12 downtown and jumped on the van run, jumped on the van, we

13 were supposed to report him.  I mean he got off, or he

14 was saying I'm not going to the VA, I just need to go

15 downtown, that was not permitted.

16 Q.    So as a driver doing a VA van run where were you

17 permitted to drive the van?

18 A.    It depends on the run.  But the run that I drove

19 most frequently was to the VA, Steadfast House, and the

20 return trips.  But there were also other runs where I

21 would, instead of going to the VA in the morning I would

22 drop students off over at AB-Tech and come back.

23 Sometimes I would have to drive veterans out to ABCCM's

24 south warehouses way out towards or in Enka, Candler, and

25 also there's that one out Hendersonville Road, 25.

**DIRECT - ARMENTO**

1  Q.    Did you decide where you were going to drive, or

2  did someone tell you where to go?

3  A.    No.  It was ABCCM who told me what my destinations

4  were.

5  Q.    Did ABCCM have any paid drivers while you were a

6  driver?

7  A.    The only paid -- there was always just one paid

8  driver, and everybody else was doing service hours.

9  Q.    Okay.  Did they advertise for paid van drivers

10  while you were a van driver?

11  A.    Yes, they did.

12  Q.    I'm going to show you Plaintiff's Exhibit 22.  I

13  believe this has been stipulated admissible and authentic

14  as well as, and we would like to move it into evidence.

15        MR.  CURRIDEN:  No objection.

16        THE COURT:  Let it be admitted.

17            (Plaintiff's Exhibit 22 is admitted.)

18        BY MS.  RIPLEY:

19  Q.    What is this document, Mr.  Armento?

20  A.    This is a copy of a notice that was placed on the

21  operation manager's window, and it's listing the

22  advertisement for paid employment the VRQ was looking for

23  drivers.

24  Q.    Did you see this when it was posted?

25  A.    Yes, I did.

DIRECT - ARMENTO

1    Q.     Do you remember roughly when that was?

2    A.     It was late 2015, around November 2015.

3    Q.     Okay.

4    A.     Excuse me.  No.  That would be 2016 because in

5    November 2015 I was working the front desk.

6    Q.     Do you remember when John Rogers was overrseeing

7    van drivers?

8    A.     Yeah.  It was at that time.  This was his notice

9    on his office window.

10   Q.     I think I'm a little confused on what the time is

11   --

12   A.     Okay.

13   Q.     -- because I think you said 2015.  Then maybe

14   that, I think, changed it to 2016?

15   A.     That's correct.

16   Q.     Do you remember roughly when this was posted?

17   A.     John Rogers became operations manager after Marc

18   Monacelli.  That happened late spring or early summer

19   2015.  Part of John Rogers getting to know the front desk

20   managers and the duty drivers was during those meetings

21   -- he sat in on some of those meetings, and we expressed

22   a need that we need drivers.

23   Q.     Okay.  Did you apply to be a paid driver?

24   A.     Yes, I did.  There was a sign-up sheet placed on

25   the front desk and it listed these same requirements, and

## DIRECT - ARMENTO

1  you put your name and your room number, maybe your phone

2  number, but for certain your name and your room number.

3  Q.     And were you ever offered a paid driving job?

4  A.     After I left the front desk the offer was

5  communicated in such a way that I was led to believe that

6  I had a job as a van driver.  It wasn't directly

7  expressed that the next person we're going to hire is

8  you, Greg.  That was not directly expressed.  But after I

9  left the front desk they said that we're going to put you

10 on schedule more now, and that was, like, a Monday,

11 Wednesday.  Then it became Friday and they said we're

12 going to be hiring more van drivers.  So that was kind of

13 like -- led me to believe that I had a VRQ job in my

14 future as a van driver.

15 Q.     Why did you keep driving even though they never

16 paid you?

17 A.     Well the service hours were required.  That was --

18 it was just -- it's in the handbook.  It's expressed you

19 talk to other veterans.  And so the thing about -- I

20 would rather do van driving than working the kitchen or

21 the laundry or in maintenance or --

22 Q.     What did you think would happen if you didn't do

23 service hours?

24 A.     Well if you didn't do service hours then you would

25 get strikes or possibly expelled.  You would lose your VA

## DIRECT - ARMENTO

1  grant per diem benefit.

2  Q.    Did anyone ever get written up for not performing

3  service hours while you were a resident at the VRQ?

4  A.    Yes, they did.

5  Q.    I'd like to show you Plaintiff's Exhibit 20.  Do

6  you know what this type of form is?

7  A.    This is a VRQ incident report.

8  Q.    As a front desk manager did you regularly handle

9  VRQ incident reports?

10 A.    Every shift you were required to read the incident

11 reports from the previous shift or even the whole day.

12 Q.    So was that a regular part of your job as a front

13 desk manager?

14 A.    Yes, it was.  Every shift change you had to read.

15 There was a whole list of things.  You had to perform an

16 effective shift change, and reading the incident reports

17 from the previous shift or two shifts was required.

18 Q.    Would the VRQ incident report -- were the VRC

19 incident reports created as a regular course of business

20 of the VRQ?

21 A.    Yes, they were.

22 Q.    After you saw them at the front desk what did you-

23 all do with them?  Did you file them somewhere?

24 A.    Yes.  There was -- we would create copies.  One

25 would go on the front desk supervisor's desk, one would

## DIRECT - ARMENTO

1  go in the person's case manager's folder so the case

2  manager was aware the front desk supervisor was aware

3  and, also, another one would go in to a three-ring binder

4  for following shift.

5  Q.    Were those maintained by the VRQ?

6  A.    Yes, they were.

7  Q.    Were the incident reports created by someone who

8  had knowledge of the incident?

9  A.    Yes.  They were typically reported to the front

10 desk.  Sometimes -- I happen to know in this case this

11 incident report was created by Chef Cox.

12 Q.    Do you know if it was created close in time to the

13 incident that it speaks of?

14 A.    Yes.

15 Q.    Your Honor, we would like to move Plaintiff's

16 Exhibit 20 into evidence.

17        THE COURT:  Any objection?

18        MR.  CURRIDEN:  No objection.

19        THE COURT:  Let it be admitted.

20           (Plaintiff's Exhibit 20 is admitted.)

21        BY MS.  RIPLEY:

22 Q.    Mr.  Armento, do you remember seeing this

23 particular incident report, Exhibit 20?

24 A.    Yes, I do.

25 Q.    And what was the resident written up for?

**DIRECT - ARMENTO**

1  A.     The kitchen relies on some veteran residents to

2  perform service hours in the kitchen.  And this

3  particular veteran -- evidently, it says that he was --

4  if I may read.

5  Q.     You may read it.

6  A.     Pardon?

7  Q.     You may read it.

8  A.     Tom has been scheduled on Tuesdays for two weeks

9  for breakfast shifts.  He had to be called down for

10 service hours today after missing two shifts this weekend

11 due to illness.  He was cursing, disrespectful to lead

12 cook Ron Abraham.  Ron sent him out of the kitchen.

13 Please issue strike and warning that failure to C/O,

14 continue resumed service hours is grounds for removal

15 from the per diem program.

16 Q.     Thank you.

17        Shifting gears a little bit.  Are you employed

18 now?

19 A.     No, I'm not.

20 Q.     Are you in school?

21 A.     Yes, I am.

22 Q.     Are you working towards a degree?

23 A.     I am.

24 Q.     What type of degree?

25 A.     It's an Associate of Fine Arts.

## DIRECT - ARMENTO

1  Q.     Where are you enrolled?

2  A.     At AB-Tech.

3  Q.     How are you doing?

4  A.     I'm doing really well, to my own surprise.

5  Success in spite of myself.

6  Q.     While you were at the VRQ did you look for jobs

7  outside the VRQ?

8  A.     I did.

9  Q.     Did you ever find any jobs?

10  A.     Yeah.  I was -- I had some success.

11  Q.     Where did you have -- with what employers did you

12  have some success?

13  A.     There was a small business, a fruit stand, Honey

14  House, that was just down the road from the VRQ.  Since I

15  did not own a vehicle, this was within walking distance

16  of me of where I lived at the VRQ.  The owner had several

17  pieces of equipment that needed repair.  Also, there was

18  a surveillance system that was inoperative so he brought

19  in a new cash register.  I trained and wrote a manual for

20  how to operate the cash register.  I never really worked

21  the counter for them because I don't know a whole lot

22  about fruit freshness and stuff.  But, yeah, he found my

23  skills -- my skill set useful.

24  Q.     Did you ever refuse any jobs that were offered to

25  you while you were a resident at the VRQ?

## DIRECT - ARMENTO

1    A.    Yeah.  I have a friend of mine who has a web

2    design business, which I also do, and part of it was from

3    out of town like New York.  This business was building

4    websites, and they needed some people to be testing

5    those.  But, no, I couldn't do that because the internet

6    at the VRQ was intermittent.  Sometimes you could rely on

7    it and sometimes you couldn't.  At one point in time it

8    went out for 40 days.  And I just found that -- that

9    would be irresponsible for me to take the job, especially

10   from a close friend, and then not be able to fulfill my

11   commitment to him.

12   Q.    Okay.  Showing you Plaintiff's Exhibit 7.  And

13   I'll start with page 5.  Do you know what this document

14   is?

15   A.    I do now, yes.

16   Q.    What do you mean by "I do now?"

17   A.    I had never seen it before until discovery?

18   Q.    Discovery in this litigation?

19   A.    Yes.

20   Q.    And can you state what this document is for the

21   record?

22   A.    Yeah.  There are several agreements and --

23   basically, it seems to be an outline for an interview

24   process and a contract for employment for 1,000 hours.

25   Q.    Okay.

## DIRECT - ARMENTO

1  A.     If you go back to the Table of Contents I can

2  probably give you a better explanation.

3  Q.     Since you said you're not familiar with it I don't

4  want you to do that.  But that page 5 I was showing you,

5  it said "temporary employment program manual;" right?

6  A.     Yes.

7  Q.     Now I'm showing you page 10 of Exhibit 7.  This

8  participation agreement.  Did you ever sign anything like

9  this?

10 A.     No.

11 Q.     Okay.  I believe this has been stipulated

12 authentic and admissible as well.

13        MR.  CURRIDEN:  Yes.

14        MS.  RIPLEY:  Okay.  We'd like to move this into

15 evidence as Exhibit 7.

16        THE COURT:  Any objection?

17        MR.  CURRIDEN:  No objection.

18        THE COURT:  Let it be admitted.

19             (Plaintiff's Exhibit 7 is admitted.)

20        BY MS.  RIPLEY:

21 Q.     And my last document for you, Mr.  Armento, is

22 Plaintiff's Exhibit 17.  Do you recognize this document?

23 A.     Yes.

24 Q.     Can you read the title at the top?

25 A.     "ABCCM Employee Enrollment and Change Notice

DIRECT - ARMENTO

1  Form."

2  Q.    What is the effective date of change?

3  A.    The effective date is June 1st 2016.

4  Q.    Okay.  What does it say down there next to

5  "employee signature?"

6  A.    "Refused to sign."

7  Q.    Is that true?  Did you refuse to sign this?

8  A.    Yes, I did.

9  Q.    Why?

10  A.    Well it says I was being removed from the 1,000

11  hours completed, and I was not in the 1,000 hours

12  program.

13  Q.    When did you learn that ABCCM thought you were in

14  the 1,000 hours program?

15  A.    I was in a front desk manager's meeting on Monday

16  morning, and there was -- I had asked a question about,

17  can we not get the schedule for the front desk manager's

18  work week done before Sunday of the week that it started.

19  And I was -- the front desk supervisor asked me, what do

20  you need to know that for?  I said well I like to be able

21  to plan my life.  He said well you're not going to be

22  needing to do that much more.  You've got 50 hours left

23  on your 1,000 hours.  So you just -- you don't need to

24  have the schedule done earlier than that.

25  Q.    Okay.  You said it was a Monday morning at a front

CROSS - ARMENTO

1  desk manager's meeting, but when in time was it?

2  A.    Oh.   That was probably -- I think probably early

3  April of 2016.

4  Q.    Okay.  So getting close to this date of June 1st

5  2016?

6  A.    Yes.

7  Q.    And had you -- prior to learning that they thought

8  you were in the 1,000 hours program had you heard of the

9  1,000 hours program?

10 A.    Yes, I had.  You work a front desk shift with

11 other desk managers and you have time to have

12 conversations during the slow hours.  And it had come up

13 that some other desk managers were in the 1,000 hours

14 program.

15 Q.    Okay.  So other desk managers knew they were in

16 the 1,000 hours program and they told you?

17 A.    They did.

18 Q.    Your Honor, we would like to move Exhibit 17 into

19 evidence.

20       MR.  CURRIDEN:  No objection.

21       THE COURT:  Let it be admitted.

22          (Plaintiff's Exhibit 17 is admitted.)

23       MS.  RIPLEY:  I have no further questions at this

24 point.

25       THE COURT:  Cross-examination.

CROSS - ARMENTO

1          MR.  CURRIDEN:  Yes, Your Honor.  Thank you.

2                    **CROSS-EXAMINATION**

3          BY MR.  CURRIDEN:

4    Q.    Good afternoon, Mr.  Armento.

5    A.    Hi.

6    Q.    Just a little bit of your background.  I

7    understand you're a veteran; correct?

8    A.    That's correct.

9    Q.    You served in the Army back in the mid '70s?

10   A.    That's correct.

11   Q.    For a period of about nine months?

12   A.    That's correct.

13   Q.    And you were stationed at bases in Texas and

14   Colorado?

15   A.    That's correct.

16   Q.    Okay.  And it was a three-year enlistment, but you

17   got out early on a hardship discharge?

18   A.    Yes, that's correct.

19   Q.    And after that you attended college on the G.I.

20   Bill; correct?

21   A.    Yes.  Methodist College in Fayetteville, North

22   Carolina.

23   Q.    All right.  And shifting gears to your intake at

24   the VRQ in September of 2015.  I'll show you a document

25   that's been marked as Defendant's Exhibit 1.  If we

CROSS - ARMENTO

1   scroll to the top of that.  That is an ABCCM client

2   intake form; correct?

3   A.     Yes.  That's what it says.

4   Q.     And if we go to page 7.  There's your signature at

5   the end of it.  Actually, this is part of one of the

6   plaintiff's exhibits that's already been admitted.  But

7   that's your signature at the end of that client intake

8   document; correct?

9   A.     Well I believe it's my signature at the end of

10  this particular form.  I signed my name more than once

11  that day.

12  Q.     Okay.  Just above your signature on that page it

13  says by signing below you acknowledge that VRQ staff

14  reviewed our rules and this form with you and that you

15  agree to honor our ministry and comply with the

16  expectations of the program.

17  A.     That's correct.  That's what it says.

18  Q.     And you agreed with that upon your intake on

19  September 2nd of 2015.

20  A.     Yes, I did.

21  Q.     And then if we look at page 5 of that document --

22  of course, this is something that John Rogers is filling

23  out during the intake process with you.

24  A.     That's right.

25  Q.     And if we scroll down to -- what do you need to

CROSS - ARMENTO

1 accomplish in the next 30 days?  And it says employment.

2 Is that correct that you were looking to become employed

3 within 30 days?

4 A.      Yes, it says that.

5 Q.      Okay.  And then get into primary care at the VA.

6 A.      Yes, it says that.

7 Q.      And then below that "VOL work," or volunteer work.

8 A.      It says VOL work.

9 Q.      Is that something you worked with John Rogers as

10 one of your objectives to checking in -- --

11 A.      No.  It was actually suggested to me.

12 Q.      Okay.  Are you saying you disagreed or you didn't

13 agree?

14 A.      No, I didn't agree.  I mean I agreed with his

15 suggestion.  I said, okay, volunteer work.  This is my

16 first day at the VRQ.  I had no idea what that entailed.

17 But if I could be of help I knew that was good for my

18 spiritual health.

19 Q.      All right.  And then if we look at page 7 --

20 actually, page 8 is the one that we already discussed

21 that you signed.

22 A.      If that's a question, yes, that's --

23 Q.      No, that was not a question.

24 A.      Okay.

25 Q.      I thought we had -- there was one that we hadn't

## CROSS - ARMENTO

1    been over but we already went over that.

2        You testified you were also provided a copy of the

3    VRQ resident handbook.

4    A.    Yes, I did.

5    Q.    And I'd like to turn your attention to Defendant's

6    Exhibit 3, the VRQ resident handbook agreement.  That's

7    your signature on that document; correct?

8    A.    Yes, that is my signature.

9    Q.    And you signed it on September 2nd of 2015?

10   A.    Correct.

11   Q.    Which was the day of your intake at the VRQ?

12   A.    Yes, it was.

13   Q.    And it says I, Greg Armento, have received and

14   read the Veteran's Restoration Quarters resident

15   handbook.  I have had the opportunity to ask questions

16   and fully understand all of its contents.  I agree to

17   follow all of the policies, rules and guidelines included

18   in the handbook.  I understand that if I fail to abide by

19   the written contents of this handbook I will be subject

20   to disciplinary procedures, including warnings, strikes,

21   90-day protocols and/or immediate dismissal from the

22   program.

23   A.    Yes.  I read that and understood it.

24   Q.    And you signed indicating your agreement with that

25   policy.

CROSS - ARMENTO

1    A.     That's right.

2    Q.     Let's take a look at the VRQ handbook.  I think

3    this is a duplicate exhibit.  We've got it as Exhibit 2,

4    Defendant's Exhibit 2.  And there's a Director's Welcome

5    Letter.  And this is part of what you reviewed in the

6    process of reviewing the VRQ resident handbook; correct?

7    A.     Yes.

8    Q.     And about halfway down sentence that says you will

9    be asked.  Do you see that?

10   A.     Yes, I see that.

11   Q.     It says you will be asked to give back as well or

12   to whom much is given, much is required.  What I mean by

13   this is we will ask for your consideration, cooperation

14   and respect.  You will be asked to keep up your personal

15   hygiene and keep your room sanitary.  You will also be

16   assigned to an area of service on campus, such as the

17   housekeeping department, maintenance, computer lab, front

18   desk.  Once employed, you are no longer required to do

19   service unless you want to.  that was part of what you

20   read and agreed to when you signed the VRQ resident

21   handbook.

22   A.     Yes.  I agree that is part of what I read and

23   agreed to.

24   Q.     And you understand at that time service hours were

25   not paid work?

CROSS - ARMENTO

1    A.      No, I did not.

2    Q.      You did not understand that service hours were

3    unpaid?

4    A.      That's correct.  This is the first day that I'm at

5    the VRQ.

6    Q.      You understood that service hours were required of

7    people who were not employed; correct?

8    A.      Yes, I understood that service hours were

9    required.  If you did not perform them then displainary

10   actions could follow, and even removal from the program.

11   Q.      And you testified about that a minute ago with

12   regard to that front desk incident report; right?

13   A.      The front desk incident report is an example of

14   what I just described, yes.

15   Q.      And the individual in that report, Tom

16   Constantini, he was never removed from the program was

17   he?

18   A.      Yeah.  By the time I left the VRQ, Tom Constantini

19   was not there at the VRQ.

20   Q.      As far as you know he was not removed for failing

21   to do service hours.

22   A.      That's true, I do not know that for a fact.

23   Q.      And you understood that one of the main goals of

24   your stay at the VRQ was permanent employment; correct?

25   A.      I know employment or education, yes, those were

1   goals.

2   Q.    And you were expected to do your part to achieve

3   those goals?

4   A.    Yes, I was.

5   Q.    And if we go to page 10 of the VRQ resident

6   handbook, the part that discusses service hours.  The

7   first bullet point there says unemployed residents must

8   perform service hours to remain motivated and engaged

9   with campus life.

10  A.    Okay.  While you were reading that my page was

11  jumping up and down.

12  Q.    I apologize for that.  Are you able to see it now?

13  A.    Okay.  The first bullet point.  Okay.  All

14  unemployed residents must perform service hours to remain

15  motivated and engaged with campus life.

16  Q.    And the fact that it says "unemployed residents

17  must perform service hours," was that not an indication

18  to you that service hours were unpaid?

19  A.    No, not at all.  It does not say unemployed --

20  unpaid.  It doesn't say free.

21  Q.    Upon your intake you were also given, I think,

22  what was marked as Plaintiff's Exhibit 3, and It's also

23  Defendant's Exhibit 5.  If we could take a look at that.

24  I'm sorry.  It's Defendant's Exhibit 5.

25        The first sentence of that says:  Service hours

## CROSS - ARMENTO

1  are a program requirement for residents who are not

2  actively enemployed or attending school.  If you are

3  required to perform service hours you will be assigned to

4  one of the following departments.  Are you saying after a

5  reading that you still did not understand that service

6  hours were not unpaid?

7  A.    By the time I read that I was employed and working

8  at the front desk.

9  Q.    Well I think you said earlier this was John

10 Rogers' writing.

11 A.    No.  This is -- it could be John Rogers's writing

12 -- wait a minute.  What is this?  Was this -- okay.  I

13 understand what this is.  You're absolutely correct.  And

14 let me correct my own words.  This was issued to me on

15 day one.  Can you go back up to the top?

16 Q.    (Indicating.)

17 A.    Service hours are program requirements for

18 residents are not actively employed or attending school.

19 If you are required to perform service hours you will be

20 assigned one of the following departments.  There again,

21 this was pretty much the same words to the effect of what

22 we just read in the resident's handbook.  It does not say

23 unpaid work, labor, service hours.  It doesn't say you

24 will perform free labor.  So I just had an understanding

25 that if I had a job I would not have to perform service

CROSS - ARMENTO

1  hours.

2  Q.    It certainly doesn't say that you would be paid,

3  does it?

4  A.    You know, that's just been the norm in my life and

5  I guess everybody else's in America that you perform

6  labor, work, you get paid for it.  Isn't that what our

7  economy is based on?

8  Q.    That unemployed people performing service should

9  be paid for those service hours?

10  A.    No.  Those are your words not my words.

11        MS.  RIPLEY:  Objection, Your Honor.  I think he's

12  asking the same question over and over again.

13        THE COURT:  Overruled.

14        BY MR.  CURRIDEN:

15  Q.    These documents don't say anything about getting

16  paid, and there was no representation from anyone else

17  that you would get paid for service hours; correct?

18  A.    Actually, there was.  During my two years at the

19  Veteran's Quarters there was the opportunity to get paid

20  for hours as a duty driver.  Those hours that I had been

21  working as service hours would become paid hours.

22  Q.    You're saying somebody told you that you would get

23  paid for hours you worked as a duty driver?

24  A.    It was part of the sign-up sheet for service

25  hours.  There was an offer for payment there and, also,

## CROSS - ARMENTO

1  working on the front desk, which is -- evidently, I was

2  working more than 40 hours in my first week there and

3  second week there and third week there but somehow the

4  service hours were being deducted, and I expected payment

5  for those.

6  Q.    And at least by the time you became aware that

7  service hours were being deducted, by then you knew that

8  you were not going to be compensated for service hours;

9  correct?

10 A.    That was a slow realization.  You know, did that

11 happen the one day I woke up and understood that and was

12 convinced of that?  I could not put a finger on that

13 date.  It was a slow realization because I was exhausting

14 my chain of command.  I talked to my case manager, I

15 talked to my front desk supervisor, I talked to the U. S.

16 Department of Labor, and I talked to ABCCM.  We actually

17 had a meeting in the director's office where there was a

18 possibility that I was going to get paid for some of my

19 service hours.

20 Q.    But nobody from ABCCM -- you had that expectation

21 but nobody from ABCCM was reinforcing that.  Nobody was

22 telling you you were going to get paid for service hours;

23 correct?

24 A.    Well I believe that was the result of me getting

25 ten hours on one paycheck and another ten hours on

CROSS - ARMENTO

1  another one.  I did get paid for what were previously

2  called service hours.

3  Q.    Because those hours were moved into a different

4  category?

5  A.    Yeah.

6  Q.    But there were still hours that stayed in the

7  service hours category.

8  A.    I'm confused by that question.

9  Q.    When there was an adjustment made and you were

10  paid for an additional ten hours on two consecutive

11  paychecks, that's correct?  You testified about that; is

12  that right?

13  A.    Well, yeah.  You're talking about categories and

14  service hour deductions that were never placed in

15  categories on my paycheck stub.  The service hours were

16  never recorded on paychecks, or I was never given a

17  receipt for it.  So those categories that you were just

18  talking about that's what I found confusing.

19  Q.    And when -- but you would acknowledge that after

20  your meeting with Mary Sczudlo you were told that you'd

21  get paid for an additional ten hours on two consecutive

22  paychecks?

23  A.    That is correct.

24  Q.    But you knew at that time there were still other

25  hours that were considered service hours that you would

## CROSS - ARMENTO

1  not be paid for; is that correct?

2  A.    That I was not paid for yet.  But I knew it was

3  possible to get paid for service hours at that time.

4  Q.    It was possible in your mind?

5  A.    Well it was possible on my paycheck twice.

6  Q.    You went through -- you testified that you went

7  through a week of training at the front desk.

8  A.    Yeah.  I believe it was a week or maybe ten days.

9  I started on the 8th.  Yeah, okay, about a week.  I

10 started on the 8th, and I think I got on payroll the

11 14th, if those numbers are accurate.

12 Q.    You understood at that time that the hours would

13 be considered service hours and you would not be paid for

14 them; is that correct?

15 A.    No.  I understood I was working on the front desk

16 and I was being trained as a front desk manager.  No one

17 had given me a time sheet.  There was a potential for

18 being paid as a front desk manager so I kept track of my

19 hours.  I knew there was a front desk shift log that

20 someone else was writing that said that Greg is now on

21 the front desk.  We just had a shift change.  Someone

22 else has just replaced Greg.  I didn't believe in the

23 accuracy of someone else's numbers so I kept my own hours

24 in a notebook.

25 Q.    I'd like to turn your attention to what's been

CROSS - ARMENTO

1  marked as Defendant's Exhibit 12, the last page of that

2  exhibit.

3       MS. RIPLEY:  Objection, Your Honor.

4       THE COURT:  What's the basis of your objection?

5       MS. RIPLEY:  These documents have not been

6  authenticated.

7       THE COURT:  He hasn't asked a question about it

8  yet.

9       MS. RIPLEY:  I will wait.  I will withdraw my

10  objection.

11      THE COURT:  Okay.

12      BY MR. CURRIDEN:

13  Q.    You testified earlier that Slim Jones was your

14  case manager; correct?

15  A.    Yes, I did.

16  Q.    And you would meet with him on a monthly basis

17  more or less; correct?

18  A.    More or less.  More less than more.

19  Q.    And during the course of your meetings he would

20  keep notes of your discussion?

21  A.    I believe he did.  I didn't really see him type

22  anything.  It was not until discovery that I see these

23  case notes that you have on the screen in front of me.

24  Q.    All right.  And these case notes were provided in

25  the initial disclosures in the beginning of this case;

CROSS - ARMENTO

1  correct?

2  A.     Yes, they were.

3  Q.     The case notes from September 16th of 2015 say

4  that you're staying sober and that you're hopeful you

5  will get a paying job soon.  Would it be correct that

6  you, as of September 16th of 2015, were hopeful of

7  getting a paying job?

8  A.     No, that's not accurate, because by September 16th

9  I had a job at the front desk.

10 Q.     And it says in the second sentence of the entry

11 from 9/16 of '15:  Veteran said that he has started

12 working at the front desk for his service hours.  Would

13 you disagree that that's accurate?

14 A.     Yes, I would, because I was hired on -- I started

15 performing the duties of a front desk manager on the 8th.

16 I started -- was informed that I was going to start being

17 paid -- I believe that was on the 14th, and this is dated

18 the 16th.  So I already had a paying job by this date.

19 Q.     At that time you had not been to the personnel

20 department to fill out any forms or records?

21 A.     Oh, that's true.  I had not been to the personnel

22 department.

23 Q.     And isn't it true that after your training at the

24 front desk that Randy Gamble explained to you that you

25 were still expected to do service hours?

CROSS - ARMENTO

1  A.    No, not really.  He just told me that Monday
2  through Friday were days between 8:00 a.m. and 4:00 p.m.
3  were days that I was not allowed to record my hours.  He
4  didn't say why.  He may have said those were service
5  hours but, you know.
6  Q.    So he explained that those were service hours and
7  you just didn't agree with that.
8  A.    No.  It wasn't for me to agree or disagree.  He
9  didn't tell me which shift I would be on either.  Now
10  that I had been trained I could have gone on the night
11  shift or I could have gone on the afternoon shift.
12  Q.    When did Randy Gamble explain to you how to fill
13  out your time sheet?
14  A.    I believe it was the day I showed up to work as a
15  full-time employee that morning.
16  Q.    And can you tell me what day that was?
17  A.    September 14th 2016.  It would have been a
18  Thursday.
19  Q.    And is it --
20  A.    Excuse me.  Because payroll starts on Thursday and
21  ends on Wednesday, or the work week does at ABCCM's front
22  desk.
23  Q.    And is it your testimony now that Randy Gamble did
24  not explain to you at that point that you were still
25  expected to do service hours?

CROSS - ARMENTO

1  A.     Well it seems to me that if I was going to be

2  working from 8:00 a.m. to 4:00 p.m. Monday through Friday

3  those hours have been service hours.  So he did not

4  expressly say that I was not going to perform service

5  hours.  Consequently, I also understood that that same

6  shift that I just described was paid on Saturday and

7  Sunday.

8  Q.     I'm not sure if you answered my question.

9  A.     Okay.

10  Q.     Is it your testimony that Randy Gamble did not

11  explain to you on that occasion that you were still

12  expected to do service hours?

13  A.     Boy, I'm having trouble with that one.  Did he not

14  explain?  Would you please repeat it one more time?  I'm

15  really trying to understand.

16  Q.     Did Randy Gamble -- did he or did he not explain

17  to you, when he explained how to fill out your time

18  sheet, that you were still expected to do service hours?

19  A.     No, he didn't explain that.

20  Q.     All right.  Do you recall giving a deposition in

21  this case?

22  A.     Yes, I do.

23  Q.     And you came to my office and I asked you a bunch

24  of questions -- first of all, the court reporter put you

25  under oath.

CROSS - ARMENTO

1  A.     That's correct.

2  Q.     And you answered those questions under oath as

3  truthfully as you could?

4  A.     Yes, I could.  Yes I did.

5  Q.     All right.  I'd like to have you look at

6  Defendant's Exhibit 16 which is marked for identification

7  purposes only and which is a transcript of your

8  deposition.  We're going to look at page 92.  I'm looking

9  at Line 8.  And I'll read you the question and ask you if

10  I've read it correctly.

11        So the question, starting at Line 8:  "And

12  sometime after being employed at the front desk, let me

13  ask you this, was there a period that you worked at the

14  front desk where you understood that your work was

15  service hours and not time for which you would be paid in

16  cash?"

17        And your answer.  Could you go ahead and read it

18  there on Lines 13 through 16?

19  A.     "When Randy Gamble explained to me how to fill out

20  my time sheet that's when I became aware that I was not

21  going to be paid for all hours that I worked."

22  Q.     So Randy Gamble told you at that time that you

23  were still expected to do service hours; is that correct?

24  A.     No, he did not expressly tell me I was expected to

25  do service hours.  I was -- could be working the midnight

CROSS - ARMENTO

1  shift, could be working the day shift or the afternoon

2  shift.  This -- the way you formed that question is at

3  some time after being employed at the front desk.  So,

4  yeah, at some point after being employed at the front

5  desk I realized that I was not going to be paid for all

6  my service hours.

7  Q.    According to your answer, that was when Randy

8  first told you how to fill out a time sheet.

9  A.    That's what it says.  So is there a disconnect in

10 your mind that I need to answer?

11 Q.    That was your answer under oath at the time you

12 gave your deposition; correct?

13 A.    Yes, it is.

14 Q.    Looking back at your case notes with Slim Jones,

15 which is marked as Defendant's Exhibit 12.  I'm going to

16 go to the date of October 2nd of 2015.  Are you familiar

17 -- you have had a chance to review these case notes, have

18 you not?

19 A.    Not this one particularly and recently.

20 Q.    All right.  On the first line there it says,

21 "Veteran said that he's having problems at the front

22 desk.  He said that he is working there part-time and

23 also doing his service hours there."

24     MS.  RIPLEY:  Your Honor, we object that this is

25 hearsay.

CROSS - ARMENTO

1          THE COURT:  Response, Mr. Curriden?

2          MR. CURRIDEN:  We're not moving to admit them

3    into evidence at this point.  It's just

4    cross-examination, and it's an admission against his

5    interest.

6          THE COURT:  Have you established that that was

7    written by him?

8          MR. CURRIDEN:  No, Your Honor.

9          THE COURT:  Then that document is not an admission

10   by the plaintiff.  The objection is sustained with the

11   current foundation.

12         BY MR. CURRIDEN:

13   Q.    Would you agree that as of October 2nd of 2015 you

14   were complaining you were having issues about your work

15   at the front desk?

16   A.    That I had verbalized it to someone by October

17   2nd?  I'm trying to put that into context, my

18   understanding and when I actually expressed it to someone

19   at ABCCM.  It's possible.  I won't actually defend it --

20   Q.    Your case manager was encouraging you to talk to

21   the front desk manager -- front desk supervisor Randy

22   Gamble about it; correct?

23   A.    When I spoke to my case manager he -- like I said,

24   I followed my chain of command.  I talked to my case

25   manager first, and he referred me to the front desk

CROSS - ARMENTO

1  supervisor, Randy Gamble.  As to any date?  I can't

2  specifically nail down a date.

3  Q.     And you refused to talk to Randy Gamble about it;

4  is that correct?

5  A.     No.  I talked to Randy Gamble twice, I think,

6  about it.

7  Q.     Do you deny that there was ever a point of time

8  that you understood your front desk was part-time work

9  and that you were still expected to do ten hours of

10 service hours?

11 A.     I'm sorry.  I don't understand.  Can you please

12 say it again, please?  Ask your question.

13 Q.     Are you denying there was ever a time that you

14 understood that you were to work 20 hours at the front

15 desk, time that would be paid time, and that you were

16 still expected to do ten hours of service hours?

17 A.     That was not my understanding because I knew at

18 this point in time I was doing 40 hours.  And anything

19 over 20 hours, according to the service hour requirement,

20 exempted you from performing service hours.  At 19 hours

21 you had to perform ten -- 19 hours of employment meant

22 that you had to do ten hours of service, and I was doing

23 40 or plus.

24 Q.     I want to shift your attention to the Transitional

25 Employment Program, or the 1,000 hours program.  And you

CROSS - ARMENTO

1  were familiar with that program during your time at the
2  VRQ; correct?
3  A.    I became familiar with it as -- because other
4  front desk managers were enrolled in the TEP program, the
5  thousand hour program.  That's how I initially heard
6  about it.  And my familiarity -- the first time I talked
7  to any ABCCM employee was when I was confronted with it
8  by Randy Gamble telling me that my thousand hours were
9  up.
10 Q.    So at least by then you were aware that at least
11 as far as Randy Gamble and others were concerned you were
12 in the thousand hours Transitional Employment Program.
13 A.    I'm sorry.  There was one word there that I didn't
14 quite hear correctly.
15 Q.    So by the time Randy Gamble told you you were
16 reaching the end of your thousand hours you now, by then,
17 at least as far as the ABCCM folks were concerned, you
18 were involved in the thousand hours program.
19 A.    I still don't understand that.  I was never in the
20 thousand hours program.  I never signed any documents.
21 There's two 1,000 hour programs.  So I don't know what --
22 does that answer your question?
23 Q.    No.  Let me restructure the question.  You contend
24 that you were never a part of the thousand hours program.
25 A.    That's correct.

## CROSS - ARMENTO

1  Q.     You understand that ABCCM contends that you were.

2  A.     That's correct.  I understand that ABCCM, today,

3  believes that I was part of the thousand hour program.

4  Q.     And by the time Randy Gamble came to you for the

5  first time and said you're reaching the end of your

6  thousand hours, by then you knew that as far as ABCCM was

7  concerned you were in the thousand hours program.

8  A.     At that point in time I believe Randy Gamble

9  thought I was in the thousand hour program.

10  Q.     Did you know of any grant per diem residents who

11  were getting paid by ABCCM who were not part of the

12  thousand hours program?

13  A.     I was not aware of everybody's employment status

14  at ABCCM.

15  Q.     You recognize that there was some -- there were

16  some residents at the VRQ who were not part of the grant

17  per diem program; correct?

18  A.     There are somewhere between six and ten civilians.

19  Q.     And there are also some vets who are a part of the

20  Permanent Supportive Housing Program; correct?

21  A.     Yes, there are.

22  Q.     And you were familiar with that program, or you

23  became familiar with it during the term of your stay at

24  the VRQ?

25  A.     That's correct.

## CROSS - ARMENTO

1  Q.      Shifting your attention to your time as a van

2  driver.  You understood, did you not, that all of your

3  time as a van driver, as far as ABCCM was concerned, was

4  service hours; is that correct?

5  A.      Yes.

6  Q.      And you were told as of January of 2017 that you

7  were no longer even required to do any service hours; is

8  that correct?

9  A.      That's incorrect.

10  Q.      You deny that?

11  A.      Yes, I do.

12  Q.      Would you agree that there was a time when you

13  were told you no longer were required to do service

14  hours?

15  A.      No.  I would not agree with that at all.  No one

16  has ever communicated that to me.  No one at ABCCM ever

17  communicated to me, either written or verbally, that I

18  was not required to perform service hours.

19  Q.      Do you recall preparing a spreadsheet of your van

20  driver time as an exhibit to your motion for preliminary

21  injunction in this case?

22  A.      Can you tell me which document?  Who authored it?

23  Am I the author of the document you're talking about?

24  Q.      It's your document.  It's a spreadsheet that you

25  prepared summarizing your van driver time that you

CROSS - ARMENTO

1  attached to a motion you filed -- attached to your motion

2  for preliminary injunction.

3  A.     How many pages was it?

4  Q.     We'll pull it up.  It's document 4-3.  Do you see

5  a document there in front of you?

6  A.     Yes, I do.

7  Q.     Do you recognize that document?

8  A.     I do.

9  Q.     And you created this document; correct?

10  A.     Yes, I did.  This was my best guesstimate.  This

11  is pre-discovery.

12  Q.     And this was filed -- if you look at the blue

13  lettering on the left-hand side it was filed June 12th of

14  2017.

15  A.     That's correct.  It is filed simultaneously with a

16  complaint, I believe.

17  Q.     And you were still a resident at the VRQ at that

18  time; correct?

19  A.     Yes, I was.

20  Q.     Is it your testimony now that you were continuing

21  to do work as service hours as a van driver?

22  A.     That's right.  Service hours were still required

23  of me.

24  Q.     And this spreadsheet that you prepared, it stops

25  on January 12th of 2017; correct?

CROSS - ARMENTO

1  A.      Let's see.  Yep, that's what it does.

2  Q.      So this is your summary of plaintiff's work hours

3  as a duty driver filed in June of 2017, and it stops on

4  January 12th of 2017.  Is that right?

5  A.      That's right.  That date is significant because I

6  had run something like a 14-hour day, and I felt like I

7  was being set up to fail.  And I composed an email and

8  sent it to Scott Rogers and, I think, Tim McElyea might

9  have got gotten a copy as well.

10  Q.      But you're denying now that sometime around

11  January 12th of 2017 you were told you no longer had to

12  do service hours.

13  A.      That's correct.  There's no date on when I

14  finished writing this, and I believe that this document

15  could have been finished somewhere around January 12th.

16  I did not update it.  I believe at the time when I wrote

17  a complaint I also wrote an affidavit.  I wrote a motion

18  for injunctive relief along with a memorandum on the

19  applicability of the Fair Labor Standards Act and

20  compiled somewhere in the neighborhood of, I don't know,

21  maybe 30 exhibits, 40 exhibits.  So it wasn't -- it's not

22  like I finished writing this document on June 12th.

23  Q.      And you were -- all that you just described, you

24  were spending a significant amount of time, at that

25  point, preparing documents, filing documents, researching

CROSS - ARMENTO

1  documents for your lawsuit; correct?

2  A.    I don't know about significant.  It's how I fall

3  asleep at night.

4  Q.    During your time at the VRQ you were encouraged

5  repeatedly to find employment outside the VRQ; is that

6  correct?

7  A.    Well I was encouraged but I wouldn't say

8  repeatedly.

9  Q.    You knew that was one of the primary objectives of

10  the services being provided at the VRQ, didn't you?

11  A.    Yes.  Also education was.

12  Q.    You mentioned that you did some work at the Honey

13  House, a fruit stand.

14  A.    That's correct.

15  Q.    And that was some time after you stopped working

16  at the front desk; is that correct?

17  A.    When my relationship -- when my working

18  relationship with the Honey House began it began before I

19  left the front desk.

20  Q.    In terms of the timeframe of when you started with

21  the Honey House, would it be correct to say it was some

22  time around June of 2016?

23  A.    No.  I know that there's a -- I was asked by my

24  case manager, Slim Jones, to provide proof of employment.

25  I told him that I had been working at the Honey House

## CROSS - ARMENTO

1  installing a surveillance system so that he can watch the
2  interior of his store on his cell phone and repairing a
3  label printer.  I even repaired some computers while I
4  was there.
5  Q.     And that was a part-time job?
6  A.     Yes.  I was -- before June it was a part-time job
7  because I was working at the front desk.
8  Q.     It never became a full-time job did it?
9  A.     Well it was -- there was part of the -- what we
10  had discussed.  I told them that I was going to be
11  leaving the front desk, and that since he did not have a
12  web presence I think selling his relishes and honeys on
13  the internet could be profitable, and that I showed him a
14  portfolio on his own computer some of the websites that I
15  had built.  So we had discussed doing some contract work.
16  I built websites that, you know, were probably 18, 20
17  pages, somewhere in the neighborhood of seven, $8,000.
18  So I had some skills and some success.
19  Q.     And this was around the time your job at the front
20  desk was finishing and you were reaching the end,
21  according to ABCCM, of your thousand hours.
22  A.     That's correct.  And that's when I had approached
23  him with the website.  That was going to be in addition
24  to all the other kinds of support I was providing him.
25  Q.     And you were going to write up a proposal for the

## CROSS - ARMENTO

1   website?

2   A.      Yes, I was.  I did.

3   Q.      This was in June or July of 2016?

4   A.      That's when we committed to it.

5   Q.      You didn't actually get the proposal done until

6   December; correct?

7   A.      Was it December or November?  I may have emailed

8   him.  There's an email that I provided in my voluntary

9   discovery.  The proposal was submitted.  I think we

10  committed to doing it in November, I believe.  So it

11  might have been as early as November.  You have those

12  records in front of you and I do not right now.

13  Q.      And you were -- at some point in there you were

14  offered a job as a cashier at the Honey House?

15  A.      It was floated.  It wasn't necessarily offered a

16  job but, yeah, it was floated.  Maybe it was offered and

17  I did not accept it.  Being the only person in the Honey

18  House -- actually, as a cashier, sometimes you're the

19  only person in the Honey House, and you have to know

20  about the product.  A lot of it is produce, and it has to

21  be turned and, you know, you can offer discounts on the

22  spot to someone, and that was not something I was

23  comfortable with.  I don't believe it was in my wheel

24  house.

25  Q.      You didn't think you were capable of learning

## CROSS - ARMENTO

1  those things to be the cashier at the Honey House?

2  A.    Well the other thing about getting employment at

3  the VRQ is that you're expected to end the cycle of hire,

4  fire, hire, fire, hire, fire.  You're expected to find a

5  career and move into that career; get long legs instead

6  of baby steps if you were to characterize jobs.  You want

7  a job that's going to last a long time not a series of

8  short jobs.

9  Q.    At some point if you're concerned about supporting

10  yourself you have to get some job?

11  A.    That's right.  That's why we were talking about

12  websites and electronices and that sort of thing.

13  Actually, my goal when I got there was higher education.

14  That was my goal.

15  Q.    But the website design job that you said was in

16  your wheel house.  You said you would do a proposal in

17  June or July, and you didn't do the proposal until

18  November or December; correct?

19  A.    That's true.  What happened was my

20  responsibilities quadrupled at the VRQ as far as being

21  able to -- my driving responsibilities.

22  Q.    And you're saying your driving responsibilities

23  prevented you from getting outside employment?

24  A.    No.  I'm saying the time for taking to write a

25  proposal and develop three designs, that it's a multiple

CROSS - ARMENTO

1   phase process.  Let me explain it this way.  We agreed to
2   the potential for a website.  He hasn't spent any money.
3   I would write him a proposal, and I believe somewhere in
4   my voluntary discovery there is about a three or four
5   page proposal.  So we share expectations and we divide
6   responsibilities.  Then if he agrees to the proposal then
7   he writes me a check and then I develop three website
8   designs that also include a web identity, more or less, a
9   logo, a theme for that.  And each webpage design has two
10  full pages that I was paid for.
11  Q.     Am I understanding you correctly to be saying that
12  the reason the proposal took you so long from June or
13  July until November or December was because of your van
14  driving responsibilities?
15  A.     Well, yeah.  I'm trying to recollect but, yeah, I
16  think there were van driving responsibilities that took
17  place.  I know that I started -- we made an agreement in
18  July.  August came around and I began to develop the
19  proposal.  When that proposal was accepted was after I
20  delivered it -- actually, that's it.  I delivered it at
21  one point, and you would have to look at the email.  Then
22  he took his time making up his mind about it.  Then he
23  accepted the proposal and he wrote me a check, and I
24  executed three designs.
25  Q.     As far as other outside employment goes.  I think

CROSS - ARMENTO

1  you had said that you had done some work mowing lawns.

2  A.    That's correct.

3  Q.    And that was about four hours every two weeks?

4  A.    That's true.

5  Q.    And, so, besides the mowing lawns four hours every

6  two weeks and the Honey House employment we've been

7  discussing, you never had any other outside employment

8  during your time at the VRQ.

9  A.    No.  No, that's not true.  I got computer repair

10 work from other people as well.  I think somewhere in the

11 voluntary discovery there is actually another computer

12 repair job in there as well.

13 Q.    One other computer repair job?

14 A.    Yeah.  The thing is I can't make someone hire me.

15 I can only present myself to them, and they have to

16 evaluate my skill set and whether it fits into their

17 needs.

18 Q.    One of the ministers affiliated with ABCCM, David

19 Lagardi, asked you to develop a website for him; is that

20 correct?

21 A.    That's true.  I was working at the front desk, but

22 I was also aware that I had signed a -- during -- on

23 October 1st, during my employment documents, there's an

24 agreement of noncompete or conflicting interest or

25 something like that.  So if David and I were to have a

## CROSS - ARMENTO

1  conflict over payment, or whether or not I did, or what
2  he wanted me to do or something like that, then there
3  would be an issue.  And that would put my front desk job
4  at risk because David was a volunteer at ABCCM and had a
5  longstanding relationship with ABCCM, more than I did at
6  the time.
7  Q.    That was your interpretation of the policy;
8  correct?
9  A.    I can only act on my own interpretation.
10 Q.    You didn't approach anyone at ABCCM and say, hey,
11 this guy has asked me to design a website.  Is there any
12 conflict?
13 A.    No, I did not.
14 Q.    There was also someone who approached you, a
15 member of the American Legion post at the VRQ, about
16 building a website for a local church.
17 A.    Yes, that's true.
18 Q.    And you turned that one down as well; correct?
19 A.    No.  Actually, I was working more hours than I --
20 at the front desk at that time.
21 Q.    Did you ever approach anyone at ABCCM and say I'm
22 having trouble getting outside employment because of the
23 time I'm working at the front desk or working as a van
24 driver?
25 A.    Well the income from the front desk, I could rely

## CROSS - ARMENTO

1  on that. And, second of all, the person who was involved
2  with the American Legion who had asked me to build a
3  website for the local church was also a -- had a
4  longstanding relationship with ABCCM. And my job at the
5  VRQ would be at risk if there's a conflict. Building
6  websites is a custom built, custom design process. It's
7  not like I can pull one off the shelf.
8  Q.     There again you never approached anyone at the
9  VRQ, or anyone at ABCCM, to say I've been offered this
10  job opportunity; do you-all see this as a problem or
11  conflict?
12  A.     Yeah. That's -- if I did I would go to my case
13  manager, and I had not had a lot of success with my case
14  manager and bringing him problems that were outside of
15  his --
16  Q.     But you never went to him or anyone else about
17  this --
18  A.     No. I had learned that I was persona non grata.
19  So I just was doing what I was told.
20  Q.     There was a sculptor in Black Mountain who offered
21  you a job as his assistant; correct?
22  A.     Yeah. He does beautiful work.
23  Q.     And you turned that job down; correct?
24  A.     Yeah. That would have been somewhere around June,
25  July, August of 2017. And I replied back in the email,

## CROSS - ARMENTO

1  which I believe you have a copy of, that I'm going to

2  school.  I'm enrolled at AB-Tech.

3  Q.    And there was a point when -- we can pull up the

4  case note if you'd like to see it, but let me just ask

5  you.  First, do you recall a time when your case manager,

6  Slim, suggested that you contact Labor Max Staffing

7  saying that they like vets and that there were a lot of

8  folks at the VRQ who got work through them?

9  A.    I don't know if he specifically identified them as

10  someone liking vets, but he did mention Labor Max.  He

11  had a business card which he made a photocopy of and gave

12  it to me.

13  Q.    But you told him you were not interested; correct?

14  A.    Not true.  I called Labor Max.  They have a

15  website, and I went on their website and searched for

16  graphic art, advertising, PhotoShop, those key words, and

17  none of those jobs showed up on their database.  I

18  believe they're more than just Asheville.  They're

19  regional.  But at the time that I called the phone number

20  no one answered, so I went on the website.  There may --

21  I don't think one job in Asheville showed up.

22  Q.    Not one job in the fields that you specified?

23  A.    No.  I was curious to see how they were -- whether

24  or not there were more jobs to offer in Asheville.  No.

25  I know how to do a search.

CROSS - ARMENTO

1   Q.      Would you agree that there came a time around

2   April of 2017 that you refused to continue updating your

3   contract for success with ABCCM?

4   A.      No.

5   Q.      You understand what the contract for success is;

6   correct?

7   A.      Yes, I do.  I filled one out in my initial months

8   there at the VRQ.

9   Q.      And it was something to be updated every six

10  months; correct?

11  A.      I would not know what ABCCM's policy is.

12  Q.      When you checked in to the VRQ you were

13  unemployed; correct?

14  A.      That's correct.

15  Q.      You were homeless.

16  A.      That's correct.

17  Q.      You had run out of options in terms of housing and

18  employment.

19  A.      That's correct.

20  Q.      And you were looking to the VRQ for shelter?

21  A.      And food, yes.

22  Q.      Stabilization?

23  A.      I knew how to walk.  I'm not trying to be

24  argumentative but that's such a broad word.

25  Stabilization between having a home and something to eat,

CROSS - ARMENTO

1  maybe employment, furthering my education.  That kind of

2  stabilization, yes.

3  Q.     And rehabilitation.

4  A.     Alcohol, drugs were not my issue.  I was, I think,

5  60 years old at the time, and highly skilled in a

6  technology industry.  And my self-worth was -- I couldn't

7  find employment in Orlando, my chosen location.  I went

8  to D. C. and couldn't find work -- money or employment

9  there.  I went through all my savings and came to

10 Asheville and found the VRQ.  Did I answer your question?

11 Q.     I'm not sure, but I'll go ahead and ask another

12 one.

13        You didn't check into the VRQ expecting to become

14 a VRQ employee, did you?

15 A.     No, I did not.

16 Q.     And you understood that there were requirements

17 and expectations of being a resident there; correct?

18 A.     I understood that.

19 Q.     Including staying sober, which I know you said was

20 not an issue for you.

21 A.     That's correct.

22 Q.     Meeting the curfew.

23 A.     That's correct.  I understood there was a curfew

24 to be met.

25 Q.     Keeping your room clean?

CROSS - ARMENTO

1    A.    Yes, that was also an understanding.

2    Q.    Meeting with a caseworker.

3    A.    Meeting with a caseworker.

4    Q.    Working on finding permanent housing.

5    A.    No.  That wasn't necessarily my requirement.  I

6    think employment was my first.  I think we covered a

7    document earlier that said that employment was -- as far

8    as finding permanent housing, I understood that one of

9    the documents that's -- there's a series, something

10   called the VI-SPDAT.  It's an evaluation of your

11   homelessness.  And that goes before a committee, and they

12   assess your permanent housing and whether you're ready

13   for it or not.

14        So finding employment, gainful employment, that

15   would be one way I could move out.  Or, also, if it turns

16   out that I can't get anybody to hire me then there's also

17   VASH and other housing opportunities that ABCCM has to

18   offer.  I'm close to retirement as well.

19   Q.    And you understood that those requirements we

20   listed:  Staying sober, meeting the curfew, cleaning your

21   room, meeting with a caseworker.  You weren't expecting

22   to be paid for those things, were you?

23   A.    No, not at all.

24   Q.    You understood that those were part of the

25   program.

CROSS - ARMENTO

1    A.      Yeah.   It's part of my program now that I'm living

2    on my own too.

3    Q.      Those requirements didn't go away when you became

4    an employee and started getting paid for work at the

5    front desk, did they?

6    A.      I'm sorry.  Could you please repeat that?

7    Q.      Once you became employed and started getting paid

8    for some of the time you were working at the front desk

9    all those other requirements didn't go away, did they?

10   A.      No, they did not.

11   Q.      And in terms of the time that you worked at the

12   front desk, as well as your time as a van driver.  During

13   the course of that work you were able to form connections

14   with other vets working those jobs; right?

15   A.      That's true.

16   Q.      And you were able to feel as though you were

17   making a valuable contribution; correct?

18   A.      That's very true.  That was part of -- after being

19   at the Veteran's Quarters I got excited about this could

20   be a calling for me.  I never considered social work in

21   my future before I arrived at the Veteran's Quarters, but

22   I saw that my communication skills, professional

23   communication skills, and I can make a valuable

24   contribution to the VRQ and the ABCCM.

25   Q.      And are you here today saying you never understood

CROSS - ARMENTO

1   all of that to be a progression or a process into a job
2   outside of the VRQ?
3   A.      I didn't see that my desire or wanting to be part
4   of the solution at the VRQ inhibited me from finding work
5   outside the VRQ.  I was open to options.  I would love to
6   have found -- have been employed by someone that
7   acknowledged my skill set and contributions to the
8   communication arts and would hire me.  I was very open to
9   that possibility.  I submitted applications around town,
10  I submitted them online, and the very first one I did was
11  while I was in the intake room.  Warren Wilson College
12  was looking for a graphic designer.  They had a graphic
13  designer job there in September of 2015, and that's just
14  up the road from the VRQ.
15  Q.      I think I'm about finished, but I would like to
16  jump back to a plaintiff's exhibit, the advertisement for
17  the van driver job, that you testified about.  That is
18  Plaintiff's Exhibit 22.  Do you see that document in
19  front of you now?
20  A.      I see an advertisement for paid employment.
21  Q.      And the last little arrow, or bullet point, there
22  says "must qualify through Land of Sky."  Do you see
23  that?
24  A.      I do see that.
25  Q.      You understand the payment is going to come from a

1   grant through the Land of Sky; right?

2   A.     Yeah.  I imagine the check is probably going to

3   have their logo on it and be signed by one of their

4   officers.

5   Q.     So this advertisement is not an advertisement to

6   become an employee of ABCCM; correct?

7   A.     It's an advertisement to become a paid driver at

8   the VRQ.

9   Q.     Paid by Land of the Sky.

10  A.     That's what I understand it to mean.

11  Q.     All right.  If I could have just a moment.

12         THE COURT:  You may.

13         MR.  CURRIDEN:  Thank you, sir.  Those are my

14  questions.

15         THE COURT:  Any redirect?

16         MS.  RIPLEY:  Your Honor, we have no further

17  questions.

18         THE COURT:  Okay.  Mr.  Armento, you may return to

19  your table.

20                  (Witness excused.)

21         THE COURT:  Call your next witness.

22         MS.  RIPLEY:  Your Honor, the plaintiff rests.

23         THE COURT:  Will there be evidence for the

24  defendant?

25         MR.  DUNLAP:  Yes, Your Honor.  At this time we

1  would like to move under Rule 52C for judgment as a

2  matter of law.

3      THE COURT:  Do you wish to make an argument

4  regarding that?

5      MR.  DUNLAP:  We will be brief.  Your Honor, I

6  think our argument is outlined in our trial brief and our

7  Proposed Findings of Fact and Conclusions of Law.  We

8  would encourage the Court to adopt our motion for

9  judgment as a matter of law based on the finding that Mr.

10  Armento is not an employee of ABCCM, that the program

11  benefited primarily the residents of the VRQ and did

12  benefit -- was intended to benefit Mr.  Armento, that

13  there was no reasonable expectation of compensation,

14  there was no offer of employment for doing service hour

15  work, that it was made pretty clear through the intake

16  over the course of Mr.  Armento's work there that this

17  was not going to be a paid position, and the service hour

18  work that was part of the larger rehabilitative program.

19      In the alternative, Your Honor, if the Court does

20  find him to be an employee of ABCCM, we would move that

21  the Court find that he's entitled only to minimum wage

22  compensation because --

23      THE COURT:  What does that have to do with a

24  motion for judgment as a matter of law?  I mean that's a

25  damages argument, isn't it?

```
 1        MR.  DUNLAP:  We would be -- well I think we would
 2   agree with the Court on that.  We would defer those
 3   arguments.
 4        THE COURT:  Any other bases or arguments you want
 5   to state for your judgment of law?
 6        MR.  DUNLAP:  We would also refer the Court to our
 7   briefs and trial briefs and Findings of Fact and
 8   Conclusions of Law on that.
 9        THE COURT:  Thank you.
10        Ms.  Brooke, Ms.  Ripley, do you want to say
11   anything regarding that motion?
12        MS.  RIPLEY:  Yes, Your Honor.  I just -- we
13   stipulated, actually, that Mr.  Armento was an employee
14   of the VRQ when he was paid for his work at the front
15   desk.  Under the North Carolina Wage and Hour Act once
16   you are an employee you cannot be a volunteer.  So we
17   would say as a matter of law that he was never legally a
18   volunteer when he was performing hours at the front desk,
19   and that his van driving was actually a continuation of
20   that front desk work.  The employer - employee
21   relationship was established when they offered him a job
22   at front desk and it continued until he stopped working
23   for them, for the defendant.  Therefore, all of that time
24   he spent working for them was under that employer -
25   employee relationship, and it should have been paid at
```

## DIRECT - SCZUDLO

1  the wage rate that was disclosed to him.

2          THE COURT:  Okay.  I'll reserve ruling on the

3  issue of judgment as a matter of law.

4          With that, will there be any evidence for the

5  defendant?

6          MR.  CURRIDEN:  Yes, Your Honor.  I believe that

7  our next witness is in one of the conference rooms.  If I

8  could --

9          THE COURT:  If you could please retrieve your

10 witness.

11         MR.  CURRIDEN:  Thank you.

12         THE COURT:  Call your next your -- your first

13 witness, Mr.  Curriden.

14         MR.  CURRIDEN:  Your Honor, the defense calls Mary

15 Sczudlo.

16         THE COURT:  Come forward and be sworn, ma'am.

17             (Witness duly sworn at 3:38 p.m.)

18         THE COURT:  You may proceed.

19         MR.  CURRIDEN:  Thank you, Your Honor.

20                    **DIRECT EXAMINATION**

21         BY MR.  CURRIDEN:

22 Q.    Good afternoon, ma'am.  Would you please state

23 your full name for the record?

24 A.    Marry Sczudlo.

25 Q.    And where do you live currently?

## DIRECT - SCZUDLO

1  A.      Fletcher.

2  Q.      What?

3  A.      Fletcher.

4  Q.      What is your current occupation?

5  A.      I am owner of Underground Fitness, and the interim

6  director for New City Christian Schools.

7  Q.      Was there a time when you worked for ABCCM?

8  A.      There was.

9  Q.      And what period of time did you work there?

10 A.      For the period 2013 through the beginning of 2017.

11 Q.      What was your job there?

12 A.      I was the director of homeless services.

13 Q.      What were your duties as director of homeless

14 services?

15 A.      I was responsible for the Veteran's Restoration

16 Services and for Steadfast House.

17 Q.      And your responsibility for the Veteran's

18 Restoration Quarters, was that during the period of

19 September of 2015 until you left ABCCM?

20 A.      Yes.

21 Q.      I'm sorry.  When did you say you left ABCCM?

22 A.      I left around February of 2017.

23 Q.      And what were your responsibilities with regard to

24 the VRQ?

25 A.      It reported through me, and it was oversight of

**DIRECT - SCZUDLO**

1  what was going on at the Veteran's Restoration Quarters

2  just as it was for Steadfast House.

3  Q.     And can you give me some idea of what your

4  day-to-day responsibilities involved?

5  A.     We were looking at all of the policies that were

6  implemented, as well as looking at the programs for the

7  rehabilitation of our veterans at the Veteran's

8  Restoration Quarters, as well as the women at Steadfast

9  House because that is why those two programs exist was

10  for the rehabilitation of homeless veterans, and for

11  women and children.

12  Q.     Were you familiar with the service hours program

13  at the VRQ or Veteran's Restoration Quarters?

14  A.     I was.

15  Q.     What did you understand to be the purpose or the

16  objective of that program?

17  A.     It was a piece of the rehabilitation program that

18  we had in place to help our veterans get to a place where

19  they could become self-sustainable.

20  Q.     And for whose benefit would you say the service

21  hours program was?

22  A.     It was for the veterans.

23  Q.     Did ABCCM need the service hours program in order

24  to get the food served, the front desk staffed, and the

25  other aspects of --

## DIRECT - SCZUDLO

1  A.      ABCCM and the VRQ in particular had over 2,000

2  volunteers that showed up every year consistently, and

3  they did everything.  We did have volunteers that have

4  worked at the front desk.  We have many cook teams and

5  people that provide all three meals.  We have volunteers

6  that come and do landscaping, building, construction.  So

7  we have many volunteers that are there to do all the

8  things that need to be done at ABCCM.  So it is a very

9  separate thing than service hours.

10 Q.      In your experience, how common was it for VRQ

11 residents to expect to be paid for service hours?

12 A.      Other than Greg, in my whole time there, no one

13 had ever, ever expressed any desire or need or thought

14 that they deserved to be paid.

15 Q.      Were people allowed to do service hours beyond the

16 minimum requirements?

17 A.      We did have some men that were so grateful to be

18 there, felt so positive about the program, that they did

19 volunteer to do more time.  But it wasn't something that

20 was mandated.  It was something that they offered.

21 Q.      Were you familiar with the Transitional Employment

22 Program, or the thousand hours program?

23 A.      Yes.

24 Q.      And what was the objective of that program?

25 A.      It was also part of the rehabilitation process.

## DIRECT - SCZUDLO

1  So many of our men, when they came to the Veteran's

2  Restoration Quarters, they knew it was a rehabilitation

3  program.  Many of them had difficulties keeping jobs

4  because they didn't show up on time.  The responsibility

5  and the rigor of showing up on time, being responsible

6  for work.  All of those things was something that needed

7  to be learned.  So this was a safe place for them to do

8  that because they were not outside in the world.  They

9  were inside ABCCM reporting to ABCCM people.  So if they

10  didn't show up on time, if they -- you know, if they had

11  anger issues where they blew up, they were dealing with

12  ABCCM in a safe place so they could learn how to deal

13  with that.  So when they transitioned to a place where

14  they were working in the public work force they were more

15  prepared at that point to take that job and be able to

16  keep it.

17  Q.    Do you know Greg Armento, the plaintiff in this

18  lawsuit?

19  A.    I know of him and I did meet him.  He was one of

20  our residents.

21  Q.    And how did -- what was the occasion of you

22  meeting him?

23  A.    I had heard that we had -- that he was concerned

24  about how he was being paid at the front desk when he was

25  working; that he was not being paid appropriately.

## DIRECT - SCZUDLO

1   Q.      And do you know about when that was?

2   A.      It was in November of 2015 because I --

3   originally, what I thought the issue was was we were not

4   paying him appropriately and that he was missing hours.

5   So we did a review of his time, and we went back several

6   weeks.  We went back, and from the time that he actually

7   entered into the thousand hour program which, I believe,

8   was in September.  So we went from September all the way

9   through the beginning of November when I found out from

10  the agency I think was the last.  And we looked at his

11  service hours versus the time that he worked, and we did

12  it in such a way that we made sure that we didn't miss

13  anything.  So we looked at what the schedule was, which

14  -- to work on the front desk.  And then we also looked at

15  the time sheets they turned in.  Then we looked at what

16  his service hours were that he was credited for.

17          And what we determined was that he had been short

18  paid during that period by 20 hours.  That he had -- he

19  actually worked more.  And his service hours were ten

20  because he was working part-time.  And the way the

21  program works is if you are not working or going to

22  school full- time, or if you're not working at all or

23  going to school at all, it's 20 hours a week.  If you

24  work part-time, or if you go to school part-time, it's

25  ten hours a week.  However, if you were working full-time

### DIRECT - SCZUDLO

1 or going to school full-time, or the combination of the
2 two was full-time, then you didn't have to do any service
3 hours.  So with the thousand hour program the way it was
4 looking that he was going to be working he would have
5 been a part-time employee.  So he should have been
6 credited for ten service hours a week.
7 Q.    I believe you prepared a spreadsheet summarizing
8 the findings of that review, and I'll let you take a look
9 at that.  It's been marked as Defendant's Exhibit 10.  Do
10 you see the document there on the screen in front of you?
11 A.    Mm-hmm.  ("Yes.")
12 Q.    Is that a copy of the spreadsheet that you
13 prepared?
14 A.    It is.
15 Q.    Based upon your review -- well what was it based
16 upon?
17 A.    So you will see there's a schedule that is for the
18 front desk because they have to prepare that in advance
19 to make sure that the front desk is covered, and it is
20 listed by person and the times that they're supposed to
21 be working.  We also, then, looked at his time sheets.
22 So every two weeks they turn in a time sheet to be turned
23 in to payroll.  So we looked at what he was paid and the
24 times he was supposed to work, and that's also a double
25 check across.  Because sometimes one of the men may cover

**DIRECT - SCZUDLO**

1  for somebody else, let's just say, or they may switch

2  days.  So we wanted to make sure that we were looking

3  very accurately at the times that he was working at the

4  front desk, and then to see if he had had any adjustment

5  for service hours or not.

6  Q.    All right.  Your Honor, at this time, Defendant's

7  Exhibit 10 has been stipulated as authentic and

8  admissible, and at this time we would move it be admitted

9  into evidence.

10        THE COURT:  Any objection?

11        MS.  RIPLEY:  No, Your Honor.

12        THE COURT:  Let it be admitted.

13            (Defendant's Exhibit 10 is admitted.)

14        BY MR.  CURRIDEN:

15  Q.    I understood you to say this was based upon his

16  time sheets, the front desk schedule, and the payroll

17  records.

18  A.    Well the time sheets, payroll records but, then,

19  also knowing what was the appropriate amount of service

20  hours that he should have had to work given the amount of

21  work that he was doing through the thousand hour program

22  in a week.

23  Q.    Did the front desk schedules you looked at

24  differentiate between who was working as paid employees

25  and who was working as service hours?

**DIRECT - SCZUDLO**

1  A.     They should have been marked appropriately.

2  That's where we found -- that's part of how we found he

3  needed to be paid for another 20 hours.

4  Q.     All right.  If you could summarize each of the

5  columns -- explain what the columns are in your

6  spreadsheet.

7  A.     So the first column is the number of hours that

8  were paid -- the first column is the number of hours he

9  had recorded as service hours.  So, if you look, there

10  was 32 hours that were listed that he had as service

11  hours, and then he was paid for eight hours during that

12  week.  He should have had 20 hours of service hours.  He

13  was short paid 12 hours, so that's why the column shows

14  he was due 12 hours.

15  Q.     Did you have an opportunity to meet with

16  Mr.  Armento and review this spreadsheet?

17  A.     At the end, it was -- it was like the -- I might

18  have the date wrong, but it was either the 10th or the

19  12th of November as soon as we got done reviewing it.  We

20  sent it to his case manager, along with all of the

21  appropriate documentation that showed this is all the

22  front desk schedules, all the time sheets.  His service

23  hour requirements were all attached so his case manager

24  could go over it with him.  But I also brought him in and

25  said we're really sorry.  There was a mistake and we

## DIRECT - SCZUDLO

1  should have paid you 20 more hours, and this is the

2  calculation, and this is how I did it, and so we will be

3  turning this in for additional pay for you at your

4  thousand hour program rate which was $9 an hour.

5  Q.    And what was his response?

6  A.    His response was that, first of all, thank you for

7  the money.  You know, he said thank you.

8       MS.  RIPLEY:  Objection, Your Honor.  Hearsay.

9  I'm sorry.  I might have misunderstood, but I thought you

10 said this was all relayed through the case manager.

11      THE WITNESS:  No.  I said we gave a copy to the

12 case manager to talk to him, but I also talked to him in

13 my office.

14      MS.  RIPLEY:  I'm sorry.  Objection withdrawn.

15      THE WITNESS:  So I just wanted to let him know we

16 did, because we promised to look into this and that we

17 looked into it, what the difference was, and that -- I

18 believe Slim Jones was his case manager and would be

19 going over all this stuff with him.  But this was the

20 spreadsheet and I was happy to explain it to him but that

21 we owed him 20 additional hours and that it would be

22 coming in his paycheck.

23      I asked him if he had any questions about that,

24 and he said basically he understood what we did and he

25 appreciated -- I think he appreciated being paid the

## DIRECT - SCZUDLO

1  additional money, but he had -- his issue was that he

2  believed that he should be paid for service hours.  And I

3  just said that's not the way our program works; service

4  hours are not paid time.

5       BY MR. CURRIDEN:

6  Q.    And in preparing your spreadsheet how was it

7  determined what would be paid time and what would be

8  service hours?

9  A.    Well in the first week he was still 20 hours

10 because he really didn't start the program until the end

11 of that week.  So that's why you will see there's 20

12 hours in that first week.  But then every week after

13 that, because he was working, and he was working not 40

14 hours a week, it was ten hours because that's the way the

15 program works.  If you're part-time then you only have to

16 do ten service hours.  So if you look on the spreadsheet

17 you'll see the required service hours were ten hours a

18 week.  So we looked at what he was paid but what was

19 credited as service hours and found the discrepancy of

20 how much more he should have been paid above and beyond

21 the service hours that was the requirement for the

22 program.

23 Q.    Did there seem to be any confusion on his part

24 about whether he was expected to continue doing service

25 hours?

## DIRECT - SCZUDLO

1  A.     I don't think -- his confusion was not about the

2  service hours.  His confusion -- I don't think it was

3  confusion.  He just did not agree with the fact that he

4  was not paid for service hours.  He felt -- what he said

5  to me was he felt that he was being taken advantage of

6  and that he was providing work for ABCCM and that he

7  should be paid for those hours.

8  Q.     Did you you explain to him what was expected of

9  him with regard to service hours a that the point?

10  A.     I explained it was a part of the service hours

11  program which was a part of the program at VRQ, and that

12  he understood that program when he accepted being put

13  into that program.

14  Q.     Did you talk to him about the thousand hours

15  program at this point?

16  A.     Other than that he was being paid $9 an hour just

17  trying to comply with the rules of what was agreed to for

18  him to be in that program.

19  Q.     Did he seem to have any understanding that he was

20  in the thousand hours program?

21  A.     Yeah.

22  Q.     Did he claim that your summary, based upon your

23  review, was inaccurate in any way?

24  A.     He didn't think that the calculation was

25  inaccurate.  The part that he felt was inaccurate was

## DIRECT - SCZUDLO

1    that he wasn't going to be paid for the service hours.

2    Q.    Do you know who Randy Gamble is?

3    A.    I do.

4    Q.    What was Randy Gamble's position at the time of

5    September of 2015?

6    A.    He was the front desk manager.

7    Q.    Okay.  Did Randy have authority to require people

8    to work beyond either the amount they were -- well let me

9    strike that.

10         Did Randy have authority to require people to work

11   beyond the minimum requirement of service hours?

12   A.    Are you asking me if he was trying to get them to

13   work more service hours than was required by the program?

14   Is that the question?

15   Q.    Did he have the authority to make him work more

16   service hours than was required by the program?

17   A.    No.  He could ask them.

18   Q.    And were there times when that happened?

19   A.    He may have.  I don't know that.  I know that we

20   have asked other -- if we had a need because someone was

21   sick, or we needed to cover a position, there would be

22   times when we would ask people if they would like to

23   volunteer to do that.  Some would say yes and they would

24   do it; some would say no and they wouldn't.  There was no

25   ramifications for saying no.

## DIRECT - SCZUDLO

1  Q.    Did Randy have authority, unilaterally, to hire

2  people in to the Transitional Employment Program?

3  A.    Well there were a certain number of positions that

4  were allocated to the front desk, and if there was an

5  opening he could hire, but it ran through another

6  program.  So those people were vetted.  They had to apply

7  for that, and then Randy could hire someone if there was

8  an open position.

9  Q.    So was there an approval process that went beyond

10 Randy before someone could be hired?

11 A.    Randy would always talk to either the operations

12 manager or Tim McElyea, the director.

13 Q.    And how about firing people?  Was Randy -- did

14 Randy have authority to unilaterally fire people from the

15 Transitional Employment Program?

16 A.    Not without permission from his supervisors.

17 Q.    Were there any other occasions when you met with

18 Mr. Armento about his service hours and his paid time?

19 A.    I'm trying to think if I actually met with him.  I

20 did meet with him in June.

21 Q.    Okay.

22 A.    Afterwards.  But it was because he was -- again,

23 he was unhappy about the fact that he was not being paid

24 for his service hours.

25 Q.    And let me have you take a look at Defendant's

## DIRECT - SCZUDLO

1  Exhibit 11.  Does that appear to be a memo that you

2  prepared?

3  A.    It's a documentation for the file.  Whenever we

4  have a meeting and a resident had a complaint we would

5  document the meeting and what was discussed at that

6  meeting.

7  Q.    Is this an accurate copy of the documentation you

8  prepared as a result of your meeting in June of 2016 with

9  Mr.  Armento?

10 A.    It is.

11 Q.    At this time, Your Honor, we would move that

12 Defendant's Exhibit 11 be moved into evidence.

13        THE COURT:  Any objection?

14        MS.  RIPLEY:  No, Your Honor.

15        THE COURT:  Let it be admitted.

16            (Defendant's Exhibit 11 is admitted.)

17        BY MR.  CURRIDEN:

18 Q.    Have you had a chance to review this memo

19 recently?

20 A.    I did.

21 Q.    And how did that -- how did this come about, or

22 what triggered this memo?

23 A.    You need to make this a little bigger because I

24 have old eyes.

25 Q.    I'm battling the sun over here myself.

## DIRECT - SCZUDLO

1  A.      There we go.   Thanks.   We had a discussion because

2  he still -- he had some concerns.   He didn't agree with

3  the service hours.   He really felt like he needed to be

4  paid for that time.   He also felt like there were times

5  when he was told he was approaching the thousand hours

6  and he was not.   And he wanted to make sure that he had

7  all of his thousand hours, and we did need to look into

8  that.   We needed to look at the way the thousand hours

9  were accumulated.   It's not -- if somebody is in the

10  early times of their thousand hour program it's not --

11  you know, someone may have looked in it week four and

12  it's not a big deal.   But when they get to 900 or the

13  thousand we need to look at what that is so they don't go

14  above and beyond the thousand hour program.

15      I think Greg was told -- at least what he said to

16  me was he was almost at his thousand hours at one point,

17  and he was only at around 800-some.   And then he was told

18  he was almost at his thousand hours and he was only at

19  900-some.   So I know I talked with Tim McElyea, the

20  director, and also with Randy, and said we really need to

21  make sure that this process is clean.   Let's go back and

22  do the calculation and find out exactly where he stands.

23  So they did, and he was not quite at his thousand hours.

24  Then they just monitored it very carefully so when he hit

25  his thousand hours they knew that exact point and could

1  tell him.

2  Q.    Was he claiming at that point in your

3  communications with him that he had never been in the

4  thousand hours program?

5  A.    No.

6  Q.    Did there seem to be any confusion on his part

7  about whether he was in the thousand hours program?

8  A.    Not that he said to me.  Just about whether that

9  thousand hour program ended.

10 Q.    And were there any VRQ residents who were in the

11 grant per diem program and who were doing work for pay at

12 the VRQ who were not in the thousand hours program?

13 A.    Not that I recall.

14 Q.    So, in other words, anyone who was a grant per

15 diem participant staying at the VRQ and doing work and

16 being paid at the VRQ was in the thousand hours program?

17 A.    Unless they were with the Land of Sky.  We had a

18 partnership with Land of Sky as well.

19 Q.    Okay.  In that case they were not being paid by

20 ABCCM; is that right?

21 A.    That's correct.  They were paid by Land of Sky.

22 Q.    So were they considered employees of ABCCM?

23 A.    Yes.  Well they -- I mean they were paid by Land

24 of Sky but they worked at ABCCM.

25 Q.    Right.  So ABCCM was not paying them --

## CROSS - SCZUDLO

1  A.     They were not.

2  Q.     -- as an employer writing paychecks to them?

3  A.     Nor we would send time sheets in to Land of Sky.

4  Q.     Do you know how long service hours have been a

5  part of ABCCM's program for homeless vets?

6  A.     Again, it was there when I got there.

7  Q.     And that was in 2013?

8  A.     Yes.

9  Q.     This is similar to a question I asked you earlier

10 but a little bit different.  Before Greg Armento, to your

11 knowledge, did anyone ever claim that the service hours

12 program was in violation of North Carolina wage and hour

13 laws?

14 A.     Not to me.

15 Q.     Did you have any reason to believe the program was

16 in violation of such laws?

17 A.     No.

18 Q.     Thank you, ma'am.  Those are my questions.

19        THE COURT:  Cross-examination.

20        MS.  RIPLEY:  Thank you, Your Honor.

21                    **CROSS-EXAMINATION**

22        BY MS.  RIPLEY:

23 Q.     Hi, Ms. Sczudlo.  My name is Clermont Ripley, I'm

24 one of the attorneys for Mr.  Armento, and I do have a

25 couple of questions for you.

CROSS - SCZUDLO

1    You didn't interview Mr. Armento when he first

2 arrived at the VRQ; right?

3 A.    No, I did not.

4 Q.    You weren't part of his intake?

5 A.    No.

6 Q.    You didn't know anything about his work history?

7 A.    No.

8 Q.    And you didn't know if he had issues --

9 A.    Not when he came in.  I mean he shared some things

10 in some conversations that he had worked in other places

11 and some things that he had done, but that's something

12 Greg had said when we had some conversations.

13 Q.    That was after he was enrolled in the VIDE

14 program?

15 A.    Yes.  Right.

16 Q.    After he started doing service hours?

17 A.    Right.

18 Q.    You didn't know if he had problems showing up on

19 time during his previous employment?

20 A.    I would not have known that, no.

21 Q.    What is your background?  Do you have a social

22 work degree?

23 A.    No.  I have a Bachelors in Accounting and Business

24 Management, and an MBA.

25 Q.    You mentioned a couple of things about

1  rehabilitative program.  A lot of the things done at the

2  VRQ are part of rehabilitative program.  Do you have any

3  training in rehabilitative programs?

4  A.    Well I work with our social workers pretty

5  closely, and we also worked to actually add additional

6  pieces and components on to the rehabilitation program

7  that I was a part of to help monitor how well people were

8  doing, and also working with them to know, following and

9  tracking their success.

10  Q.    Did you -- in your role as director of homeless

11  services did you change any policies or make any updates

12  to the policies of the VRQ?

13  A.    We documented the policies.  We made sure that

14  they were the same across both Steadfast House and the

15  Veteran's Restoration Quarters.  I'm trying to remember.

16  Are there any policies in particular?

17  Q.    Yeah.  Well you said the service hours policy was

18  already in place when you got there.  Did you have any

19  input into changes to the service hours policy?

20  A.    To my knowledge, that program was not changed.  It

21  had always been just as I described it earlier.

22  Q.    Okay.  Were you involved in any of the handbook

23  revisions that occurred while you were there?

24  A.    Yes.

25  Q.    I think it was the 2017 handbook -- the 2016

CROSS - SCZUDLO

1  handbook.  Well what I'm getting at is the 20 hours, the

2  ten hours, the amount of service hours someone has to

3  work based on whether they're employed part-time or not

4  at all.  That wasn't in the handbooks, the first couple

5  of handbooks, that applied while Mr.  Armento was there,

6  but later it did show up in the handbooks.  Did you have

7  anything to do with that?

8  A.     Yeah, I did, because it was not clear in the

9  policy handbook.  It was in the policy.  Maybe this will

10 help you.  There were many policies that were they were

11 and they individual policies, but -- so they were there,

12 they were available.  The case managers knew about them

13 and in their work one-on-one with our residents they

14 would use those policies.

15        As we looked at the handbook, in trying to make

16 things better, clearer, we took the policies that existed

17 and we put them into the handbooks so that they were all

18 in one place instead of individual documents and so that

19 people could see very specifically what those policies

20 were.

21 Q.     Okay.  But it wasn't just adding policies that

22 were missing to the handbook.  It was also making edits

23 to the existing language in the handbook; right?

24 A.     Edits were only to make sure that the policies

25 that were in place were appropriately listed in a

CROSS - SCZUDLO

1  handbook.

2  Q.      Did you make any changes to the transitional

3  employment policy?

4  A.      The transitional employment -- are we talking

5  about one specific thing?  The whole program?

6  Q.      There's a manual and I'll pull it up.  It's

7  already been introduced into evidence, but there's a

8  Transitional Employment Program manual.  Are you familiar

9  with -- sorry.

10 A.      It's black.

11 Q.      We're completely not hooked up.  Sorry.  I can ask

12 you my questions while she works on this.

13         One specific policy I'm interested in is, you were

14 talking a little while ago about how important it is to

15 make sure that people know that they have notice when

16 they are reaching the end of their thousand hours to make

17 sure they get some notice.  In May of 2016 there was an

18 amendment -- amended policy about the two weeks notice

19 for the thousand hours program.  Do you remember working

20 on that policy?

21 A.      Two weeks?

22 Q.      Now that this is here I can show you what I'm

23 talking about.  If you look on the screen in front of

24 you, this is Plaintiff's Exhibit 7, page 4, Transitional

25 Employment Program policy updated May 5th 2016, two

CROSS - SCZUDLO

1  weeks' notice policy.

2  A.     I might be confused, but the Transitional

3  Employment Program is not -- the VRQ supplies people to

4  be in that program.  They don't run that program.

5  Q.     Who runs that program?

6  A.     ABCCM.  But it's another part of ABCCM.  So the

7  people who would have written this policy are not the

8  people at the VRQ.

9  Q.     Okay.

10 A.     We would abide by the policy.

11 Q.     So you didn't have anything to do with changing

12 this policy that I just asked you about.

13 A.     No.  And I don't know that this is a change.  It

14 just could be another clarification.

15 Q.     Okay.

16 A.     Because my understanding is that there was always

17 a notice period to make sure people knew when they were

18 getting close to their thousand hours.  They had to

19 because the program ended at a thousand.  They had to

20 track that.

21 Q.     Do you know who the TEP coordinator was in the

22 fall of 2015?

23 A.     You know I can see her, and I'm having a senior

24 moment and I can't remember her name.  I can't.

25 Q.     Where did she work?

CROSS - SCZUDLO

1   A.      She worked in the Acts building.

2   Q.      Did she work for VRQ or a different part of the

3   ABCCM?

4   A.      She worked for a different part of ABCCM.

5   Q.      Which part?

6   A.      Veterans Services of the Carolinas.

7   Q.      Okay.  Was her name Susan Garrett?

8   A.      That would be it, yeah.

9   Q.      so I want to explore that relationship a little

10  bit more.  You said it was administered by the Veterans

11  Services of the Carolinas, the TEP program, but residents

12  of the VRQ were enrolled in it.  So how did -- how did

13  the residents at the VRQ get enrolled in the TEP program?

14  A.      They would work with their case managers.  And if

15  they were -- if they wanted to be part of that program,

16  work program, then they would be recommended to Susan

17  Garrett.  They would be then looking at what openings

18  they would apply, and she would interview them and make

19  recommendations.  Then they would work with the people at

20  the VRQ to determine where those positions might be and

21  if that person would be qualified to do that job.

22  Q.      Were people who worked as duty drivers ever part

23  of the TEP program?

24  A.      There were volunteers, and I think that we had a

25  position that was also a driver.

## CROSS - SCZUDLO

1  Q.     If you look at page 6 of Plaintiff's Exhibit 7 --
2  I can make this bigger if you'd like.  But what I wanted
3  to ask about is the job descriptions in that table of
4  contents.  Do you see a job description there that would
5  be for the van drivers?  The shuttle drivers?
6  A.     No.
7  Q.     Okay.  So if you were -- the VRQ residents who are
8  paid to drive the van weren't in the TEP program.
9  A.     As I said, I couldn't recall.  I thought there
10 might be a position but I can't recall.  We know that
11 many of them were volunteers or service hour positions.
12 Q.     I'm sorry.  Can you repeat that?
13 A.     I said many of them were service hour positions.
14 Q.     The drivers were.
15 A.     Yes.
16 Q.     As director of homeless services at the VRQ did
17 you ever come in contact with your counterparts at other
18 GPD programs around the state?
19 A.     On the phone, maybe, but most of that was done by
20 the directors of those programs.
21 Q.     In terms of the service hour requirements.  We
22 keep hearing if you work part-time or are unemployed you
23 have to work a number of hours.  What if you're
24 self-employed or working on a contract basis?  How many
25 service hours do you have to work?

CROSS - SCZUDLO

1  A.    It's the same requirement.  Self-employed?  It
2  would be the same.
3  Q.    So, for example, Mr.  Armento submitted website
4  proposals to some outside people.  How do you track how
5  many hours he was doing that in order to figure out
6  whether he needed to do service hours or not?
7  A.    He would have to present that.
8  Q.    But service hours -- that 20-hour or 10-hour
9  requirement's really only referring to people who are
10 traditionally employed somewhere with a weekly schedule
11 that's going to show your hours; right?
12 A.    Under normal conditions.  Most of our -- I would
13 say that if there was something that was different than
14 somebody working for someone else, or their hours were --
15 track where their hours were tracked, as you say, as a
16 contract person or working for themselves.  If they made
17 a case to present that then we would consider it if they
18 could prove that, but it would have to be proven.  And I
19 would say to you in my almost four years there no one
20 ever brought forth that they were a contractor or, you
21 know, doing something as a self-employed person.
22 Q.    Because most of the VRQ residents who got outside
23 jobs were doing hourly work; correct?
24 A.    That's correct.
25 Q.    I'd like to have you look at the defendant's

CROSS - SCZUDLO

1  exhibit.  I apologize.  What I'd like to look at is the
2  spreadsheet that you created, the documents of Mr.
3  Armento's hours, and I'm having trouble finding it.
4       THE COURT:  Are you talking about Defendant's 10?
5       MS.  RIPLEY:  Yes.
6       THE COURT:  Put it up on the screen, please.
7       MS.  RIPLEY:  Can someone else bring up
8  Defendant's 10 on the screen?
9       MR.  CURRIDEN:  We can.
10      BY MS.  RIPLEY:
11  Q.    I only have it in the bookmarked version.  I can
12  try asking my question without you looking at it, and
13  then you can let me know if you need to see it.
14       When I was looking at it before I was looking at
15  the numbers trying to understand how you figure out the
16  service hours because -- we've got it.  Okay.  You've got
17  it now.  Thank you.  So we're looking at -- it just went
18  away on my screen.  Okay.  Do you see it Ms. Sczudlo?
19  A.    I do.
20  Q.    Looking at that second week, 9/20 to 9/26.  If you
21  add up the first column, which is the service hours, and
22  the second column, which is paid, 16 plus 24 is 40;
23  right?  So if you just look at that and you say, okay, he
24  worked 40 hours that week, why isn't that just 40 hours
25  of work?

1   A.      Because it's service hours and work hours.

2   Q.      But isn't that retroactive?  I mean, I guess I'm

3   just trying to understand -- it feels like someone could

4   come along and say, let me just designate some of these

5   as service hours and some of these at work, and where you

6   draw that line impacts how many service hours he had to

7   work.  Right?

8   A.      I think you need to look at the whole spreadsheet

9   and you need to look at the number of hours he worked.

10  You can't take an isolated week because there could be a

11  time -- no different than a person working part-time.

12  There may be times that they work more than their normal

13  32 hours or their normal 20 hours.  You need to look at

14  all of it together.  And we -- it's always looked at --

15  the way we looked at it is to say that if you look at the

16  number of hours that he works mainly it is less than 40,

17  and it is -- that is considered a part-time position.

18          So I can't scroll this up.  But if you scrolled

19  this up to the next week -- okay.  So this is where,

20  again, we have two weeks, but then it goes to only 24

21  hours.  Then the next week it's only 16 hours.  And if

22  you keep going, you know, it goes -- then it was 32

23  hours.  Then it was 16 hours.  So we had two weeks where

24  I see the direction that you're taking, but you're taking

25  isolated weeks not the overall.  And what was the norm

## CROSS - SCZUDLO

1  was this.  So, you know, the only thing you can say is do
2  we -- do we switch this program back and forth?  It's not
3  every week.  Are you -- it's what is it that you're going
4  to be doing in this program?  On a thousand hour service
5  program his pattern was to be working much less than 40
6  hours.
7  Q.    Okay.  So you looked at the pattern not at the
8  work week?
9  A.    In this particular a case, yes.  I meant all cases
10 but, I mean, that's how I justified doing this.  His
11 calculation at ten hours versus looking week by week by
12 week by week.
13 Q.    Okay.  And you also just said something about if
14 it was under -- I'm not specifically asking about this
15 page or Mr. Armento's hours anymore.  I'm actually -- if
16 you- all don't mind taking it off the screen so we don't
17 get confused.
18        MR. CURRIDEN:  Okay.
19        BY MS. RIPLEY:
20 Q.    Under the policy a moment ago you said if they're
21 under 40 hours then it's not full-time and they have to
22 perform service hours, but is that in writing anywhere?
23 A.    It's our definition of full full-time.
24 Q.    How do you define "full-time?"
25 A.    For 40 hours a week.

1    Q.    Is that in writing anywhere?

2    A.    I can't answer that.

3    Q.    Okay.  You've never seen an application from

4    Mr. Armento to enroll in the TEP program; right?

5    A.    I have not.

6    Q.    You also -- sorry I keep jumping around.  You were

7    talking about the end of the TEP program and how it's

8    important to make sure that you know when someone hits

9    that thousand hours.  What happened if someone went

10   beyond 1,000 hours?

11   A.    I don't know of anyone who's ever done that.

12   Q.    So you-all could stop someone from working so they

13   didn't go beyond 1,000 hours?

14   A.    The program is designed and funded because it is

15   part of a rehabilitative program, and it is only for

16   1,000 hours.

17   Q.    So, because the program is funded for 1,000, you

18   wouldn't allow anyone to work beyond 1,000.

19   A.    They shouldn't be going beyond 1,000.

20   Q.    But how do you make sure that doesn't happen?

21   A.    Because we track the hours.

22   Q.    And then you tell them to stop working?

23   A.    We tell them.  That's why you get to that point.

24   And if they are at that point and they only have ten

25   hours they know that they have ten hours to work in that

1   program.

2   Q.    So you don't let them work beyond 1,000 hours?

3   A.    They should not be.

4   Q.    "They should not be" is a little bit different

5   than whether or not you-all let them.  Would you let

6   someone work beyond 1,000 hours?

7   A.    No.

8   Q.    Okay.  Thank you.  No further questions.

9          THE COURT:  Any redirect?

10         MR.  CURRIDEN:  Just a followup question.

11                     **REDIRECT EXAMINATION**

12         BY MR.  CURRIDEN:

13  Q.    Ms. Sczudlo, at the time of September, October,

14  November of 2015, do you know the status of

15  implementation of documentation for the Transitional

16  Employment Program, the manual that you were shown and

17  other documents about the formalities of the program?

18  A.    I had not seen the actual handbook, this.  I've

19  never seen that.  But I know from having spoken to Susan

20  about the program what the requirements were about the

21  thousand hours.

22  Q.    But the process you described of Susan sitting

23  down and going through the requirements of the program.

24  Do you know when that was implemented?

25  A.    I think it's always been.  I'm assuming that it's

always been that way because it had been that way from
the time that I was there.

Q.    All right.  Thank you, ma'am.  Those are my
questions.

        THE COURT:  Any recross?

        MS.  RIPLEY:  Nothing, Your Honor.

        THE COURT:  May Ms. Sczudlo be released?

        MR.  CURRIDEN:  Yes, Your Honor.

        THE COURT:  Any objection?

        MS.  RIPLEY:  No.

        THE COURT:  Ma'am, you may step down.  You're free
to go.

                    (Witness excused at 4:23 p.m.)

        THE COURT:  We're going to take the afternoon
break in just a moment because we're going to get a
schedule because, as of right now, I don't have a court
reporter past 11 o'clock tomorrow morning.

        Mr.  Curriden, what do you have left of
defendant's evidence?

        MR.  CURRIDEN:  Your Honor, we have two short
witnesses, and Mr.  McElyea.

        THE COURT:  When you say "short witnesses," do you
mean 15 minutes?

        MR.  CURRIDEN:  I mean 30 minutes or less.

        THE COURT:  And with Mr.  McElyea how long are you

1   talking about?

2       MR.  CURRIDEN:  I'm anticipating 30 to -- sorry --

3   60 to 90 minutes for Mr.  McElyea.

4       THE COURT:  How long?

5       MR.  CURRIDEN:  I estimate we could finish by

6   11:00 tomorrow.

7       THE COURT:  How long do you expect on cross-

8   examination for the witnesses just mentioned?

9       MS.  RIPLEY:  We don't think we will need to

10  question the short witnesses very much.  We don't think

11  they'll have much relevant to say.  For Mr.  McElyea we

12  definitely will need some time on cross, but it's hard to

13  know exactly how long until we hear his testimony.

14      THE COURT:  Because if I -- if you're telling me

15  that you'll be finished by 11 o'clock and I don't make

16  any further arrangements for a court reporter tomorrow,

17  which would be quite an expense for the court, then if

18  you're coming up on 11 o'clock tomorrow morning and I run

19  out of time, the clock runs out on me.  So are you

20  sufficiently confident that we will be done by 11 o'clock

21  tomorrow morning?

22      MR.  CURRIDEN:  I am, Your Honor.

23      THE COURT:  Ms.  Ripley, do you have any reason to

24  doubt it?

25      MS.  RIPLEY:  If he's not finished questioning his

### DIRECT - DARNELL

1   witness until 11:00, then --

2        MR.  CURRIDEN:  I understand there needs to be

3   cross-examination.  If Mr.  McElyea is the first witness

4   tomorrow, I can be done with him by between 10:00 and

5   10:30.

6        THE COURT:  How about if we start at 8 o'clock

7   tomorrow morning?

8        MR.  CURRIDEN:  That would give us more of a

9   cushion.

10       MS.  RIPLEY:  Does that work for your court

11  reporter?

12       THE COURT:  It's better than going past 11

13  o'clock.

14       MS.  RIPLEY:  That's okay with us.

15       MR.  CURRIDEN:  We can reevaluate it when we

16  conclude today and see where we are, but that's my best

17  projection at this point.

18       THE COURT:  Well what I will do -- because I am

19  right up against a hard deadline for getting in another

20  court reporter for tomorrow, so I am going to say we

21  don't need one based on your statements about how long

22  things are going to take.  We will reevaluate when we

23  finish up at the end of the day, and then I'll let you

24  know what time we're going to start tomorrow morning.

25  I'm usually here between 6:00 and 6:30 so that doesn't

### DIRECT - DARNELL

1  bother me, but I'm not going to do that to you-all.  But

2  don't you-all run me over either.  Okay?

3       Let's go ahead and take ten minutes.

4            (Off the record at 4:25 p.m.)

5            (On the record at 4:36 p.m.)

6       THE COURT:  Call your next witness, Mr. Curriden.

7       MR. CURRIDEN:  Your Honor, if we could -- before

8  that I'd like to move to admit a couple of exhibits that

9  were identified that I believe have been stipulated in

10  terms of their authenticity and admissibility.  They're

11  Defendant's Exhibit 1, the ABCCM intake form, and

12  Defendant's Exhibit 3, the VRQ resident handbook

13  agreement.

14       THE COURT:  Any objection?

15       MS. RIPLEY:  No, Your Honor.

16       THE COURT:  Let them be admitted.

17            (Defendant's Exhibits 1 and 3 are admitted.)

18       MR. CURRIDEN:  Thank you.

19       MR. DUNLAP:  Your Honor, at this time, the

20  defense would call Jeremy Darnell.

21       THE COURT:  Come forward to be sworn.

22       THE CLERK:  If you would put your left hand on the

23  Bible, and raise your right hand.

24            (Witness duly sworn at 4:38 p.m.)

25       THE COURT:  You may proceed.

DIRECT - DARNELL

### DIRECT EXAMINATION

1

2      BY MR. DUNLAP:

3   Q.    Please state your full name for the record.

4   A.    It is Jeremy Lane Darnell.

5   Q.    Now, Mr. Darnell, just briefly, by way of

6   background, were you -- are you --

7        COURT REPORTER: You're going to have to pull that

8   microphone down, please.

9        BY MR. DUNLAP:

10  Q.    Are you a veteran?

11  A.    Yes.

12  Q.    Can you briefly describe your service?

13  A.    I joined the Army in 1996, in the reserves, and

14  went active duty in 1997. I served until around 2001

15  when I went to civilian status due to my job still

16  serving with the same unit and stuff. In 2006 I left the

17  military.

18  Q.    Okay. And what did you do in the military?

19  A.    I started off Airborne infantry, and then I went

20  into Special Operations.

21  Q.    Okay. Now, at a certain point, you were a

22  resident of -- well you came to the VRQ; correct?

23  A.    Say again.

24  Q.    At a certain point you came to the VRQ; correct?

25  A.    Correct. I came to the VRQ in September of 2015.

## DIRECT - DARNELL

1 Q.    Can you tell me about how you ended up there?

2 A.    Sure.  Due to my first marriage, my daughter lived

3 in North Carolina and my second wife.  And I came to

4 North Carolina to visit my daughter and family, and my

5 wife and I split up then.  A friend of mine, Eric Cox,

6 who's the executive -- the Executive Chef and food

7 service director for ABCCM told me about ABCCM.  Then I

8 called ahead and had everything set up for me to come

9 there before I actually wound up homeless.

10 Q.    Okay.  Do you know the plaintiff, Mr.  Gregory

11 Armento?

12 A.    I do.  He was one of my roommates.

13 Q.    Okay.  Do you remember about what timeframe

14 you-all were roommates?

15 A.    I believe 2016 and 2017, that timeframe in there.

16 I don't remember the exact dates.

17 Q.    How long were you roommates?

18 A.    Probably at least six months if not longer.  It's

19 kind of hard to remember the timeframes exactly.

20 Q.    How would you describe your relationship with

21 Mr.  Armento?

22 A.    Positive, for the most part.  We got along.  We'd

23 argue once in a while, but we stayed in contact after he

24 left.  As far as I know we're friends.

25 Q.    How was he as a roommate?

# DIRECT - DARNELL

1   A.     Like I said, sometimes we had issues. There were

2   times when Chris and I would do pretty much all the

3   cleaning, or Greg spent a lot of time on his computer.

4   He did do service hours while we were there, and he

5   volunteered to drive. For the most part we got along.

6   Q.     Did you ever witness -- let me rephrase that.

7         How would you describe Mr. Armento's efforts to

8   get a job outside of the VRQ?

9   A.     For the most part, I didn't see him actively

10   searching for a job. There's times when I would point

11   out some computer jobs. I have a friend that owns a

12   pretty big knife company in town that was looking for

13   markets and website, computer stuff, and it would have

14   been salaried, full-time, and I pointed that out. There

15   were some other jobs I pointed out. Eventually, he got a

16   job at the stand -- there was a fruit stand down from us,

17   and he got a job doing their website but that stand

18   didn't stay up long. I don't know whatever happened.

19   Q.     Now when you would talk to him about these other

20   job leads, as far as you know -- well what was his

21   reaction to that?

22   A.     Sometimes he would say he's overqualified, and

23   sometimes it just -- it wouldn't go anywhere. He

24   wouldn't say anything more. So I don't know if he looked

25   at them or whatnot, but for the most part it didn't seem

## DIRECT - DARNELL

1  like he was interested in them.

2  Q.    Did he seem motivated to find a job outside of

3  VRQ?

4       MS. BROOKE: Objection. Calls for speculation.

5       THE COURT: Sustained.

6       BY MR. DUNLAP:

7  Q.    Did you ever see Mr. Armento working on this

8  lawsuit?

9  A.    Yes. For the past several months he was there he

10  was -- that was his main focus, in my opinion.

11  Q.    Did he ever comment on his progress in the

12  lawsuit?

13  A.    He did. There was one time he said that it was

14  going really well and that he thought they should give

15  him an honorary law degree, and I think he was joking

16  about that. You know how we are as military. We joke

17  about all sorts of stuff.

18  Q.    And was that based on the amount of work he was

19  doing?

20  A.    Right. It was pretty in-depth. I never read it,

21  but from my understanding it was pretty in-depth.

22  Q.    Did Mr. Armento give an interview to the news

23  about his experience at the VRQ?

24  A.    He did. I don't remember which station it was,

25  but there was one -- one interview that I know of, yes.

## DIRECT - DARNELL

1  Q.     Did you see the interview?

2  A.     I looked it up online and watched it online.

3  Q.     In the comments that he made during that interview

4  did you find them to be truthful?

5  A.     No.   I felt it was skewed, embellished, and skewed

6  such as they tried to make it look like ABCCM kicked him

7  out.  But that was at his end of the two years, and we

8  all know when we do orientation that we've got two years

9  there.  It's not guaranteed.  We can extend but it's not

10 guaranteed that we can do anything but use the time

11 wisely while we're there to save up money, or try to get

12 housing through HUD, VASH, or something like that.

13 Q.     Did he talk about the kind of work he was doing at

14 VRQ during that interview?

15 A.     He mentioned working the front desk.  He mentioned

16 scrubbing toilets at 4:00 a.m., stuff like that.  I don't

17 remember if he mentioned that he volunteered to drive or

18 anything like that.

19 Q.     What did he say about scrubbing toilets?

20 A.     That there were times he would have to scrub

21 toilets at 4 o'clock in the morning.

22 Q.     Was that truthful?

23 A.     Not to my knowledge.  I mean we never scrubbed

24 toilets in our room at 4:00 a.m.  Housekeeping usually

25 took care of the toilets in the main area unless

## DIRECT - DARNELL

1  something absolutely disastrous happened.  I don't see

2  scrubbing toilets at 4:00 a.m.

3  Q.    When you arrived at the VRQ was there an

4  orientation or an intake process?

5  A.    There was.  There were multiple of them.  When I

6  first arrived I had everything set up.  So I signed some

7  paperwork explaining that they told me the rule, they

8  told me the service hours, and all that.  Then I had a

9  longer  orientation later on when I moved from intake to

10  the actual per diem program.

11  Q.    What did they tell you about the service hours

12  during your intake?

13  A.    The service hours are part of the rehabilitation

14  process and that they're required unless you have medical

15  needs or full-time employment or full-time school.  If

16  you're part-time school or part-time employment they

17  reduced the service hours from 20 to ten hours.  If

18  you're full-time -- sorry.  If you have medical

19  conditions you're not required to do service hours if the

20  medical conditions are bad enough to where they prevent

21  you from doing them.

22  Q.    Did anyone ever tell you the service hours would

23  be compensated?

24  A.    No.  They're part of rehabilitation to get you out

25  of your room doing work, being productive so we're just

CROSS - DARNELL

1  not laying in our room all day.  I mean that's --

2  Q.     Did they say anything to lead you to believe that

3  those service hours would be compensated?

4  A.     No.

5  Q.     How has your experience at ABCCM impacted your

6  life?

7  A.     Very positively.  For two years I didn't have

8  worry about paying rent.  For two years I got to focus on

9  getting back on my feet, getting back into the world,

10 getting back employed, dealing with legal issues with my

11 divorce and all that that I had to, enough to where I

12 still volunteer in the kitchen.  I'm still a resident

13 there.  I still volunteer in the kitchen when I can.  I

14 still mentor guys when I can.  So it's had a pretty

15 positive effect.

16 Q.     And you're part of the transitional housing

17 program at this point.

18 A.     I'm in a permanent housing situation there.  I'm

19 not sure if that's transitional or not.

20 Q.     Right.  But it's -- so it's different than the per

21 diem program.

22 A.     Correct.  I basically pay so much a month to still

23 live there.

24 Q.     Okay.  No more questions.

25        THE COURT:  Cross-examination.

CROSS - DARNELL

1          MS.  BROOKE:  Yes, Your Honor.

2                     **CROSS-EXAMINATION**

3          BY MS.  BROOKE:

4     Q.    Mr.  Darnell, my name is Carol Brooke and I'm one

5     of Mr.  Armento's attorneys.

6          You didn't become Mr.  Armento's roommate until

7     about March of 2016; is that right?

8     A.    Correct.

9     Q.    And you were his roommate for about six months you

10    said?

11    A.    I'm not sure exactly the timeframe.  I believe six

12    months but maybe a little bit longer.

13    Q.    Okay.  So you can't testify to any of Mr.

14    Armento's job searching that took place prior to becoming

15    his roommate, isn't that correct?

16    A.    That's correct.

17    Q.    Did Mr.  Armento ever drive you to the emergency

18    room in the VRQ van?

19    A.    He drove me to doctors' appointments I had.  I

20    don't remember if I ever went to the emergency room or

21    not but, yes, doctors appointments.

22    Q.    Was that helpful to you?

23    A.    Yes, very much.

24    Q.    Did you ever do van driving yourself?

25    A.    I cannot drive due to seizures.

CROSS - DARNELL

1  Q.      I'm sorry?

2  A.      I said I am unable to drive due to seizures.

3  Q.      Gotcha.  Did you perform service hours yourself?

4  A.      I did until eventually I didn't because of -- I

5  was having seizures and stuff like that and my doctors

6  said, you know, I can't work a set schedule.  So I did do

7  that until I was having seizures in the kitchen, and I

8  was having seizures in the computer lab to where it

9  wasn't medically feasible.  After that I would volunteer

10 when I could.

11 Q.      When you performed service hours, what kind of

12 work did you do?

13 A.      Okay.  I worked in the kitchen.  I'm a trained

14 chef, so I would be put in charge of the kitchen on a

15 shift and help the kitchen run smoothly.  I would assign

16 tasks to volunteers or assign tasks to service hour

17 people to make sure food got out in time, it was the

18 right quality, and all that.

19 Q.      Was your work in the kitchen of benefit to the

20 VRQ?

21 A.      Yes.

22 Q.      How did it benefit the VRQ?

23 A.      It was man hours and help that a certified chef,

24 certified chef instructor, was on the premises.

25 Q.      Did you need any training to become a chef for the

## CROSS - DARNELL

1  VRQ?

2  A.    Not for the VRQ.  I was a chef prior to that.

3  Q.    Were you provided a schedule of when you would

4  perform your service hours?

5  A.    Yes.  They were always scheduled in advance.

6  Q.    Could you work service hours if you were not

7  scheduled for them?

8  A.    You could volunteer if you so choose.

9  Q.    Okay.  But could you show up when you were not

10  scheduled and ask to work extra hours?

11  A.    I was always welcome in the kitchen to help any

12  time.  There were times, just like now, when I show up to

13  do events.  I mentor the culinary class we have there.  I

14  help teach the culinary class that I have there -- that

15  we have there.  So, yes, in my situation if I wanted to

16  do more I could.

17  Q.    Okay.  What about someone who didn't have your

18  background and training?  Could they show up in the

19  kitchen any time they wanted to do service hours, or did

20  they need to stick to a schedule?

21  A.    If we need help then, yes, they can show up any

22  time in the kitchen.  I can only speak for the kitchen.

23  I can't speak for anywhere else.  We do have people that

24  come in and volunteer in the kitchen whenever we need

25  help, or they come and ask if we're going to need help

CROSS - DARNELL

1  that night even though they're not on the schedule.

2  Q.    What was your work experience prior to coming to

3  the VRQ?

4  A.    As far as after the military or with the military?

5  Q.    Most recently.  Before coming to the VRQ.

6  A.    Most recently, I was a chef.

7  Q.    Okay.  And you mentioned you had been trained as a

8  chef?

9  A.    Yes, ma'am.

10  Q.    What was your training?

11  A.    I have a degree from Texas Culinary Academy Cordon

12  Bleu.  So it's an Associates Degree in Culinary Arts.

13  Q.    Were you ever part of the Transitional Employment

14  Program at the VRQ?

15  A.    No, I was not.

16  Q.    Did your service hours in the kitchen at the VRQ

17  provide you with any additional training?

18  A.    Not for myself but for others, yes.  Someone who

19  isn't as qualified as I was to be in the kitchen we would

20  teach them -- we would set it -- if they only wanted to

21  wash dishes they would only wash dishes.  If they wanted

22  to learn how to cook we would teach them how to cook.  We

23  offered a culinary class as well.

24  Q.    You already had significant experience in the

25  kitchen at the time you came to the VRQ?

CROSS - DARNELL

1  A.      Correct.

2  Q.      What would have happened if you had refused to

3  perform service hours in the kitchen?

4  A.      I do not know.  I don't know.  I never refused

5  service hours.

6  Q.      Okay.

7  A.      I can give you an example of what happens when a

8  service hour employee doesn't show up.

9  Q.      What happens?

10 A.      So we would do a write-up that would go to their

11 case manager, and their case manager would discuss that

12 with them, and then whatever was decided between the case

13 manager.  And then the case manager would usually excuse

14 them from it or have them make up the hours.

15 Q.      Okay.  Did you ever see Mr.  Armento bring

16 computers or cash drawers from his work at the Honey

17 House to his room to work on there?

18 A.      I don't remember fully.  Is the Honey House the

19 fruit stand?

20 Q.      Yes.

21 A.      I believe there might have been a couple instances

22 that he did.

23 Q.      Were you aware he was setting up a camera

24 surveillance system for the Honey House?

25 A.      Yes.  He mentioned it at one time.

## DIRECT - MCELYEA

1   Q.      Do you know people from the VRQ who had trouble
2   finding a job outside the VRQ?
3   A.      Not with the people I dealt with daily, which
4   would be the kitchen staff and stuff like that.  There's
5   always restaurants.  There's always stuff like that.  So,
6   no, not that I'm --
7   Q.      Were the people from the kitchen people you mostly
8   dealt with?
9   A.      Yes.
10  Q.      You currently live in Permanent Supportive
11  Housing; is that correct?
12  A.      Correct.
13  Q.      Do you pay rent?
14  A.      I do.
15  Q.      How much do you pay?
16  A.      I pay $425 a month.
17  Q.      Is that a lower rent than you might pay if you had
18  to find housing somewhere else in Asheville?
19  A.      Yes.
20  Q.      Are you working at this time?
21  A.      I am.
22  Q.      What are you doing?
23  A.      I teach for AB-Tech.
24  Q.      All right.  Do you have a lease with the VRQ?
25  A.   I believe so.  I believe we sign leases.  I know

DIRECT - MCELYEA

1  it hasn't undated, since I signed my paperwork when I

2  went in to PSH.

3  Q.    How long is your lease for?

4  A.    I don't think it has a set time.  I'm not sure.  I

5  do not know.

6  Q.    Okay.  That's all my questions, Your Honor.

7        THE COURT:  Any redirect?

8        MR. DUNLAP:  Yes, Your Honor.

9              **REDIRECT EXAMINATION**

10       BY MR. DUNLAP:

11  Q.    When you were working in the kitchen did you-all

12  have community volunteers from outside the VRQ to help?

13  A.    Yes.  We have volunteers come in almost daily for

14  a minimum of lunch and dinner.Q.    Nothing further.

15       THE COURT:  Anything else?

16       MS. BROOKE:  No, Your Honor.

17       THE COURT:  May Mr. Darnell be released?

18       MR. DUNLAP:  Yes, Your Honor.

19       THE COURT:  Any objection?

20       MS. BROOKE:  No, Your Honor.

21       THE COURT:  Thank you, Mr. Darnell.  You may step

22  down.  You're free to go.

23              (Witness excused at 4:57 p.m.)

24       THE COURT:  Call your next witness.

25       MR. DUNLAP:  Your Honor, with the Court's

## DIRECT - MCELYEA

1   permission, I'll go get him.

2        THE COURT:  Please do.  Call your witness.

3        MR.  DUNLAP:  The witness is answering the call of

4   nature, Your Honor, and he will be in in just a minute.

5        THE COURT:  Then call a different witness.

6        MR.  CURRIDEN:  We would call Tim McElyea.

7        THE COURT:  Come forward to be sworn.

8             (Witness duly sworn at 4:59 p.m.)

9        THE COURT:  You may proceed.

10       MR.  CURRIDEN:  Thank you, Your Honor.

11                    **DIRECT EXAMINATION**

12       BY MR.  CURRIDEN:

13  Q.    Would you please state your full name, sir?

14  A.    My name's Tim McElyea.

15  Q.    And where do you work, sir?

16  A.    I'm the director at the Veteran's Restoration

17  Quarters.

18  Q.    What is your educational background?

19  A.    I attended East Tennessee State University, and

20  received a bachelors in business.

21  Q.    And are you a veteran?

22  A.    I am.  I'm a combat veteran.

23  Q.    What branch of the military did you serve in?

24  A.    Army.

25  Q.    And where and when did you serve?

**DIRECT - MCELYEA**

1  A.     I spent three years on active duty, seven in guard

2  and reserves.  My wartime deployment was in the Persian

3  Gulf.

4  Q.     All right.  How did you end up working at the VRQ

5  with ABCCM?

6  A.     Well, actually, I started as a volunteer in 2009.

7  My wife works with a company that did volunteer work

8  there in the kitchen.  She had just started.  She came

9  home one day, you know, told me that she was going to be

10  home late the next day because she was doing volunteer

11  work with her company.  I asked her where that was, and

12  she was like, you know, it was a program for homeless

13  veterans.  And I was like, I didn't know there was such a

14  thing.  Could you, you know, see if I could volunteer

15  too?  Could I go with you guys?  So she asked her boss,

16  her boss said yes, that would be great, and I started

17  going out with their cook team volunteering there.

18         I did that for a couple years, and then an

19  opportunity came up to work there.  I had a job that I

20  was, you know, working already and had been, you know, at

21  for a little while and -- but, you know, the opportunity

22  came up there to, you know, serve and make a difference

23  and, you know, I was always really impressed with, you

24  know, the operation there and the way ABCCM conducted

25  business and how they treated the veterans there with

DIRECT - MCELYEA

1  dignity and respect.  You know, of course, I jumped at

2  the opportunity to come on board.

3  Q.    And when did you start your employment there?

4  A.    I started there in 2014.

5  Q.    What was your position when you started?

6  A.    I started as the assistant director.

7  Q.    Now you're the director?

8  A.    Yes.

9  Q.    What are your responsibilities as director of the

10 VRQ?

11 A.    Well I generally, you know, oversee the operation

12 of VRQ.  Of course, I'm responsible for, you know,

13 outreach, community outreach, and, you know, help, you

14 know, get our message out about, you know, what we do and

15 make other veterans aware of, you know, that we exist

16 and, you know, this is what we do.

17 Q.    Do you supervise case managers?

18 A.    I do.

19 Q.    And did you do that from September of 2015 through

20 September of 2017?

21 A.    Yes.

22 Q.    And did that include Eugene "Slim" Jones,

23 Mr.  Armento's case manager?

24 A.    It did.

25 Q.    By the way, is Mr.  Jones still with the VRQ?

## DIRECT - MCELYEA

1  A.      He is not.

2  Q.      Do you know his current whereabouts?

3  A.      I do not.

4  Q.      In terms of the VRQ.  In general, is there

5  anything about the goals and objectives that you'd like

6  to add that Mr.  Rogers didn't already cover?

7  A.      No.  I think Reverend Rogers pretty much covered

8  it in detail.

9  Q.      Okay.  As far as the service hours program goes.

10 From your perspective as the director of the VRQ who

11 benefits most from service hours?

12 A.      Well I think that the residents do.  You know it's

13 rehabilitative.  Our goal is transitional housing.

14 That's our main goal.  But I think it helps veterans

15 reestablish community, and that's something that's very

16 important.  And, you know, being an active part of

17 community when we are able to get them in housing, and

18 the goal is for them to stay in housing and, you know, be

19 a productive part of society again.  And that means, you

20 know, contributing and that sort of thing.

21      I think there's a lot of aspects to, you know, the

22 service side of the program and it is something to keep

23 them engaged and active and participating in community.

24 You know, it certainly gives them an avenue to --

25 especially, you know, when they come on board and they're

## DIRECT - MCELYEA

1  trying to get, you know, reestablished and that sort of

2  thing, again, to keep them engaged and active and keep

3  their mind off of things.

4      There may be things that have brought -- or

5  reasons they have come to the program and that sort of

6  thing.  And it also helps them build comraderie with the

7  other veterans and the volunteers that we have and that

8  sort of thing, and really start establishing that

9  environment around them that's going to help them when

10  they transition out of the program.

11 Q.    And if the service hours program were eliminated

12 what would be the result in terms of how the veterans

13 spend their time?

14 A.    Well I'd certainly think it would be detrimental

15 to the veterans because that component then, you know,

16 goes away.  You know I personally feel like that, you

17 know, them having an avenue to be able to, you know, give

18 back and contribute and that sort of thing, you know,

19 helps them tremendously.  I would think, you know, that

20 they would certainly have more time to sit around.  You

21 know, I think it would exacerbate mental health issues

22 that we see coming in, substance abuse issues, you know,

23 and all of those kinds of things.  So I think it's really

24 important, you know, to keep them engaged.

25 Q.    And I take it you know Mr.  Armento?

DIRECT - MCELYEA

1  A.     I do.

2  Q.     And how do you know Mr. Armento?

3  A.     Well I know him from being a resident in our

4  program.

5  Q.     Okay. And the VRQ keep records related to

6  Mr. Armento's stay at the VRQ?

7  A.     Yes.

8  Q.     Are you familiar with his records, his file?

9  A.     I am.

10  Q.     Were those records generated at or near the time

11  of the events and things that they document?

12  A.     Yes.

13  Q.     And were they made by people with knowledge of

14  their contents and the things that they document?

15  A.     Yes.

16  Q.     And were the records kept in the course of ABCCM's

17  regularly conducted activities?

18  A.     Yes.

19  Q.     Was it ABCCM's practice to keep such records?

20  A.     Yes.

21        MS. RIPLEY: Objection. Your Honor, I'm not sure

22  which records we're talking about.

23        MR. CURRIDEN: I'm about to have him look at

24  some.

25        MS. RIPLEY: Okay.

## DIRECT - MCELYEA

1    THE COURT:  The objection, at this point, is

2  overruled.

3    BY MR.  CURRIDEN:

4  Q.    Mr.  McElyea, some of these have already been

5  admitted so I'm going to be jumping around just a little

6  bit.  Let me have you look, first, at Defendant's Exhibit

7  7 which is a multi-page document entitled "ABCCM Contract

8  for Success."  Are you familiar with that document?

9  A.    I am.

10  Q.    Is that an accurate copy of Mr.  Armento's

11  "contract for success" that was maintained in his ABCCM

12  file?

13  A.    Yes.

14  Q.    And what is the purpose of the contract for

15  success?

16  A.    The contract for success is -- it basically is a

17  vehicle to outline the veteran's goals while they're in

18  the program, and then list the objectives to, you know,

19  accomplishing the goals that, you know, they've set for

20  themselves.

21  Q.    And what are the -- let's just look at this --

22  well what are some of the typical goals that are included

23  in a contract for success?

24  A.    Well, of course, you know, we usually see

25  employment, education, you know, income.  You know, they

### DIRECT - MCELYEA

1   may have some other goals like, you know, to help them

2   with employment or whatever, like transportation, you

3   know, a personal vehicle.  You know, some of the other

4   ones may be, you know, reestablishing relationships with

5   family, you know, siblings, you know, sons, daughters,

6   you know, whatever the case may be.

7   Q.    All right.  At this time, Your Honor, we would

8   move Defendant's Exhibit 7 be admitted.

9         THE COURT:  Any objection?

10        MS.  RIPLEY:  No, Your Honor.

11        THE COURT:  Let it be admitted.

12            (Defendant's Exhibit 7 is admitted.)

13        BY MR.  CURRIDEN:

14  Q.    Let me have you look at Defendant's Exhibit 8

15  which -- it's a multi-page document, but we'll scroll

16  through and let you see the different pages.  My question

17  will be, are these part of the file that VRQ maintains

18  for

19  Mr.  Armento?

20  A.    Yes.

21  Q.    The first two were employee enrollment and change

22  notice forms.  Are those part of the file maintained on

23  Mr.  Armento at VRQ?

24  A.    Yes.

25  Q.    And the ABCCM new employee checklist?

DIRECT - MCELYEA

1    A.      Yes.

2    Q.      And documents related to his withholdings and

3    other documents upon becoming a paid employee?

4    A.      Yes.

5    Q.      And the date on, for example, this W-4.  What do

6    you see there at the date of this document?

7    A.      10/1/2015.

8    Q.      Okay.  And another employee withholding allowance

9    certificate.  Do you see a date at the bottom of this

10   document?

11   A.      Yes.

12   Q.      What date is that?

13   A.      10/1/2015.

14   Q.      All right.  And then an employee contact info

15   form.  Is that part of the file maintained on Mr.

16   Armento?

17   A.      Yes.

18   Q.      An authorization for payroll and direct deposits.

19   A.      Correct.

20   Q.      And what's the date on that one?

21   A.      10/1/2015.

22   Q.      And then there's a -- it looks like a canceled

23   check.

24   A.      Correct.

25   Q.      Is that part of the process of becoming a paid

## DIRECT - MCELYEA

1  employee?

2  A.    Correct.

3  Q.    And then there's a conflict of interest policy.

4  Is that something people sign upon becoming paid

5  employees?

6  A.    Yes.

7  Q.    And the date of that one is also October 1st of

8  2015?

9  A.    Correct.

10 Q.    And there's an electronic media policy also on the

11 same date?

12 A.    Correct.

13 Q.    And an acknowledgment of the receipt and

14 understanding of the drug and alcohol policy?

15 A.    Yes.

16 Q.    And, also, that's on October 1st of 2015?

17 A.    Yes.

18 Q.    All right.  At this time, Your Honor, we would

19 move that Defendant's Exhibit 8 be admitted.

20        THE COURT:  Any objection?

21        MS.  RIPLEY:  No, Your Honor.

22        THE COURT:  Let it be admitted.

23             (Defendant's Exhibit 8 is admitted.)

24        BY MR.  CURRIDEN:

25 Q.    I'd like to now turn your attention to Defendant's

**DIRECT - MCELYEA**

1    Exhibit 12.  Do you recognize that document?

2    A.     I do.

3    Q.     It's actually a 22-page document, but can you tell

4    us what this is?

5    A.     Yes.  Those are case notes.

6    Q.     And who prepares the case notes?

7    A.     The particular individual's social worker.  So

8    their case manager.

9    Q.     And are those something that are maintained as

10   part of the VRQ file for Mr.  Armento?

11   A.     They are.

12   Q.     And do they document his interactions and

13   discussions with his case manager?

14   A.     They do.

15   Q.     All right.  And would that include any issues or

16   problems he might be having with regard to his service

17   hours?

18   A.     It could, yes.

19   Q.     And would it also include efforts to find

20   employment outside the VRQ?

21   A.     Yes.

22   Q.     Would it include discussions or documentation

23   related to his contract for success?

24   A.     Yes.

25   Q.     And his pursuit of the goals outlined in his

## DIRECT - MCELYEA

1  contract for success?

2  A.     Yes.

3  Q.     At this time, Your Honor, we would move to admit

4  Defendant's Exhibit 12.

5         THE COURT:  Any objection?

6         MS. RIPLEY:  Yes, Your Honor.

7         THE COURT:  What's the basis?

8         MS. RIPLEY:  We still think that this document

9  has not been authenticated, and when Mr. Armento

10  testified earlier he pointed out errors in these case

11  notes.  We don't think it's been shown that they're an

12  accurate reflection of their conversations.  We certainly

13  would not like it to be admitted for the truth of --

14         THE COURT:  Well, first you said authenticated and

15  then you said that there is other evidence to doubt the

16  veracity of the document.  Now the veracity of the

17  document that goes to the weight, that doesn't go to

18  admissibility.  Correct?

19         MS. RIPLEY:  Correct.

20         THE COURT:  Let's talk about authentication.

21  What's wrong with the authentication that's been offered?

22         MS. RIPLEY:  We don't know that these case notes

23  were made close in time to actual conversations.

24         THE COURT:  Anything else?

25         MS. RIPLEY:  No.  I guess under our business

## DIRECT - MCELYEA

1  records rule that's our main objection.

2      THE COURT:  As to that objection, that is

3  sustained with the present foundation that has been laid.

4              **FURTHER DIRECT EXAMINATION**

5      BY MR.  CURRIDEN:

6  Q.     Mr.  McElyea, you mentioned that you -- that as

7  part of your responsibilities you supervised case

8  managers.  Is that correct?

9  A.     Correct.

10 Q.     And upon meeting with case managers what did those

11 discussions entail?

12 A.     When I meet with case managers in general?

13 Q.     Correct.

14 A.     We talk about, you know, the folks that are on

15 their case load and, you know, what we're looking at with

16 them, what their progress is, you know, issues that

17 they're having, you know, and that sort of thing.  It's

18 part of a file audit process as well.  So I'll have

19 meetings with them and they'll bring their case files in

20 and we'll look at them, because case files are subject to

21 federal audits as well through the VA.

22 Q.     And how frequently do you meet with case managers?

23 A.     At least once a month.  But it -- you know, it

24 depends too.  If there are pressing issues or that sort

25 of thing, we'll meet more frequently.  I have a senior

### DIRECT - MCELYEA

1  case manager, as well, that -- actually, she's the

2  assistant director now.  But they have meetings weekly

3  and have discussions and meet monthly.

4  Q.    In this case did you meet with Eugene "Slim" Jones

5  monthly more or less?

6  A.    Yes.

7  Q.    And did those meetings include discussions of

8  Mr.  Armento's case?

9  A.    They did.

10 Q.    Were the discussions -- what was -- what role, if

11 any, did the case notes play in those discussions?

12 A.    Well, of course, we would review the case notes,

13 you know, from the meetings that you know he would have

14 and, you know, give me updates on what's going on with

15 him and that sort of thing.  So we would look at the

16 documentation.

17 Q.    And from those meetings were you able to determine

18 if the case notes were made by Mr.  Jones at or near the

19 time so that he had had his interactions and meetings

20 with Mr.  Armento?

21 A.    Yes.  I mean when we met it was, you know,

22 reviewing what they had done for -- like, for example,

23 you know, if you've got me pulled up on the screen we

24 would meet, I don't know, probably around the first week

25 or two in June and look at what -- you know, what

## DIRECT - MCELYEA

1  happened the previous month.

2  Q.    All right.  Your Honor, at this time we would

3  renew our motion to admit Defendant's Exhibit 12.

4        THE COURT:  Any objection?

5        MS.  RIPLEY:  Your Honor, I'll renew my objection

6  on the same basis.

7        THE COURT:  Okay.  That's overruled.  The

8  particular objection regarding whether or not the records

9  were kept at or near the time of the provision of the

10  information has now been added to the foundation and,

11  therefore, Exhibit 12 will be admitted.

12             (Defendant's Exhibit 12 is admitted.)

13        MS.  RIPLEY:  We also object to the relevance of

14  this exhibit.  We think that the notes regarding what

15  Mr.  Armento and his case manager discussed have nothing

16  to do with whether he was in an employer - employee

17  relationship and whether any of defendant's affirmative

18  defenses are valid.

19        THE COURT:  Since I have not read this document

20  yet I have no idea whether or not they are relevant so

21  I've admitted the document.  If it turns out that it is

22  irrelevant I will ignore it.

23        MS.  RIPLEY:  Okay.

24        THE COURT:  You may proceed, Mr.  Curriden.

25        MR.  CURRIDEN:  Thank you, Your Honor.

DIRECT - MCELYEA

**FURTHER DIRECT EXAMINATION**

1  BY MR. CURRIDEN:

2  Q.    Are you familiar, Mr. McElyea, with the intake

3  process for new VRQ residents?

4  A.    Yes.

5  Q.    Is there anything in that process, in general,

6  that would give them, a new resident, the expectation

7  that they would be paid for service hours?

8  A.    No.

9  Q.    As far as you know, was there any indication

10  during Greg Armento's intake that he would be paid for

11  service hours?

12  A.    No.

13  Q.    How was it determined where Mr. Armento would do

14  his service hours?

15  A.    Each resident is given a form which I think we saw

16  earlier of, you know, where their preference would be to

17  do service hours.  Now, of course, you know, we always

18  try to meet that preference and get them, you know, where

19  they would like to be.  You know sometimes we're

20  successful at that, sometimes we're not, and it's based

21  on need.

22       For example, with computer lab or what have you,

23  you know, there's only so many slots in there that we can

24  have because it's a really small area.  So if we can't

## DIRECT - MCELYEA

1   accommodate then, you know, we look at, you know, skill

2   set-wise and that sort of thing, you know, and where else

3   that we could use them.  Of course, in Mr.  Armento's

4   case, he's very articulate, intelligent, knowledgeable

5   with computers and that sort of thing.  You know, we

6   moved him over to the front desk because he showed

7   aptitude to be able to do that skill with computers and

8   that sort of thing.

9   Q.    Do you know why in this case where he put his

10  choice would be computer lab why he ended up at the front

11  desk?

12  A.    I don't off the top of my head, no.  My guess

13  would be, you know, maybe we had full slots in there or

14  something like that.  There could have been some openings

15  at the front desk that we, you know, moved him over, but

16  I don't know that for a hundred percent certainty.

17  Q.    And did Mr.  Armento become involved in the

18  thousand hours Transitional Employment Program?

19  A.    Yes.

20  Q.    And when did that occur?

21  A.    It was September, October, somewhere in there of

22  '15.  I believe it was '15.

23  Q.    And upon entry into the thousand hours program how

24  much time was he expected to work in that program, and

25  how much time was he expected to do service hours?

**DIRECT - MCELYEA**

1  A.      Well, of course, it's a thousand hour program.

2  You know, probably the average would have been, you know,

3  about 20 hours a week.  In the thousand hour program, you

4  know, in accordance with the service hour guidelines, he

5  would have been working probably about ten service hours

6  I think.

7  Q.      And during his time there were there any VRQ grant

8  per diem program residents who were working for pay

9  within the facility who were not part of the thousand

10  hours program?

11 A.      No.

12 Q.      And who was in charge of overrseeing how

13 Mr.  Armento's time was divided at the front desk between

14 the thousand hours program and the service hours?

15 A.      That would have been the front desk supervisor,

16 Randy Gamble.

17 Q.      I know we've heard others testify about this but I

18 want to get your take on it.  Did Mr.  Gamble have

19 authority to make someone work more than the minimum

20 requirement for service hours?

21 A.      No.  Again we could ask, you know, if the need was

22 there, but no.

23 Q.      And were people free to refuse when asked?

24 A.      Yes.

25 Q.      And would there be any negative consequences for

**DIRECT - MCELYEA**

1  their refusal to work more than the minimum requirement

2  of service hours?

3  A.      No.

4  Q.      Going back to the contract for success.  And I

5  don't know that we need to look at it specifically.  The

6  last one of Exhibit 7 is dated October 15th of 2016,

7  almost a year before Mr.  Armento left the VRQ.  Are you

8  familiar with that?

9  A.      Can you say that one more time?

10 Q.      Well let's go ahead and look at Exhibit 7, the

11 contract for success.

12 A.      Yes.

13 Q.      These are in reverse chronological order so the

14 last one is October 15th of 2016.  Do you see that?

15 A.      Yes.

16 Q.      And as far as you know is that the last time he

17 did a contract for success?

18 A.      Just to be perfectly honest I am not sure.

19 Q.      Okay.  Let me have you look back at the case

20 notes.  I'm referring to the one there from September

21 16th 2015.  So if he came into the program around

22 September 2nd this would be about two weeks into his stay

23 there.  Is that accurate as far as you know?

24 A.      Yes.

25 Q.      The second sentence of this one says, "Veteran

1  said he has started working at the front desk for his

2  service hours."

3  A.      Correct.

4  Q.      Based on your interactions with the case manager

5  did you have an understanding as to whether Mr.  Armento

6  knew the difference between service hours and paid time?

7  A.      He did.

8  Q.      It goes on to say that -- in the last sentence --

9  he said that he is staying sober and hopeful he will get

10  a paying job soon.

11  A.      Correct.

12  Q.      What does that tell you about whether he had

13  become involved in the thousand hours program at that

14  point?

15  A.      That he was not involved in the thousand hour

16  program at this point.

17  Q.      Let me have you look at October 2nd of 2015.  The

18  first sentence there.  Are you able to see that?

19  A.      Yes.

20  Q.      "The veteran said he's having problems at the

21  front desk.  He said he is working there part-time and

22  also doing his service hours there."  What does that

23  tell you about his understanding as to whether he was

24  still required to do service hours at that point?

25  A.      That there was an understanding that he had a

## DIRECT - MCELYEA

1  service hour component that -- obligation that needed to

2  be fulfilled, you know, as part of being a resident in

3  the program.

4  Q.    It says there he said that Randy has been making

5  him work way over the ten additional hours that he is

6  supposed to do with his service hours.  "C.M."  Does that

7  stand for "case manager?"

8  A.    Yes.

9  Q.    Case manager asked him if he has brought it to

10  Randy's attention, and veteran said that he has not.

11  Case manager suggested to him that he discuss the matter

12  with Randy first because he is his supervisor.  Veteran

13  said he is unable to talk to Randy, and he plans on going

14  to Marc to discuss the matter.

15      MS.  RIPLEY:  Your Honor, I object to this.  This

16  is hearsay and should not be relied on for the truth of

17  the matter asserted.

18      THE COURT:  This document came in under 803.6.

19  It's already been admitted under that basis.  That's a

20  hearsay exception.  Overruled.

21      BY MR.  CURRIDEN:

22  Q.    It goes on to say:  Veteran said he is going to

23  follow that chain of command on this matter.  Once again,

24  case manager suggested he start with his supervisor

25  first.  Veteran said he was going to do what he wanted to

1    do.

2         Was this part of the discussions between you and

3    Mr. Jones about Mr. Armento's case?

4    A.    Yes.

5    Q.    And what was your understanding, at that point, of

6    Mr. Armento's willingness to go through proper channels

7    and be engaged in the program?

8    A.    Well, you know, at this point, especially with him

9    being new, you know, to the program and coming in, you

10   know, my hope was that as he become a little more

11   acclimated with the VRQ and that sort of thing, maybe let

12   his guard down a little bit, you know, that he'd be more

13   open to discuss and use the chain of command and that

14   sort of thing.

15   Q.    Let me have you look at the next date, 11/2 of

16   2015.  In The second sentence there it says he said that

17   he is still having problems at the front desk but he said

18   that he is going to handle it himself.  Once again, case

19   manager suggested to him that he discuss his issues with

20   Randy.  Veteran explained to case manager that he knew

21   what he needed to do.

22         Was Mr. Armento, in terms of your understanding

23   and the meeting with his case manager, expressing a

24   willingness to work out the issues there with the

25   supervisor?

## DIRECT - MCELYEA

1  A.      Right around this point I was on medical leave.   I

2  was on medical leave for about six or eight weeks, so

3  this particular starts getting into, you know, when I was

4  on medical leave.

5  Q.      I take it you were back from medical leave by July

6  of 2016; is that correct?

7  A.      Oh, yeah.   Yes.

8  Q.      And on July 13th, the third sentence there says he

9  told case manager that he is now working at the Smoky

10  Mountain Honey House produce stand down the street from

11  the VRQ, and he was asked to bring in verification that

12  he was employed.   What was the purpose of the

13  verification of the outside employment?

14  A.      Well there was a couple of things because, you

15  know, you can see there, too, that, you know, he had

16  savings.   So we wanted to, you know, verify that he was

17  working and contributing to his savings but also wanted

18  to, you know, verify the employment and that sort of

19  thing.   You know, a service hour adjustment would have

20  been made, you know, in accordance with that.   Most guys

21  when they, you know, get jobs -- actually, all guys when

22  they get jobs we ask for, you know, verification and that

23  they're employed and that sort of thing.   Of course, you

24  know, we want to make the service hour adjustment as

25  well.

## DIRECT - MCELYEA

1  Q.     What was your understanding of the amount of time
2  he was working for the honey house?
3  A.     That he was working about 20 hours a week.
4  That's, you know, what he reported.  And, you know, he
5  was making $10 an hour.  So that was my understanding of
6  what he was doing.
7  Q.     And that's documented in the next note.
8  A.     It is.
9  Q.     July 22nd of 2016?
10 A.     Right.
11 Q.     So by working 20 hours a week would he still be
12 required to do service hours?
13 A.     Well he would have been working on a part-time
14 basis.  So yes.
15 Q.     Was Mr. Armento required to do service hours the
16 whole time he was at the VRQ?
17 A.     He was not.
18 Q.     Why not?
19 A.     When he started getting closer to his grant per
20 diem stay being over I had a discussion with his case
21 manager and, you know, told his case manager, hey, we
22 need to, you know, make sure that he's totally focused on
23 employment and getting housing.  So let's pull him off
24 service hours and let him focus on -- you know put his
25 full focus on getting employment and getting housing.

## DIRECT - MCELYEA

1  Q.      And who all was involved in making that decision?

2  A.      That was myself and his case manager.

3  Q.      Do you know when he was told he no longer had to

4  do service hours?

5  A.      I think it was January or February 2017.  I think

6  at that point he was, you know, right around having six

7  months left in the program mark.  And, you know, for

8  employment and to get housing, you know, you're going to

9  have to have a little bit of time to be able to do that

10 and, you know, save some money and that sort of thing.

11 Q.      All right.  Let me have you take a look at the

12 note from February 13th of 2017.  Are you able to see

13 that up there?

14 A.      Yes.

15 Q.      The third sentence there says:  Veteran then

16 turned in a copy of his bank saving statement.  He

17 currently has $5.07 in his account.

18         Why is that something that is reviewed and

19 documented in the case notes?

20 A.      Well we have a requirement with our program to

21 save 60 percent of disposable income.  That's why we put

22 together a budget, you know, with the program

23 participants.  So it's -- you know, we notate it in there

24 so we can kind of see progress and, you know, where

25 they're standing and that sort of thing.  Again, you

## DIRECT - MCELYEA

1  know, he's getting close to exit at this point, or his

2  term being up with us, so, you know, we really need to

3  make some significant progress here in, you know, trying

4  to getting employment, save some money, and that sort of

5  thing.

6  Q.    It goes on to say:  Case manager then asked

7  veteran why he is not able to stick to his savings money

8  sheet and save any money.  The veteran stated he is not

9  working the same amount of hours that he was before.  He

10 stated he is now waiting for his income tax refund.  Case

11 manager pointed out he only has seven months in the

12 program.  Case manager then asked veteran if he has put

13 in any applications for employment.  The veteran said he

14 has not.

15       What does that tell you about Mr. Armento's

16 efforts to find outside employment at this point?

17 A.    Well if he said he's not, you know, applying, you

18 know, at different places, you know, I think his chances

19 for his employment are not very good, you know, if you're

20 not applying.

21 Q.    It then goes on to say, case manager then gave

22 veteran contract information for Labor Max Staffing.

23 Case manager explained to him that they really like

24 working with veterans, and there are a few veterans that

25 live at the VRQ that are working there.  Veteran then

## DIRECT - MCELYEA

1  told case manager he prefers -- I think that should be

2  white collar job.  Case manager explained to veteran that

3  Labor Max has all types of jobs and that he should focus

4  on just getting some income coming in and later focus on

5  the type of job he really likes.  Case manager then

6  reminded him how fast seven months can go.  After lengthy

7  discussion case manager asked veteran to keep me posted

8  on his job search.  Veteran said that he would do so.

9        As far as you recall, in Mr. Armento's case, what

10  do you recall about his efforts to find employment from

11  this point until he left the VRQ in September of 2017?

12  A.      Well I think in some of the case notes here, and

13  in some of the discussion that I had, that he was really

14  focused on his lawsuit against us.  You know, I had

15  talked to his case manager and that sort of thing about

16  that we need to, you know, be focused on the issue at

17  hand.  We're not, you know, discussing the lawsuit or

18  anything like that.  We need to be discussing employment

19  and housing and, you know, the plan for exit and

20  self-sustainability.

21  So, you know, that was pretty much, you know, our take on

22  it.  That, you know, we wanted to try to keep focus on

23  the pertinent issues and the reasons that, you know,

24  veterans come into the program and, you know, continue to

25  work toward making that transition in to permanent

## DIRECT - MCELYEA

1   housing and self-sustainability.

2   Q.    All right.  I'd like to have you look at the note

3   for the next month.  And we're not going to --

4   thankfully, we're not going to read this whole thing.

5   I'd like to direct your attention -- well, first of all,

6   at the very top, the note from 3/14 indicating veteran

7   turned in a copy of his bank savings statement.  Veteran

8   currently has $55.07 in his account.

9        What does this indicate about Mr.  Armento's

10  ability or efforts to work and save money to prepare for

11  his exit?

12  A.    Yeah.  Well he's not -- you know he's not saving

13  any money at this point, you know.  And I think at this

14  point, too, we weren't seeing a lot of movement on the

15  job front either.

16  Q.    All right.  Then I'd like to direct your attention

17  to about two-thirds of the way down.  Here we go.  If you

18  can see the cursor there.  Veteran said that at this time

19  he has no exit strategy and he was not going to work on

20  one.  He said that he has been studying law so that he

21  could get ready for the lawsuit he has with the VRQ.

22  Once again, case manager explained to him he doesn't need

23  to discuss his lawsuit with me.  Case manager then

24  pointed out to veteran that in the last six months he has

25  been at the VRQ he has reported that he's earned $1,480

## DIRECT - MCELYEA

1  and also received his income tax check but now only has

2  $55.07 in his savings account.  Case manager strongly

3  suggested to veteran that he start bringing in some

4  income before his discharge date from the VRQ.  Veteran

5  said that he would have some income and he was not

6  worried about it.

7        What does this tell you about his level of

8  engagement or involvement in the program to find

9  permanent housing and outside employment?

10 A.    Yeah.  Well, I mean, again, you know, not a lot of

11 movement on the job front or, you know, locating housing.

12 You know, in my opinion, and in looking at the notes and

13 speaking with his case manager and that sort of thing,

14 the focus was on, you know, litigation against ABCCM

15 versus, you know, finding a job, finding employment, you

16 know, housing and that sort of thing.

17 Q.    Then just moving to the next case note from April

18 13th of 2017.  It says -- the third or fourth sentence

19 there says case manager then explained to veteran that

20 his contract for success was going to end on April 15th

21 of 2017 and it needed to be updated.  Veteran explained

22 to case manager he was not going to update it.  He then

23 started to discuss what was going on with his lawsuit

24 against the VRQ.  Once again case manager explained to

25 him that I did not need to know about his lawsuit.

## DIRECT - MCELYEA

1    What does this document about his willingness to
2 set goals, pursue those goals, and engage in the services
3 and the program being offered to him there at the VRQ?
4 A.    Well, I mean, you know, I think it's pretty much
5 what I've said earlier.  At this point he -- you know his
6 time is continuing to shrink at this point, and he's
7 going to probably have three, maybe four months left in
8 the program.  So, you know, he's -- to me, he was just
9 going to, you know, ride out the rest of his time there.
10 Q.    And then let me scroll to the next one.  Again, I
11 don't think we need to read this whole thing of May 25th
12 of 2017, but let me just ask you.  Are you aware of
13 opportunities for Mr.  Armento to be placed in housing --
14 permanent housing through the HUD VASH program?
15 A.    There were housing interventions available and
16 offered.  Again, you know, with housing and housing first
17 there's really two tracks.  There's housing first moving
18 into, you know, housing -- this is initially when you
19 come to the program and you're offered two tracks, the
20 housing first or to stay in the main, you know, in GPD,
21 the grant per diem, which is what, you know, Greg had
22 chosen to do and not pursue housing.  We had -- I think
23 in testimony earlier we had talked about, or someone had
24 mentioned the VI-SPDAT.  It's a vulnerability index.
25 Q.    What was that the VI-SPDAT?

DIRECT - MCELYEA

1  A.     Yeah.  It's called VI-SPDAT.  It's a vulnerability

2  index.

3  Q.     Okay.

4  A.     It's basically based on a series of questions and

5  gauges the vulnerability for housing.  So just to give

6  you an example.  It's on -- basically, the way that we

7  look at it with our community partners is if you score a

8  ten or above that makes you eligible for HUD VASH housing

9  intervention.  Nine to five makes you eligible for SSVF,

10 Supportive Services for Veteran Family intervention.  And

11 then anything less than a five you're basically eligible

12 for GPD.  But, again, that's up to the veteran to, you

13 know, say I want, you know, housing intervention or I do

14 not.  I want to go as the self-sustainability route.

15 Q.     What happened in Mr. Armento's case?

16 A.     Well initially when he came in I believe his

17 VI-SPDAT score at that point was a six, which would have

18 qualified him for SSVF and SSVF intervention.  And he

19 declined saying he wanted to, you know, stay in the grant

20 per diem program.  And we had had discussions with him

21 post that, especially when we were getting close here

22 about, you know, housing intervention and that sort of

23 thing.  I think in one particular instance that we talked

24 to or -- talked to him about it and he said he was

25 interested.  And we did a lot of leg work to, you know,

### DIRECT - MCELYEA

1  make an intervention happen for him at that point, and he

2  came back and said that he wasn't interested at that

3  time.

4  Q.    All right.  And for either of those programs, the

5  one that you mentioned he qualified for early on and then

6  the leg work that was done subsequently.  When a vet goes

7  into those programs I take it they no longer have to do

8  service hours; is that correct?

9  A.    For housing intervention?  No, that's not correct.

10 If they're still in the GPD program the service hours is

11 based on their work schedule versus --

12 Q.    And my question maybe wasn't clear.  But if he

13 were to have accepted one of these other housing

14 interventions to go into the HUD VASH program, or the

15 earlier program, the USVF?

16 A.    The SSVF.

17 Q.    SSVF.  Does the vet continue to do service hours

18 after getting housing through one of those programs?

19 A.    Well after they get housing through one of those

20 programs they move out.

21 Q.    They're no longer at the VRQ?

22 A.    Right.

23 Q.    So obviously they're not doing service hours.

24 A.    Correct.

25 Q.    Down towards the bottom of this note here where

DIRECT - MCELYEA

1 the curser is, it says: He then explained to case

2 manager that he wanted another per diem at the VRQ. Case

3 manager then explained to him that the VA is not really

4 giving out second per diems to veterans at the VRQ when

5 the first one is not successful and if the veteran has

6 not been working on their goals. Veteran then explained

7 to case manager he would deal with his own issues. He

8 then left the office.

9       Are veterans able to qualify for multiple per

10 diems or multiple stints in the grand per diem --

11 A.     They can. And, kind of, let me explain how that

12 works. So if you're an eligible or qualified veteran

13 you're allowed three grant per diems for your lifetime.

14 Those grant per diems can be up to two years and they can

15 be used for a variety of different things. Tranitional

16 housing is one. A residential drug treatment program

17 would be, you know, another one that you could use, you

18 know, a grant per diem for. But after those three are

19 utilized you have to get special permission through the

20 VA to get any additional and it's difficult.

21       It's very difficult to get an additional grant per

22 diem after you've used three. Also, those grant per

23 diems don't have to be used in the same place. Sometimes

24 a grant will be granted by the VA to use consecutive GPDs

25 but that's extremely, extremely rare, also, to use them

## DIRECT - MCELYEA

1 in the same program. Because I think kind of the -- the

2 feeling amongst GPD providers, too, because GPD providers

3 have the right to say no as well. You know, that you had

4 three grant per diems it doesn't necessarily mean you

5 have to use them with a particular program.

6       So if a veteran has went through the program and

7 exhausted, you know, two years in that program and really

8 not came out with anything or made, really, any progress

9 or anything like that, you know, more than likely I'd say

10 99 percent of the time they're not going to be granted

11 another GPD to go back into that same program because

12 they weren't, you know, successful in that program on the

13 initial, you know, start.

14

15

16

17

18

19

20

21

22

23

24

25

CROSS - MCELYEA

1  Q.     All right.  Just changing gears a little bit.

2  Before Mr.  Armento was there ever any indication to you

3  that the service hours program was in violation of any

4  North Carolina or other wage and hour laws?

5  A.     No.

6  Q.     Thank you, sir.  Those are all my questions.

7         THE COURT:  Cross-examination.

8                 **CROSS-EXAMINATION**

9         BY MS.  RIPLEY:

10 Q.     Mr.  McElyea, when were you on medical leave in

11 2015?

12 A.     It was -- it was some time, I think, in November.

13 It was October, November, December, right in there.  I

14 can't remember the exact dates.

15 Q.     Were you back at work before Christmas?

16 A.     I believe so, yes.

17 Q.     Were you back by Thanksgiving?

18 A.     I'm not sure.  I don't think so.  I could have

19 been but I don't think so.

20 Q.     So probably most of November and early December

21 you were out?

22 A.     Maybe.  The piece that you spoke to Ms. Sczudlo

23 about, when she was here, I was not in the office for any

24 of that.

25 Q.     You were not in the office October 12th 2015?

## CROSS - MCELYEA

1  A.      Correct.

2  Q.      Thank you for remembering that.

3         A minute ago you said the VA would not grant

4  another grant per diem to someone who was not successful.

5  How does the VA measure whether someone is successful?

6  A.      There are metrics that you go by.  And, of course,

7  they would look at what happened in the program.  So, for

8  example, if they had a need of housing exit or bad

9  discharge, or they weren't successful in, you know,

10 employment or, you know, moving into housing or, you

11 know, anything like that then, you know, they're probably

12 not going to grant, like, an extension.  So, again,

13 that's kind of, you know, how it works.

14 Q.      You said they probably wouldn't grant an

15 extension, but do you know for sure that they don't grant

16 extensions if someone wasn't able to find their own

17 housing?

18 A.      Not for sure, no.  It kind of depends on, you

19 know, what's going on at the time in the VA and whether

20 it's granted or not granted, you know.  Because the focus

21 of the VA is really on, you know, housing first and

22 moving people into permanent housing.

23 Q.      Does the VA ask the grant per diem grantee -- so

24 in this case the VRQ -- Did they ask the VRQ for their

25 input as to whether someone should have a second per

## CROSS - MCELYEA

1  diem?

2  A.     We have liaisons that meet with us weekly.  So,

3  you know, the liaisons are pretty much kept abreast of,

4  you know, what's going on with the program participants

5  and that sort of thing.  So we could certainly, you know,

6  advocate but it doesn't necessarily mean that, you know,

7  one's going to be, you know, provided.

8  Q.     Okay.

9  A.     Certainly not one that's going to last another two

10 years.

11 Q.     I'm going to jump around a bunch here because I'm

12 responding to things that you testified to.

13        Was Mr.  Armento ever demoted after he reached the

14 pillar level?

15 A.     No.

16 Q.     In order to have someone drive for the VRQ they

17 have to be on the ABCCM auto insurance; right?

18 A.     Correct.

19 Q.     And to add to someone to your auto insurance they

20 have to have a driver's license and a clean driving

21 record?

22 A.     Yes.

23 Q.     In North Carolina, in order to get a driver's

24 license, you have to have your own auto insurance; right?

25 A.     Okay.  Sure.  I'm not up on DOT or, you know, that

CROSS - MCELYEA

1  sort of thing, but sure.

2  Q.    So Mr. Armento, as a driver, would have had a

3  driver's license and his own personal auto insurance?

4  A.    Yes.  He would have had a driver's license, yes.

5  I don't -- he wouldn't necessarily have to have his own

6  auto insurance.  Because if he's driving our vehicle

7  then, you know, he would be on our insurance.

8  Q.    And --

9  A.    I'm sorry.  I don't know in North Carolina if it's

10 a requirement that you, you know, have insurance to get a

11 license, especially if you don't, you know, have a

12 vehicle or whatever.

13 Q.    Okay.  ABCCM can add people to its auto insurance,

14 right, and ABCCM can take people off of its auto

15 insurance?

16 A.    Mm-hmm.  ("Yes.")

17 Q.    I'm sorry.  You were nodding.

18 A.    Yes.

19 Q.    Let me ask that again.  ABCCM can add people to

20 their auto insurance?

21 A.    Yes.

22 Q.    And ABCCM can take people off of their auto

23 insurance?

24 A.    Yes.

25 Q.    I know we're all getting tired but you still need

### CROSS - MCELYEA

1  to speak.

2      You were asked when did Mr. Armento enroll in the

3  -- enter into the TEP program, and I believe your answer

4  was September or October, somewhere in there.  Why don't

5  you know the actual date?

6  A.   In the six years that I've been there I've had

7  thousands of guys come through the program.  So I don't

8  remember, you know, exact dates for everything.  It's too

9  many folks.

10 Q.   But there isn't a document showing that he entered

11 the TEP program; right?

12 A.   Not that I'm aware of.  A specific document?  No.

13 Q.   You testified that you and Mr.- -- that you told

14 Mr. Jones --

15 A.   Correct.

16 Q.   -- Mr. Armento's case manager to tell Mr.

17 Armento to stop performing service hours.  Is that right?

18 A.   Correct.

19 Q.   Did you see any note about that in these case

20 notes that we just spent a while going through?

21 A.   I did not, no.

22 Q.   But you saw other notifications from Mr. Jones --

23 excuse me -- notations from Mr. Jones about service

24 hours conversations.

25 A.   As far as what?

CROSS - MCELYEA

1  Q.    We looked at some from early 2015 where Mr.  Jones

2  wrote down things that he and Mr.  Armento supposedly

3  discussed about service hours; right?

4  A.    I think I saw some documentation that said the

5  words "service hours" in it, yes.

6  Q.    But there aren't any notations that say the case

7  manager told Mr.  Armento he can stop performing service

8  hours.

9  A.    I didn't see any in these notes, no.

10  Q.    And you never told Mr.  Armento to stop performing

11  service hours?

12  A.    I did not personally, no.

13  Q.    When did Mr.  Jones stop working for the VRQ?

14  A.    Let's see.  I think around, maybe, January of this

15  past year.

16  Q.    Was he fired?

17  A.    He had attendance issues.

18  Q.    So was he fired?

19  A.    He was let go for attendance issues, yes.

20  Q.    Okay.  You don't know whether Mr.  Jones actually

21  met with Mr.  Armento before making these case notes.

22  A.    Do I know that he -- whether he did for sure or

23  not?

24  Q.    Yes.

25  A.    I don't know that for sure.  Usually, what happens

CROSS - MCELYEA

1  is when they sit down and the case managers sit down and

2  meet with them they document as they meet.

3  Q.    It's possible that Mr. Armento just turned in his

4  savings account statement and Mr. Jones made notations

5  saying something about the savings account.

6  A.    Say that again.  I'm not --

7  Q.    I think you-all have control right now of the

8  screen so I guess we need to transfer it to us.

9        As we looked through those case notes there's --

10  about once a month there's an entry that says --

11  A.    Yes.

12  Q.    -- really the same language over and over again.

13  Met with Mr. Armento.  He gave me his savings account

14  statement.  I told him he needs to save more money.

15  Something along those lines; right?

16  A.    Yes.

17  Q.    And it includes the amount that's in his savings

18  account?

19  A.    In the savings, yes.

20  Q.    And it's possible that Mr. Jones was creating

21  those case notes just based on a piece of paper that

22  Mr. Armento turned in as opposed to a face-to-face

23  meeting.

24  A.    Sometimes what happens with guys, because the

25  schedules are, you know, for the resident and for the

1  case managers, because they -- you know, of course, they

2  have case loads and other people that they meet with.

3  They have deadlines set up for everybody to turn in their

4  bank statements.  And then when they meet with them they

5  will talk to them about bank statements and how much

6  money they have in their savings accounts and that sort

7  of thing.  So it's not always that the program

8  participant walks in with the bank statement and meets

9  and talks about, you know, about how much money they have

10  right then.  They could turn the statement in, and then

11  in their next meeting the case manager sits down with

12  them and discusses it.

13  Q.    And the case managers had sort of a checklist of

14  things they were supposed to go over with their

15  residents?

16  A.    Sure.

17  Q.    Was whether or not you're staying sober on that

18  checklist?

19  A.    Yes.

20  Q.    So there's a bunch of entries in there that say

21  Mr. Armento reported that he's staying sober.  Why would

22  he report that he's staying sober if he didn't have a

23  drinking problem?

24  A.    Because a guy is sober now doesn't necessarily

25  mean he'll be sober later.  Because we see a lot of, you

1  know, folks that come in and say, you know, I don't have

2  a problem, and then a problem shows up.  Or I don't have

3  a problem and then a problem develops.  So, you know,

4  that's an important piece of being there.  Because just

5  to be perfectly honest, you know, a large percentage of

6  our population do have substance abuse issues.

7  Q.     But when Mr.  Jones writes Mr.  Armento reports he

8  is staying sober that's because Mr.  Jones asked, are you

9  staying sober?

10  A.     Sure.

11  Q.     What kind of training do the case managers get?

12  A.     From where?

13  Q.     From the VRQ?

14  A.     We have different classes at different times that

15  they go through.  Motivational interviewing.  Crisis

16  intervention.  Those are, you know, just a couple.  And

17  we have a couple of those classes offered a year.

18  Q.     How many residents does each case manager handle?

19  A.     Usually around 25.  That number can go up or down,

20  you know, based on the population that we have at the

21  time.  But usually that -- right about that 25 mark.

22  Q.     And do they have to have a background in social

23  work or counseling or anything?

24  A.     The majority of our case managers are social

25  workers.  Now, you know, we have some that, you know,

CROSS - MCELYEA

1   have degrees in psychology or, you know, something like

2   that, but the majority of our staff are all social

3   workers.

4   Q.      So you would ask for social work or a related

5   field?

6   A.      Yeah.  We have BSWs and MSWs, the majority.

7   Q.      Sorry.  What was that first acronym?

8   A.      Bachelors in Social Work.  BSW.

9   Q.      Okay.  When Mr. Armento first enrolled at the VRQ

10  you weren't part of his intake interview?

11  A.      No, I was not.

12  Q.      You didn't go over the handbooks with him?

13  A.      I did not.

14  Q.      And you didn't go over service hours requirements

15  with him?

16  A.      I did not.

17  Q.      And those service hour requirements.  Those are a

18  VRQ requirement.  It's not a VA requirement; right?

19  A.      Correct.

20  Q.      And I believe you said that he was assigned to the

21  front desk as opposed to the computer lab because there

22  was an opening at the front desk?

23  A.      I said there could be, yes.

24  Q.      Okay.  But you're not sure?

25  A.      I'm not sure, no.

**CROSS - MCELYEA**

1  Q.      Did they --

2  A.      It would make sense because usually if that -- if

3  they put a preference on there and they can't get that

4  preference then, yeah, we'll try to fall back to

5  something that's, you know, still in their wheel house

6  and will be, you know, we'll try to line up an

7  appropriate --

8  Q.      But the ABCCM didn't create a new position for

9  Mr.  Armento at the front desk.

10  A.      No.  No.

11          THE COURT:  Ms.  Ripley, how much longer do you

12  expect to take with this witness?

13          MS.  RIPLEY:  I think ten minutes at the most.

14          THE COURT:  Okay.  Let's go ahead and finish him

15  up.

16          BY MS.  RIPLEY:

17  Q.      And you could have told the front desk managers

18  not to let Mr.  Armento drive the vans anymore; right?

19  A.      Yeah, I could have.  Sure.

20  Q.      I believe you said in your affidavit that ABCCM

21  does not have VRQ residents perform service hours in any

22  area where ABCCM might earn a profit.  What areas does

23  ABCCM earn a profit?

24  A.      I'm going to be honest.  I can't think of any area

25  in ABCCM that we would earn a profit.

## CROSS - MCELYEA

1  Q.     So what did you mean by that in your affidavit?

2  A.     That if there was at some point in time some area

3  that, you know, we could earn a profit from that we would

4  not allow our program participants to participate in

5  that.

6  Q.     Are you involved at all in the payroll process for

7  ABCCM?

8  A.     Somewhat, yes.

9  Q.     We looked at a bunch of documents earlier, and in

10  Mr.  Armento's employee -- personnel file, I guess, is

11  how it was referred to -- it was Defendant's Exhibit 8 --

12  that were signed on October 1st 2015.  Do you remember

13  that?

14  A.     Not off the top of my head but okay.

15  Q.     Well what I actually want to show you is one of

16  our exhibits so let me go to that.  Okay.  So what I'm

17  showing you is a front desk weekly schedule.  Do you see

18  that arrow?

19         THE COURT:  There's nothing on the screen.

20         BY MS.  RIPLEY:

21  Q.     I'm sorry.  I apologize.  Thank you for stopping

22  me.  I'm rushing now.

23         Let me know when you can see it please.

24  A.     Okay.

25  Q.     Okay.  So this is a front desk weekly schedule.

## CROSS - MCELYEA

1  Do you see that note that says "start payroll" with the
2  arrow?
3  A.    Okay.
4  Q.    Are you familiar with the pay periods for the VRQ?
5  A.    I am.
6  Q.    They're two-week pay periods; right?
7  A.    Yes.
8  Q.    So this one would have started on October 17th and
9  ended right around October 1st or 2nd.  I can't do that
10 math.
11 A.    Okay.
12 Q.    So all those October 1st documents were filled out
13 before the end of the pay period, although they were
14 after the beginning of the payroll.
15 A.    Okay.
16 Q.    Did you take any affirmative steps to investigate
17 whether the service hours, the unpaid service hours, were
18 legal?
19 A.    As far as with Mr. Armento or what?
20 Q.    Mr. Armento or in general.
21 A.    No.  That program was in existence when I came on
22 board --
23 Q.    Okay.
24 A.    -- and had been for many years.
25 Q.    I believe you testified that Randy Gamble didn't

CROSS - MCELYEA

1  have the authority to require people to work additional

2  service hours.  You were Randy Gamble's supervisor;

3  right?

4  A.     Correct.

5  Q.     So you could tell him to stop doing something if

6  he was doing something inappropriate; right?

7  A.     Correct.

8  Q.     I think I'm finished.  Let me just look at my

9  notes real quick.

10         Do you have any mental health training?

11 A.     Me, personally?

12 Q.     Yes.

13 A.     No.

14 Q.     Or substance abuse training.

15 A.     No.

16 Q.     You testified earlier that you thought it would be

17 -- that it would exacerbate mental health issues and

18 substance abuse issues if residents weren't required to

19 work service hours.  That's just your opinion.  It's not

20 based on any training or --

21 A.      It's not based on any training.  However, I have

22 done this for six years and been around thousands of

23 veterans and been a veteran myself, a veteran that has

24 worked with other combat veterans, such as myself, and

25 worked with the VA's social work team and our social work

1  team and social work teams in my community.

2  Q.     Based on that, you know it's good for people to be

3  occupied --

4  A.     Yes.

5  Q.     -- so that they don't have substance abuse

6  relapses or --

7  A.     I think even being occupied there's still that

8  risk.  But I think with them being occupied and active

9  and having purpose that it mitigates those risks to an

10  extent.  Yes.

11  Q.     Back at the beginning of the questioning you were

12  looking at a contract for success, and I believe you

13  listed a handful of the kind of typical goals that show

14  up in the contract for success.

15  A.     Sure.

16  Q.     Are there actually standard goals that are

17  supplied for the contract for success?

18  A.     There can be.  We really try to work with the

19  veteran to, you know, reach the goals that they want to

20  reach.  Now, of course, you know, employment and housing,

21  you know, is our primary goal.  Again, it's based on, you

22  know, the individual -- the individual person.

23  Q.     In terms of your experience working with the VA's

24  social work team and being a veteran yourself.  I'm

25  backing up to a question from a moment ago where you said

1  you think being occupied is good to help people who have

2  substance abuse or mental health issues.

3  A.    Sure.

4  Q.    If they were paid for the work that they were

5  doing could it still be beneficial?

6  A.    Of course.

7  Q.    No further questions.

8       THE COURT:  Anything else?

9       MR.  CURRIDEN:  Just brief -- very briefly, Your

10 Honor.

11           **REDIRECT EXAMINATION**

12      BY MR.  CURRIDEN:

13 Q.    Mr.  McElyea, the vets who come into the VRQ

14 program.  Are they ideal candidates to do the work that

15 is to be done around the VRQ?  In other words, if all the

16 objective was was to get the work done, would these be

17 the --

18 A.    No, they would not be the ideal candidates.  We

19 make, you know, a lot of allowances and, you know, we're

20 a place of grace and mercy and, you know, really believe

21 in showing that and, you know, we give a lot of latitude.

22 Q.    All right.  And you were asked about the front

23 desk schedules.  And I believe -- if I can have the

24 screen.  Does this exhibit, Defendant's exhibit 9, appear

25 to be accurate copies from Mr.  Armento's file of the

**REDIRECT - MCELYEA**

1  front desk schedules?  It looks like they go from

2  September 13th of 2015 through November 14th of 2015.

3  A.    Yes.

4  Q.    And if we look at page 2, but it's the earliest

5  date, September 13th.  It indicates there service hours,

6  and under "service hours" is Greg Armento's name;

7  correct?

8  A.    Yes.

9  Q.    Is this something he would have seen, as somebody

10  working at the front desk?  If we go to the next one, the

11  week of September 20th, it also has Mr.  Armento's name

12  under "service hours;" correct?

13  A.    Yes.

14  Q.    The following one, the week of September 27th,

15  dwindles there under service hours.  And then this one

16  here starting the week of October 4th he's up there as an

17  ABCCM employee.

18       At this time, Your Honor, we would move

19  Defendant's Exhibit 9 be admitted into evidence.

20       THE COURT:  Any objection?

21       MS.  RIPLEY:  No, Your Honor.

22       THE COURT:  Is it any different from Plaintiff's

23  14?

24       MR.  CURRIDEN:  The order of the pages is a little

25  different.  Was Plaintiff's Exhibit 14 admitted?

1          MS. RIPLEY:  I don't think I moved to admit it.

2     And I actually -- your version includes more weeks.

3     Chronologically, I think it probably makes a better

4     exhibit.

5          THE COURT:  Okay.  They're both in.  My chart

6     shows Plaintiff's 14 is in, but since they're not

7     identical they're both in.

8          Please continue, Mr. Curriden.

9          MR. CURRIDEN:  Those are all my questions.  Thank

10    you.

11         THE COURT:  Anything else, Ms. Ripley?

12         MS. RIPLEY:  Nothing further.

13         THE COURT:  Thank you, Mr. McElyea.  You may

14    return to your seat.

15              (Witness excused at 6:15 p.m.)

16         THE COURT:  For tomorrow we only have one witness;

17    is that correct?

18         MR. CURRIDEN:  Your Honor, I think at this point

19    we will forego that witness and rest.

20         THE COURT:  Okay.  Is there anything else then

21    that we need to do, or is there any other evidence that

22    needs to be presented or things that have been identified

23    that either side wants to offer into evidence?  Just

24    looking very quickly at the plaintiff's exhibit list, I

25    believe all of the exhibits that have been identified and

offered have been admitted with the exception of
Plaintiff's 11 of which I withheld a ruling, and I will
do that after my review of the exhibit.

With regard to the defendant's exhibits, all the
exhibits that have been identified have been offered and
admitted with the exception of Defendant's 2 and
Defendant's 5.  And then you also marked the deposition
transcript for the purposes of prior inconsistent
statements, so that's not even offered.  But are you
offering 2 and 4 or not?

MR.  CURRIDEN:  I believe those are identical to
witnesses that have already been admitted by the
plaintiff and so I would not need to move those into
evidence.

THE COURT:  Okay.  Very good.  Anything else?

MS.  RIPLEY:  Your Honor, at the pretrial
conference we discussed post-trial briefs.  I don't know
if we're going to discuss the timing for that or if we
should expect an ECF notification.

THE COURT:  That was actually the next thing I was
going to talk about.

First of all, with regard to post-trial briefs,
you've already given me trial briefs.  You've already
given me fairly extensive proposed findings and
conclusions.  I don't need to read the same thing over

1  and over again.  So is ten pages sufficient for a
2  post-trial brief?
3          MR.  CURRIDEN:  I think it would be for us, Your
4  Honor.  I'm not sure -- well --
5          MS.  RIPLEY:  The Proposed Findings of Law and
6  Conclusion of Fact that defendants turned in -- defendant
7  turned in, I think, was about 45 pages, and it raised
8  some arguments we had not seen yet.  So I think we would
9  like to have a chance to respond to those.  And given
10 that that was 45 -- a handful of pages were stipulations.
11 So I don't know exactly how many -- what portion of that
12 was devoted to their legal arguments.  But if we can
13 incorporate our trial brief and then just focus on
14 responding to their new legal arguments.
15         THE COURT:  Well let me be clear.  I don't want
16 you to repeat what you've already had me read.
17         MS.  RIPLEY:  Right.
18         THE COURT:  You don't need to incorporate your
19 trial brief or anything like that.
20         MS.  RIPLEY:  Okay.
21         THE COURT:  Just in terms of arguing what you
22 still need to argue that you haven't yet had an
23 opportunity to argue.  Ms. Ripley, what do you need?
24 What do you think your requirements are?
25         MS.  RIPLEY:  May we have 15, Your Honor?

1    THE COURT:  Mr. Curriden, you don't have an
2  objection to that because you didn't have an objection to
3  ten.

4    MR. CURRIDEN:  That's correct, Your Honor.

5    THE COURT:  So both sides may have 15 pages.

6    I also don't want to interfere with people's
7  holiday plans.  How much time does each side need?

8    MS. RIPLEY:  I don't think that we will need that
9  much time, but we also do not want to interfere with our
10 holiday plans.  I'm not looking at a calendar, but I'm
11 thinking about the Friday that is eight days after
12 Thanksgiving.

13    MR. CURRIDEN:  That seems appropriate to me.

14    THE COURT:  December 6th?

15    MS. RIPLEY:  I believe that is right.

16    THE COURT:  Okay.  In light of the fact if we were
17 doing this as closing arguments at the end of a trial
18 you'd be arguing one behind the other.  So is there any
19 objection to the briefs on both sides being due on the
20 same day?

21    MR. CURRIDEN:  No, Your Honor.

22    MS. RIPLEY:  No.

23    THE COURT:  Okay.  They're both due on December
24 the 6th with a limit of 15 pages.

25    Anything else that we need to address?

1      MR.  CURRIDEN:  Only, just for the record, that we

2  would renew our motion for judgment as a matter of law

3  that we made at the close of the plaintiff's case.  I

4  believe we don't need to be heard about that.  We don't

5  have any new arguments.

6      THE COURT:  With that, just as I withheld my

7  ruling previously, particularly in light of the

8  discussion that we had at the final pretrial that this

9  case might come down to a question of law, I'll withhold

10  ruling again.  Because if it does come down to a purely

11  legal issue then I believe that a judgment as a matter of

12  law would be appropriate, even after having heard all the

13  evidence and read all your arguments, but I'm not

14  previewing one way or the other that that is going to be

15  the basis of any ruling.  So, having heard your motion, I

16  take that under advisement.

17      MR.  CURRIDEN:  Thank you, Your Honor.

18      THE COURT:  Anything else?

19      MR.  CURRIDEN:  Not from the defense.

20      THE COURT:  Okay.  Very good.  I appreciate all

21  your preparation, I appreciate you marshaling the

22  evidence that you presented, and I look forward to

23  getting the briefs from both sides and then we'll wrap

24  this up.

25      Marshal, please recess us until further call.

1          (Off the record at 6:20 p.m.)

2                    **CERTIFICATE**

3     I,  Tracy Rae Dunlap, RMR, CRR, an Official Court

4  Reporter for the United States District Court for the

5  Western District of North Carolina, do hereby certify

6  that I transcribed, by machine shorthand, the proceedings

7  had in the case of GREGORY G. ARMENTO versus ASHEVILLE

8  BUNCOMBE COUNTY CHRISTIAN MINISTRY, INC., Civil Action

9  Number 1:17-CV-150, on December 2, 2019.

10

11           ___/s/Tracy Rae Dunlap_____
             TRACY RAE DUNLAP, RMR, CRR
12           OFFICIAL COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25