UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
File No.: 1:17cv00150-MR-DSC

GREGORY G. ARMENTO,

                Plaintiff,

v.

ASHEVILLE BUNCOMBE
COMMUNITY CHRISTIAN
MINISTRY, INC.,

                Defendant.

## DEFENDANT'S POST-TRIAL BRIEF

Comes now Defendant Asheville Buncombe Community Christian Ministry, Inc. ("Defendant" or "ABCCM"), in accordance with this Court's instruction following the bench trial of this matter on November 13, 2019 and submits the following Defendant's Post-Trial Brief.

## BACKGROUND

At the conclusion of trial, the Court directed the Parties to submit post-trial briefs in lieu of oral summations. The Court instructed the Parties not to repeat the arguments outlined in their pre-trial filings and to focus on the new evidence presented at trial. ABCCM does not abandon any of the positions or issues it has raised by way of these pre-trial filings by omitting them here.

# DISCUSSION

1. **Plaintiff's evidence that the service hour program did not benefit him personally does not make ABCCM his employer under the primary beneficiary test.**

Plaintiff offered testimony suggesting that ABCCM's service hour program did not benefit him personally. Under the primary beneficiary test, however, the court does not focus on whether the worker personally took advantage of the opportunities offered by the position or subjectively experienced a benefit. Rather, the court looks primarily to the objective factors, such as the purpose of the program and the opportunities made available to the participants.

For example, in *Vaughn v. Phoenix House Found., Inc.*, No. 14-CV-3918 (RA), 2019 WL 568012 (S.D.N.Y. Feb. 12, 2019), the plaintiff alleged that the uncompensated work in his rehabilitation program was menial, did not contribute to his treatment, did not develop skills that would translate into stable employment, and left him with little time and energy to participate in therapeutic sessions. *Id.* at *1. In determining that the plaintiff was nevertheless the primary beneficiary of the work program, the *Vaughn* court focused on the purpose of the program and the benefits that were made available to the plaintiff, not whether he actually took advantage of or subjectively appreciated those benefits. *Id.* at *9.

> His work facilitated the day-to-day operations of his residence and provided him with the opportunity to develop skills of vocation and self-sufficiency—even if they were not the skills that Vaughn himself would have

> independently chosen to develop….Vaughn's allegations that Phoenix House did not properly supervise or accommodate him do not plausibly suggest that Vaughn was Phoenix House's employee—they suggest, at most, that the treatment Vaughn received was unsatisfactory.

*See also Purdham v. Fairfax Cty. Sch. Bd*., 637 F.3d 421, 428 (4th Cir. 2011) ("Accordingly, we review '*the objective facts* surrounding the services performed to determine whether the totality of the circumstances' establish volunteer status…or whether, instead, the facts and circumstances, *objectively viewed*, are rationally indicative of employee status.") (emphasis added, internal citation omitted).

This more objective approach is how the primary beneficiary test must work otherwise the test would create counterproductive incentives. Specifically, if courts were to focus primarily on the individual outcome or subjective experience of a particular individual in an uncompensated work program, participants would be incentivized to willfully fail because of the promise of compensation. Organizations running these programs would suddenly discover they have an unexpected and unpredictable level of exposure because the question of whether the participant was actually an employee would be based on the whims and motivations of the individual participants. The result would be a chilling effect on any kind of volunteer, training, internship, or rehabilitative program in North Carolina. Since these programs promote the general welfare through civic service, facilitate rehabilitation through work, and increase the competitiveness of the state's work force through internships,

3

education, and training, this outcome would also run counter to the NCWHA's policy of "promoting the general welfare of the people of the State without jeopardizing the competitive position of North Carolina business and industry." N.C.G.S. § 95-25.1(b). Accordingly, when applying the primary beneficiary test, the Court must focus on the goals, purpose, and opportunities these kinds of programs provide rather than the subjective experience or individualized outcome of the participant.

Here, as an initial point, the evidence revealed that Plaintiff did in fact benefit from his service hour work. For example, Plaintiff testified that his work at the VRQ allowed him to form connections with other VRQ residents and to feel as though he were making a valuable contribution. (Tr. 205:12-24.) Plaintiff also admitted that he identified volunteer work on his VRQ intake form, in part, because it was good for his spiritual health. (Tr. 170:7-18.)

Whether or not Plaintiff appreciates it, the service hour work also benefited him with a schedule, a purpose, and a structured environment. While Plaintiff's position is that his service hour work primarily benefited ABCCM because it assisted ABCCM's operations, it should not be ignored that his work was in direct service to the facility which was providing him free room, board, and other opportunities for enrichment. *See Vaughn*, at \*8 ("Particularly in light of the fact that Vaughn did not work 'to produce goods or services that are sold in commerce,…but rather to 'serve

4

various institutional missions of the [facility], such as ... care and maintenance,' …any such benefit does not meaningfully compare to the substantial benefits Vaughn received from participating in Phoenix House's treatment program.")(citations omitted). Plaintiff reported a positive outcome after his time at the VRQ, as he is now enrolled full time in school, pursing a degree and, by his own account, doing quite well. (Tr. 162:20-163:5.)

Plaintiff's claim that the Service Hour Program did not benefit him personally is belied by the fact that he stayed at the VRQ for two years participating the entire time in the Service Hour Program even though he was not being paid for this work. He declined opportunities for outside employment, which would have exempted him from the Service Hour Program. (Tr. 195:13-201:25.) His reasons for declining this work were, variously, that his actual goal at the VRQ program was higher education (although he never enrolled in a higher education program until his two year GPD had expired) (Tr. 196:13-14), that he was holding out for a career job instead of a series of short jobs (although he would later say that he declined opportunities in his field of choice, in part, because he already had a job at the VRQ front desk) (Tr. 196:2-8; 198:18-199:6; 199:14-200:1;181:3-9), that the opportunities to work for ABCCM sponsors may have caused a conflict of interest with his front desk work (although he never sought to clarify this) (Tr. 198:18-200:19). He declined to move to another program, such as Supportive Services for Veteran Family intervention

5

(SSVF), which would have provided him free food and shelter with no service hour requirement. (Tr. 290:13-24.) At the end of the two years, Plaintiff sought to have another per diem appointment, which would qualify him to stay in the program for another two years. (Tr. 291:1-2.) It defies reason that Plaintiff would stay in the VRQ's program, absorbing its limited resources from taxpayer funds and charitable contributions, displacing another potential VRQ resident, and then seek to stay for another two years if he felt that the VRQ Service Hour Program was not benefiting him.

More importantly, however, are the objective facts that the Service Hour Program was designed to provide a benefit to the participants and did, in fact, provide that benefit. Scott Rogers, the Executive Director of ABCCM, testified that the Service Hour Program was developed in consultation with the residents of the VRQ. (Tr. 84:17-85:1; 88:1-12; 96:12-21.) He testified that the service hour work was part of the larger, holistic "healthy living structure" in which ABCCM was rehabilitating the residents. (Tr. 91:19-92:17.) He further testified that most residents came to the VRQ without any boundaries or structure, and from places of long-term, personal isolation. (*Id.*) The service hour work helps the residents re-learn the benefits of structure, how to work on teams, how to communicate, and how to be part of a community. (Tr. *Id.*; 262:9-263:10.) It teaches them responsibility and how to have healthy living standards in their own lives. (Tr. 92:14-17.) It also

6

instills in them confidence and a sense of pride and dignity that many of them have lost. (Tr. 97:7-12.) The evidence was that many residents continue to volunteer for service hour work beyond that which is required, and even after they were exempt by virtue of outside employment, disability, or school enrolment. (Tr. 95:16-19.) Accordingly, as a general matter, the Service Hour Program is designed to primarily benefit, and does in fact primarily benefit, the VRQ residents.

In terms of the benefit the Service Hour Program provides to ABCCM, the evidence was that residents did not even need to perform their service hours at ABCCM. (Tr. 98:19-99:5.) Residents thus have the option of doing service hour work which would result in no benefit whatsoever to ABCCM. (*Id.*)

Further, when residents found outside employment, they were exempted from service hour work, yet they still enjoyed all of the same benefits and amenities as the Service Hour Program participants. (Tr. 99:11-14.) Nevertheless, ABCCM relentlessly pushed VRQ residents, including Mr. Armento, to find work or education outside of the Service Hour Program. (*E.g.* Pl. Ex. 1. A 5-7 (Transitional Housing Program Description); Def. Ex. 12 (Case Notes).) This framework is entirely inconsistent with the concept that service hour work is meant to benefit ABCCM over the residents.

ABCCM also showed it could operate in the same manner without the resident's service hour work by enlisting help from its network of over 200 churches

and several thousand volunteers. (Tr. 86:18-87:11; 97:16-24.) If it needed to, ABCCM could staff the Service Hour Program positions entirely with community volunteers and continue to operate as it currently does. (*Id.*) ABCCM could also scale back the amenities that the Service Hour Program allows it to offer to its residents. For example, if ABCCM canceled its shuttle service, which is primarily run through the Service Hour Program, it would still be eligible for VA funding through the GPD program. (Tr. 65:2-22.) The difference would be that the VRQ residents would not have the shuttle service benefit, not that ABCCM would suffer from a business perspective. Accordingly, while the Service Hour Program is used to perform some of ABCCM's services, it is not necessary or essential for ABCCM's continued operations.

Finally, Mr. Rogers testified that the funds received from the VA fell well short of funding the VRQ's entire program. (Tr. 80:10-81:15.) He also testified that, should the VRQ ever turn a "profit," it would have to return that money to the VA per the requirements of its participation in the GPD program. (Tr. 106:11-16.) Accordingly, any cost savings which result from the Service Hour Program would either go to offset the costs of the amenities and services ABCCM offered to VRQ residents, thereby benefiting the participants, or be turned over to the VA.

In sum, the Service Hour Program is based on the simple proposition that VRQ residents would benefit more from a minimal amount of meaningful work than

8

from an excess amount of idle time. Any benefit the VRQ receives from the Service Hour Program, whether through cost savings or additional services, is returned directly to the participants in the form of amenities which exceed the GPD program requirements. By allowing participants to satisfy this requirement by working for other non-profits, they can choose to do work which would not benefit ABCCM in any way whatsoever. Finally, whether or not Plaintiff subjectively appreciates it, the Service Hour Program did benefit him. To the extent that it did not, Plaintiff's complaints are, properly understood, about the quality of the program, and the NCWHA does not provide a remedy for this kind of complaint. *See Vaughn*, at *9 (that the defendant did not "provide the *optimal* learning experience" for the plaintiff did not transform the defendant into the primary beneficiary of the relationship, and the plaintiff's remedy was with the "appropriate regulatory authority" rather than the FLSA). Because, from an objective standpoint, ABCCM's Service Hour Program benefits the participants more than ABCCM, the participants are not "employees" under the NCWHA.

2. **Plaintiff's position would require the Court to ignore the "economic reality" that he held a dual role as both an employee and participant in the VRQ program.**

Plaintiff worked for ABCCM as an employee through the Transitional Employment Program ("TEP"). Plaintiff appears to take the position that this would make him an ABCCM employee for all purposes, including his service hour work.

9

Plaintiff's position, however, glosses over the "economic reality" of his dual status as both an employee and a participant in the VRQ's rehabilitative services.

Even after Plaintiff was enrolled in the TEP program and became an employee of ABCCM, he was still a participant in the VRQ's program. (Tr. 104:6-16; 204:19-205:10.) He was also expected to continue to meet the responsibilities of the VRQ's program, such as making curfew, applying for outside jobs, updating his goals for success, and, of course, completing his service hours. (Tr. 105:4-18; 204:19-205:10; 41:3-7.) His status as an ABCCM employee did not change his status as a participant in the VRQ program. Rather, at that point, he had a dual status as an ABCCM employee and a VRQ participant. Plaintiff did not become entitled to payment for his continued participation in the Service Hour Program any more than he was entitled to be compensated for the other program requirements such as making curfew, applying for outside jobs, or updating his goals for success.

Plaintiff testified that he was confused by this dual role, and that it was not properly explained to him. The weight of the evidence, however, directly contradicts Plaintiff's testimony. For example, Tim McElyea testified that Plaintiff understood the difference between service hour work and TEP work as early as September 16, 2015, about two weeks after he arrived at the VRQ, when he reported to his case manager that he had "started working at the front desk for his service hours." (Tr. 277:20-279:278:16; Def. Ex. 12 at 0023). As early as September 20, 2015, Plaintiff

10

would have seen that his front desk time was listed on the schedule as service hours. (Tr. 309:4-13; Def. Ex. 9 at 2.) On October 2, 2015, Plaintiff explained to his case manager that he was working at the front desk "part time and also doing his service hours there." (Def. Ex. 12, at 0022). This, again, confirmed that Plaintiff understood the difference between his work through the TEP and his service hour work. (Tr. 278:17-279:3.) Defendant's witness Mary Sczudlo testified that she met with Plaintiff on November 10 or 12, 2015, and that Plaintiff understood the difference between his service hour work and his work through the TEP program at that time. (Tr. 218:15-19; 220:23-221:21; 226:2-9.) Although he denied it at trial, Plaintiff admitted in his deposition that he became aware he was not going to be paid for his service hour work right after his front desk training. (Tr. 181:23-185:13.)

Even if Plaintiff failed to understand his dual role, there can be no actual offer of employment without showing intent on the part of ABCCM. There is simply no evidence whatsoever that ABCCM intended to offer Plaintiff employment beyond his position in the TEP program. Plaintiff attempted to generate this evidence at trial by stating that there was nothing on his intake documentation stating that the service work was *not* compensated. (Tr. 174:16-20.) The agreement to compensate him for his service hours, according to Plaintiff, was thus implied. Plaintiff cannot meet his burden of proof, however, by pointing to an absence of evidence to the contrary. *E.g. Meineke Car Care Centers, Inc. v. Duvall*, No. 3:06-CV-180-W, 2007 WL 1100841,

11

at *2 (W.D.N.C. Apr. 12, 2007) (plaintiff "does not meet this burden simply by relying on an absence of evidence to the contrary.")  Even so, the evidence is that there was no offer of employment to Plaintiff for service hour work.  (Tr. 274:6-13.)

Plaintiff's position on this point is, at its essence, a complaint that ABCCM had poor messaging with regard to the service hour work.  Even if Plaintiff is correct, his unilateral misunderstanding does not create a contract for employment, and Plaintiff's remedy is not through the NCWHA.  *See Williams v. Strickland*, 87 F.3d 1064, 1067 (9th Cir. 1996) ("[p]laintiff's later statement in his declaration and deposition of a different unilateral state of mind, which was not expressed to anyone at the time of his admittance, is not sufficient to create a genuine issue of fact in the face of that record.")(citation omitted).

3. **In the alternative, should the Court find Plaintiff's service hour work is covered by the NCWHA, the Court should not award liquidated damages or attorney's fees.**

Under N.C.G.S. § 95-25.22(a1), the Court is not required to award liquidated damages where the defendant can establish that the "omission was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation" of the NCWHA.  Under N.C.G.S. § 95-25.22(d), the Court can also decline to award attorney's fees in its discretion.

Mr. Rogers testified that ABCCM's Service Hour Program was developed in coordination with the residents of the VRQ.  (Tr. 84:17-85:1; 88:1-12; 96:12-21.)

ABCCM has had some variation of the Service Hour Program in place since 1987 and, before now, it has never received a complaint or any other kind of notice that this program may be in violation of the NCWHA or FLSA. (Tr. 94:5-8; 99:15-24.) Ms. Sczudlo and Mr. McElyea offered similar testimony. (Tr. 213:12-14; 227:9-17; 293:2-5.) Despite Plaintiff's efforts to recruit others in this complaint, no one else has joined his cause. (Tr. 108:4-7.)

Mr. Rogers further testified he attends annual conferences where he speaks to other people who run similar work rehabilitation programs, and no one has ever indicated that this kind of work therapy program could be a violation of wage protection laws. (Tr. 99:25-100:13.) In fact, over the years, numerous other programs have visited ABCCM's VRQ to model their programs after it. (*Id*.) Mr. Rogers also testified there are 16 other GPD programs in North Carolina and he has either visited or consulted with them all. (Tr. 108:24-109:9.) Every one of them has a program similar to ABCCM's where uncompensated service work is performed by the residents as part of their rehabilitative therapy. (*Id.*)

Mr. Rogers also testified that he had attended training on the specific issue of what constituted an employer and employee relationship, and there was nothing he learned that caused him any concern about ABCCM's Service Hour Program. (Tr. 113:2-15; 114:12-18.)

Finally, Plaintiff made extensive complaints about this issue to the North Carolina Department of Labor, Senator Tom Tillis, and numerous attorneys where he laid out his case without any opposition from Defendant. (Tr. 141:18-21; Doc. 1-14.) Senator Tillis' office referred the issue to the Department of Veteran's Affairs and the Department of Labor. (Tr. 141:25-142:6.) Evidently none of these parties have agreed with Plaintiff that ABCCM's Service Hour Program was operating in violation of any wage protection laws. Accordingly, even if ABCCM had specifically checked its program with the N.C. or U.S. Departments of Labor, which would have included its side of the case, it is highly unlikely that they would have come to any different conclusions.

Because ABCCM created and ran its Service Hour Program in good faith, because ABCCM's Executive Director has made efforts to evaluate the legality of the program by participating in specific training, because ABCCM's program is considered within the industry to be a model program, because Plaintiff is the only person to raise this issue in over 20 years of continuous operation, and because the regulatory agencies charged with the enforcement of the wage protection laws have not found fault with the program, the Court should find that ABCCM has met its burden to show that it ran the Service Hour Program in good faith and that it had reasonable grounds for believing that it was not violating the NCWHA.

For these same reasons, the Court should not award attorney's fees. *Kornegay v. Aspen Asset Grp., LLC*, 204 N.C. App. 213, 247, 693 S.E.2d 723, 746 (2010) (finding trial court's decision not to award attorney's fees was supported by the same facts that supported its decision not to award liquated damages).[1]

Respectfully submitted this the 6th day of December, 2019.

                                         *s/Jonathan H. Dunlap*
                                         Stephen B. Williamson, NC Bar #20203
                                         Dale A. Curriden, NC Bar #24196
                                         Jonathan H. Dunlap, NC Bar #43584
                                         Attorneys for Asheville Buncombe
                                         Community Christian Ministry, Inc.
                                         Van Winkle, Buck, Wall, Starnes, and Davis
                                         11 N. Market Street
                                         Asheville, NC 28801
                                         Telephone: (828) 258-2991
                                         Facsimile: (828) 255-0255
                                         Email: swilliamson@vwlawfirm.com
                                         Email: dcurriden@vwlawfirm.com
                                         Email: jdunlap@vwlawfirm.com

---

[1] Should the Court reach the issue of attorney's fees, ABCCM requests supplemental proceedings in accordance with *Rice v. Danas, Inc.,* 132 N.C. App. 736, 743, 514 S.E.2d 97, 102 (1999) (in NCWHA action, court explained that "motions for costs or attorney's fees are 'independent proceeding[s] supplemental to the original proceeding...'" (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990))). ABCCM requests these proceedings to present evidence of the parties' settlement negotiations in support of its position that Plaintiff made settlement impossible because his demands 1) were well in excess of any relief he could achieve through this action, and 2) would impose conditions on ABCCM that were financially unworkable.

# CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2019 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record that have made an appearance in this case as follows:

Clermont F. Ripley
Carol Lee Brooke
North Carolina Justice Center
PO Box 28068
Raleigh, NC 27611
919-856-2154
clermont@ncjustice.org
carol@ncjustice.org
Attorneys for Plaintiff

                                      *s/Jonathan H. Dunlap*
                                      Jonathan H. Dunlap