# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:17-cv-00150-MR-DLH

| | | |
|---|---|---|
| **GREGORY ARMENTO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| **ASHEVILLE BUNCOMBE** | ) | |
| **COMMUNITY CHRISTIAN** | ) | |
| **MINISTRY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court following a bench trial on November 13, 2019. Upon consideration of the testimony and evidence presented by the parties, the Court hereby enters the following Findings of Fact and Conclusions of Law.

## PROCEDURAL BACKGROUND

On June 12, 2017, the Plaintiff Gregory Armento ("Armento" or the "Plaintiff") initiated this suit against the Defendant Asheville Buncombe Community Christian Ministry, Inc., ("ABCCM" or the "Defendant"), alleging failure to pay minimum wage and overtime in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206 and 207, and the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. §§ 95-25.3 and 95-25.4;

record-keeping violations under 29 U.S.C. § 211(c) and N.C. Gen. Stat. § 95-25.13; misclassification of employees under 29 C.F.R. Part 541; retaliation and wrongful termination in violation of 29 U.S.C. §§ 215 and 218c and the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-241; claims under 42 U.S.C. §§ 1983 and 1985; and claims for "duress, undue influence, and illegal contracts" and intentional infliction of emotional distress.  [Doc. 1].

On July 7, 2018, the Defendant filed a motion to dismiss the Plaintiff's claims, except for the NCWHA claim, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and a motion for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure on the Plaintiff's FLSA, NCWHA, and REDA claims.  [Docs. 46, 49].

On March 27, 2019, the Court issued an Order granting the Defendant's motion to dismiss with respect to the Plaintiff's claims for record-keeping violations under the FLSA and NCWHA; duress, undue influence, and illegal contracts; intentional infliction of emotion distress; retaliation and wrongful termination under the FLSA and REDA; and violations of 42 U.S.C. §§ 1983 and 1985, but denied the Defendant's motion with respect to the Plaintiff's claims for unpaid wages and overtime violations under the FLSA and NCWHA.  [Doc. 66].  In the same Order, the Court granted the

Defendant's motion for summary judgment with respect to the Plaintiff's claims for minimum wage and overtime violations under the FLSA but denied the Defendant's motion with respect to the Plaintiff's claims for minimum wage and overtime violations under the NCWHA. [Id.]. As a result, the Plaintiff's only remaining claim is for unpaid wages and overtime violations under the NCWHA. [Id.].

This matter thereafter proceeded to a bench trial. Upon conclusion of the presentation of evidence, the Court allowed the parties to file supplemental briefs. The parties filed those briefs on December 6, 2019. [Docs. 110, 111]. Having been fully heard and briefed, this matter is ripe for disposition.

## FINDINGS OF FACT

### A. The Parties

1. The Plaintiff Gregory Armento is a United States Army veteran who was homeless in 2015.

2. The Defendant Asheville Buncombe Community Christian Ministry, Inc., is a nonprofit corporation, organized in accord with Section 501(c)(3) of the Internal Revenue Code. [Second Revised Joint Stipulations ("Joint Stip."), Doc. 95 at ¶ 1].

3. The Defendant operates The Veteran's Restoration Quarters ("VRQ")

in Asheville, North Carolina. [Id. at ¶ 2].[1] The VRQ offers rehabilitative services to homeless veterans with the goal of making them self-sufficient, drug-free and alcohol-free, and capable of establishing permanent housing and permanent employment.

4.    The VRQ provides homeless veterans with transitional housing, meals, counseling, a gym, an onsite chaplain, educational assistance, a computer room, a library, laundry facilities, Alcoholics Anonymous meetings, nursing services, psychologist services, case management services, claims assistance, and transportation to the local United States Veteran's Administration (the "VA") medical center. [Id. at ¶ 2-3].

5.    The VRQ receives funding by way of grants from the VA through the Homeless Providers Grant/Per Diem Program ("GPD Program") pursuant to Title 38 of the United States Code and subject to the requirements thereof. [Id. at ¶ 2]. The funding from the VA only partially covers the cost of the services provided by the VRQ. The VRQ pays the rest of its costs with funding from other sources, including charitable donations and grants from entities like Land of Sky

---

[1] The Defendant also operates a separate similar facility for female veterans that is not at issue here.

4

Regional Council, a local non-profit organization. Neither the Defendant nor the VRQ derives any funding from work performed by VRQ residents. As a non-profit entity subject to the requirements of the GPD Program, the Defendant would have to return the grant money it receives from the VA if it earned a profit.

6. Roughly 2,500 individuals volunteer regularly at the VRQ by preparing and cooking meals, helping at the front desk, teaching life skills classes, performing maintenance, cleaning, assisting with landscaping, providing housekeeping, and performing other similar activities. The VRQ does not compensate volunteers for the hours that they work.

**B.    Service Hours**

7. As part of the overall housing and rehabilitative services program at the VRQ, all residents are required complete a certain number of "Service Hours" by performing various chores around the VRQ. [Id. at ¶ 7]. The only exception to the Service Hours requirement is that VRQ residents who are employed full-time or attend school full-time do not have to perform Service Hours. [Id. at ¶ 10]. Residents are not paid for completing Service Hours. Residents can perform Service Hours at the VRQ by maintaining the living spaces, cleaning

5

the kitchen, cleaning common areas, staffing the front desk and computer lab, or driving a van. Residents also can perform their Service Hours at a different ABCCM location or a charitable organization that has no affiliation with ABCCM.

8.  Service Hours further the mission and purpose of the VRQ by providing structure for residents' lives and helping them build job skills and gain experience to become self-sufficient and employable. Residents also develop a sense of personal pride in the VRQ by working Service Hours.

9.  The number of Service Hours that a resident must perform is determined by his employment and school enrollment status. Residents employed full-time or enrolled in school full-time do not have to perform any Service Hours. Unemployed residents must perform twenty Service Hours per week, while residents who are employed part-time or enrolled in school part-time must perform ten Service Hours per week. The Defendant defines part-time employment as working thirty hours or less per week.

10. While some residents perform more Service Hours than are required, such extra service is on a volunteer basis and there are no repercussions for refusing to work extra Service Hours if asked.

6

11.   Residents performing Service Hours at the VRQ perform chores that would otherwise be performed by community volunteers, resident volunteers, or residents providing hours pursuant to other programs (e.g. the Transitional Employment Program, *infra*).   Community volunteers typically complete the chores around the VRQ more effectively and reliably than residents performing Service Hours, primarily because VRQ residents generally have a history of employment difficulties and other related problems.   While the Defendant has more issues with residents performing Service Hours than volunteers, it is particularly forgiving towards residents when they make mistakes performing Service Hours.

12.   The VRQ has enough community volunteers to perform all the chores that are performed by residents performing Service Hours.  According to Reverend Scott Rogers, the Executive Director of ABCCM, the VRQ would only use volunteers and would not have residents perform any Service Hours at all if its sole objective was to ensure that the work was performed and performed in the most effective manner.

13.   The VRQ enforces its rules through a "Three Strikes Accountability Policy."  [Plaintiff's Ex. 1-A at 11].  That policy provides that residents can receive a strike for committing infractions or violating rules,

including by refusing to perform required Service Hours. [Id.]. Residents can be removed from the VRQ for committing their third strike, although residents who commit particularly serious infractions can be removed prior to their third strike. [Plaintiff's Ex. 1-A at 11; Plaintiff's Ex. 20 at 1].

### C.    Transitional Employment Program

14.    The VRQ also has a Transitional Employment Program, which allows residents to work at the VRQ for pay. [Joint Stip. at ¶ 12]. Unlike the Service Hours program, residents are not required to work in the Transitional Employment Program. Residents wishing to participate in the Transitional Employment Program must apply and be approved. Residents can work up to 1,000 hours in the Transitional Employment Program. [Id. at ¶ 13].

15.    Participants in the Transitional Employment Program work in various positions at the VRQ, including as front desk managers and as van drivers. [Id.].

16.    The Transitional Employment Program is designed to help "transition homeless veterans into meaningful employment in the community." [Plaintiff's Ex. 7 at 3]. The Transitional Employment Program provides

participants with "the experience, knowledge, and skills necessary to attain competitive employment in the community." [Id.].

17. The Transitional Employment Program allows unemployed residents to earn money, develop job skills, build responsible habits, demonstrate accountability, acclimate to consistent employment, generate an employment history, and otherwise transition towards self-sufficiency. [Joint Stip. at ¶ 12]. The Transitional Employment Program also empowers the Defendant to give residents who complete the program an honest job recommendation for potential employers.

### D. Plaintiff's Enrollment at the VRQ

18. The Plaintiff enrolled at the VRQ on September 2, 2015. [Id. at ¶ 5].

19. As part of the enrollment process, the Plaintiff received forms detailing VRQ policies. One of the forms said that "Service Hours are program requirements for residents who are not actively employed or attending school." [Id. at ¶ 9]. Another form, which the Plaintiff signed, said "I understand there is no cost for my residency in the VRQ transitional housing program. I will be receiving free room and board." [Id. at ¶ 6]. The Plaintiff also received a VRQ Resident Handbook, which stated that "[a]ll unemployed residents must perform service hours to remain motivated and engaged with campus life." [Id. at ¶ 10]. The Plaintiff

9

signed a document that said "I agree to follow all of the policies, rules, and guidelines included in the handbook.  I understand that if I fail to abide by the written contents of this handbook, I will be subject to disciplinary procedures to include warnings, strikes, 90-day protocols and/or immediate dismissal from the program."  [Id. at ¶ 11].

20.  The Plaintiff's intake documents made it sufficiently clear that the Service Hours were part of the rehabilitation program of the VRQ and were unpaid.  The Plaintiff understood that Service Hours were a required element of living at the VRQ unless the Plaintiff was employed full-time or attending school full-time.  The Plaintiff also understood that residents who worked part-time or went to school part-time were required to perform ten Service Hours per week.

**E.    Plaintiff's Work as a Front Desk Manager**

21.  Front desk managers at the VRQ answer phone calls, sign residents in and out of the building, provide security, administer breathalyzer tests, and conduct bag checks.  [Plaintiff's Ex. 7 at 20].

22.  Front desk manager shifts are performed by residents performing Service Hours, residents enrolled in the Transitional Employment Program, and volunteers.  The VRQ has enough community volunteers

10

alone to staff the front desk manager positions without needing to staff residents performing Service Hours.

23.   The Defendant creates a weekly schedule for front desk managers. [Defendant's Ex. 9 at 1]. The schedule lists the residents working in the Transitional Employment Program as well as the residents working for Service Hours. [Id.]

24.   The Plaintiff enrolled in the Transitional Employment Program and worked part-time as a front desk manager at the VRQ from September 8, 2015 to June 1, 2016. [Joint Stip. 95 at ¶ 14]. The Plaintiff made $9.00 per hour for his work in the Transitional Employment Program at the front desk. [Id. at ¶ 17].

25.   The Plaintiff worked only part-time in the Transitional Employment Program, so he still was required to perform ten Service Hours per week. [Doc. 12 at 22]. The Plaintiff performed a substantial portion of those Service Hours as a front desk manager. [Joint Stip. at ¶ 18].

26.   The Plaintiff performed the same tasks while working as a front desk manager whether he was working in the Transitional Employment Program or performing Service Hours. [Id. at ¶ 20].

11

### F.    Plaintiff's Dispute Regarding Service Hours

27.    The Plaintiff's first full week as a front desk manager was the week of
September 13, 2015.  [Defendant Ex. 10 at 1].  During that first week,
the Plaintiff worked forty hours, thirty-two of which were initially logged
as Service Hours and eight hours as part of the Transitional
Employment Program.  [Id.].  During the next week, the Plaintiff again
worked forty hours, sixteen of which were initially logged as Service
Hours and twenty-four hours as part of the Transitional Employment
Program.  [Id.].  In his third week as a front desk manager, the Plaintiff
worked forty-eight hours, twenty-four of which were initially logged as
Service Hours and twenty-four hours as part of the Transitional
Employment Program.  [Id.].  Those three weeks were the only weeks
in which the Plaintiff worked forty or more hours between his Service
Hours and his hours in the Transitional Employment Program.  [Id.].
Those three weeks also were the only weeks in which the Plaintiff
worked more than ten Service Hours while in the Transitional
Employment Program.  [Id.].

28.    On October 2, 2015, at the end of his third week as a front desk
manager, the Plaintiff met with Gene "Slim" Jones ("Jones"), his case
manager at the VRQ.  [Defendant's Ex. 12 at 23; Defendant's Ex. 7 at

1].  During that meeting, the Plaintiff expressed concerns about the hours he was working in the front desk manager position.  [Defendant's Ex. 12 at 22].  The Plaintiff told Jones that he was working at the front desk part-time and was doing his Service Hours at the front desk, but his supervisor was requiring him to work more than the ten Service Hours he was required to perform.  [Id.].

29.  In November 2015, the Plaintiff met with Mary Sczudlo ("Sczudlo"), the director of homeless services at the VRQ, regarding his complaints. As of November 2015, the Plaintiff's main complaint was that his employment status was not re-adjusted weekly based on the number of combined Service Hours and Transitional Employment Program hours that he worked in the prior week.  For instance, the Plaintiff claims that he should have been paid for all forty of the hours that he worked during the week of September 20, 2015 because he worked forty hours the week before and therefore should have been considered a full-time employee.  Sczudlo told the Plaintiff that he was classified as part-time because he was only paid for a maximum of thirty hours per week and therefore still needed to work ten Service Hours per week.  [Id.].  Nevertheless, Sczudlo told the Plaintiff that she would investigate his complaints about the hours he was working.  [Id].

30. On December 2, 2015, Sczudlo met with Jones regarding the Plaintiff's complaints and told him that her investigation found that the Plaintiff's pay had been calculated incorrectly. [Id]. Sczudlo showed Jones a document detailing the Plaintiff's hours and the corrections that needed to be made to his pay. [Id]. With those corrections, the Plaintiff's first ten hours of each week were considered Service Hours and any additional hours after those first ten hours were Transitional Employment Program hours for which he was to be paid. For example, the Plaintiff received six more paid hours for the week of September 20, 2015 after the corrections were made:

### Summary of Greg Armento's Service Hrs. And Paid Time

|  | Date | Shift | Training Service Hrs | Paid | Required Svc. Hrs. | Hrs. due to be Paid | Amt. due at $9/Hr. |
|---|---|---|---|---|---|---|---|
| Sunday | 9/13/2015 | | | | | | |
| Monday | 9/14/2015 | 8 - 4 pm | 8 | | | | |
| Tuesday | 9/15/2015 | 8 - 4 pm | 8 | | | | |
| Wednesday | 9/16/2015 | 8 - 4 pm | 8 | | | | |
| Thursday | 9/17/2015 | | | | | | |
| Friday | 9/18/2015 | 8 - 4 pm | 8 | | | | |
| Saturday | 9/19/2015 | 8 - 4 pm | | 8 | | | |
| | Sub-Total | | 32 | 8 | 20 | 12 | |
| Sunday | 9/20/2015 | 8 - 4 pm | | 8 | | | |
| Monday | 9/21/2015 | | | | | | |
| Tuesday | 9/22/2015 | | | | | | |
| Wednesday | 9/23/2015 | Mid - 8 am | | 8 | | | |
| Thursday | 9/24/2015 | 8 - 4 pm | 8 | | | | |
| Friday | 9/25/2015 | 8 - 4 pm | 8 | | | | |
| Saturday | 9/26/2015 | 8 - 4 pm | | 8 | | | |
| | Sub-Total | | 16 | 24 | 10 | 6 | |

[Defendant's Ex. 10 at 1].

31.    On December 2, 2015, Jones met with the Plaintiff to explain the corrections to his pay as well as how and when the Plaintiff would be paid in recognition of the corrections.  [Defendant's Ex. 12 at 20].  The Plaintiff said that the Defendant's adjustments were still incorrect, that he should be paid for more hours, and that "his battle was not over" with the Defendant.  [Id.].  The Plaintiff was paid in accordance with the corrections despite his protests.

32.    On May 13, 2016, Jones met with the Plaintiff again.  [Id. at 15].  The Plaintiff said he was "thinking about what he wants to do after his hours run out" in the Transitional Employment Program.  [Id.].  As such, the Plaintiff clearly expressed his understanding that he was enrolled in the Transitional Employment Program and that his participation in the Transitional Employment Program was capped at 1,000 hours.

33.    The Plaintiff was removed from the Transitional Employment Program on June 1, 2016 after he completed 1,007 hours of work.  [Plaintiff's Ex. 8 at 1].  The Plaintiff refused to sign the form documenting his removal from the Transitional Employment Program, for the first time claiming that he was never in the Transitional Employment Program and was never subject to a 1,000-hour limit.  [Id.].  The Plaintiff's

15

testimony at trial that this was always his understanding, however, was not credible.

34. Notwithstanding the Plaintiff's protest, he was removed from the Transitional Employment Program because he had exceeded the 1,000-hour maximum.

35. The Plaintiff performed a total of 349 Service Hours as a front desk manager while enrolled in the Transitional Employment Program. [Joint Stip. at ¶ 19].

36. After working in the Transitional Employment Program, the Plaintiff obtained part-time employment for periods of time mowing lawns, working at the Smokey Mountain Honey House, and as a computer repairman. The Plaintiff was only required to work ten Service Hours per week when he was employed part-time in those positions.

   **G.    Plaintiff's Work as a Van Driver**

37. The Plaintiff also performed Service Hours as a van driver at the VRQ. [Id. at ¶ 24].

38. As a van driver, the Plaintiff transported residents to appointments at the VA hospital, to the gym and other establishments in Asheville, responded to emergencies involving residents, and picked up

16

homeless individuals when it was below freezing outside. The Plaintiff helped set the schedule for van drivers.

39. The Defendant considered the Plaintiff's work as a van driver to be entirely for Service Hours and informed him that as such, his work as a van driver would not be compensated. [Joint Stip. at ¶ 25].

40. Van driver shifts are performed by residents performing Service Hours, residents enrolled in the Transitional Employment Program, and volunteers. The VRQ can staff the van driver shifts without using residents performing Service Hours.

41. The Plaintiff performed a total of 766.6 Service Hours as a van driver from November 9, 2015 to July 3, 2017. [Id. at ¶¶ 24, 26].

## H. Plaintiff Leaves the VRQ

42. Under the terms of the GPD Program, an individual is typically limited to a twenty-four-month stay at the VRQ. [Id. at ¶ 38].

43. The Plaintiff left the VRQ on September 2, 2017, after living there for exactly twenty-four months. [Id. at ¶¶ 38, 5, 39].

44. The Plaintiff is currently enrolled full-time at Asheville-Buncombe Technical Community College in Asheville, North Carolina.

17

## <u>CONCLUSIONS OF LAW</u>

**I.    Was the Plaintiff an Employee when Performing Service Hours?**

The Plaintiff presents claims for minimum wage and overtime violations under the NCWHA.  Specifically, the Plaintiff argues that he is owed wages for the Service Hours he worked at the VRQ.

In pertinent part, the NCWHA defines "employee" as "any individual employed by an employer," and defines "employ" as "to suffer or permit to work."  N.C. Gen. Stat § 95-25.2.  Notwithstanding this broad definition, it is obvious that a volunteer who is "permitted to work" for a non-profit chartiable organization is not an employee.  Because no cases under the NCWHA articulate the distinction between an employee and a volunteer, this Court may also "look to the FLSA for guidance."  <u>Rehberg v. Flowers Baking Co.</u> <u>of Jamestown, LLC</u>, 162 F. Supp. 3d 490, 503 (W.D.N.C. 2016) (citations omitted).

Whether the Plaintiff was "a volunteer is a matter of law to be determined by the court."  <u>Purdham v. Fairfax Cty. Sch. Bd.</u>, 637 F.3d 421, 428 (4th Cir. 2011) (citing <u>Castillo v. Givens</u>, 704 F.2d 181, 185 (5th Cir. 1983), <u>cert. denied</u>, 464 U.S. 850 (1983)).  The Court must "review 'the objective facts surrounding the services performed to determine whether the totality of the circumstances' establish volunteer status, or whether, instead,

18

the facts and circumstances, objectively viewed, are rationally indicative of employee status." Id. (quoting in part Cleveland v. City of Elmendorf, 388 F.3d 522, 528 (5th Cir. 2004)). The Court must determine "whether the principal purpose of the seemingly employment relationship was to benefit the person in the employee status." Isaacson v. Penn Cmty. Servs., Inc., 450 F.2d 1306, 1309 (4th Cir. 1971) (citing Walling v. Portland Terminal Co., 330 U.S. 148 (1947)); see also McLaughlin v. Ensley, 877 F.2d 1207, 1209 (4th Cir. 1989). To be deemed an employee, the Plaintiff must show that the Defendant received most of the benefit from the relationship, not just some benefit. Isaacson, 450 F.2d at 1309-10.

The Plaintiff argues that he was unaware that his Service Hours were to be unpaid time, and his understanding was that he would be paid for those hours. While an individual's understanding as to whether he/she would be compensated may be relevant in determining their employee or volunteer status, Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 301 (1985), the Plaintiff's testimony in this regard was manifestly not credible. The Plaintiff was presented with several documents detailing the Service Hours program during his intake at the VRQ. Those documents were sufficiently clear regarding the unpaid nature of the Service Hours. Moreover, the Plaintiff's statements to his case manager showed his clear

understanding of the program and the unpaid nature of the Service Hours. As such, the Court has found and does find that the Plaintiff fully understood from the outset that he would not be paid for the Service Hours he was to perform.

Moreover, the nature of the agreement that existed between the Plaintiff and the Defendant indicates a lack of an employment relationship regarding the Service Hours. As part of the overall VRQ agreement between the Plaintiff and the Defendant, the Plaintiff could have avoided performing any Service Hours by attending school full-time (as he currently does), obtaining full-time employment, or leaving the VRQ. The Plaintiff also could have performed his hours at another location that was not affiliated with the Defendant. In addition, the Plaintiff exercised a degree of autonomy over when he performed Service Hours because he had input into the work schedule as a van driver. Further, the Plaintiff concedes that there was never any discussion during his entire two years at the VRQ as to any rate of pay for Service Hours. From the time of the receipt of his first paycheck for Transitional Employment Program hours, the Plaintiff was fully aware that he was not paid and would not be paid for Service Hours and was not considered to be an employee regarding those hours.

The Plaintiff points to the facts that (1) the Defendant supervised and exercised control over residents performing Service Hours; (2) the Defendant created work schedules for residents performing Service Hours and expected them to stick to that schedule or face repercussions; and (3) the Plaintiff performed the same tasks as a front desk manager when he worked Service Hours and when he worked in the Transitional Employment Program. While control can be an important factor in distinguishing between an employee and an independent contractor, it provides little information to address the distinction between employees and volunteers.[2] The efforts of volunteers must be coordinated by some supervising authority to be effective. Therefore, the fact that a supervisor directed the activities and set the schedules of Transitional Employment Program workers, Service Hours workers, and community volunteers, all working side-by-side, provides no indications that the Plaintiff was an employee.

---

[2] The Plaintiff urges the Court to examine the relationship between the Plaintiff and the Defendant under the "economic reality test." [Doc. 91 at 3; Doc. 111 at 2]. The Fourth Circuit, however, has determined that the economic reality test "'is best suited to determine whether, as a matter of economic reality, an individual is in business for himself or herself as an independent contractor, or is an employee of another'" and is "of limited utility in determining whether an individual is an 'employee,' as opposed to a 'volunteer.'" Purdham, 637 F.3d at 433 (citing Krause v. Cherry Hill Fire Dist. 13, 969 F.Supp. 270, 272 (D.N.J.1997)). The question presented here is not whether the Plaintiff was an independent contractor as opposed to an employee. As such, the Court's analysis will examine the objective facts of the relationship between the Plaintiff and the Defendant and focus on whether the principal purpose of that relationship was to benefit the Plaintiff or the Defendant.

21

Of much greater importance to the determination of the Plaintiff's status are the facts surrounding the principal purpose of the entire Service Hours arrangement, and for whose benefit that arrangement was designed. The Court has found and does find that the Service Hours were primarily for the residents' benefit. The Service Hours provide structure for VRQ residents' lives, which limits idleness that can lead to problems like drug and alcohol abuse. That is particularly true for residents who are unemployed or only employed part-time, like the Plaintiff, who would otherwise have large amounts of idle time each day.

Service Hours also give residents a chance to build job skills and gain experience that will help them become self-sufficient and employable after their stay at the VRQ. Residents working Service Hours get experience working under supervisors, interacting with co-workers, and handling customers and the public. Service Hours help residents learn to be accountable, timely, and responsible. Service Hours also allow residents to build resumé material so they can find a job after their stay at the VRQ.

Service Hours also provide an opportunity for residents to build those job skills and gain that work experience in a more forgiving environment than one provided by an ordinary employer. Residents working Service Hours are given significantly more leeway to make mistakes and errors than typical

22

employees. For example, the Defendant is more likely to correct significant errors committed by residents working Service Hours by requiring that resident to perform training, rather than terminating that resident as would be the case in a typical employment relationship. That forgiving environment is especially important for residents like the Plaintiff, who was previously unable to maintain consistent employment and benefitted from the opportunity to make mistakes without facing termination.

While the Defendant receives some benefit from the residents performing Service Hours, that benefit is substantially less than the benefit the residents receive. Residents performing Service Hours help the Defendant staff its front desk, computer lab, and kitchen, maintain the living spaces at the VRQ, keep the common areas at the VRQ clean, and offer transportation to residents. The Defendant, however, has enough volunteers to complete those tasks without requiring residents to perform any Service Hours at all. Those tasks, therefore, would have been performed at no cost to the Defendant whether performed by residents working Service Hours or by volunteers working for free. As such, the Defendant did not profit from residents such as the Plaintiff working Service Hours. See Isaacson, 450 F.2d at 1310 (finding that a plaintiff was a volunteer because the plaintiff

"cannot be said to have displaced a bona fide applicant who desired to sell his services at prevailing rates.").

Moreover, any benefit the Defendant receives from the performance of Service Hours is offset by the fact that the Defendant would have a more efficient operation if it staffed chores entirely with volunteers, rather than with residents performing Service Hours. Residents working Service Hours provide lower quality work and generally create more issues than volunteers. The Defendant, however, utilizes residents in order to provide benefits to the residents. Like in Isaacson, the Defendant created this program "to accommodate [the Plaintiff] and others similarly classified." 450 F.2d at 1310.

The benefit received by the Defendant is further offset by the fact that the residents can perform their Service Hours by working at charities and non-profits other than the VRQ, including places having no affiliation with the Defendant. That further reduces the benefit that the Defendant receives from the Service Hours and indicates that the Service Hours program is primarily for the benefit of the residents.

The facts of this case are most similar to the facts of Harker v. State Use Industries, where the Fourth Circuit held that prisoners participating in a prison work program were not employees under the FLSA because they

performed work "as a means of rehabilitation and job training" and the prison had "a rehabilitative, rather than pecuniary, interest in" the prisoners' labor. 990 F.2d 131, 133 (4th Cir. 1993). In that case, the Fourth Circuit emphasized that the prison work program gave prisoners a chance to work "in an atmosphere that mirrors the conditions of a true private employer," which "helps prepare [them] for gainful employment upon release." Id. Likewise, the Fourth Circuit noted that

> the FLSA does not cover these inmates because the statute itself states that Congress passed minimum wage standards in order to maintain a 'standard of living necessary for health, efficiency, and general well-being of workers.' 29 U.S.C. § 202(a). While incarcerated, inmates have no such needs because the DOC provides them with the food, shelter, and clothing that employees would have to purchase in a true employment situation.

Id.

Even though the residents are free to leave the VRQ, their situation is like that of the prisoners in Harker in that the residents perform Service Hours as a means of "rehabilitation and job training." Id. Moreover, as a non-profit charitable entity, the Defendant has "a rehabilitative, rather than pecuniary, interest in" the residents' labor. Id. Like the program in Harker, the Service Hours program allows residents to work "in an atmosphere that mirrors the conditions of a true private employer," which "helps prepare [them] for gainful

employment upon release." Id. Finally, like the workers in Harker, the residents performing Service Hours are provided "with the food, shelter, and clothing that employees would have to purchase in a true employment situation." Id.

If the Court were to adopt the Plaintiff's position on this issue, it would have consequences reaching far beyond this case and the provision of federal service to homeless veterans. See 38 C.F.R. § 61 et seq. For instance, the Court takes judicial notice that one who seeks to receive housing from Habitat for Humanity is required to provide a certain number of hours in constructing Habitat for Humanity houses at the direction of supervisors from Habitat for Humanity. If such beneficiaries were to be considered employees, rather than volunteers, simply because they are required to work hours under the direction of Habitat staff, the entire program would be in jeopardy. Habitat for Humanity and the provision of service to homeless veterans are not the only examples of a non-profit requiring some unpaid effort on the part of a recipient of such assistance, and as such, the Plaintiff's construction of the NCWHA would jeopardize a broad range of charitable activity across this state. The Court declines to interpret the scope of the employee provision in the NCWHA in a manner that would have such far-reaching and unintended consequences.

26

The Plaintiff urges the Court to take a very simplistic approach and conclude that he was an employee merely because the Defendant "suffer[ed] or permitted [him] to work," citing N.C. Gen. Stat. § 95-25.2. This argument, however, ignores the fact that every charity and non-profit "suffers or permits" every volunteer to work. This begs the question of whether the arrangement is one of employment or volunteerism.

For all these reasons, the Court finds and concludes that the Service Hours were primarily for the Plaintiff's benefit. The Plaintiff was a volunteer in that he voluntarily came to the VRQ seeking the benefits of the Defendant's program, knowing that there was an unpaid Service Hour component to that program. The Plaintiff voluntarily remained in that program and continued to perform Service Hours despite being able to opt-out of the Service Hours requirement by obtaining full-time employment, enrolling full-time in school, or leaving the program. Looking at the totality of the circumstances, the Court finds and concludes that the structure and purpose of the Service Hours program were such that the Plaintiff was a volunteer rather than an employee when working those hours, and thus was outside the scope of the NCWHA. See Purdham, 637 F.3d at 428 (citation omitted).

## II. Was the Plaintiff an Employee when working in the Transitional Employment Program?

The Plaintiff next argues that even if he is deemed to be a volunteer, he still must be paid for the Service Hours that he worked during the time he was also enrolled in the Transitional Employment Program. In support of that argument, the Plaintiff cites N.C. Gen. Stat § 95-25.14(a)(5), which provides an exemption to the NCWHA requirement to pay minimum wage for "[b]ona fide volunteers in medical, educational, religious, or nonprofit organizations" when "an employer-employee relationship does not exist."

The Plaintiff's reliance on N.C. Gen. Stat § 95-25.14(a)(5), however, is misplaced for two reasons. First, Section 95-25.14 pertains to the situation where there is an existing employment relationship, and the employee is then required to provide "off the clock" work as a "volunteer" as a condition (express or implied) of continued employment under that agreement. That is not the case here. The Plaintiff's Service Hours were not a condition of his participation in the Transitional Employment Program, but rather an integral part of the VRQ program whereby he was receiving the housing, meals, training, and other benefits provided by the VRQ. In other words, the Plaintiff had one agreement with the Defendant regarding his receipt of VRQ services, which included the provision of Service Hours, and a separate agreement with the Defendant regarding his participation in the Transitional

28

Employment Program. Those two agreements were funded from entirely separate sources and are distinct. This is far from a situation where someone applies for and is hired for a job and then is ordered to provide "off-the-clock" hours. Section 95-25.14(a)(5) is simply inapplicable to "convert" the Plaintiff's Service Hours to paid hours.

Second, the Plaintiff was not an employee of the Defendant by virtue of his participation in the Transitional Employment Program for the same reasons that working Service Hours did not make the Plaintiff an employee of the Defendant. The Defendant's Transitional Employment Program shares many characteristics with the Defendant's Service Hours program. Both programs aim to "transition homeless veterans into meaningful employment in the community." [Plaintiff's Ex. 7 at 3]. Both programs help residents gain "the experience, knowledge, and skills necessary to attain competitive employment in the community." [Id.]. Both programs exclusively draw from the VRQ's residents, regardless of whether those residents are the best candidates for the work or their abilities qualify them for the position. Both programs allow residents like the Plaintiff to learn critical job skills, gain important experience, and develop a work history. Both programs also give those opportunities to individuals who often lacked the skills and work experience to otherwise obtain those opportunities. The programs are so

29

similar that the Plaintiff performed the same tasks regardless of whether he was working Service Hours or in the Transitional Employment Program.[3] [Joint Stip. at ¶ 20].

Like the Service Hours program, the Transitional Employment Program is similar to the situation addressed by the Fourth Circuit in Harker, where less-than-minimum-wage programs were deemed not to create an employer-employee relationship. Like those programs, the Transitional Employment program was created specifically "to accommodate [the worker] and others similarly classified[,]" Isaacson, 450 F.2d at 1310, by providing "rehabilitation and job training." Harker, 990 F.2d at 133. The Transitional Employment Program further mirrors those programs by helping prepare participants "for gainful employment upon release" by allowing them to "work in an atmosphere that mirrors the conditions of a true private employer." Id. The Transitional Employment Program also replicates those programs' "rehabilitative, rather than pecuniary, interest" in the residents' labor. Id. Finally, like those programs, a resident in the Transitional Employment

---

[3] The Defendant refers to the Plaintiff as an employee with regard to his Transitional Employment Program hours in that he was paid for those hours. That, however, is an entirely difference question from whether the Plaintiff's efforts fall within the scope of the NCWHA.

Program resides where he works and receives meals, housing, and shelter from the entity he works for.  Id.

The differences between the Service Hours program and the Transitional Employment Program are not enough to establish that the Plaintiff was an employee.  While the Transitional Employment Program pays residents for the hours they work, that fact in and of itself is not dispositive of the question of whether a person is an employee rather than a volunteer.  Isaacson, 450 F.2d at 1308; see also Harker, 990 F.2d at 133.  That payment is offset by the fact that the Transitional Employment Program limits participants to working 1,000 hours.  Under such a program, the Defendant must train a new worker, terminate that workers' participation once he reaches 1,000 hours, and then repeat the cycle.  Because of that cycle, the Defendant faces constant turnover in its positions regardless of how capably a Transitional Employment Program participant performs in his role.  That is completely unlike a traditional employment relationship, where employers retain capable employees for as long as possible, further indicating that the Transitional Employment Program is primarily for the workers' benefit.

The Court finds and concludes that based on the "totality of the circumstances" related to the Transitional Employment Program, the

"seemingly employment relationship was to benefit the person in the employee status."  Isaacson, 450 F.2d at 1309 (citation omitted).  As such, the Plaintiff's work in the Transitional Employment Program did not create an employer-employee relationship and the Plaintiff's argument based on § 95-25.14(a)(5) fails.[4]

**O R D E R**

**IT IS, THEREFORE, ORDERED** that this action is hereby **DISMISSED WITH PREJUDICE** in its entirety, and the Defendant shall recover their costs of the action from the Plaintiff.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: December 31, 2019

Martin Reidinger
United States District Judge

---

[4] Even if the Plaintiff were an employee, any wages he would be entitled to receive for his Service Hours would be offset by "the reasonable cost . . . of furnishing [him] with board, lodging, or other facilities."  N.C. Gen. Stat. § 95-25.2(16).  Just as the Defendant did not profit when paying Plaintiff nothing for his Service Hours, the Defendant likewise would not profit if incurring an additional cost of paying a minimum wage for those hours.  The Plaintiff's argument to the contrary is without merit.

32