**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1100

GREGORY G. ARMENTO,

Plaintiff - Appellant,

v.

ASHEVILLE BUNCOMBE COMMUNITY CHRISTIAN MINISTRY, INC.,

Defendant - Appellee.

---------------------------

NATIONAL EMPLOYMENT LAW PROJECT; DISABILITY RIGHTS NORTH CAROLINA; NEW YORK LEGAL ASSISTANCE GROUP; NORTH CAROLINA ADVOCATES FOR JUSTICE; UCLA SCHOOL OF LAW VETERANS LEGAL CLINIC,

Amici Supporting Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Martin K. Reidinger, Chief District Judge. (1:17-cv-00150-MR-DSC)

Argued: January 27, 2021                    Decided: April 21, 2021

Before MOTZ, FLOYD, and RUSHING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Clermont Fraser Ripley, Carol Lee Brooke, NORTH CAROLINA JUSTICE CENTER, Raleigh, North Carolina, for Appellant. Jonathan Hopkins Dunlap, Dale Allen Curriden, THE VAN WINKLE LAW FIRM, Asheville, North Carolina, for Appellee. **ON BRIEF:** Stephen B. Williamson, THE VAN WINKLE LAW FIRM, Asheville, North Carolina, for Appellee. Holly Stiles, Christopher A. Hodgson, DISABILITY RIGHTS NORTH CAROLINA, Raleigh, North Carolina, for Amicus Disability Rights North Carolina. Catherine K. Ruckelshaus, NATIONAL EMPLOYMENT LAW PROJECT, INC., for Amici National Employment Law Project, New York Legal Assistance Group, and UCLA School of Law Veterans Legal Clinic. Kevin P. Murphy, HERRMANN & MURPHY, PLLC, Charlotte, North Carolina; M. Travis Payne, EDELSTEIN & PAYNE, Raleigh, North Carolina, for Amicus The North Carolina Advocates for Justice.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Plaintiff-Appellant Gregory Armento appeals a district court's final judgment following a bench trial in favor of Defendant-Appellee Asheville Buncombe Community Christian Ministry, Inc. (ABCCM). Armento sought unpaid wages, minimum wages, and overtime pursuant to the North Carolina Wage and Hour Act (NCWHA). The district court concluded that the NCWHA did not apply because Armento was not an "employee" of ABCCM. We agree and affirm the judgment of the district court.

## I.

### A.

ABCCM is a non-profit corporation that operates the Veterans Restoration Quarters (VRQ), a homeless shelter for male veterans in Asheville, North Carolina. VRQ is divided into three components: Emergency Shelter, Transitional Housing, and Permanent Supportive Housing. The Transitional Housing program is at issue here. Transitional Housing is intended to help residents learn self-sufficiency and find permanent housing and employment.

The U.S. Department of Veterans Affairs' (VA) Homeless Providers Grant / Per Diem Program (GPD Program) provides federal grant funding to the VRQ's Transitional Housing program. Pursuant to the terms of the GPD Program, residents are typically limited to a twenty-four month stay in Transitional Housing. VRQ's remaining funding comes from other sources, including charitable donations. Roughly 2,500 individuals

3

regularly volunteer at VRQ by preparing meals, helping at the front desk, teaching classes, and cleaning.

All residents of the Transitional Housing program are required to participate in VRQ's Service Hours Program, an unpaid work rehabilitation program. Many of the residents come from backgrounds of prolonged social isolation such that they lack even basic communication skills. The Service Hours Program, also referred to as "service hours," is designed to provide structure to residents' lives, reintegrate residents into a community, and help residents build basic job skills. Residents may complete service hours either by performing chores at VRQ or by volunteering at another charity within the community. The amount of service hours a resident must perform depends on the resident's employment and school enrollment status. Residents who are unemployed and not enrolled in school must perform twenty service hours per week. Residents who are employed part-time or enrolled in school part-time must perform ten service hours per week. Residents who are employed full-time or attending school full-time are exempt from the service hours requirement. Residents may also request exemptions for disability or for other individualized reasons. VRQ maintains a "Three Strikes Accountability Policy" under which residents can accumulate strikes for violating rules, including for refusing to comply with the Service Hours Program. Residents can be removed from VRQ for committing a third strike.

In addition to the mandatory, unpaid Service Hours Program, VRQ also has an optional, paid Transitional Employment Program. The Transitional Employment Program is designed to help "transition homeless veterans into meaningful employment in the

4

community" by allowing them to earn money, develop job skills, acclimate to consistent employment, build responsible habits in a forgiving environment, and generate an employment history.  J.A. 193.  Residents may work up to 1,000 hours in the Transitional Employment Program.  The 1,000-hour cap is intended to encourage participants to seek permanent, outside employment rather than remain employed within VRQ.  Some of the positions available in the Transitional Employment Program overlap with the positions available in the Service Hours Program.

## B.

Armento arrived at VRQ on September 2, 2015 and enrolled in the Transitional Housing program.  He received various forms detailing VRQ policies, including the Service Hours Program.  He signed a consent form stating that he would receive free room and board so long as he complied with those policies.

On September 8, 2015, Armento began working as a Front Desk Manager as part of the Transitional Employment Program.  He enrolled by speaking with Front Desk Supervisor Randy Gamble, who hired Armento on the spot without requiring an application or resume.  As a Front Desk Manager in the Transitional Employment Program, Armento made nine dollars per hour.  Front Desk Managers answer phones, sign residents in and out of the building, administer breathalyzer tests, conduct bag checks, and provide limited security.  The position is generally staffed by residents performing service hours, residents enrolled in the Transitional Employment Program, and volunteers.

5

Because ABCCM considered this work to be part-time, it required Armento to complete ten hours per week in the Service Hours Program. Armento completed his service hours by working additional hours as a Front Desk Manager. He performed the same tasks during his service hours and his Transitional Employment Program hours.

Armento soon became concerned with the total number of hours he performed as a Front Desk Manager through the Service Hours Program and the Transitional Employment Program. On October 2, 2015, Armento met with his Case Manager, Gene Jones, about his "problems at the front desk." J.A. 476. He told Jones that he was working part-time "and also doing his service hours" at the front desk, but that his supervisor was "making him work way over the [ten] additional hours that he is supposed to with his service hours." *Id*. When Jones suggested that Armento talk to his supervisor about the problem, Armento refused and said he instead planned "to follow th[e] chain of command." *Id.*

In November 2015, Armento met with Mary Sczudlo, VRQ's Director of Homeless Services. Armento told Sczudlo that he should be paid for his service hours because he was working more than forty hours per week in combined service hours and Transitional Employment Program hours and was therefore a full-time employee. Sczudlo reviewed the records for Armento's prior five weeks of employment and determined that Armento had, in fact, been short-paid for a total of twenty Transitional Employment Program hours.[1]

---

[1] Armento was only required to work ten service hours per week (except for the first week, during which he was still considered unemployed because he was in training and thus had to work twenty service hours). After five weeks, Armento had logged more than ten service hours for three weeks and fewer than ten hours for two weeks. For the three weeks that Armento logged more than ten service hours, Sczudlo credited the extra hours

6

Sczudlo subsequently met with Armento to inform him that he would be compensated for that mistake.  Armento reiterated that he should also be paid for his service hours, not just Transitional Employment Program hours.  Sczudlo explained that service hours are always unpaid.

Armento contacted various government agencies, civil rights groups, and media outlets about his complaints, including the VA, the U.S. Department of Labor (DOL), and the North Carolina Department of Labor.  He also contacted U.S. Senator Thom Tillis, whose office submitted the inquiry to the VA and the DOL and requested that Armento's complaints be investigated.  On April 11, 2016, the VA formally responded to Senator Tillis's office indicating that it had investigated the matter and would be not be taking further action.

In April 2016, VRQ staff twice advised Armento that he was nearing the end of his 1,000 hours in the Transitional Employment Program.  On May 13, 2016, Armento told Jones "that his job at the front desk w[ould] be ending at the end of th[e] month" and he was "thinking about what he want[ed] to do after his hours run out."  J.A. 469.  On June 1, 2016, ABCCM removed Armento from the Transitional Employment Program following completion of 1,007 Transitional Employment hours.  Armento had also completed a total

---

as Transitional Employment Program hours.  For the two weeks that Armento logged fewer than ten service hours, Sczudlo subtracted hours from Armento's total Transitional Employment Program hours.  This calculation resulted in the twenty-hour total.

7

of 349 service hours as a Front Desk Manager while dually enrolled in the Transitional Employment Program.[2]

On September 2, 2017, exactly twenty-four months after he enrolled, Armento became ineligible to continue receiving funding through the GPD Program, and he left the VRQ's Transitional Housing component.  ABCCM staff assisted him in qualifying him for another housing program available through the VA.

## C.

On June 12, 2017, Armento filed a pro se complaint against ABCCM.  Armento alleged many federal and state claims, including claims for unpaid wages, minimum wages, and overtime under the NCWHA.  Following ABCCM's motion to dismiss and motion for summary judgment, the district court dismissed or granted summary judgment to ABCCM on all but the NCWHA claims.  The district court held a bench trial on those claims on November 11, 2019.

On December 31, 2019, the district court ruled that the NCWHA did not cover Armento because he was not an employee of ABCCM in the context of either the Service Hours Program or the Transitional Employment Program.  In so finding, the district court considered "the totality of the circumstances" and "the principal purpose of the seemingly

---

[2] Armento also performed service hours as a van driver at VRQ.  As a van driver, Armento transported residents to the VA hospital and other establishments in Asheville, responded to emergencies involving residents, and picked up homeless individuals when temperatures dropped below freezing.  ABCCM considered Armento's work as a van driver to be service hours and therefore uncompensated.

8

employment relationship." J.A. 810–11 (first quoting *Purdham v. Fairfax Cnty. Sch. Bd.*, 637 F.3d 421, 428 (4th Cir. 2011); and then quoting *Isaacson v. Penn Cmty. Servs., Inc.*, 450 F.2d 1306, 1309 (4th Cir. 1971)).  With regard to the Service Hours Program, the district court explained that the program's principal purpose was to benefit the residents, that Armento could have performed service hours at a non-ABCCM-affiliated location, that Armento could have avoided performing service hours entirely by attending school full-time or obtaining full-time employment, and that Armento was aware from the outset that service hours were unpaid.  With regard to the Transitional Employment Program, the district court explained that despite the hourly wage, the program's principal purpose was similarly to benefit the residents.

Armento timely appealed the district court's ruling.

## II.

"This Court reviews judgments stemming from a bench trial under a mixed standard: factual findings are reviewed for clear error, whereas conclusions of law are reviewed de novo."  *Helton v. AT&T Inc.*, 709 F.3d 343, 350 (4th Cir. 2013) (citing *Plasterers' Loc. Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 215 (4th Cir. 2011)). Under the "clearly erroneous" standard, we afford the district court's findings of fact the "highest degree of appellate deference" and will not reverse unless we have a "definite and firm conviction that a mistake has been committed."  *Evergreen Int'l, S.A. v. Norfolk Dredging Co.,* 531 F.3d 302, 308 (4th Cir. 2008) (quoting *United States Fire Ins. Co.*, 966 F.2d 820, 823 (4th Cir. 1992); and then quoting *United States v. Gypsum Co.*, 333 U.S.

9

364, 395 (1948)). "In cases in which a district court's factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference." *Id.* (citing *Evergreen Int'l*, 531 F.3d at 308).

Whether Armento was an employee covered by the NCWHA is a legal question that we review de novo. *See Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006).

## III.

Armento contends on appeal that the district court erred in concluding that he was not an employee of ABCCM pursuant to the NCWHA. Armento also asserts that the district court made several clearly erroneous findings of fact.

## A.

We first address whether Armento was an employee of ABCCM pursuant to the NCWHA. The NCWHA is intended to "protect[] those who, as a matter of economic reality, are dependent upon the business to which they render service." *Laborers' Int'l Union of N. Am. v. Case Farms, Inc.*, 488 S.E.2d 632, 634 (N.C. Ct. App. 1997) (quoting *Poole v. Loc. 305 Nat'l Post Off. Mail Handlers*, 318 S.E.2d 105, 107 (N.C. Ct. App. 1984)). It provides that "[a]ny employer who violates" its provisions related to minimum wage, overtime, or wage payment "shall be liable to the employee or employees affected." N.C. Gen. Stat. § 95-25.22(a). The NCWHA broadly defines the relevant terms: an "employee" is "any individual employed by an employer," *id.* § 95-25.2(4), and to

10

"employ" is "to suffer or permit to work," *id.* § 95-25.2(3). Armento has the burden of showing he is an "employee." *See Powell v. P2Enterprises, LLC*, 786 S.E.2d 798, 800 (N.C. Ct. App. 2016) (citing *Steelman v. Hirsch*, 473 F.3d 124, 128 (4th Cir. 2007)).

Because the NCWHA defines the relevant terms identically to the Fair Labor Standards Act (FLSA), we may look to federal interpretations of the FLSA for guidance. *See* 13 N.C. Admin. Code § 12.0103.[3] The Supreme Court has repeatedly emphasized that the term "employee" should be broadly interpreted under the FLSA, *see Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–24 (1992), though "obviously" with practical limits, *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947); *see also Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985) ("While the statutory definition is exceedingly broad, it does have its limits." (citations omitted)).

In light of this breadth, "[t]he test of employment under the [FLSA] is one of 'economic reality.'" *Alamo Found.*, 471 U.S. at 301 (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). The economic reality test "calls for pragmatic construction of [the] concept" of employment by "examin[ing] 'the circumstances of the

---

[3] Pursuant to the North Carolina Administrative Code,

> [w]here the legislature has adopted the language or terminology of the [FLSA] . . . the Department of Labor will look to . . . federal law as a guide for interpreting the North Carolina law. Such federal interpretations will therefore be considered persuasive and will carry great weight as a guide to the meaning of the North Carolina provisions and will be controlling for enforcement purposes.

13 N.C. Admin. Code § 12.0103.

11

whole activity,' rather than 'isolated factors,' or 'technical concepts.'" *Steelman*, 473 F.3d at 128 (first quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); then quoting *Goldberg*, 366 U.S. at 33). The test asks whether these circumstances reflect a "traditional understanding of employment." *Id.* at 129. Thus, the Supreme Court has applied the FLSA "without regard to deviations from traditional employment paradigms that are largely technical," but has not applied the FLSA to "relationships [that] have deviated from the traditional understanding of employment in fundamental ways." *Id.*

For example, the Supreme Court has held that prospective railroad yard brakemen in a pre-employment training course did not constitute employees under the FLSA. *See Portland Terminal*, 330 U.S. at 152–53. Following completion of the week-long course, the railroad provided retrospective pay to only those trainees it ultimately hired. *See id.* at 150. The course exclusively involved observation and closely supervised work, meaning the trainees did "not displace any of the regular employees," did "not expedite the company business," and in fact sometimes "actually impede[d]" the business. *Id.* at 149–50. Noting that the railroad received no "immediate advantage" from the trainees' work, *id.* at 153, the Court explained that the FLSA was "obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another," *id.* at 152.

In contrast, the Supreme Court held in *Alamo Foundation* that unpaid associates who staffed a nonprofit organization's commercial businesses were employees under the FLSA. *See* 471 U.S. at 299–303. Although the associates received no cash wages, they worked in expectation of "implied" compensation in the form of food, shelter, and clothing.

*See id.* at 301.  The associates were therefore "entirely dependent upon the [organization] for long periods, in some cases several years."  *Id*. at 301 (quoting *Donovan v. Tony & Susan Alamo Found.*, 567 F. Supp. 556, 562 (W.D. Ark. 1982)).

Interpreting this guidance, we have repeatedly emphasized the relationship's primary purpose as an important factor.  *See, e.g.*, *McLaughlin v. Ensley*, 877 F.2d 1207, 1209 (4th Cir. 1989) (using the "primary beneficiary" inquiry to determine that trainee was an employee).  In *Harker v. State Use Industries*, we held that prisoners participating in a work program were not employees because they performed work "not to turn profits for their supposed employer, but rather as a means of rehabilitation and job training."  990 F.2d 131, 133 (4th Cir. 1993).  We explained that this "custodial relationship" did not constitute the "'bargained-for exchange of labor' for mutual economic gain that occurs in a true employer-employee relationship."  *Id.* (quoting *Vanskike v. Peters*, 974 F.2d 806, 809 (7th Cir. 1992); *Gilbreath v. Cutter Biological, Inc.,* 931 F.2d 1320, 1325 (9th Cir. 1991)).

Similarly, in *Isaacson*, we held that a conscientious objector who performed work for a nonprofit organization in lieu of military service was not an employee.  *See* 450 F.2d at 1309.  There, "the principal purpose of the seemingly employment relationship was to benefit the person in the employee status" by "providing him with the opportunity to perform work of national importance to his liking."  *Id.* at 1309–10.  Additionally, because the organization specifically "created positions . . . to accommodate conscientious objectors," the conscientious objector "cannot be said to have displaced a bona fide

13

applicant who desired to sell his services at prevailing rates[] or . . . to be an exploited unorganized laborer, evils which the [FLSA] was designed to prevent." *Id.* at 1310.

With this framework in mind, we consider whether Armento was an employee of ABCCM.

### 1.

Preliminarily, Armento argues that the district court erred by failing to apply the economic reality test. We disagree. The district court properly applied the economic reality test, albeit not by name, by analyzing "the totality of the circumstances." J.A. 810–11 (quoting *Purdham*, 637 F.3d at 428). In doing so, the district court considered whether Armento worked in expectation of compensation, "the facts surrounding the principal purpose" of the relationship, and "for whose benefit that arrangement was designed." J.A. 814. This comports with the economic reality test's focus on "the circumstances of the whole activity." *Steelman*, 473 F.3d at 128 (quoting *Rutherford*, 331 U.S. at 730).

Armento's confusion stems from the district court's express rejection of the similarly named—but distinct—"economic reality" test from *Schultz v. Capital International Security, Inc.*, 466 F.3d 298 (4th Cir. 2004). In *Schultz*, we held that "a court considers the 'economic realities' of the relationship between the worker and the putative employer" to determine "whether a worker is an employee *or an independent contractor.*" *Id.* at 304 (emphasis added) (quoting *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 570 (10th Cir. 1994)). With an eye to that dichotomy, *Schultz* recited a six-factor "economic reality" test focused on the parties' respective levels of control, dependency, risk, and opportunity for profit. *See id.* at 304–05. But we have repeatedly explained that when, as

14

here, "[t]he plaintiff is [i]ndisputably not an independent contractor," this six-factor test has "little relevance." *Steelman*, 473 F.3d at 129 n.1; *see also Purdham*, 637 F.3d at 433 ("[T]he test is best suited to determine whether, as a matter of economic reality, an individual is in business for himself or herself as an independent contractor . . . [and] is of limited utility in determining whether an individual is an employee, as opposed to a volunteer." (quoting *Krause v. Cherry Hill Fire Dist. 13*, 969 F. Supp. 270, 274 (D.N.J. 1997) (cleaned up)). Thus, despite the similarity in name, *Schultz*'s economic reality test is not appropriate here. The district court correctly rejected this test in favor of considering the "totality of the circumstances." J.A. 810–11 (quoting *Purdham*, 637 F.3d at 428).

## 2.

With that said, Armento's participation in neither the Service Hours Program nor the Transitional Employment Program reflects a "traditional understanding of employment" under the proper economic reality test. *Steelman*, 473 F.3d at 129. It is useful to analyze each program separately.

### a.

First, Armento was not an employee of ABCCM by virtue of the Service Hours Program. The primary beneficiary of the Service Hours Program is the VRQ residents

15

themselves, not ABCCM.[4]  *See Isaacson*, 450 F.2d at 1309 (considering whether "the principal purpose of the seemingly employment relationship was to benefit the person in the employee status").  In contrast to the associates in *Alamo Foundation*, the VRQ residents performed service hours "not to turn profits for their supposed employer, but rather as a means of rehabilitation and job training."  *See Harker*, 990 F.2d at 133 ("By producing useful goods in an atmosphere that mirrors the conditions of a true private employer, [the defendant] helps prepare inmates for gainful employment upon release.").  The objective of the Service Hours Program—undisputed by Armento—is to transition homeless veterans back into gainful employment by reintegrating them into a community, habituating them to structure, building their confidence, teaching them basic job skills, and limiting their idle time.  *Cf. McLaughlin*, 877 F.2d at 1209 (finding trainees were employees where they "were taught only simple specific job functions related to [the employer's] own business").  Residents may also choose to perform their service hours at charities unaffiliated with ABCCM, in which case ABCCM receives *no* benefit.

Further, Armento neither expected nor received compensation—explicit or

---

[4] Armento argues that the district court erred in considering whether Armento or ABCCM was the "primary beneficiary" of Armento's work.  He claims that the primary beneficiary test is appropriate only in the context of determining whether an individual was an employee or a trainee.  Not so.  Although our case law emphasizes the importance of the primary beneficiary test in that context, we have also implicitly considered the test as part of the holistic economic reality analysis.  *See, e.g.*, *Harker*, 990 F.2d at 133 (considering whether inmates' work was intended to benefit inmates or to profit prison).

16

implicit—through the Service Hours Program. *See Alamo Found.*, 471 U.S. at 301.[5] True, VRQ residents receive free room and board in exchange for complying with VRQ policies, and the Service Hours Program is a generally mandatory VRQ policy. But unlike in *Alamo Foundation*, VRQ residents do not perform service hours in direct exchange for room and board. In *Alamo Foundation*, the associates worked on a "'commission' basis, and were prohibited from obtaining food from the cafeteria if they were absent from work." 471 U.S. at 301 n.22. Here, the Service Hours Program is part of the overall rehabilitative relationship between ABCCM and residents, and benefits are not directly premised upon participation. The Service Hours Program includes many exemptions, including for those employed full-time, those enrolled as students full-time, those with disabilities, and those with individualized needs. Indeed, VRQ staff excused Armento from the Service Hours Program in early 2017 so that he could focus on obtaining employment and securing permanent housing. Such exemptions do not in any way change the allocation of benefits.

Nor does a resident performing service hours "displace[] a bona fide applicant who desired to sell his services at [the] prevailing rates." *Isaacson*, 450 F.2d at 1310. Rather, ABCCM "created the position occupied by [Armento] to accommodate [Armento] and others similarly classified." *Id*. For the first twenty years of ABCCM's operation, it staffed

---

[5] At trial, Armento testified that he did not understand at intake that the Service Hours Program was uncompensated. The district court found that Armento's "testimony in this regard was manifestly not credible." J.A. 811. Armento does not expressly dispute this factual finding on appeal. To the extent he does dispute the district court's finding of incredibility, we see no error in that conclusion. Armento's statements to his case manager throughout his time at VRQ firmly establish that he understood the unpaid nature of the Service Hours Program.

the relevant positions with volunteers. ABCCM began replacing the volunteers with residents for the express purpose of benefiting those residents. Indeed, residents generally provide lower quality work than volunteers. *See Portland Terminal*, 330 U.S. at 150 (noting that trainees did "not expedite the company business"). Should ABCCM need additional help, "[v]olunteers are more than willing to jump in and fill any gaps." J.A. 574.[6] Should ABCCM lack enough volunteers to fill these gaps, it would simply eliminate many of the positions. As such, applying the NCWHA to the Service Hours Program would not further its goal of "prevent[ing] the unfair competition that arises when businesses cut their costs by paying exploitatively low wages." *Steelman*, 473 F.2d at 132.

b.

Nearly the same reasoning applies to the Transitional Employment Program. The only major distinction between the two programs is that the Transitional Employment Program paid Armento a nine-dollar hourly wage.[7] Although compensation is an important

---

[6] The district court found, as a matter of fact, that ABCCM had "enough community volunteers to perform all the chores that are performed by residents performing Service Hours." J.A. 799. Armento argues that this was clear error. He points to testimony that community volunteers rarely drive the vans; are not available to drive the vans at night; and do not perform all the essential functions of a front desk manager, such as conducting security patrols. But this testimony establishes only that volunteers do not *currently* perform these chores. ABCCM offered evidence at trial that volunteers could fully staff all of the chores and that ABCCM had operated as such for its first twenty years. Accordingly, we cannot say that the district court clearly erred.

[7] The Transitional Employment Program also included some superficial trappings of an employment relationship. Armento filled out paperwork that typically signifies the beginning of an employment relationship—including an I-9, W-2, and E-Verify

18

factor in considering whether an individual is an employee, *see Alamo Found.*, 471 U.S. at

301, it is not dispositive, *see Isaacson*, 450 F.2d at 1308 (holding that plaintiff was not an

employee despite payment of a "subsistence salary"); *Harker*, 990 F.2d at 133 (holding

that plaintiff was not an employee despite payment of hourly wage); *Purham*, 637 F.3d at

434–35 (holding that plaintiff was not an employee despite payment of stipend linked to

"overtime" hours).  Finding compensation dispositive would be contrary to the Supreme

Court's instruction to focus on "'the circumstances of the whole activity,' rather than

'isolated factors.'"  *Steelman*, 473 F.3d at 128 (quoting *Rutherford*, 331 U.S. at 730).[8]

Here, "the circumstances of the whole activity" establish that ABCCM did not

compensate Armento pursuant to an employment relationship.  *See id*.  The compensation

Armento received did not reflect the "'bargained-for exchange of labor' for mutual

economic gain that occurs in a true employer-employee relationship."  *Harker*, 990 F.2d at

133 (quoting *Vanskike*, 974 F.2d at 809; *Gilbreath,* 931 F.2d at 1325).  Unlike in *Alamo*

---

authorization—and he was designated as an "employee" in onboarding forms.  While the
parties' understanding of the putative employee's classification is certainly relevant, it is
not controlling.    *See Alamo Found.*, 471 U.S. at 301–02 (finding associates to be
employees despite the fact that they "vehemently protest[ed] coverage under the [FLSA]").

[8] Armento cites *Williams v. Strickland*, 87 F.3d 1064 (9th Cir. 1996), in an attempt
to show that compensation is dispositive.  There, the Ninth Circuit held that the plaintiff
was not an employee by virtue of his participation in the Salvation Army's six-month
rehabilitation program, which included unpaid, full-time work therapy.  *See id.* at 1067.
The Ninth Circuit distinguished *Alamo Foundation* on the basis that the plaintiff's
"relationship with the Salvation Army was solely rehabilitative," whereas *Alamo
Foundation* involved "*both* a rehabilitative element and an implied agreement for
compensation."  *Id*. at 1067–68.  Armento proffers this analysis to establish that a
relationship that contemplates compensation is necessarily one of employment.  True,
*Williams* distinguished *Alamo Foundation* on the basis of compensation.  But *Williams* did
not hold that the presence or absence of compensation is dispositive.

19

*Foundation*, Armento was not "entirely dependent upon" ABCCM by virtue of the compensation. 471 U.S. at 301 (quoting *Donovan*, 567 F. Supp. at 562). ABCCM provided room and board to Armento independent of his participation in the program. Indeed, the entire purpose of the Transitional Employment Program is to *eliminate* dependence upon ABCCM's free resources. It does so by creating an artificial job market available only to Armento and those similarly classified and by capping participation at 1,000 hours.

\*     \*     \*

Accordingly, Armento was not an employee of ABCCM by virtue of either the Service Hours Program or the Transitional Employment Program.[9]

## B.

We next address Armento's remaining disputed findings of fact. We do not dwell long here. Even if we agreed with Armento that the district court erred, each of the alleged errors is rendered harmless by our conclusion that Armento was not an employee of

---

[9] Armento provides authority for the proposition that if he is an employee of ABCCM with regard to the Transitional Employment Program, he cannot be considered a volunteer with regard to the Service Hours Program. Because we conclude that Armento was not an employee of ABCCM with regard to either program, these authorities are unavailing.

ABCCM with regard to either the Service Hours Program or the Transitional Employment Program. *See* 28 U.S.C. 2111 (codifying harmless error on appellate review).

First, Armento argues that the district court erred in finding that ABCCM "defines part-time employment as working thirty hours or less per week." J.A. 798. Armento asserts that ABCCM considered part-time employment to be twenty hours or less per week at the relevant time. Because Armento worked twenty or more hours per week in the Transitional Employment Program, he argues that he should have been considered a full-time employee and therefore exempt from the service hours requirement altogether. As such, he requests that ABCCM pay him for all the service hours he worked as if they were Transitional Employment Program hours. Armento is correct that *nowhere* does the record define "part-time" as thirty hours or less per week. Yet any error was harmless. Because Armento was not ABCCM's employee vis-à-vis the Transitional Employment Program, ABCCM's potentially unfair application of its programs does not implicate the NCWHA.

Second, Armento asserts that the district court erred in calculating the number of weeks he worked and the number of hours he worked per week. Once again, because Armento was not an employee, this is harmless error at most.

Third and finally, Armento argues that the district court erred in finding that even if Armento were an employee, the cost of room and board offset any lost wages. *See* J.A. 824 n.4 (citing N.C. Gen Stat. § 95-25.2(16)). Of course, the district court did not find that Armento was an employee and thus did not make any damages calculations. Even assuming otherwise, this is at most harmless error because Armento was not an employee.

21

VI.

We are wary of the risks at stake here. We do not condone the use of shelter residents as an unprotected labor pool available at substandard wages or uncompensated hours. Our holding is limited to the specific facts at issue. ABCCM created an artificial job market specifically designed to provide Armento with rehabilitative training. To the extent that the relationship contemplated compensation, it did not reflect a bargained-for exchange of labor for value and did not foster dependence upon ABCCM. For the foregoing reasons, the district court's judgment is

*AFFIRMED*.

22